# IN THE UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

RECEIVED
05/27/2025
KELLY L. STEPHENS, Clerk

### Case Nos. 23-5795 & 23-6108

**HONORABLE ORDER OF KENTUCKY COLONELS, INC.,**
Plaintiff-Appellee,

v.

**COL. DAVID J. WRIGHT,**
Individually and on behalf of all other similarly titled individuals.
**Defendant-Appellant**

---

# APPELLANT'S MOTION TO TAKE JUDICIAL NOTICE OF ADJUDICATIVE FACTS AND CORRECT THE RECORD PURSUANT TO FRE 201(d) AND FRAP 10(e)(2)(B)

---

BEFORE THE HONORABLE JUDGES OF THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT:

COMES NOW Appellant, **Col. David J. Wright**, a Kentucky Colonel, appearing *pro se in forma pauperis*, and respectfully moves this Honorable Court, pursuant to **Federal Rule of Evidence 201(d)** and **Federal Rule of Appellate Procedure 10(e)(2)(B)**, to take judicial notice of adjudicative facts and correct the appellate record in the above-captioned appeal.

This Motion is presented in good-faith to address ongoing historical revisionism, fraudulent concealment of facts, suppression of exculpatory evidence, and ambiguous material, representing contemporary and historical misrepresentations by Appellee — the **Honorable Order of Kentucky Colonels ("HOKC")** — regarding the origin, nature, source, and ownership of the civic title

1

**"Kentucky Colonel"** and the nominal use of the **descriptive term "Kentucky Colonels"** to define a cultural and social class of people recognized internationally since 1833.[1]

Appellant submits that the **Kentucky Colonel** title is a **public domain civic honor** originating in **1775** ("Old Kentucky") and has been continually granted by the Commonwealth of Kentucky as a non-proprietary title of civic authority, recognition, and honor. The record before this Court has been tainted by Appellee's **fabricated "1813 origin myth"** and fraudulent assertions of a **"1931 first-use date"** to establish overreaching rights; both of which have been discredited and proven erroneous by historical records, official government documents, prior court rulings, and HOKC's own contradictory filings with the **USPTO.**

To preserve judicial integrity and prevent further abuse of process, Appellant respectfully requests that this Court *take judicial notice of the historical facts* presented herein and in the accompanying **Historical Fact Declaration** (a historical dossier) with its certified supporting exhibits (submitted as **Appendix A-E**), and issue appropriate relief to correct the record, prevent fraud, and protect the public's right to cultural and historical truth.

For more than eighty years the Honorable Order of Kentucky Colonels ("HOKC") has promoted a fictitious origin narrative—claiming a first gubernatorial commission in 1813 and since 2004 has claimed an uninterrupted proprietary lineage as the creators of the term (phrase) "Kentucky Colonels" beginning in 1931—to justify exclusive overarching commercial trademark rights for the terms **"Kentucky Colonel"** and **"Kentucky Colonels" well-defined in the public domain as cultural archetype.**  Primary sources collected by Appellant legally establish that the title originated as a *public* civil-militia commission on **23 May 1775**, evolved into a ubiquitous literary archetype by 1833, was officially adopted by the Commonwealth of Kentucky in 1875, and was nationally recognized by the US Congress in 1936 as part of America's cultural heritage, notwithstanding the

---

[1] **Exhibit – Colonel Nimrod Wildfire:** The Original Literary Archetype of the Kentucky Colonel. This exhibit discusses the earliest known published instance of the phrase "Kentucky Colonel," which appeared in 1833 in connection with a play titled *The Lion of the West* (retitled The Kentuckian for British audiences). The play featured the character Colonel Nimrod Wildfire, a caricature of the American frontier spirit based on Colonel David Crockett, US Congressman.

Honorable Order of Kentucky Colonels or the false designation of origin they created in 1941. Because Appellee's misstatements and failure to disclose relevant facts has produced an overbroad, speech-chilling injunction, this Court should correct the record pursuant to *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944).

## Composition of Motion for Judicial Notice and Correction of the Record

| Prenominal Label | Subject Coverage | Demonstrative Function |
|---|---|---|
| Appendix A | **Sources and Origins** | Bibliographic index and summaries over 60 historical/legal sources documenting the origin of the term "Kentucky Colonel" and phrase "Kentucky Colonels" since 1775. |
| Appendix B | **Descriptive Quotation Passages** | Literary and satirical portrayals of Kentucky Colonels quoted from U.S. publications notwithstanding the HOKC manifestation in 1933. |
| Appendix C | Images of the Kentucky Colonel | Historical photographs, lithographs, videos, and visual depictions of the archetype defining the ideal of the Kentucky Colonel (the person). |
| Appendix D | Things Referred to as Kentucky Colonel(s) | Commercial, cultural, and civic usages of the term in America's public imagination across domains (sports, whiskey, music). |
| Appendix E | **Exhibits Exposition** | Legal summaries of all evidentiary exhibits filed with or referenced not included in Appendices A–D; organized by FRE/FRAP and indexed. |
| Declaration of Historic Fact (Appellant) | **Historical Dossier Kentucky Colonel** | False Designation of Origin (1813 Myth) and the True Origins of Kentucky's Colonels historically. Prepared in support of correcting the public record, judicial notice under FRE 201(b). |
| Exhibit–[Title] Primary Exhibits Filed | 20 Exhibits on Various Subject and Topics | Key exhibits relied on in Appellant's Motion, including trademark applications, USPTO filings, prior case law, correspondence, and historical publications. |
| Exhibit–[Title] Supplemental Exhibits | 15 Supplemental Supporting Exhibits | Supplemental supporting materials submitted after the original motion to dismiss which are factual representations, including government records, archived webpages, and responses. |
| Exhibit–[Title] Exculpatory Exhibits | 80+ Additional Judicial Notice Exhibits | Cross-reference exhibits, newspaper article transcriptions, original USPTO files, historical accounts found throughout Appellant's copyright (negated by HOKC controversial claim) incorporated by publicly accessible Google Drive (Government Accessible) hyperlink PDF for inclusion in the record. |
| Memorandum of Law | 5 Legal Memoranda | Various Memorandums in Law Supporting Judicial Notice in Demonstrating Fraud, Generic and Descriptive Nature of the Terms "Kentucky Colonel" and "Kentucky Colonels" etc. |

# SECTION I. INTRODUCTION

This Motion seeks judicial notice of verifiable adjudicative facts and official public records establishing that the title "Kentucky Colonel" and the term "Kentucky Colonels" are civic distinctions of public domain origin, not subject to private trademark ownership. See *Fed. R. Evid.* 201(b). Since 1933, Appellee—the Honorable Order of Kentucky Colonels, Inc. ("HOKC")—has promoted a false historical narrative, asserting that it created, owns, or exclusively represents this title. These claims are unsupported by any legitimate historical or governmental record and are contrary to settled public recognition and legal precedent.

This Motion is not speculative. It is grounded in primary source documents, court records, trademark filings, and government publications whose accuracy is beyond reasonable dispute. See *Fed. R. Evid.* 201(b)(2); *United States v. Ferguson*, 681 F.3d 826, 834 (6th Cir. 2012).

Appellant respectfully submits the ***Declaration of Historical Fact Regarding the Origin and Public Domain Status of the Term "Kentucky Colonel"*** as a principal evidentiary foundation for this Motion. This sworn declaration, executed pursuant to 28 U.S.C. § 1746 and supported by Appendices A through E, presents verified and self-authenticating historical records establishing that the title "Kentucky Colonel" originated as a civic and governmental distinction in 1775, not in 1813 as falsely asserted by the Honorable Order of Kentucky Colonels, Inc. ("HOKC"). The declaration draws exclusively upon public documents, government-certified records, historical markers, pre-1932 publications, and archival sources admissible under Federal Rules of Evidence 201(b), 902(1)–(7), and 803(8), (16), and (18). It corrects a persistent myth that has been used to misrepresent the title's origin for commercial and legal advantage, and it provides a legally sufficient basis for this Court to take judicial notice of the public domain status of the term "Kentucky Colonel" and to correct the appellate record accordingly.

Among the judicially noticeable evidence is:

- The 1775 Transylvania Convention Minutes, confirming the civic use of the title "Colonel" in Kentucky's earliest government;

- In frontier territories (counties) of the Commonwealth of Virginia, first Augusta, then Finley, then Kentucky the "Colonel" was the highest designated civilian title and militia rank under the Governor and the Privy Council as of 1776, the colonels of the Kentucky District formed 2, 3, then 4, until they had nine counties, a District Court was established in 1789, then in 1784 the Danville Conventions began, in 1791 thirteen colonels and other delegated leaders (major landowners and civil leaders) petitioned for statehood to succeed the Kentucky District as the Commonwealth of Kentucky. (Virginia issues thousands of Kentucky Land Grants to Revolutionary soldiers through the early 19th century.)

- Gubernatorial appointment records showing that "Colonel" has been continuously used as an honorable civil and ex-officio militia rank by each Governor since at least 1816, and as early as 1793 by Governor Isaac Shelby when he designated Percival Butler with the honorable title of Colonel as the Adjunct General of the state (military advisor);

- A 1936 Congressional address formally recognizing the Kentucky Colonel as a figure of American cultural heritage;

- Prior court decisions, including *Honorable Order of Ky. Colonels, Inc. v. Building Champions, LLC*, 345 F. Supp. 2d 716, 723–24 (W.D. Ky. 2004), rejecting HOKC's claim of exclusive trademark ownership;

- HOKC's own contradictory filings with the U.S. Patent and Trademark Office, including applications falsely asserting an "1813 origin" and "1931 first-use" date.

Judicial notice of these adjudicative facts is essential not only to preserve appellate integrity but to prevent the continued weaponization of fictitious history for improper legal advantage and enrichment under the Lanham Act. See 15 U.S.C. § 1125(a). The Court's recognition of these facts is warranted under *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246 (1944), which mandates that courts correct the record where fraud undermines judicial integrity.

# SECTION II. BACKGROUND AND PROCEDURAL HISTORY

## A. Background

On February 20, 2020, the Honorable Order of Kentucky Colonels, Inc. ("HOKC"), a Kentucky charitable corporation holding federal trademark registrations for the phrase "Kentucky Colonels," initiated suit against Col. David J. Wright and his nonprofit entities—Kentucky Colonels International, Globcal International, and Ecology Crossroads Cooperative Foundation—asserting claims under the Lanham Act and state law for trademark infringement, false designation of origin, and cybersquatting. See *Verified Complaint*, Honorable Order of Ky. Colonels, Inc. v. Kentucky Colonels International et.al. Wright, No. 3:20-cv-00132-RGJ (W.D. Ky. Feb. 20, 2020), ECF No. 1.

HOKC alleged that the defendants' websites and online platforms offered "memberships" under the name "Kentucky Colonels International," creating confusion and diluting HOKC's claimed goodwill. Wright responded that his use of the term was non-commercial, based on his own status as a commissioned Kentucky Colonel, an independent association of Kentucky Colonels, rooted in historical, fraternal, social media, and civic recognition of the title. He invoked fair use, First Amendment protection, and the term's longstanding public domain status.

## B. Procedural History

On February 25, 2020, the district court issued a temporary restraining order (TRO) without full adversarial hearing, enjoining Wright and the entities from using the disputed terminology. See *Temporary Restraining Order*, id., ECF No. 14. The case was later reassigned to Judge Rebecca Grady Jennings, who extended the TRO and on August 13, 2020, granted a preliminary injunction. See *Mem. Op. & Order*, id., ECF No. 58, prior to Defendant, Col. Wright being permitted to Answer the complaint notwithstanding the corporate defendants.

Despite the pendency of dispositive defense motions—including a motion to dismiss and a motion for judgment on the pleadings—the court entered default judgment against the nonprofit entities and denied all of Wright's dispositive filings without consideration or full hearing. See id. Further the district court never weighed Wright's Answer and Affirmative Defenses id., ECF No. 62.

Wright filed additional motions (professional but emotive as a 1st year pro-se defendant) that were never considered or heard, the court suggested the matter should be settled and accommodated a Confidential Court Mediated Conference. Following mediation, the parties submitted an agreed permanent injunction and order of dismissal, both entered on February 23, 2021. See *Agreed Permanent Injunction*, id., ECF No. 93; *Agreed Order of Dismissal*, id., ECF No. 94. These orders formally closed the case and prohibited future use of "Kentucky Colonels" as a trademark or website as kycolonels, permitting Kentucky Colonel and Kentucky Colonelcy as titles for defendants descriptive efforts in name, and protecting his inherent rights for educational, literary, historical, and noncommercial purposes. Unfortunately the agreed permanent injunction did not work because it violates the Appellant's Constitutional Rights with prior restraints.

In January 2023, HOKC filed a new post-judgment case alleging violations of the agreed injunction. The district court denied renewed default judgment, allowed limited discovery, and scheduled a remote contempt hearing. See *Order*, id., ECF No. 105. On August 9, 2023, the court found Wright to be infringing and his organizations in contempt and imposed sanctions totaling $7,500. See *Mem. Op. & Order*, id., ECF No. 129.

Subsequent orders awarded HOKC an additional $9,425 in attorney's fees and $1,052.25 in costs. See *Order*, id., ECF No. 138. Default judgments were re-entered against the corporate defendants for $10,477.25, and the court compelled further post-judgment discovery. See *Orders*, id., ECF Nos. 149, 150.

In April 2025, Wright filed motions seeking judicial notice, recusal, and sanctions under Rule 11 based on newly discovered evidence of fraud and misrepresentation in HOKC's trademark filings. See *Motion for Judicial Notice*, id., ECF No. 171; *Motion for Recusal*, id., ECF No. 170; *Motion for Sanctions*, id., ECF No. 176. The court denied all relief and released HOKC's bond. See *Orders*, id., ECF Nos. 182, 183.

Appellant now seeks review under Federal Rule of Appellate Procedure 10(e)(2)(B) and Federal Rule of Evidence 201(d), presenting judicially noticeable facts and official records that refute the foundational assertions underlying HOKC's original claims and correct the appellate record.

---

# SECTION III. STATEMENT OF FACTS AND TIMELINE

## A. Historical Origins and Public Domain Status of the Title "Kentucky Colonel"

### 1. The Transylvania Convention of 1775: Founding of the Title

The earliest known civic use of the title "Colonel" in Kentucky traces to the Transylvania Convention of May 23, 1775, held beneath the "Divine Elm" at Fort Boonesborough. Organized by Colonel Richard Henderson and attended by Daniel Boone, this assembly established a provisional government independent of British rule. See *Appendix A* (Sources and Origins); *Exhibit* – Kentucky's First Government in Law.

The title "Colonel" was conferred as a designation of civic and militia leadership, not military rank. Boone, already a Transylvania Company officer, was tasked with opening the Wilderness Road. Col. John Bowman, later appointed in 1776 by Virginia Governor Patrick Henry, became Kentucky County's first official colonel with civil authority. See *A History of the Daniel Boone National Forest, 1770–1970*, ch. XIV (U.S. Dep't Agric. 1975).

8

## 2. Gubernatorial Appointments and Institutional Practice (1816–Present)

Gubernatorial commissions awarding the title "Kentucky Colonel" have been continuously issued by the Commonwealth of Kentucky since at least 1816. These commissions, authenticated and archived by the state, confirm the title's status as a symbolic civic honor. See *Exhibit* – Governors' Appointments and Commissions.

No record exists of any gubernatorial act creating proprietary control over the title. Historically, commissions have been bestowed across a wide range of recipients—from soldiers and statesmen to educators and civic volunteers—as a form of public recognition rather than legal authority or commercial branding.

## 3. Congressional Recognition of the Title (1936)

In 1936, the United States Congress formally recognized "Kentucky Colonel" as part of the nation's cultural heritage. See *Exhibit* – Congressional Record, 1936. The title was acknowledged as a symbol of goodwill and honor, reflecting Kentucky's contribution to American identity and tradition.

This recognition predated any trademark enforcement or monopolization attempt by HOKC. It confirms the national perception of the Kentucky Colonel as a public persona rather than a proprietary asset.

## 4. Literary and Cultural Ubiquity (1833–Present)

As early as 1833, the figure of the "Kentucky Colonel" entered American literature and satire. The archetypal portrayal of Colonel Nimrod Wildfire in *The Lion of the West* (later retitled *The Kentuckian*) captured the public imagination as a symbol of frontier virtue, hospitality, and eccentricity. See *Exhibit* – Colonel Nimrod Wildfire (1833); *Appendices A* and *B*.

The character and title proliferated in media throughout the 19th and 20th centuries—appearing in novels, newspapers, cartoons, and films. These portrayals cemented the Kentucky Colonel's role as a publicly recognizable and culturally embedded civic type.

## B. HOKC's Creation and Misrepresentation of Historical Origins

### 1. Private Incorporation and Organizational Purpose (1933–1957)

The Honorable Order of Kentucky Colonels was created in 1933 as a private social club encouraged by Governor Ruby Laffoon. Its original function was to promote Kentucky's image during the Great Depression in conjunction with the Kentucky Derby. HOKC remained unincorporated until 1957, when it filed Articles of Incorporation as a nonmember nonprofit governed solely by its board. See *Exhibit* – HOKC Articles of Incorporation (1957) and (1992).

Nothing in HOKC's founding documents or early correspondence reflects any historical control over the term "Kentucky Colonel." The organization was not authorized by statute, executive order, or regulation to act on behalf of colonels at large.

### 2. Fabrication of the "1813 Origin" and "1931 First-Use Date"

HOKC first asserted its false "1813 origin" narrative at a 1941 Derby Eve dinner, claiming that Governor Isaac Shelby commissioned Charles S. Todd as the first Kentucky Colonel. No record in state archives substantiates this assertion. See *Exhibit* – Myth of the Kentucky Colonel 1813 Origin.

In the early 2000s, HOKC further claimed a "1931 first-use" date to secure trademark protection. In fact, HOKC was not formed until 1933, and the 1931 date pertains to a distinct entity, the Kentucky Colonels Association, founded by James Henry Hardin. See *Exhibit* – Fraudulent Succession of 1931.

### 3. Fraudulent Trademark Filings Before the USPTO

Three days prior to initiating this litigation in 2020, HOKC filed three trademark applications falsely asserting exclusive rights to the term "Kentucky Colonels," claiming a fabricated first-use date of 1931 and historical origin in 1813. See U.S. Trademark Applications Nos. 88800020, 88800035, 88800038.

These applications contravene *In re Bose Corp.*, 580 F.3d 1240, 1244 (Fed. Cir. 2009), which holds that "[a] trademark is obtained fraudulently under the Lanham Act only if the applicant knowingly makes a false, material representation with the intent to deceive the USPTO."

## C. Appellant's Lawful and Protected Use of the Title

### 1. Educational and Civic Engagement Since the 1990s

Appellant Col. David J. Wright, a duly commissioned Kentucky Colonel, has lawfully used the title in civic, educational, and commemorative capacities since the 1990s. His publications, websites, and public outreach projects have consistently emphasized historical documentation and public recognition of the Kentucky Colonelcy. See *Exhibit* – Adlai E. Stevenson Memoir Excerpt; *Appendix C* (Images of the Kentucky Colonel).

Wright's actions are protected by the First Amendment and fair use principles as affirmed in *Taubman Co. v. Webfeats*, 319 F.3d 770, 777–78 (6th Cir. 2003) (parody, commentary, and non-commercial use of trademark-protected terms is protected expression).

### 2. Retaliatory Litigation by HOKC

After decades of lawful public expression and criticism of HOKC's false historical claims, Appellant was sued in 2020—immediately following HOKC's last-minute trademark applications. The complaint echoed prior unsupported exclusivity claims previously rejected by the district court in *Building Champions*, 345 F. Supp. 2d at 723–24.

That earlier ruling denied HOKC a preliminary injunction, holding that the term "Kentucky Colonels" was widely used and lacked sufficient secondary meaning to confer enforceable rights.

---

# SECTION IV. LEGAL BASIS AND AUTHORITY

## A. Judicial Notice Under Federal Rule of Evidence 201

Federal Rule of Evidence 201(b) permits a court to take judicial notice of a fact not subject to reasonable dispute when it:

1. Is generally known within the court's territorial jurisdiction; or

2. Can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

The adjudicative facts presented in this Motion satisfy both criteria. These include official records such as the 1775 Transylvania Convention minutes, authenticated gubernatorial appointment certificates, and the 1936 *Congressional Record* recognizing "Kentucky Colonel" as part of the national heritage. All are publicly accessible, verifiable, and historically uncontested. See *Fed. R. Evid.* 201(b)(1)–(2); *United States v. Ferguson*, 681 F.3d 826, 834 (6th Cir. 2012).

Where a party requests judicial notice under Rule 201(d), "the court shall take judicial notice if requested by a party and supplied with the necessary information." *Fed. R. Evid.* 201(d). Appellant has provided certified documentation, referenced exhibits, and a supporting historical declaration under 28 U.S.C. § 1746.

Courts routinely recognize facts of this nature, particularly when they are drawn from government records or longstanding historical usage. See *Passa v. City of Columbus*, 123 F. App'x 694, 697 (6th Cir. 2005) (judicial notice of public records proper on motion to dismiss); *D.S. v. E. Knox Cnty. Bd. of Educ.*, 706 F.3d 600, 607 (6th Cir. 2013) (historical newspaper archives judicially noticeable); *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246 (1944) (judicial relief required where judgment was obtained through misrepresentation of facts).

## B. Record Correction Under Federal Rule of Appellate Procedure 10(e)(2)(B)

Federal Rule of Appellate Procedure 10(e)(2)(B) provides that "[i]f anything material to either party is omitted from or misstated in the record by error or accident, the omission or misstatement may be corrected." *Fed. R. App. P.* 10(e)(2)(B).

This authority enables the Court to ensure that the record reflects accurate historical facts essential to adjudication. Where, as here, the appellee's case was advanced through factual misrepresentation—including a fabricated "1813 origin" and "1931 first-use" date—correction is not merely permitted, but required. See *Hazel-Atlas*, 322 U.S. at 245–46.

The integrity of the appellate process depends on an accurate and complete record. See *Gonzalez v. Crosby*, 545 U.S. 524, 532 (2005) (fraud may justify post-judgment relief under Rule 60 where it infects the proceeding itself); *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 437 (1982) (due process requires meaningful opportunity to be heard on material facts).

## C. Sixth Circuit Precedent on Fraudulent Trademark Assertions and Historical Fabrication

The Sixth Circuit has repeatedly addressed false advertising, fraud, and false designation claims under the Lanham Act:

- In *Lexmark International, Inc. v. Static Control Components, Inc.*, 697 F.3d 387, 396–97 (6th Cir. 2012), aff'd, 572 U.S. 118 (2014), the Court held that a false advertising claim under 15 U.S.C. § 1125(a) requires a showing that the plaintiff falls within the zone of interests protected by the Act and has suffered a commercial injury proximately caused by the misrepresentation. The HOKC is not the origin of Kentucky Colonels.

- In *Taubman Co. v. Webfeats*, 319 F.3d 770, 777–78 (6th Cir. 2003), the Court emphasized the need to narrowly construe trademark protections to avoid infringing on nominative or expressive uses, holding that parody and commentary are non-infringing absent likelihood of confusion.

- In *Eagles, Ltd. v. American Eagle Foundation*, 356 F.3d 724, 728–29 (6th Cir. 2004), the Court reaffirmed that trademark rights arise only through actual, senior use in commerce—not by mere association or narrative construction.

13

Each of these authorities reinforces the conclusion that Appellee's use of fabricated historical claims to bolster trademark exclusivity is unlawful, unsupported by the record, and harmful to both commercial competitors and the public.

## D. Judicial Transparency and Correction of Misstatements in the Record

The Sixth Circuit has articulated a clear policy preference favoring judicial transparency and accuracy in public filings:

- In *Shane Group, Inc. v. Blue Cross Blue Shield of Michigan*, 825 F.3d 299, 305 (6th Cir. 2016), the Court held that "[t]he public has a strong interest in obtaining the information contained in the court record," and that secrecy is disfavored except under the most compelling circumstances.

- In *Mason v. Adams Cnty. Recorder*, 901 F.3d 753, 759 (6th Cir. 2018), the Court affirmed that the public and parties are entitled to rely on the accuracy of judicial and governmental records, particularly where issues of public concern are implicated.

Here, the historical record before the Court has been tainted by fraudulent misrepresentations and omission of verified facts. Judicial notice of the authentic record is essential to ensure the accuracy, transparency, and fairness of these proceedings.

---

## SECTION V. ARGUMENT

## A. Judicial Notice Is Mandatory for Indisputable Historical Facts Under Rule 201

The adjudicative facts presented herein are not subject to reasonable dispute and qualify for mandatory judicial notice under Federal Rule of Evidence 201(b)–(d). Appellant has provided the

requisite materials in the form of certified public records, official archival materials, and historical documentation readily verifiable through public sources. See *Fed. R. Evid.* 201(b)–(d).

Sixth Circuit precedent holds that courts must take judicial notice when supplied with accurate and reliable records. See *Passa v. City of Columbus*, 123 F. App'x 694, 697 (6th Cir. 2005) (judicial notice appropriate for public records in Rule 12(b)(6) context); *United States v. Ferguson*, 681 F.3d 826, 834 (6th Cir. 2012) (prior judicial filings and agency records); *D.S. v. E. Knox Cnty. Bd. of Educ.*, 706 F.3d 600, 607 (6th Cir. 2013) (historic newspaper accounts).

These authorities support judicial notice of the following:

- The 1775 Transylvania Convention and founding use of the title "Colonel" in a civic context;

- Official gubernatorial appointment records demonstrating the non-exclusive, public domain nature of the title "Kentucky Colonel";

- The 1936 *Congressional Record* recognizing the Kentucky Colonel as a civic archetype;

- Extensive historical and literary portrayals of Kentucky Colonels in American culture prior to the formation of HOKC;

- HOKC's own corporate documents, which contradict its exclusivity claims;

- Fraudulent USPTO filings asserting false origin and first-use dates.

Each item is accurately cataloged and summarized in *Appendix E* pursuant to Rule 1006 and authenticated under Rules 901–902.

## B. Record Correction Is Required to Prevent Fraud and Ensure Judicial Integrity

The Court is authorized and compelled to correct the record where material facts have been misstated or omitted, particularly where such misstatements were made in furtherance of judicial fraud. See *Fed. R. App. P.* 10(e)(2)(B); *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 245–46

(1944) (court must vacate judgments procured by fraud); *Gonzalez v. Crosby*, 545 U.S. 524, 532 (2005) (fraud as basis for extraordinary relief); *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 437 (1982) (due process requires correction of falsified adjudicative premises).

Appellee has repeatedly advanced misrepresentations that materially altered the course of litigation, including:

- The false assertion that the term "Kentucky Colonel" originated with Governor Isaac Shelby in 1813—a claim unsupported by gubernatorial records or historical evidence;

- The fabricated "1931 first-use" claim used in USPTO filings and court pleadings, despite HOKC's formation in 1933 and incorporation in 1957;

- Suppression of the 2004 *Building Champions* ruling that already rejected HOKC's trademark exclusivity claims.

These misrepresentations have distorted the legal landscape, secured overbroad injunctions, and chilled First Amendment expression. See *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991) (courts possess inherent power to sanction abuse of process); *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814–15 (1945) (judicial integrity requires protection from litigants who commit fraud).

## C. Judicial Notice Is Necessary to Safeguard Constitutional Rights

HOKC's misuse of trademark enforcement, grounded in false claims of origin, has functioned as a prior restraint on Appellant's expressive use of the Kentucky Colonel title—contravening settled First Amendment jurisprudence.

The Supreme Court has held that trademark statutes may not be applied in a manner that suppresses lawful expression or commentary. See *Matal v. Tam*, 582 U.S. 218, 230–33 (2017) (Lanham Act

cannot be applied to censor disfavored speech); *Radiance Found., Inc. v. NAACP*, 786 F.3d 316, 330 (4th Cir. 2015) (trademark law cannot be weaponized to silence commentary).

Appellant's educational and commemorative use of the title "Kentucky Colonel," as a civic honor and cultural symbol, constitutes expressive activity. His public engagement, online historical archive, and literary treatment of the subject predate the litigation and fall squarely within protected speech under *Taubman Co. v. Webfeats*, 319 F.3d 770, 778 (6th Cir. 2003) (non-commercial and critical uses of trademarks are protected).

The injunctions obtained through fraudulent assertions have impermissibly restrained that expression. Judicial notice and record correction are required to prevent the continued enforcement of unconstitutional orders rooted in historical falsehoods.

## D. Judicial Notice Protects the Public Record from Historical Revisionism

This litigation now extends beyond a private dispute to implicate the public's right to historical truth. When federal courts accept or enforce fabricated narratives, they risk embedding misinformation into binding precedent.

The Sixth Circuit has recognized the importance of transparency and historical accuracy in public judicial records. See *Shane Grp., Inc. v. Blue Cross Blue Shield of Mich.*, 825 F.3d 299, 305 (6th Cir. 2016) (judicial records must remain open to public scrutiny); *Mason v. Adams Cnty. Recorder*, 901 F.3d 753, 759 (6th Cir. 2018) (accuracy of government records essential to public trust).

HOKC's narrative—that it created (or is somehow exclusively responsible for) the title "Kentucky Colonel," dates back to 1813, and holds exclusive trademark rights to its use—is unsupported by any contemporaneous record prior to 1940. These fictions have distorted judicial outcomes and deceived the USPTO. Unless corrected, the result will be an institutionalized fraud.

This Court has the opportunity—and the duty—to preserve historical integrity, protect the public interest, and prevent further misuse of the judicial system by taking notice of the true, verifiable historical record.

---

# SECTION VI: SPECIFIC ADJUDICATIVE FACTS SUBJECT TO JUDICIAL NOTICE

Pursuant to **Federal Rule of Evidence 201(b)**, Appellant respectfully requests that this Court take judicial notice of the following adjudicative facts, each of which is derived from official records, authenticated historical documents, and publicly accessible materials that are **not subject to reasonable dispute**. Each fact is directly relevant to this appeal because it demonstrates the **public domain status** of the title **"Kentucky Colonel"**, and the term "Kentucky Colonels" and exposes the **false historical narrative promoted by HOKC**, and corrects the record to reflect the true historical and legal context of this title.

## A. Historical Origin and Public Domain Status of the Title "Kentucky Colonel" and Class of People "Kentucky Colonels"

1. **The Transylvania Convention of May 23, 1775: The First Use of the Title "Colonel" in Kentucky**

   ○ **Exhibit: Kentucky's First Government in Law.**

   ○ **Explanation:** This document establishes the first civic and governmental use of the title "Colonel" in Kentucky's history, recognizing civic leaders such as **Colonel Richard Henderson** and **Colonel Daniel Boone**.

   ○ **Relevance:** It demonstrates that the title "Colonel" was a public, civic designation from the very beginning, not a proprietary title or a military rank.

2. **Gubernatorial Commissions Recognizing "Kentucky Colonel" as a Public Honor (1816–Present)**

   ○ **Exhibit: Governors' Appointments and Commissions.**

   ○ **Explanation:** Official gubernatorial records confirm that the title "Colonel" has been continuously conferred by the Commonwealth of Kentucky as a **public domain honor and a courtesy title**.

   ○ **Relevance:** These commissions disprove HOKC's false claim of exclusive ownership of the title, origination, or its creation.

3. **1936 United States Congressional Recognition of the Cultural Significance of "Kentucky Colonel"**

   ○ **Exhibit: Congressional Record, 1936.**

   ○ **Explanation:** The United States Congress formally recognized the title "Kentucky Colonel" as part of American cultural heritage, acknowledging its public domain status.

   ○ **Relevance:** This recognition directly contradicts HOKC's claims of exclusive ownership.

4. **Historical Literary and Cultural Depictions of "Kentucky Colonel" (1833–1920)**

   ○ **Exhibit: Colonel Nimrod Wildfire (1833); Appendixes A and B.**

   ○ **Explanation:** These cultural depictions demonstrate that the title "Kentucky Colonel" has been publicly recognized and celebrated in literature, film, and popular culture for over two centuries.

   ○ **Relevance:** These materials establish the public domain status of the title long before HOKC was founded.

## B. HOKC's False Historical Claims and Fraudulent Activities

1. **HOKC's Formation in 1933 as a Private Social Club**

○ **Exhibit: HOKC Articles of Incorporation (1957), HOKC Disambiguation.**

○ **Explanation:** HOKC's first trademark applications, newspaper articles, and magazines confirm that it was established in 1933 as a private, honorific social group, with no connection to the historic tradition of Kentucky Colonel.

○ **Relevance:** These exhibits contradict HOKC's false claims of a "1931 first-use date" and possible earlier establishment.

2. **The Fabricated "1813 Origin Myth"**

○ **Exhibit: Myth of the Kentucky Colonel 1813 Origin.**

○ **Explanation:** HOKC has repeatedly asserted that the title "Kentucky Colonel" originated in 1813, when **Governor Isaac Shelby** allegedly commissioned **Charles S. Todd**. No historical record supports this claim.

○ **Relevance:** Judicial notice is necessary to correct this false historical narrative, which has been weaponized to assert fraudulent trademark claims.

3. **HOKC's Fraudulent "1931 First-Use Date" Claim in USPTO Filings**

○ **Exhibit: Fraudulent Succession 1931.**

○ **Explanation:** Despite being founded in 1933, HOKC has falsely claimed a "1931 first-use date" in its trademark applications, in Trademark Trial and Appeals Board ("TTAB") cases and in two lawsuits before the US District Court for the Western District of Kentucky.

○ **Relevance:** This fraudulent claim was used to mislead the courts and to secure improper federal trademark protections for the term "Kentucky Colonels".

4. **HOKC's Fraudulent Trademark Applications Filed with the USPTO (2020)**

○ **Exhibit: Fraudulent Trademark Applications (Applications 88800020, 88800035, 88800038).**

○ **Explanation:** These applications falsely claim that HOKC is the exclusive owner of the phrase "Kentucky Colonels," based on fabricated historical facts and its connection to the title.

○ **Relevance:** These fraudulent filings constitute false designation of origin under the **Lanham Act, 15 U.S.C. § 1125(a)**.

## C. Judicial Decisions Exposing HOKC's False Claims

1. **HOKC v. Building Champions, LLC, 345 F. Supp. 2d 716 (W.D. Ky. 2004)**

   ○ **Exhibit: Judicial Decision Rejecting HOKC's Exclusivity Claim.**

   ○ **Explanation:** The District Court rejected HOKC's claim of exclusive ownership over the name "Kentucky Colonels," recognizing its public domain status.

   ○ **Relevance:** This decision directly refutes HOKC's claims in this appeal.

2. **HOKC's Misrepresentation of "Membership" and False Claims of Public Authority**

   ○ **Exhibit: HOKC Membership Memo and Correspondence.**

   ○ **Explanation:** HOKC's own internal documents reveal that it is not a membership organization, contradicting its public claims of representing the interests of Kentucky Colonels. Kentucky Colonels are merely donors and customers of the HOKC.

   ○ **Relevance:** These misrepresentations are central to HOKC's false narrative of exclusivity.

## D. Historical Recognition of the Public Domain Status of the Title "Kentucky Colonel"

1. **Kentucky Historical Society's Official Historical Markers Recognizing the Transylvania Convention**

   ○ **Exhibit: Kentucky Historical Markers Nos. 1520 (Fort Boonesborough) and 2396 (Divine Elm).**

- ○ **Explanation:** These state-approved markers confirm the civic origin of the "Kentucky Colonel" title and the founding of the Transylvania Colony in 1775.

- ○ **Relevance:** These markers provide government-verified recognition of the true historical origins of the title.

2. **Historical Analysis of "Kentucky Colonel" in Legal and Cultural Scholarship**

   - ○ **Exhibit: Scholarly Analyses Recognizing Public Domain Status.**

   - ○ **Explanation:** Legal and historical scholars have long recognized the title "Kentucky Colonel" as a public domain civic honor, not a proprietary brand.

   - ○ **Relevance:** These analyses provide an authoritative, independent confirmation of the public nature of the title.

---

# SECTION VII. CONCLUSION AND PRAYER FOR RELIEF

This Motion presents a narrow but consequential request: that the Court take judicial notice of verified historical and governmental records establishing that the title "Kentucky Colonel" and the term "Kentucky Colonels" are civic honors in the public domain—not proprietary trademarks of a private social club. Appellee's contrary narrative, including the invented "1813 origin" and falsified "1931 first-use" date, lacks support in any official archive, legal ruling, or historical source.

The Honorable Order of Kentucky Colonels has repeatedly asserted these falsehoods in court pleadings, before the U.S. Patent and Trademark Office, and in public fundraising appeals. The resulting misuse of judicial and administrative processes has led to overbroad injunctions, contempt findings, and speech restrictions based on an erroneous record. Judicial notice and record correction are necessary to safeguard the integrity of the appellate record and prevent the continued enforcement of judgments procured by fraud and historical misrepresentation.

Appellant has provided authenticated exhibits, official government records, scholarly documentation, and procedural history sufficient to warrant judicial notice under *Fed. R. Evid.* 201(b), and correction of the appellate record under *Fed. R. App. P.* 10(e)(2)(B). See *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246 (1944); *Passa v. City of Columbus*, 123 F. App'x 694, 697 (6th Cir. 2005).

## RELIEF REQUESTED

Accordingly, Appellant respectfully prays that this Honorable Court:

1. **Grant Judicial Notice** pursuant to Federal Rule of Evidence 201(d), recognizing the adjudicative facts outlined in Section VI as historical truths verifiable from sources whose accuracy cannot reasonably be questioned;

2. **Correct the Appellate Record** pursuant to Federal Rule of Appellate Procedure 10(e)(2)(B), to accurately reflect the verified public domain status and true historical origins of the title "Kentucky Colonel";

3. **Reject Appellee's False Narrative** of proprietary origin and exclusive ownership, in light of overwhelming public record and legal authority;

4. **Safeguard Constitutional and Public Interests**, including the First Amendment rights of Appellant and other commissioned colonels to refer to and represent themselves using historically recognized civic titles; and

5. **Grant such other and further relief** as this Court may deem just and proper to protect judicial integrity and prevent the institutionalization of historical fraud.

Appellant expressly reserves the right to supplement this Motion with additional authenticated exhibits or legal authorities should further evidentiary developments or record disputes arise on appeal.

Respectfully submitted in good-faith this 27th day of May, 2025,

Puerto Carreño, Colombia

**Col. David J. Wright**

Defendant-Appellant, Pro Se

# CERTIFICATE OF SERVICE

I hereby certify that on **May 27, 2025**, I **submitted** the foregoing "Motion to Take Judicial Notice of Adjudicative Facts and Correct the Record" (with exhibits) for filing via **email** to the Clerk of the Court, in accordance with the Court's procedures for pro se litigants. Upon docketing, the Court's **CM/ECF system** will automatically serve all registered ECF users, including counsel for Appellee.

Deborah S. Hunt, Clerk                                      /s/ Col. David J. Wright
Sixth Circuit Court of Appeals                         David J. Wright, Pro-se Appellant
501 Potter Stewart U.S. Courthouse                         DATED: May 27, 2025
100 East Fifth Street
Cincinnati, Ohio 45202-3988

# CERTIFICATE OF APPENDICES A–E AND EXHIBITS

I, **Col. David J. Wright**, pro se Appellant in the above-captioned matter, hereby certifies pursuant to 28 U.S.C. § 1746 and the Federal Rules of Evidence as follows:

1. **Personal Knowledge.** I am the compiler and custodian of the materials identified as Appendices A, B, C, D, and E (collectively, "the Exhibits"). The statements made herein are based on my personal knowledge, as a researcher, and based on a candid diligent review of the sources referenced.

2. **Composition of the Appendices and Exhibits.**

   a. **Appendix A – Sources and Origins** contains true and correct copies and accurate excerpts of primary and secondary works (1784–2022) that establish the historical emergence of the *Kentucky Colonel* title.

   b. **Appendix B – Descriptive Quotation Passages** reproduces verbatim quotations from newspapers, magazines, and books demonstrating public, descriptive usage of "Kentucky Colonel" and "Kentucky Colonels."

   c. **Appendix C – Images of the Kentucky Colonel** comprises authentic photographs, lithographs, certificates, and other visual artifacts illustrating the evolution of the colonel's public image.

   d. **Appendix D – Things Referred to as Kentucky Colonel(s)** catalogues commercial products, athletic teams, and other entities that have employed the term in trade and popular culture since the late-nineteenth century.

   e. **Appendix E – Exhibits Exposition** is a Rule 1006 summary index of the foregoing materials and additional record items; it supplies pinpoint annotations, provenance data, and repository links for all underlying documents. Published with Google Workspace at: <https://www.kycolonelcy.us/kentucky-colonel-history-exhibits>

3. **Authenticity and Completeness.** To the best of my knowledge and belief, each document or image contained in the Appendices and Exhibits is a true and correct copy of the source from which it was obtained, unaltered except for minor formatting required for electronic

presentation. Where originals are in color, color fidelity has been maintained. Where certified governmental records are included, the certification or official seal is verifiable.

4. **Method of Compilation.** Materials were gathered from publicly available archives, governmental repositories, academic databases, and my personal collection. Each item is either (i) self-authenticating under Fed. R. Evid. 902, (ii) accompanied by metadata sufficient to establish authenticity under Fed. R. Evid. 901(b)(1) or (b)(7), or (iii) summarized in Appendix E pursuant to Fed. R. Evid. 1006, with full copies retained for inspection.

5. **Accessibility.** Exact electronic replicas (PDF/JPEG) of every item summarized or excerpted are stored in a secure Google Drive folder accessible to the Court and opposing counsel. If the Court so orders, I will promptly furnish hard-copy printouts or certified duplicates.

6. **Accuracy of Summaries.** The summaries and pinpoint citations provided in Appendix E accurately reflect the substance of the underlying documents and were prepared by me without omission or embellishment.

7. **Purpose.** The Exhibits are submitted to assist the Court in taking judicial notice of adjudicative facts that are not subject to reasonable dispute—specifically, the public-domain origin, historic ubiquity, and descriptive commercial use of the terms "Kentucky Colonel" and "Kentucky Colonels."

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Respectfully submitted this 27th day of May, 2025, from Puerto Carreño, Colombia.

**Col. David J. Wright**

Defendant-Appellant, Pro Se