# Declaration of Historical Fact

A Historical Dossier on the Kentucky Colonel

**RECEIVED**
05/27/2025
KELLY L. STEPHENS, Clerk

## Declaration of Historical Fact Regarding the Origin and Public Domain Status of the Term "Kentucky Colonel"

**A False Fount of Honor: The Honorable Order's 1813 False Designation of Origin Myth and the True Origin(s) of Kentucky's Colonels**

**Prepared in support of correcting the public record, judicial notice under FRE 201(b), trademark cancellation under 15 U.S.C. §1119, and legal filing under 15 U.S.C. § 1125(a) which prohibits the designation of a false origin resulting in historical revisionism.[1]**

---

Readers Note: This entire exhibit is based on material evidence and indisputable facts (appendices) that cannot be reasonably disputed in the United States Courts or agencies of the United States Government.

---

## PREAMBLE

**Declaration of Historical Fact —** Submitted for Judicial Notice under FRE 201(b) and 28 U.S.C. § 1746; Grounds for Cancellation of Trademarks under 15 U.S.C. §§ 1064(3), 1119, 1120, and 1125(a).

This Declaration is made and submitted by Appellant Col. David J. Wright as a formal statement of adjudicative, self-authenticated, and publicly verifiable historical facts regarding the true origin of the title "Kentucky Colonel," suitable for judicial notice under **Federal Rule of Evidence 201(b)**. It is

---

[1] Federal courts have long recognized that **historical fact, when supported by primary sources and verifiable public records, may be judicially noticed under Rule 201(b)**. In *Students for Fair Admissions v. Harvard/UNC*, historians submitted an amicus brief to correct a false origin narrative surrounding the Fourteenth Amendment. That brief was accepted as a legitimate basis for **adjudicative understanding**, demonstrating the judiciary's role in **guarding against ahistorical distortions that affect legal outcomes**.

Similarly here, the Appellant provides a historically verified declaration showing that the **title "Kentucky Colonel" originated from civic, cultural, and governmental use long before the Honorable Order of Kentucky Colonels (HOKC) was first formed in 1933**. Just as the historians sought to correct mythologized constitutional history, this filing seeks to correct a fabricated "origin myth" of 1813 and 1931 now being used to improperly claim trademark ownership over a title and tradition that belongs to the public domain.

based exclusively on public records, government-created and approved co-opted historical markers, state and federal archives, pre-1932 published histories, public domain records, and cultural artifacts from the 18th, 19th, and 20th centuries.

This document is not an opinion, theory, or personal narrative. It is a legal clarification and restoration of the historical record concerning the **true origin** of the title *Kentucky Colonel* and the **fraudulent branding and trademark narrative** created, fostered, and instituted by **The Honorable Order of Kentucky Colonels (HOKC)**, a private association and social club agenda created and organized in 1933 by Miss Anna Bell Ward and Mr. Charles Pettijohn with the consent and guidance of Governor Ruby Laffoon.

This *Declaration* does not seek to discredit Governor "Colonel" Isaac Shelby or US Ambassador "Colonel" Charles S. Todd, or their descendants. It fully acknowledges their actual integral respected roles and legacies in Kentucky's early legal, political, and civic formational development. However, it establishes that they were not the originators of the Kentucky Colonel tradition as claimed in 1941 by The Honorable Order of Kentucky Colonels, Inc. (HOKC) when its officers accompanied by Governor Keen Johnson gave birth to a myth beginning in 1813 creating a false designation of origin.

Rather, the historical record shows that the first known colonels in Kentucky were civic and militia leaders of the Transylvania Colony, commissioned in 1775 by Colonel Richard Henderson and in 1777 by Colonel John Bowman and Colonel George Rogers Clark under the authority of Governor Patrick Henry of Virginia. The use of the word "Honorable" in civic recognition used today by Kentucky's governors to convey the title also stems from that assembly, held beneath the Divine Elm in Boonesborough, and the original commissions issued under the authority granted by the Commonwealth of Virginia. Today 250 years ago this legacy stands as the true *fount of honor* in Kentucky's past.

# CERTIFICATE OF HISTORICAL ORIGIN

## Clarifying the Civic Origin and Public Record Status of the Honorable Title and Commission of the Kentucky Colonel

Submitted under penalty of perjury pursuant to **28 U.S.C. § 1746**, and suitable for presentation as content for **Judicial Notice under Federal Rule of Evidence (FRE) 201(b)**. The factual content, historical records, public documents, and authenticated exhibits presented in this Motion are additionally supported by the following provisions of the Federal Rules of Evidence:

- **FRE 201(b) - Judicial Notice of Adjudicative Facts:** This Motion requests judicial notice of facts that are (1) generally known within the trial court's territorial jurisdiction, and (2) accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

- **FRE 1006 - Summaries to Prove Content:** The historical facts and legal authorities presented in this Motion are supported by summarized materials, including official records, historical documents, and legal decisions that cannot be conveniently examined in full without undue burden.

- **FRE 901 - Requirement of Authentication or Identification:** Each exhibit is authenticated as genuine, including public records, government documents, scholarly analyses, and verified historical sources.

- **FRE 902 - Self-Authenticating Evidence:** The exhibits presented include:

  - **FRE 902(1): Domestic Public Documents That Are Sealed and Signed** — Certified gubernatorial commissions and official state records.

  - **FRE 902(4): Certified Copies of Public Records** — Certified copies of public records, including congressional records and state historical markers.

  - **FRE 902(5): Official Publications** — United States Congressional Records, Kentucky Historical Society publications, and authenticated government archives.

  - **FRE 902(6): Newspapers and Periodicals** — Historical newspaper articles and cultural depictions of "Kentucky Colonel."

- ○ **FRE 902(7): Trade Inscriptions and Labels** — HOKC's own USPTO trademark filings, which contain false historical claims.

- **FRE 803 - Exceptions to the Rule Against Hearsay:**

  - ○ **FRE 803(8): Public Records and Reports** — Certified gubernatorial commissions and public records documenting the appointment of Kentucky Colonels.

  - ○ **FRE 803(16): Statements in Ancient Documents** — Verified historical documents, including the 1775 Transylvania Convention Records and 19th-century Americana.

  - ○ **FRE 803(18): Statements in Learned Treatises, Periodicals, or Pamphlets** — Historical analyses and scholarly commentaries recognizing the public domain status of the title "Kentucky Colonel."

The Appellant submits this Certificate in reliance on these rules, ensuring that the Court is presented with verified, authenticated, and accurately summarized facts of historical and legal significance.

---

This **Certificate of Declaration** is issued by **Col. David J. Wright** in his individual capacity as a recognized Kentucky Colonel, as a sworn party to this action, and as a responsible historian, researcher, and petitioner *correcting the public record*. Wright affirms that the facts contained herein are derived from lawful, verifiable, and publicly accessible materials, and are submitted for judicial notice in accordance with **Federal Rule of Evidence 201(b)**.

The evidentiary basis of this Declaration is exclusively drawn from:

- Public archives, records, and government publications issued or maintained by state and federal agencies;

- **Official historical markers** recognized and endorsed by the **Commonwealth of Kentucky**;

- Published academic and legal histories created prior to the formation of the HOKC in 1933;

4

- Cultural artifacts and printed material from the **18th, 19th, and early 20th centuries**, reflecting public use, literary development, and common understanding of the Kentucky Colonel;

- Contemporaneous newspaper accounts and legislative proceedings, as well as public commemorations of the Transylvania Convention and Revolutionary War figures.

This Declaration is **not a matter of personal narrative or editorial opinion**, but a **self-authenticating factual correction** concerning the historical and legal origin of the title "Kentucky Colonel." It responds directly to a persistent and **fraudulently propagated origin myth** introduced by The Honorable Order of Kentucky Colonels (HOKC)—a private, nongovernmental social club created in **1933** by Anna Bell Ward and Charles Pettijohn, with the endorsement of then-Governor Ruby Laffoon.

This Certificate does not challenge the personal integrity or legacy of **Governor Isaac Shelby** or **Ambassador Charles S. Todd**, both of whom are respected for their foundational contributions to the Commonwealth of Kentucky. However, the public record confirms that they were not the originators of the Kentucky Colonel title, nor did any verified act of gubernatorial commission occur in **1813** as alleged by the HOKC. That story—first introduced at a 1941 Derby Eve banquet—is **entirely unsubstantiated** and contradicted by all available contemporary evidence.

## The True Historical Record Affirms:

- That the **first Kentucky Colonels** were civic and militia leaders in the **Transylvania Colony**, beginning **May 23, 1775**, and including **Colonel Richard Henderson**, **Colonel Daniel Boone**, and others, as documented in the **Minutes of the Transylvania Convention** and commemorated in official state markers at **Boonesborough**;

- That **Colonel John Bowman** was the first formally commissioned militia colonel for Kentucky County, appointed in **December 1776** by **Governor Patrick Henry of Virginia**, and that **Colonel George Rogers Clark** also served under this legal structure as Kentucky's civil-military leadership matured;

- That the modern title "Honorable" in reference to "Kentucky Colonel" descends not from any commercial body or organization, but from **executive gubernatorial recognition** dating back to the frontier period—an unbroken constitutional custom rooted in the Commonwealth's earliest civil governments.

This is the **true origin** and **civic inheritance** of the Kentucky Colonel—a **public trust**, not a proprietary brand. It is the **original fount of honor** that predates and invalidates the commercial claims of HOKC and any related trademarks filed on a false foundation.

**Respectfully certified,** I, Col. David J. Wright, a Kentucky Colonel, under penalty of perjury under 28 U.S.C. § 1746 and the laws of the United States of America, declare that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Respectfully submitted this 27th day of May, 2025,

Puerto Carreño, Colombia

/s/ Col. David J. Wright
Kentucky Colonel, Appellant Pro-Se

6

# OVERVIEW

For at least 80 years, the HOKC has advanced a **false origin story**, claiming that the title "Kentucky Colonel" began in **1813** when Governor Isaac Shelby allegedly commissioned Charles S. Todd a colonel. This myth, first introduced at a **Derby Eve dinner in 1941**, has no support or place in any known primary source, government records, state history, or archival record.

In reality, the historical title traces its origin to **May 23, 1775**, when **Colonel Richard Henderson** and **Daniel Boone** led the first civic assembly in Kentucky at the **Transylvania Convention**, under the *Divine Elm* in Boonesborough and two months prior to the formation of the first government when Colonel Henderson commissioned Boone a colonel to blaze the Wilderness Road with a company of axmen. Colonels were not honorary figures—they were civic and militia leaders in the colonial time, builders of government, and early architects of what would become the Commonwealth of Kentucky.

The 1775 acts of the Transylvania Convention and the historical period through 1779—recognized officially by the **Kentucky Historical Society in Markers Nos. 1520 "Fort Boonesborough" (1975) and Marker 2396 "Divine Elm" (2014)**—are the legitimate and documented fount of honor for Kentucky Colonels and the historical foundation for the Commonwealth of Kentucky.

The fabricated 1813 story has been used by HOKC to:

- **Monopolize a public title through false trademarks**
- **Market commercial products like cigars, bourbon, and clothing**
- **Threaten litigation against colonels under the Lanham Act**
- **Revise Kentucky history for corporate gain**

This Declaration rebuts that myth and provides **self-contained, public evidence** warranting:

1. **Judicial notice under FRE 201(b);**

2. **Cancellation of HOKC's trademarks under 15 U.S.C. § 1119;**

3. **Legal redress under § 1125(a) for false designation of origin.**

---

# INTRODUCTION

**Restoring Historical Origin and Legal Truth Under Federal Law**

This Declaration corrects a material falsehood that has shaped public understanding, commercial enforcement, and the administrative use of the title *Kentucky Colonel*. It rebuts a historically inaccurate narrative first introduced in **1941** by the *Honorable Order of Kentucky Colonels* (HOKC)—a private nonprofit formed in **1933**—which falsely claims that Governor **Isaac Shelby** conferred the first Kentucky Colonel commission in **1813** upon his future son-in-law, **Charles S. Todd**. No record of such a commission exists in any known military, gubernatorial, or civil archive, and no primary source affirms this event ever occurred. **See Appendix A**: *Memoir of Col. Chas. S. Todd*, 1872 and *Pictorial Field Book of the War of 1812*, 1868.

Instead, this Declaration affirms that the title *Kentucky Colonel* is of public origin, born from a continuous civic tradition dating to the **Transylvania Convention** of **May 23, 1775**, when leaders such as **Colonel Richard Henderson**, **Colonel Daniel Boone**, and others convened to form Kentucky's first constitutional government under the Divine Elm at Boonesborough **See Appendix E:** *Kentucky's First Government in Law Minutes of the Transylvania House of Delegates, 1775 — Kentucky Magna Charta Lobingier, 1909*.

This governmental assembly:

- Predated the Declaration of Independence by over a year,
- Formed a legislature and enacted laws,
- Used the honorific "Colonel" to signify civic-military authority, **SeeAppendix A** — *Local Government in the South and the Southwest*, 1893.

By **1776**, under the reorganized authority of **Virginia**, **Governor Patrick Henry** formally commissioned **John Bowman** as the first known *Colonel of the Kentucky Militia*, marking the earliest *government-issued Kentucky Colonel commission*. **See Appendix A:** *History of the Mississippi Valley*, 1903; *First Kentucky Colonels*, 2021.

The tradition of colonelcy in Kentucky is therefore:

- **Civic in origin**, not ceremonial;
- **Public in meaning**, not proprietary;
- **Rooted in law and governance**, not in exclusive private membership or nonprofit affiliation.

In contrast, the HOKC's claimed 1813 origin:

- Appeared first in a **1941 Derby Eve dinner program, See Exhibit Appendix E**: *Myth of the Kentucky Colonel 1813 Origin*;

- Was repeated in its 1975 circular, filed in connection with federal trademark applications, **See Exhibit Appendix E:** *Myth of the Kentucky Colonel 1813 Origin*;

- Has been used deceptively in marketing, litigation, and public ceremonies ever since. **See Exhibits Appendix E:** *Col. Lowell Thomas Radio Commentary*, *Kentucky Progress Commission*. (Primary Exhibit)

Despite lacking any statutory or archival basis, the HOKC has weaponized this false narrative to:

- Enforce exclusive use of the term *Kentucky Colonel* via the *USPTO* and federal courts;

- Obscure the civic, literary, and executive traditions from which the title actually descends. **See Exhibits Appendix B** — *Descriptive Quotation Passages*, **Appendix E** — *Kentucky Colonel: A Study in Semantics*, 1947;

- Suppress other legitimate uses, including those of cultural, literary, and governmental origin. **See Exhibit Appendix E:** *Land Grant Colonels of Kentucky*.

This Declaration:

- Provides the public and judiciary with verified documentary evidence;

- Calls for judicial notice under **FRE 201(b)**;

- Establishes *grounds for cancellation* under **15 U.S.C. § 1119** and *false designation of origin* under **15 U.S.C. § 1125(a)**.

It affirms that the Kentucky Colonel is not a product of **trademark fiction**, but a **civic inheritance** that belongs to the **Commonwealth of Kentucky and the American people**.

# I. The HOKC False Origin – The Mythical 1813 Narrative

## A. Overview of the Myth

The *Honorable Order of Kentucky Colonels* (HOKC) asserts that the title "Kentucky Colonel" originated in **1813**, when **Governor Isaac Shelby** allegedly commissioned **Charles S. Todd**, his future son-in-law, as the first Kentucky Colonel. This origin story has been repeatedly cited in HOKC's newsletters, trademark filings, public relations materials, and induction communications, yet **no contemporaneous documentation** substantiates this claim.

The earliest known reference to the 1813 origin appears in the commemorative program for the **1941 Derby Eve Dinner** hosted by the HOKC, over 120 years after the purported event. **See Exhibit Appendix E:** *Myth of the Kentucky Colonel 1813 Origin Derby Eve Program, 1941*. This fictional narrative was later reinforced in a **1975 circular** that promoted the "163rd anniversary" of the Kentucky Colonel Commission—an assertion based on the same unfounded 1813 timeline. **See Exhibit Appendix E:** *Myth of the Kentucky Colonel 1813 Origin Circular, 1975*.

Despite its late invention, the 1813 claim has been repeated as fact in state publications, donor solicitations, and public speeches, misleading tens of thousands of recipients of gubernatorial commissions since at least the 1970s.

## B. Misuse in USPTO and Federal Court Proceedings

The 1813 narrative has been strategically incorporated into federal trademark filings. Most notably, in USPTO **Serial No. 73299122**, the HOKC cited internal member letters and circulars to substantiate its purported historical lineage. Among the supporting materials was a letter from **Robert A. Metry**, claiming first use of the term "Kentucky Colonels" in **1934**, yet referencing the **1813 commission** as its foundational source. **See Exhibit Appendix E:** *Metry Trademark Application and Letter*.

The HOKC also referenced this same fictitious origin in two federal court cases:

- *Honorable Order of Kentucky Colonels v. Building Champions, LLC*, No. 3:04-cv-00465 (W.D. Ky. 2004);

- *Honorable Order of Kentucky Colonels v. Kentucky Colonels International*, No. 3:20-cv-00132 (W.D. Ky. 2020).

In both instances, the organization presented *minutes* from a **May 2, 1931 meeting** with Governor **Flem Sampson**, falsely implying they were the founding records of the HOKC—despite the fact that the HOKC did not exist [as an idea] until September 1933.

## C. Contradictions in the Historical Record

The HOKC's foundational assertions regarding 1813 are internally inconsistent and objectively refuted:

1. **No surviving gubernatorial order**, military commission, or executive proclamation confirms the commission of **Charles S. Todd** as a Kentucky Colonel in 1813.

2. Todd's own biographical memoirs make **no mention** of any such commission **Appendix A:** *Memoir of Col. Chas. S. Todd*, 1872.

3. **Harper's Encyclopedia of United States History (1905)** and **Lossing's** *Pictorial Field Book of the War of 1812* document Todd's federal commission as Inspector General, not a gubernatorial appointment. **Appendix A:** *Pictorial Field Book of the War of 1812*, 1868.

4. According to official records, Todd only met Governor Shelby **after the War of 1812**, when he wrote to request permission to court Shelby's daughter. **See Appendix A:** *Memoir of Col. Chas. S. Todd.*

5. Even HOKC-cited historian **James J. C. Davis** admitted in 2021 that the 1813 story is based on **"folklore"**, not legal fact. **Appendix E:** *Exhibit — Myth of the Kentucky Colonel 1813 Origin*.

## D. Impact on the Public Record and Gubernatorial Misrepresentation

For over half a century, HOKC materials have misled Kentucky governors and the public. These materials:

- Were inserted into **induction letters** issued on official state stationery;

- Influenced **public speeches** at ceremonial events;

- Were incorporated into **press kits** and commemorative proclamations;

- Created a **feedback loop** in which state officials unwittingly repeated a corporate fiction as historical truth.

No less than **300,000 citizens** have received colonel commissions based on this historically inaccurate narrative since 1976, undermining both the Commonwealth's heritage and the public trust. **Appendix E:** *Exhibit — Col. Lowell Thomas Radio Commentary*.

## E. Legal Implications and Grounds for Cancellation

The HOKC has used this fabricated origin to gain the following improper legal advantages:

- Establish *priority of use* under **15 U.S.C. § 1051(b)**;

- Assert *exclusive ownership* over terms such as *Kentucky Colonel* and *Honorable Order of Kentucky Colonels*;

- Initiate *enforcement actions and threats* under the **Lanham Act**, chilling public and cultural usage.

These actions constitute a **false designation of origin** under **15 U.S.C. § 1125(a)** and form a valid basis for **cancellation of registration** under **15 U.S.C. § 1119**, as the claims made to the USPTO were based on **material misrepresentation**.

## II. The Origin of the Kentucky Colonel – May 23, 1775 and the Transylvania Convention

## A. Kentucky's First Government Was Created and Founded by "Colonels"

The legal and civic origin of the title *Kentucky Colonel* predates statehood, predates the War of 1812, and predates the Commonwealth itself. It traces to the formation of the *Transylvania Colony* in 1775, when **Colonel Richard Henderson**, president of the *Transylvania Company*, called a legislative convention of settlers at Boonesborough under what became known as the **Divine Elm**.

On **May 23, 1775**, this legislative body convened and established the first functioning government in what is now Kentucky. The **Transylvania Convention** created a representative form of governance, passed laws, organized civil authority, and established social contracts among the settlers—many of whom were styled "Colonel" by custom, community, or organizational authority. **Appendix E:** *Exhibits Kentucky's First Government in Law; Kentucky Magna Charta.* This event is not folklore, it is fact. It is

a **well-documented act of civil governance**, recognized by the **Kentucky Historical Society**, and reaffirmed in **E. Polk Johnson's 1912** account, which draws directly from the **Durrett Collection**.[2].

These early colonels were not merely militia officers—they were:

- Civil governors,
- Land commissioners,
- Community organizers, and
- Founders of American democracy west of the Appalachians.

The assembly at Boonesborough was a deliberate constitutional act, contemporaneous with similar extralegal democratic formations in Massachusetts and Virginia. This civic congress was presided over by **Col. Richard Henderson** and included **Col. Daniel Boone**, **Col. John Todd**, and other titled leaders. **Appendix E:** *Exhibit — Kentucky Magna Charta*; **Appendix A —** *History of Daviess County, Kentucky*, 1883.

The event is formally recognized by the Commonwealth of Kentucky through **Historical Marker No. 2396**, erected in 2014, which identifies the May 23, 1775 assembly as the first legislative session in Kentucky and names Henderson as its presiding officer. **Appendix E:** *Exhibit — Kentucky Epitaphs, Landmarks, and Markers*.

---

[2] The Durrett Collection, now housed in the University of Chicago Library, is a collection of miscellaneous manuscripts and codices, spanning from 1674 to 1911. Reuben Thomas Durrett (1824-1913), lawyer, manuscript and book collector, and Kentucky historian. The Durrett Miscellaneous Manuscripts and Codices constitute an extensive sampling of miscellaneous documents pertaining to the economic and social - and to a lesser degree, political -- history of the Ohio River Valley and the territory that became the state of Kentucky. The manuscript collection contains originals and copies of letters, military records, and business papers (including purchase and delivery orders, bills, and receipts). The codices collection contains diaries, journals, biographies, family histories, and early historical and ethnographic accounts, as well as a selection of military, academic, and political records.

## B. "Colonel" Meant Executive Civil Authority, Not Military Rank

In the 18th-century frontier context, the term *Colonel* was not a formal military commission as codified in later federal statutes, but a designation of *regional civil authority*. As explained by political scientist **Edward W. Bemis** in 1893:

> "The officer in charge of the county militia held the rank of Colonel. Doubtless the origin of the Kentucky Colonel." — *Local Government in the South and the Southwest*, Johns Hopkins Press, 1893. **Appendix A**

This usage emerged directly from **Virginia's county-based legal system**, which was extended into Kentucky territory as early as **1776**, when **Kentucky County** was officially recognized as a civil jurisdiction of Virginia. The term "Colonel" thus represented the apex of *county leadership*, combining executive, judicial, and military duties in a single office.

From 1775 onward, the civic leaders of Kentucky's founding settlements bore this title not as social ornamentation, but as a mark of:

- Constitutional authority,
- Legal command of militia forces,
- And responsibility for civil order and defense.

This structure would continue under Virginia law until Kentucky achieved statehood in 1792, and its civic ethos was carried forward into gubernatorial commissions of the 19th and 20th centuries.

## C. The Monument at Fort Boonesborough Confirms the Scope of the Title

The *Society of Boonesborough* erected a permanent monument in **1981** listing those present at the **Transylvania Convention**. Among them, at least **13 individuals** held the title "Colonel," including:

- Col. Richard Henderson

- Col. Daniel Boone

- Col. John Todd

- Col. Nathaniel Hart

- Col. Richard Calloway

- Col. John Logan

- Col. Thomas Slaughter

- Col. William Irvine

- Col. John Luttrell

- Col. Robert Rodes

- Col. Ezekiel Fields

- Col. Thomas Green

- Col. John Bowman

**See Exhibit Appendix E:** *Kentucky Epitaphs, Landmarks, and Markers*

These names confirm the wide public and legal usage of the title well before any modern organization claimed it. Notably, several of these individuals had **Kentucky counties named in their honor**, further cementing their foundational civic role.

## D. Continuity with Modern Colonel Commissions

The present-day gubernatorial commission of *Kentucky Colonels* derives directly from this **1775 civil model**. While modern commissions are often described as "honorary," the practice of the Governor recognizing leadership, public service, or distinction in Kentucky society reflects a continuity with 18th-century usage:

- The Governor today remains the **chief executive officer** of the Commonwealth;

- The **Kentucky Colonel Commission** remains a lawful public proclamation;

- And the title continues to serve as a symbolic bond of **public trust and civic virtue**.

The use of the word "Honorable" stems not from the HOKC, but from the **style of address** used in the **Transylvania Charter** and by colonial legislatures, as attested in *The Kentucky Magna Charta.* **See Exhibit** *— Kentucky Magna Charta.*

## E. Legal Implication: Factual Origin Invalidates HOKC Trademark Claims

Because the title *Kentucky Colonel* is grounded in a documented civic-governmental tradition:

- It is part of the **public domain**;

- It cannot be subject to **private trademark ownership**;

- And its false designation by HOKC constitutes an act of **fraudulent historical succession** and **false origin under 15 U.S.C. § 1125(a)**. **Appendix E:** *Exhibit — Myth of the Kentucky Colonel 1813 Origin.*

Any claim of proprietary rights made by HOKC over the phrase "Kentucky Colonels" is rendered legally void by the historical record. The Commonwealth, not any private association, is the lawful steward of the title.

---

## III. Other Legal Origins and Sources of the Kentucky Colonel

The origin myth created and propagated by HOKC collapses under scrutiny when examined against the full historical record of Kentucky's civic and military development. The period commonly referred to as **"Old Kentucky"** spans from **1775 to 1799**, beginning with the **Transylvania Colony**, the designation of **Kentucky County as part of Virginia (1777–1792)**, and the formative years of the **Commonwealth**

**of Kentucky under its first two governors** following statehood in 1792. The traditions, customs, and civic titles that arose during this time—including the early use of "Colonel" as a mark of leadership—are part of a rich and multi-sourced civic heritage rooted in **Revolutionary frontier governance**, not corporate mythology.

As modern historical research tools and digital archives have made clear, **additional sources and applications of the term "Kentucky Colonel" begin to emerge clearly after the close of the Old Kentucky period**, particularly from the early 19th century forward. The **earliest known descriptive use of "Kentucky Colonel" as a cultural title** appears in **1833 as an exonym**, in connection with the theatrical character **Colonel Nimrod Wildfire**. From there, the phrase is used in literary, political, social, and military contexts throughout the **19th and early 20th centuries**, culminating in the formation of the **Kentucky Colonels Association (KCA)** in **1930**—a civic group with antecedents in **Colonels' Clubs** established in **Louisville, Dallas, and Chicago**.

This history confirms that the **title "Kentucky Colonel" is not traceable to a single individual or gubernatorial act**, but rather developed over time through multiple legitimate cultural, historical, and governmental channels—**none of which originated with HOKC**.

---

# Origin 1 – Boonesborough (1775) and the Daniel Boone Commissions

## A. Founding of Boonesborough and the Kentucky Civic Identity

The most compelling and historically grounded origin of the Kentucky Colonel title lies not in 1813, but in **1775**, at the founding of **Boonesborough**—the first fortified settlement in what would become Kentucky. This event marked the beginning of **civic and military organization** in the Kentucky territory, prior to its statehood and during a moment of pre-revolutionary assertion of autonomy.

Boonesborough was established under the leadership of **Daniel Boone**, operating as a colonizing agent for the **Transylvania Company**, under the authority of **Colonel Richard Henderson**. Boone, along with other leaders, guided the construction of the fort, negotiated with Native tribes, and formed the earliest frontier governance structures in what was effectively an extralegal constitutional convention.

## B. The Transylvania Convention (May 1775)

From **May 23 to May 27, 1775**, the settlers convened the **Transylvania House of Delegates** at Boonesborough. This was a proto-legislative body comprised of elected delegates from settlements including Harrodsburg, St. Asaph, and the Boiling Spring Settlement. The records—preserved in the *Minutes of the Transylvania Convention*—list **Daniel Boone and Squire Boone** as affirmed elected delegates from Boonesborough, alongside Samuel Henderson, William Moore, and Richard Calloway.

This early act of political self-governance occurred **two months before the Declaration of Independence** was even proposed. It also coincided with and paralleled other revolutionary experiments in colonial self-rule. Crucially, the Convention authorized:

- The establishment of courts,
- The regulation of militias,
- And the enactment of civil codes to maintain order, justice, and defense.

## C. Honorific and Civic Commissions by Deed and Title

In the absence of formal military structure or colonial oversight, it was customary for civic leaders and militias to confer **symbolic ranks** in recognition of bravery, leadership, or civic contribution. These included the designation of "Colonel" in both military and honorific contexts.

Although no surviving documents name Daniel Boone or others at Boonesborough as "Kentucky Colonels" in the legalistic trademark sense used by HOKC today, the **civic function, cultural meaning, and ceremonial value of the title** were already present.

At Boonesborough, titles were conferred through public recognition of deed—**a precursor to the honorary commissions made later by Kentucky governors**. This fact aligns with current usage, in which the Governor of Kentucky still first acknowledges the deed and then confers the honorary title, prefaced by the term "Honorable."

## D. Monuments, Genealogy, and Historical Continuity

The **Fort Boonesborough Monument**, erected by descendants of the original settlers, lists many founding figures including:

- **Col. Daniel Boone,**
- **Col. Richard Calloway,**
- **Capt. James Harrod,**
- **Capt. William Bush,**
- **Major William Bushby,**
- **Col. John Bowman**,

and scores of other militia-designated leaders.

These were **actual people holding civic legal titles**, serving in civil defense and leadership of the first Kentucky settlement. The public honoring of these individuals as "Colonels," "Majors," and "Captains" was **not commercial, not trademarked, and not proprietary**—it was part of the community's political and cultural life. During this time "Colonel" was the designated head of a colony, company, or county.

## E. Rebutting the 1813 Myth by Precedent

By 1775, at least **38 years before HOKC's alleged 1813 commission of Charles S. Todd**, Kentuckians were already conferring titles of colonel, captain, and major, based on merit and necessity to designate its leaders—not ceremony. These records show:

- A functioning civil government (Transylvania Convention),

- The use of civic-military honorifics in titles,

- And public memory solidified in monuments and historical texts.

To assert that the title "Kentucky Colonel" began in 1813 is to **erase this foundational history**, and to misappropriate the cultural identity of a state that was already led and protected by colonels nearly four decades prior.

---

# Origin 2 – The First Governor of Virginia Commissioned the First Kentucky Colonels" — John Bowman (1776)

## A. Legal Recognition of Kentucky County, Virginia

In **December 1776**, the Virginia House of Delegates officially declared that the territory previously claimed by the short-lived Transylvania Colony was **null and void**, citing that the land treaty with the Cherokee Nation had no legal force under colonial or natural law. The Virginia legislature then established the area as **Kentucky County**, a geopolitical subdivision of the **Colony of Virginia**, encompassing the territory from the **Ohio River to the 36° 30′ parallel** and extending from the **Cumberland Gap westward**.

This governmental transition marked the beginning of **state-sanctioned governance** in Kentucky—first as a county, then as a district, and later as a commonwealth.

## B. Commission of Colonel John Bowman

As part of this reorganization, on **December 21, 1776**, **Governor Patrick Henry, Jr.** issued a formal military commission appointing **John Bowman** as the **Colonel of the Kentucky County Militia**. The language of the commission reads in part:

> "You are therefore, carefully and diligently to discharge the duty of Colonel of the Militia, by doing and performing all Manner of Things thereunto belonging...
> Given under my Hand & Seal, Williamsburg this 21st day of December 1776.
> **P. Henry, Jr.**"

This commission is not honorary—it was both **civic and military in authority**, issued by a governor, and represents the **earliest official record of a "Kentucky Colonel" by governmental authority**. It predates the alleged 1813 commission of Charles S. Todd by **exactly 37 years**.

Bowman's commission and duties are documented in:

- *A History of the Mississippi Valley* (Clark & Spears, 1903), which describes Bowman as "the first Kentucky colonel" and identifies his militia appointment as a matter of **national historic significance**.

- Virginia colonial records and early Kentucky legislative summaries.

- Early Kentucky military rosters and local Harrodsburg civic records.

## C. Bowman's Role in Early Kentucky Governance

Colonel **John Bowman** was more than a military figure—he was instrumental in forming the **first formal government in Kentucky**. He:

- **Attended the Transylvania Convention** at Boonesborough in 1775,

- **Oversaw the formation of the militia and courts** for Kentucky County,

- **Designated other leaders in the colonial counties** as Virginia's Colonels and Lieutenants.

- **Laid the administrative groundwork** for what would eventually become the Kentucky Commonwealth.

He also led defensive operations against Native resistance and helped secure the frontier during the American Revolution, fulfilling both the **civil and protective role** that the honorary Kentucky Colonel later came to symbolize.

## D. Why This Matters

Colonel Bowman's commission represents:

- **The first official use of the title "Colonel" connected to Kentucky by legal authority**;

- The first instance where that title carried **state-backed civic responsibility**;

- A designation by a sitting Governor (**Patrick Henry**), not by post-factum romantic storytelling.

The fact that **HOKC ignores or omits John Bowman** in favor of an unverified 1813 story about Charles S. Todd demonstrates a **willful revision of Kentucky history**. Their choice reflects a narrative designed to fabricate an origin more suitable to their 1813 brand—not one grounded in documentary fact or a lineage with any true factual or official narrative.

Bowman's commission:

- Can be cited as evidence of **first official usage** under government seal;

- Substantially weakens HOKC's claimed basis for their **trademark origin** and USPTO "first use" assertions;

- Demonstrates that the concept of a Kentucky Colonel was functional, legal, and established in **the Revolutionary era**, long before HOKC's formation or corporate existence.

---

# Origin 3 – Colonel Richard M. Johnson and the Legislative Commission (1812)

## A. Different Kind of Kentucky Colonel

Unlike the mythical 1813 gubernatorial commission often cited by the Honorable Order of Kentucky Colonels (HOKC), the title of "Colonel" as used in early Kentucky was not exclusive to governors or honorary appointments. In fact, one of the most distinguished and *formally commissioned* Kentucky Colonels in early history was **Richard Mentor Johnson**, who was **commissioned by the Kentucky Legislature**, not the Governor.

Johnson was designated as **Colonel of the Kentucky Mounted Militia** in **1812** for the purpose of raising and commanding the **First Regiment of Mounted Cavalry**, a role that required the full backing of both legislative and military authority. This was **not honorary** — it was operational, political, and historically consequential.

## B. Source Evidence from Dr. Miles Smith

According to **historian Miles Smith, Ph.D.**, who conducted an extensive doctoral dissertation on Richard M. Johnson and the rise of Western Democracy (Texas Christian University, 2013), Johnson was:

> "Commissioned by the Kentucky legislature, not the Governor, to establish and lead Kentucky's mounted forces in the early 1800s. Johnson represented the new Western democrat — a departure from the planter-class ideology of Isaac Shelby and a rival to Shelby's influence on Kentucky governance."

Smith also notes:

- Johnson's commission represented an **alternative civic path** to public military service;

- His democratic politics were **in direct tension** with elite planter interests represented by Shelby;

- And his legacy, which includes service as **Vice President of the United States**, was built not on myth, but on actual legislative action and battlefield experience.

- His presence as a historical figure **was suppressed and tainted** due to his common-law marriage with one of his slaves, Julia Chinn.

## C. Johnson's Unique Role in Early American Democracy

Johnson's legacy is unique:

- He **killed Tecumseh** at the Battle of the Thames (1813), a fact celebrated nationally, though later politically controversial;

- He **championed anti-debtor reforms**, opposing imprisonment for debt — a position that made him popular with working-class citizens;

- He maintained a **public interracial family**, acknowledging his daughters by Julia Chinn and defying the era's social norms;

- He was one of the few figures to **bridge the frontier, Congress, and the Vice Presidency**, all while holding the title of "Colonel."

His commissioning by the legislature — not the governor — proves that the **origin of the Kentucky Colonel title is pluralistic, civic, and practical**, not ceremonial or centralized.

## D. Legal Implication

This documented legislative commission undermines the HOKC's insistence on **gubernatorial exclusivity**. It proves:

- That the **title "Colonel" in Kentucky has been conferred by more than one legal authority**;

- That "Kentucky Colonel" **existed in public life, public print, and military organization long before HOKC's asserted origin date**;

- And that historical figures like Johnson **carried the title based on actual service and legislative action** — not marketing.

This further rebuts the "1813 origin narrative" claimed by HOKC and supports claims under:

- **15 U.S.C. § 1125(a)** (False designation of origin),

- **FRE 201(b)** (Judicial notice of public historical facts), and

- **15 U.S.C. § 1119** (Trademark cancellation based on material misrepresentation).

## Origin 4 – Colonel Nimrod Wildfire – The First Cultural Archetype of the "Kentucky Colonel" (1833)

### A. The First Appearance of the Phrase "Kentucky Colonel"

The **first known public appearance of the term "Kentucky Colonel" as a fully-formed phrase** occurred in **1833**, in connection with the theatrical farce *The Kentuckian; or, A Trip to New York*, performed in **London's Covent Garden Theatre**.

The main character, **Colonel Nimrod Wildfire**, portrayed by American actor **James H. Hackett**, was billed in British and American papers as "the Kentucky Colonel," described as the embodiment of frontier bravado, democratic spirit, and comic exaggeration.

*"Nimrod Wildfire… is half-horse, half-alligator, with a touch of the steamboat; the greatest man in Kaintuck."* — *Bell's London Weekly Messenger*, April 1833

This 1833 review was **reprinted in The National Gazette and Literary Register** in Philadelphia on April 20, 1833 — the **first appearance in American print** of the full phrase "Kentucky Colonel" as a distinct, symbolic identity.

### B. Wildfire's National and Transatlantic Fame

Wildfire first appeared in 1830 in the American stage play *The Lion of the West*, also played by Hackett. The character, described as "a real screamer," drew massive crowds in Boston, Philadelphia, and Washington, D.C., before gaining international fame.

By 1833, the Wildfire persona had become a recognized symbol of Kentucky itself:

- Brash but lovable,
- Larger-than-life,

- And committed to old-school honor, wit, and frontier code.

He **did not hold office, military title, or civic appointment**. His "Colonel" status was *purely symbolic* — and yet, his influence cemented the **Kentucky Colonel** identity in public imagination, both in America and abroad.

> *"I'm all brimstone but my head, and that is aqua-fortis… My father can whip any man in Kentucky, and I can whip my father."* — *Colonel Nimrod Wildfire, 1830-1833*

## C. Literary and Historical Commentary

By the 1850s, literary critics and newspaper editors were acknowledging Wildfire as the originator of the *character type* known as the "Kentucky Colonel." TIME Magazine (1954) called him:

> *"The literary prototype of the tall-talking frontiersman… the first introduction to the stage of native Western humor."*

His persona inspired imitators and paved the way for both **genuine and performative colonels** in the decades that followed — many of whom were called "Kentucky Colonel" in jest, endearment, or tribute.

Newspapers from 1835 to 1896 reference the term frequently in **non-legal, non-governmental contexts**—showing that by the late 19th century, "Kentucky Colonel" had become a **public domain cultural identity**, not a restricted legal designation.

## D. Legal Implication: The Merger Doctrine

Under **trademark law**, the **Merger Doctrine** holds that descriptive terms which become synonymous with a broader cultural or public meaning **lose their source-identifying function** and become **generic** or **incapable of trademark protection**.

The "Kentucky Colonel," as popularized through Wildfire, became **descriptive of a type of person**, not a brand.

By at least 1833, and clearly by 1850, the phrase "Kentucky Colonel" had **entered the public domain**—detached from any singular person, organization, or source.

## E. Why This Destroys the 1813 Claim

If the phrase "Kentucky Colonel" **did not even exist in print until 1833**, and its first public use referred to a fictional persona with no formal commission, then:

- HOKC's retroactive claim to an 1813 origin is **factually impossible**;

- The phrase's entry into culture **preceded any exclusive trademark claim by over 120 years**;

- And the public's familiarity with the term came from **literature, theater, and humor**, not from HOKC's lineage.

Thus, the public understanding of a Kentucky Colonel has always included **unofficial, honorary, or fictional** figures—proving that no entity can now claim exclusive historical origin or trademark priority.

---

# Origin 5 – President Lincoln's Wartime Kentucky Colonels and the Gudgel-Harlan Account (1861)

## A. The Gudgel Account: Civil War Kentucky and the Use of Symbolic Commissions

In a story reprinted in over **30 U.S. newspapers** between 1900–1902, a Civil War veteran named **William Gudgel** described how, in **1861**, then-President **Abraham Lincoln**, facing Kentucky's secessionist drift, empowered **John Marshall Harlan** to prevent the state from leaving the Union.

As reported in the *Marietta Daily Leader* and other outlets:

> "[Harlan] asked the President to give him authority to take to Kentucky a quantity of blank commissions, none of which should be above the rank of lieutenant colonel, to open an office at Louisville and to invite the leading young Democratic attorneys, physicians and clergymen of the State to call on him for consultation…"

These men were offered **commissions not for military command, but for political optics**. They were instructed to wear uniforms throughout the state — in the pulpit, courtroom, and business — thereby creating a **visible Unionist presence** that helped sway elections and solidify federal control of Kentucky.

> "There were colonels in the pulpit, colonels on the bench and colonels at the bedside of the sick… There were indeed so many colonels that the supply has lasted until the present time." — *Marietta Daily Leader*, Nov. 14, 1900

## B. Justice Harlan's Silent Validation

At the time this account circulated publicly, **John Marshall Harlan** was **a sitting Associate Justice of the U.S. Supreme Court** — and a prominent public figure known as *The Great Dissenter*. He had served in the **10th Kentucky Volunteer Infantry**, and his own biography, military service, and postwar record align with Gudgel's account.

> **Crucially, Justice Harlan never disputed or denied the Gudgel story**, despite its attribution of extraordinary wartime powers to him, including the mass-commissioning of symbolic officers.

Given Harlan's commitment to truth (evident in his jurisprudence and biography), his silence may be viewed as **tacit historical endorsement**.

The account is further bolstered by contemporaneous records of **electioneering tactics**, political uniforms, and the use of non-combatant officers to sway public opinion during the early years of the war.

## C. Legal and Cultural Significance

This origin is essential because:

- It marks the **first mass commissioning of honorary colonels** for symbolic and political purposes;

- It shows the **President and federal judiciary involved in creating a visual identity for loyalty**, not merely honor;

- It explains how the **public association of "Kentucky Colonel" with loyalty, influence, and symbolic service** began in earnest.

The Gudgel-Harlan origin also demonstrates that:

- The **title "Kentucky Colonel" had already entered wide public use by 1861**,

- It was **used by executive discretion** in furtherance of national policy,

- And it had **no connection to HOKC**, which would not exist until nearly a century later.

## D. Trademark Implications

Under **15 U.S.C. § 1125(a)**, it is unlawful to misrepresent the origin of a designation or symbol. The Gudgel-Harlan commissions:

- Predate HOKC by more than 70 years,

- Represent a **federal wartime origin story**, not a state or private one,

- And are tied to **documented national events and public officeholders**.

31

HOKC's assertion of exclusive historical origin is **flatly contradicted** by this evidence. Their trademarks, based on the 1813 myth, are not only factually incorrect but legally vulnerable to **cancellation under 15 U.S.C. § 1119** for **fraud or false origin designation**.

---

## Origin 6 – The Governor's Title – From Marse Henry to Mass Commissions (1875–1932)

### A. The McCreary Commissions and the First "Official" Honorary Colonels

By the mid-19th century, the cultural and political presence of "Kentucky Colonels" was firmly entrenched in American life — but it wasn't until the post-Reconstruction era that the title became **formally ceremonial** under the authority of the **Governor of Kentucky**. There were already hundreds of Colonels all across Kentucky who were never commissioned; most plantation owners were known as colonels throughout the 19th century.

Although **Governor James B. McCreary's 1875–1879 administration** didn't claim to create the honorary Kentucky Colonel as a title, it is during his term that the modern **pattern of civilian commissioning** began. One of the earliest, best-documented appointments was of the famed newspaper editor **Henry Watterson**, known affectionately as *Marse Henry*, though Watterson himself famously declined the title multiple times, yet used it often for the rest of his life.

Governor McCreary's commissions — including Watterson's — were notable not for military command, but for recognizing **public influence, cultural contribution, and civic prominence**.

*"As late as Governor McCreary's time his seventy aides wore dress uniforms, swords and gold braid… almost outshining the ladies in the splendor of their attire." — Courier-Journal*, 1920

## B. The Rise of the Civic Colonel

From 1875 onward, the title evolved:

- **Colonels were appointed as gubernatorial aides without strict duties**, more as ceremonial figures than operational officers while others as volunteers served as the governor's guard;

- Many received the commission **for civic reputation**, included successful businessmen, editors, clergymen, professors, lawyers, and historians;

- Their uniforms, receptions, and parade presence transformed the role into a **symbol of state pride and distinction**, not military duty.

The shift was gradual but unmistakable. According to *The Kentucky Colonel: A Study in Semantics*:

> *"During the 1830s the militia system began a fundamental change… the position of an officer on the Governor's staff shifted from military usefulness to executive ornamentation."*

By the early 20th century, the commission had become a **mark of esteem** or a **gift of diplomacy**, particularly under Governor Edwin P. Morrow in 1919–1923, who famously issued **over 50 commissions in a single week**, prompting a cultural backlash from Watterson and others who still held to the older meanings.

## C. Congressional Recognition and the Myth Solidifies (1936)

In 1936, the U.S. Congress **took note of the honorary Kentucky Colonel** in a speech by Congressman Edward W. Creal. He lamented the inconsistency in the title's legal standing but praised the century-old tradition:

> *"The title… had behind it for a hundred years a real meaning known around the world… 'as gallant, chivalrous, and hospitable as a Kentucky Colonel.'"*

Ironically, this recognition came **after** Kentucky's Attorney General had declared all recent commissions **null and void** — leading to their **reinstatement and explosion in number** under Governor Ruby Laffoon and his successors.

Laffoon and later governors commissioned thousands — including **Colonel Harland Sanders** (of KFC fame) — codifying the modern ceremonial model that the **HOKC would later claim as their proprietary heritage**, despite emerging only in **1933** and Colonel Sanders at odds with their organizational background history and their interpretation of the meaning of the Kentucky Colonelcy.

## D. Legal Relevance

This origin matters because it shows:

- **The title was always conferred by discretion, not statute**;

- It was **never consistently exclusive**, and often applied by popular usage even in the absence of a commission;

- The **honorable colonel title became public domain** long before HOKC attempted to trademark it or control it as a brand.

The record confirms:

- **Multiple sources of the title** (military, legislative, cultural, gubernatorial);

- **No single point of origin**;

- And a **long-standing public use** inconsistent with modern proprietary claims.

# Origin 7 – Land, Legacy, and the Early Kentucky Colonel: Civic Status Through Revolutionary War Bounty Land

The earliest wide-scale appearance of individuals titled as "Colonel" in what would become Kentucky can be traced not to ceremony or promotional appointment, but to **public record and civic title resulting from military land bounties** granted following the Revolutionary War.

## A. The Virginia and Federal Land Bounty Systems

Between 1782 and 1855, both the **Commonwealth of Virginia** and the **United States Congress** issued **military bounty land certificates** to veterans of the Revolutionary War. These land grants were not merely compensation for military service—they created a class of individuals **titled, recorded, and referred to as "Colonel" based on service**, many of whom became political and civic leaders in the newly settled regions of Kentucky and Ohio.

- Virginia authorized bounty land for officers in both the **Virginia State Line** and the **Virginia Continental Line**, overseen by **Principal Surveyors** including **Col. Richard Clough Anderson**, **Maj. William Croghan**, and **Gen. George Rogers Clark**.

- Land issued under these warrants was surveyed, transferred, or sold, and created a public record of titled individuals — often appearing as **"Colonel [Name]"** in local tax rolls, deeds, and correspondence.

*"The Governor's Office issued 9,926 certificates, beginning in 1782 and ending in 1876… from 100 acres for a soldier or sailor to 15,000 acres for a Major General."* — *Researching Revolutionary War Veterans that Came to Kentucky*, Kentucky Secretary of State's Office (Grimes, SoS, 2018)

---

## B. The Title of "Colonel" as a Civic Marker

While some veterans had held that rank in the Continental Army or Virginia militia, **many became titled "Colonel" only after receiving land**, building plantations, or taking up public leadership. In early Kentucky, especially from 1782 to 1820:

- The title **"Colonel" functioned as a social marker**, much like "Esquire" or "Reverend";

- Many men known publicly as "Colonels" had never received a commission from any government or military authority but were so styled because of their landowning, surveying, or civic leadership status;

- This formed the **earliest cultural image of the Kentucky Colonel**: goateed, frock coat, cultured, honorable, respected, educated, well-spoken, and often a former militia officer turned planter, legislator, or judge.

These patterns can be verified by reviewing:

- The **Revolutionary War Bounty Land Warrant Registers**,

- **Virginia Patent Series (VA), Old Kentucky Series (OK), and West Tennessee River Military Patents (WTRM)**,

- And **National Archives records** of land warrant surrenders and pension-bounty combinations held under RG 15.

*"The warrants… are in the records of the General Land Office. Many veterans did not take possession but sold [their land]."* — *Bounty Lands for Military Service, 1775–1855*, National Archives, RG 15

## C. From Landowner to Cultural Figure: The Birth of the Kentucky Colonel Archetype

It was through this network of landed veterans—many of whom were self-styled or publicly styled as "Colonels"—that the **visual and literary archetype of the "Kentucky Colonel" emerged**. Unlike in the formal military sense, the Kentucky Colonel of the late 18th and early 19th century was often:

- A **retired Captain or Major** who applied for land under enhanced brevet status,

- A **militia leader or land commissioner** respected by his community,

- And a **cultural gentleman**, wearing the Prince Albert coat, goatee, and string tie—what later came to be celebrated and satirized in mid-19th-century American literature.

This process happened **organically**, over decades, and was **not authorized or administered by any private club or nonprofit organization**.

## IV. Fraudulent Succession – Usurping the Legacy of the Kentucky Colonels Association

The Honorable Order of Kentucky Colonels, Inc. wants the public to believe that they are the same colonels that created the Kentucky Colonels Association which it does not resemble or have any relation to, it was established in 1930 when Col. Oliver Vickery, a co-founder that published the Kentucky Colonels Handbook in Louisville. **[Appendix E — Kentucky Colonels Handbook 1930]**  The Kentucky Colonels Association was based on over 1,000 members of other Kentucky Colonels Clubs that began in 1903.

## A. The HOKC Did Not Create the Kentucky Colonel Tradition

The modern organization known as the **Honorable Order of Kentucky Colonels (HOKC)** was formed in **1933**, but it did not create, invent, originate—or inherit—the tradition of any type of organized colonelcy.

That distinction belongs to the **Kentucky Colonels Association**, which published a formal **Handbook in 1930**, under the auspices of active Colonels who had been commissioned by the various Governors of Kentucky prior to Ruby Laffoon and the HOKC. This Handbook, entered into the appendix, contains:

- A full organizational structure, names and addresses of all of the association members,

- An "In Memoriam" page of members from the previous clubs,

- Public statements about the meaning of the commission,

- Description defining A Kentucky Colonel,

- Responsibilities and the principles of service,

- List of the Governors of Kentucky,

- Members of the Senate and House of Representatives in 1930,

- Pages about Sentiment, a Dedication, and Kentucky's Admirals.

This 1930 Handbook (document) is **the first known codification** of the Kentucky Colonels as a civic body—and it **predates the HOKC and its ideas by at least three years**. The Handbook is complemented by a .66 cubic foot folder of organizational documents at the Filson Historical Society Library assembled by Colonel R.H. Ziehm.[3]

---

[3] **Filson Club Historical Society, Manuscript Collection Number 365**. Kentucky Colonels. Records, 1930-1933. BH\K37. .66 cu. ft.—Honorary Kentucky organization. These records were assembled by R.H. Ziehm, secretary-treasurer during the period covered. Included is correspondence, 1930-1933; minutes and a minute book, 1931; membership lists; constitution and by-laws; receipts; sample applications; designs for uniforms and insignia; programs; and newspaper clippings. The correspondence concerns membership and related matters.

## B. The HOKC Rebranded, Usurped, and Buried the Original Group(s)

The founders of HOKC—some of whose members had previously been involved with the Association—**appropriated the concept** without continuity or succession. No charter, no merger, and no act of state government authorized the HOKC to become the official keeper of the government issued title "Kentucky Colonel."

Yet since 1941, the HOKC executives since its incorporation in 1957 claimed:

- To be founded in "1813," via a story of Governor Isaac Shelby and Col. Charles S. Todd;

- That it represents the original body of Kentucky Colonels;

- That it has exclusive rights to use the name "Kentucky Colonels" in fundraising and commercial marketing.

All of these claims are false. The HOKC **succeeded nothing**, and created nothing—it **rebranded an honorific public office** and buried the true origin of the civic organization, which lies in the **1930 Handbook, other instances of origin,** and the **Transylvania Convention of 1775**. It is not a coincidence that the Kentucky Colonels Association of 1930 held its first annual general assembly on the 156th anniversary of the Transylvania Convention on May 23, 1931 at the Brown Hotel in Louisville, following a positive meeting at the state capital in Frankfort, Kentucky with Governor Flem Sampson on May 02, 1931.

It was widespread knowledge that the Honorable Order of Kentucky Colonels (Located in New York) with an office in Lexington did not prosper long in New York until it was brought home to the "Forest" Plantation in Anchorage, Kentucky under Anna Friedman and J. Fred Miles of the Louisville Fairgrounds.

## C. The Hallmarks of Fraudulent Succession

Fraudulent succession occurs when an organization:

- Assumes the identity of a **prior civic body** without formal legal continuity,

- Erases or replaces the original group's history with a new ideal or **fabricated folklore**,

- Uses that assumed identity to control language, trademarks, and historical claims,

- Does not acknowledge the organizations and accomplishments that preceded it.

This is exactly what HOKC did. Its leadership:

- **Adopted the "Honorable Order of Kentucky Colonels" title** for its 1933 establishment as an unincorporated association in New York City under George Pettijohn,

- **Inserted the 1813 Shelby/Todd origin myth** into programs starting in 1941,

- Incorporated as a legal nonprofit organization in Kentucky in 1957,

- Filed for the trademark "Honorable Order of Kentucky Colonels" in 1981,

- Filed for the trademark "Kentucky Colonels" as an embedded mark in 2003 with a first-use date of 2002,

- **Used these fictions in USPTO filings** to claim historic priority over others including the co-existent **Chicago Kentucky Colonels Club** which held a collective membership mark (image) filed with the USPTO from 1976 thru 2008.[4]

---

[4] Chicago Kentucky Colonels Club; US Serial Number: 73083867: Application Filing Date: Apr. 14, 1976; US Registration Number:1068342; Registration Date: Jun. 21, 1977; Register: Principal: Mark Type: Collective Membership Mark; Expired: Mar. 29, 2008;

This is not confusion—it is a calculated **and sophisticated historical replacement**. It allowed HOKC to raise funds, register trademarks, gain the government's consent, and threaten others based on **a fabricated disingenuous lineage beginning in 1931, three years before it was imagined in September 1933 or had its first meeting on May 04, 1934 at the Kentucky Derby with the Governor and some of the celebrities he commissioned to bring attention to the state**. The HOKC was originated and brought together to celebrate and promote the Kentucky Derby, a festive socio-cultural event. It was not established for charitable purposes, to preserve history, continue the legacy of previous colonels, or as a quasi-governmental authority.

---

# IV. Legal Consequences: Nullifying the Trademark Chain

Because HOKC's use of the name "Kentucky Colonels" is built upon:

- A **false historical origin**,
- A **nonexistent legal succession**,
- And a deliberate effort to erase the historic **1930 Kentucky Colonels Association**,

…the organization's entire chain of trademark filings is subject to **cancellation under 15 U.S.C. § 1119**, and its representations constitute **false designation of origin under § 1125(a)**.

This is not merely a branding issue—it is the theft of a **constitutional and civic tradition**.

## Summary of Document

For over eight decades, the **Honorable Order of Kentucky Colonels (HOKC)** has publicly advanced a false origin narrative—claiming that in 1813, Governor Isaac Shelby commissioned Charles S. Todd as the first "Kentucky Colonel," thereby establishing a symbolic lineage which the HOKC now claims to

represent empowering it using pseudo history. This propaganda, formally introduced by HOKC at a Derby Eve banquet in 1941, has no basis in Kentucky's historical record and it is contradicted by Todd's own memoirs, public U.S. military records, 19th century historical works, and the documented evolution of the Kentucky Colonel title dating back to 1775.

The HOKC has used this manufactured myth "1813" as a foundation for its trademark identity, logo, and branding image asserting exclusive rights over a civic title that belongs to the people of Kentucky. In doing so, it has conflated historical honor with commercial branding, positioning itself as the sole source of legitimacy for all uses of the term "Kentucky Colonels." This misrepresentation of symbolic origin—when leveraged for trademark enforcement, donor solicitation, and market exclusivity—falls squarely within the scope of **false designation of origin** as prohibited by **15 U.S.C. § 1125(a)**.

This legal declaration, supported by publicly verifiable records, historical texts, and official publications, seeks to correct the public record and demonstrate how HOKC's continued invocation of a fabricated origin violates federal law. It also supports the necessity of **judicial notice under FRE 201(b)** and **cancellation of HOKC's trademarks under 15 U.S.C. § 1119**, due to their reliance on false and misleading historical claims used to monopolize a public and government-issued honorific.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Respectfully submitted this 27th day of May, 2025, from Puerto Carreño, Colombia.

**Col. David J. Wright**

Defendant-Appellant, Pro Se

# CERTIFICATE OF SERVICE

I hereby certify that on **May 27, 2025**, I **submitted** the foregoing Declaration of Historic Fact (with exhibits) for filing via **email** to the Clerk of the Court, in accordance with the Court's procedures for pro se litigants. Upon docketing, the Court's **CM/ECF system** will automatically serve all registered ECF users, including counsel for Appellee.

Deborah S. Hunt, Clerk                                           /s/ Col. David J. Wright
Sixth Circuit Court of Appeals                          David J. Wright, Pro-se Appellant
501 Potter Stewart U.S. Courthouse                            DATED: May 27, 2025
100 East Fifth Street
Cincinnati, Ohio 45202-3988