# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

RECEIVED
05/30/2025
KELLY L. STEPHENS, Clerk

Case Nos. 23-5795 & 23-6108

**HONORABLE ORDER OF KENTUCKY COLONELS, INC.,**
Plaintiff-Appellee,

v.

**COL. DAVID J. WRIGHT,**
Individually and on behalf of all other similarly titled individuals.
**Defendant-Appellant**

---

# MOTION AMENDMENT OF EXHIBITS EXPANDING JUDICIAL NOTICE AND RESPONSE TO APPELLEE'S MOTION TO LIMIT FILINGS

---

Pursuant to **Fed. R. Evid. 201, Fed. R. App. P. 10(e),** and **28 U.S.C. § 1654** *Col. David J. Wright*, Appellant and *Pro Se* litigant *in forma pauperis*, respectfully moves this Court to take judicial notice of adjudicative facts and to permit supplementation of the appellate record as stated in **Appellant's Motion to Take Judicial Notice [Document 44, Filed: 05/27/2025, Page: 1].** This anticipated filing incorporates a targeted rebuttal to the Plaintiff-Appellee's defamatory and procedurally defective assertions to misdirect this Court with **"Plaintiff/Appellee's Motion For An Order Requiring Pre-Approval of Further Filings" [Document 53 Filed: 05/29/2025 Page: 1]** and justifies the evidentiary record expansion requested through prior docketed motions. In reality this Motion, the Amendment, and its Exhibits best compares in the size and suggested scope of the Plaintiff's own filings from **February 20–24, 2020 [DE-1], [DE-7] and related filings**, far exceeding some 500

pages with more than thirty attached exhibits of nothing except false claims and trademark applications that the court mistook for famous and incontestable.

This "motion amendment" **completes and supports [Document 44]**, made in good-faith to comply with **Appellant's Notice Regarding Primary and Supplemental Exhibit Filing and Evidentiary Materials for Judicial Notice [Document 51]**. This amendment is to ensure full and fair review of the underlying evidence and  proceedings, which have been tainted by factual omissions, procedural suppression, and documented misrepresentations directly affecting the Appellant as a living person and public figure that have caused him the most irreparable harm and damage to his character and reputation professionally. This Amendment includes twenty (20) primary exhibits—annotations from Appendix E—to complement the May 27, 2025 filing.

## I. DUAL PURPOSE: RESPONSE AND MOTION AMENDMENT

This filing serves a dual and urgent function in the interests of justice. **First, it formally responds to the Plaintiff-Appellee's Motion to Require Pre-Approval of Further Filings [Document 53]**, which seeks to curtail Appellant's access to the Court and the appellate record. **Second, it amends and expands Appellant's prior Motion to Take Judicial Notice**, incorporating critical adjudicative facts, noteworthy historical exhibits, and clarification of the legal basis for voiding District Court orders obtained through fraudulent means.

Through this combined Motion Amendment and Response, Appellant asserts that the Plaintiff-Appellee's invocation of judicial process was not protected petitioning activity under the *Noerr-Pennington* doctrine, but rather a calculated fraud upon the tribunal designed to secure unlawful restraints on protected speech and identity. This Court must therefore reject both the procedural and substantive defenses of HOKC's actions advanced by the Plaintiff-Appellee and permit the Appellant to fully preserve, explain, and submit evidence showing that the District Court orders now under review are void *ab initio*.

This motion amendment is grounded in fundamental rights to due process and petition, reinforced by the Appellant's right to appear *pro se* under 28 U.S.C. § 1654 and to develop the appellate record under FRAP 10(e). It seeks not to burden the Court, but to prevent an injustice facilitated by longstanding historical misrepresentations which the Appellee deliberately institutionalized fiction and pseudohistory, that made it unique like a secret society with the holy grail; but not a legitimate custodian or owner of the actual culture, customs, history, heritage, legacy, or tradition that predate them in 1934 at their first meeting. Accordingly, the Appellant moves the Court to grant this motion in full and to deny the Plaintiff-Appellee's attempt to limit responsive pleadings in the face of becoming a spectacle of compelling public and legal interest.

## II. JUSTIFICATION FOR COMBINED MOTION AND RESPONSE

This filing constitutes both a **Motion Amendment of 'Exhibits'** to a previously submitted motion with filing notice and a response to **Appellee's Motion to Limit Filings [Document 53].** Such combined filings are consistent with Sixth Circuit practice where motions and responses are closely interrelated, conveniently the very exhibits the Appellee wants to suppress, and where judicial efficiency can be served. The Federal Rules of Appellate Procedure do not prohibit combining procedural motions and responsive pleadings, especially where no confusion results. Appellant clearly identifies each legal basis, addresses the factual overlap, and ensures compliance with FRAP 27 and Sixth Circuit Local Rule 27.

The nature of this appeal—a challenge to the constitutionality, factual basis, and procedural regularity of District Court orders founded on fraudulent claims—requires that Appellant be allowed to fully preserve and contextualize the historical and adjudicative record to demonstrate more than thirteen material injustices during the US District Court proceeding. Combining procedural motions with tailored responses serves the Court's interest in comprehensive, concise, and efficient case management.

# III. RESPONSE TO DOCUMENT 53 – APPELLEE'S MOTION TO LIMIT FILINGS

Appellant Col. David J. Wright respectfully opposes the **Plaintiff-Appellee's Motion to Require Pre-Approval of Further Filings [Document 53]**. This opposition is not merely procedural—it is constitutional. The Appellee's attempt to bar the Appellant from submitting further motions or notices violates the First Amendment, due process, and the right of a self-represented litigant to fully develop the appellate record under 28 U.S.C. § 1654. Courts have consistently cautioned that restrictions on filings must be narrowly tailored and must not obstruct a party's access to judicial redress (*Procup v. Strickland*, 792 F.2d 1069, 1074 (11th Cir. 1986) (en banc)).

The Plaintiff-Appellee initiated this litigation by filing a Verified Complaint premised on demonstrably false historical claims **[W.D. Ky. Case No. 3:20-cv-00132, DE 1-1, at 23–25]**, while falsely asserting that the Kentucky Colonel title originated in 1813 and fraudulently attributing to itself the identity of the pre-existing Kentucky Colonels Association in 1931. It misled the court to believe it is a membership organization when in law it is not. Having invited this controversy through its own representations to the USPTO and the federal courts, the Plaintiff-Appellee cannot now seek to gag the Appellant from introducing rebuttal evidence. As the Supreme Court has long held, "[t]ampering with the administration of justice … involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public" (*Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246 (1944)).

Rather than being vexatious, the Appellant's filings respond directly to the core issues under appeal: whether fraud upon the court occurred, whether the court was misled by the Appellee's historical narrative, whether the injunction was overbroad and unconstitutional, and whether due process was violated through judicial suppression. Courts generally disfavor motions to strike and grant them only when the material in question has no possible relation to the controversy. See *Operating Engineers Local 324 Health Care Plan v. G & W Construction Co.*, 783 F.3d 1045, 1050 (6th Cir. 2015). The volume of Appellant's submissions reflects the scope of historical fraud introduced by the Plaintiff-Appellee—not litigation abuse.

The Plaintiff-Appellee has spent eighty years embedding falsehoods into America's historical and cultural narrative, then used those falsehoods to obtain federal trademark registrations and court

injunctions to effectively create a monopoly on a title with a mythical 1813 origin. This pattern of conduct begs the question of fraud with heightened judicial scrutiny. Any judicial notice that is now being requested arises as a direct and necessary response to that fraudulent foundation that began in 1933. Appellant's actions are consistent with preserving the integrity of the record and not—as the Plaintiff-Appellee baselessly claims—an abuse of the appellate process.

---

## IV. FRAUD EXCEPTION: THE NOERR-PENNINGTON DOCTRINE

The **Plaintiff-Appellee's reliance on litigation to suppress Appellant's speech and competitive identity is not immunized** under the *Noerr-Pennington* doctrine because the litigation constitutes a calculated fraud upon the tribunal and the public. As recognized in *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49, 60–61 (1993), immunity under *Noerr-Pennington* does not extend to "sham litigation," which includes proceedings brought for the purpose of interfering with competitors through the use of the judicial process itself, rather than the outcome of that process.

In this case, the Appellee has weaponized trademark claims and judicial filings to suppress a public-domain civic title—"Kentucky Colonel"—by fabricating its historical origin and misappropriating the identity of a 1931 nonprofit fraternal association composed of colonels appointed under ten successive Kentucky governors. (See Exhibit – *Kentucky Colonels Handbook* 1930). Such conduct falls squarely within the "fraud exception" to Noerr-Pennington immunity, recognized when parties make materially false statements to governmental entities or courts with the intent to restrain lawful competition. See *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1261–63 (9th Cir. 1982).

The **Verified Complaint in W.D. Ky. Case No. 3:20-cv-00132 [DE 1-1, at 23–25]** falsely attributed the creation of the title "Kentucky Colonel" to the Plaintiff-Appellee and misrepresented corporate history to the USPTO, claiming first-use dates in 1931 based on a government record, refusing to claim or disclose concurrent users it had knowledge of, thereby securing registrations through deception. This manufactured narrative using mere trademark applications became the basis for a series of restraining orders, preliminary and permanent injunctions, and contempt proceedings, all of

which trace back to a falsified predicate. This is not mere litigation—it is institutionalized fraud masquerading as a legal claim within the USPTO.

The Sixth Circuit has previously emphasized that courts must carefully examine whether the underlying litigation is both objectively baseless and brought with an improper motive. Here, the underlying trademark assertions were not only factually false, but the litigation was timed to stifle Appellant's expressive, nonprofit use of historical terminology. Thus, *Noerr-Pennington* offers no shield for the Appellee's actions. Where the Court is "misled or deceived," the protections of petitioning immunity are forfeited (*Fraud Exception to the Noerr-Pennington Doctrine*, at 8–10).

Accordingly, the Plaintiff-Appellee cannot invoke immunity while simultaneously prosecuting a scheme premised on deceit and judicial manipulation. The fraud exception applies, and the injunctive relief obtained through that fraud must be invalidated.

---

## V. AMENDMENT FOR JUDICIAL NOTICE

**Federal Rules of Evidence 201(b)(2) and (c)** state that **judicial notice may be taken on the court's own initiative** [when it is provided with the substantial facts], but it is also **mandatory if a party requests it and provides the court with information sufficient to support the notice**. There is no procedural limitation on providing judicial notice, leave is not required. With the extensive number of Exhibits and relevant historical facts the Court may not hesitate to create its own conclusions based solely on the collective body of evidence.

### A. Facts for Amendment

Appellant also requests this Court to take judicial notice of the following facts:

1. **Appellant created the first public-facing "Kentucky Colonels" website in 1998**, which operated until 2001 and was voluntarily closed under threat of legal action from Wyatt, Tarrant & Combs LLP on behalf of the Appellee.

2. **From 2007 to 2019, Appellant maintained online community forums and developed the unincorporated civil association "Kentucky Colonels International,"** involving participation from HOKC members, board members, and affiliates.

3. **In 2017 and 2019, HOKC Executive Director Col. Sherry Crose communicated directly with Appellant** to express interest in cooperative projects including the Kentucky Colonel Registry with Kentucky Colonels International.

4. **On January 13, 2020, Appellant submitted a merger proposal and draft agreement** under a Confidentiality Agreement signed by Col. Crose.

5. On **February 17, 2020, HOKC filed new trademark applications falsely claiming first-use dates (1931, 1951)** inconsistent with prior federal filings and binding court litigated trademark precedent.

6. On February 20, 2020, **HOKC filed suit via Wyatt, Tarrant & Combs LLP without disclosing prior contact or Mr. Theodore Myre's dual role** as HOKC board member and law partner.

7. From February 20, 2020, **HOKC engaged a news and media campaign among Kentucky News contacts and sources followed by email to 30,000 or more Kentucky colonels** it relies on for support to intentionally defame, and isolate a 23 year honorary member.

8. On January 11, 2025, the **Honorable Order of Kentucky Colonels (HOKC), through its legal counsel, invoked language from the Memorandum Opinion and Order [DE-129]—the subject of appeal in Case No. 23-5795—to initiate enforcement actions on the Facebook platform that resulted in the takedown of Appellant's social media presence and intellectual property.** This action led to the removal of at least three Facebook groups and five pages, the suspension of Appellant's personal Facebook profile, and the disabling of his access to more than six affiliated business initiatives. These actions also disrupted his ability to manage 'Globcal International,' a principal endeavor he founded in 2009, which is natively structured on the Facebook platform and comprises more than fifty active assets under his administration.

These facts are capable of accurate and ready determination through documentation and platform records, and is directly relevant to demonstrating specific, reputational, and economic harm caused by the contested order, they are supported by official court filings **([DE 169], [DE-170], [DE-171], [DE 176])**, public USPTO records, email communications, and contemporaneous media releases—all of which are subject to verification from public or judicially noticeable sources.

## B. Compliance Exhibits

On May 27, 2025 in addition to the **"Motion to Take Judicial Notice of Adjudicative Facts and Correct the Record" [Document 44]** the **Appellant filed "Notice Regarding Primary and Supplemental Exhibit Filing and Evidentiary Materials for Judicial Notice" [Document 51]**, therefore in compliance the following list with annotations under FRE 1006 represent the "Twenty Primary Exhibits", roughly 20% of the over 100 Exhibits subject to judicial notice filed herewith; further referenced in **Appendix E – Section VI (A) Judicial Notice Exhibits Submitted to the Court** unnumbered and unlettered, by title (2001 Public Notice – US Congress).

1. **2001 Public Notice to Members Following Contact from Wyatt, Tarrant & Combs:** This exhibit is a notice **published in 2001 by Col. David J. Wright** on the original **"First Website for Kentucky Colonels" (Colonel.org)**. The notice was posted after a cease-and-desist letter from Wyatt, Tarrant & Combs LLP, representing the Honorable Order of Kentucky Colonels (HOKC). The letter instructed Wright to discontinue certain aspects of his online Kentucky Colonels recognition business. (**This exhibit combined with Supplemental Exhibit – 2014-2015 Email Reply from Defendant to Matt Williams**–see **Appendix E [Document: 50 Filed: 05/27/2025 Page: 14]**–demonstrates a failure to disclose acquiescence and lack of candor with the court as the prosecuting law firm.)

2. **Adlai E. Stevenson, Something of Men I Have Known:** This exhibit features two chapters from a memoir by Adlai E. Stevenson, the 23rd Vice President of the United States under President Grover Cleveland. The chapters provide anecdotal accounts of the Kentucky Colonel title in the 19th century, predating the creation, idea and rise of the Honorable Order of Kentucky Colonels (HOKC) under Gov. Ruby Laffoon.

3. **Ambiguous Influence of the Honorable Order of Kentucky Colonels:** This exhibit documents the historical divergence between the traditional use of the Kentucky Colonel title and the narrative promoted by the Honorable Order of Kentucky Colonels (HOKC) following its formation. It argues that HOKC reinterpreted the title within a framework of private association, spectacle, and philanthropy, rather than continuing earlier traditions.

4. **Colonel Nimrod Wildfire: The Original Literary Archetype of the Kentucky Colonel:** This exhibit discusses the earliest known published instance of the phrase "Kentucky Colonel," which appeared in 1833 in connection with a play titled *The Lion of the West* (retitled *The Kentuckian* for British audiences). The play featured the character Colonel Nimrod Wildfire, a caricature of the American frontier spirit.

5. **Fraudulent Succession of 1931 First-Use:** This exhibit argues that the Honorable Order of Kentucky Colonels (HOKC) misappropriated minutes from the Kentucky Colonels Association (est. 1930). It claims that the HOKC presented these "1931 Minutes" as their own in legal proceedings to assert rights to the name "Kentucky Colonels," despite evidence that the two organizations were separate entities.

6. **Governor W. O. Bradley 1897 Photo:** This exhibit is a photograph of Kentucky Governor William O. Bradley and his staff of Kentucky Colonels, taken in 1897. It is presented as evidence that the Kentucky Colonel title was an official gubernatorial designation before the creation of the Honorable Order of Kentucky Colonels (HOKC) in 1933.

7. **Historical Markers at Boonesborough:** This exhibit contains photos and text from historical markers and a monument at or near Fort Boonesborough State Park in Kentucky. These markers confirm the early legislative governance of Kentucky and the use of the title "Colonel" as a civic leadership designation.

8. **HOKC Disambiguation:** This exhibit shows that the Honorable Order of Kentucky Colonels (HOKC) has created ambiguity around the source of the Kentucky Colonel title by negating other sources and promoting itself as the origin. It presents newspaper articles as evidence that the HOKC was officially established in September 1933, and that the phrase "Honorable Order of Kentucky Colonels" is in the public domain.

9. **Honorable Order of the Blue Goose Photo:** This exhibit is a historical photograph of the Kentucky Colonel Initiation Team of the Honorable Order of the Blue Goose International (HOBGI) from 1939. It suggests that the use of "Kentucky Colonel" in a formal, fraternal setting predates the Plaintiff's incorporation and that the HOKC name may have been influenced by pre-existing organizations like the HOBGI.

10. **Internet, Libraries, and Newspapers:** This exhibit contains selected resources from newspapers, intended to provide evidence of the existence of Kentucky Colonels in American history, independent of the Appellee.

11. **Kentucky Colonel—New Vintage © 1969:** This exhibit is a narrative portrait by Kentucky historian J. Winston Coleman Jr., describing the "Kentucky Colonel" archetype in the early 1940s. Coleman contrasts the mythical, theatrical version of the Colonel with a real-life embodiment of rural intelligence, agrarian independence, and cultural refinement. The exhibit emphasizes the Colonel's role as a land steward, scholar, and advocate for leisure, learning, and civic companionship.

12. **Kentucky Colonels Handbook © 1930:** This handbook provides a detailed account of the traditions, responsibilities, and historical recognition of Kentucky Colonels. It serves as evidence that the terms "Kentucky Colonel" and "Kentucky Colonels" were widely known and publicly recognized before the Honorable Order of Kentucky Colonels (HOKC) was founded. Some, but very few of the people named in the handbook are known or ever recognized within the HOKC in any significant way.

13. **Kentucky Colonels Newspaper Clippings:** This exhibit contains 50 historical newspaper articles from a collection of over 500, demonstrating the cultural, civic, and governmental use of the title "Kentucky Colonel" from 1872 to 1957. These clippings establish that the term was widely recognized as a public honor conferred by Kentucky governors long before the emergence of the HOKC.

14. **Kentucky Epitaphs, Landmarks, and Markers:** This exhibit highlights the use of the title "Colonel" on Kentucky roadside markers and historical monuments. It notes that a significant percentage of these markers use the term "Colonel" or "Col.". Examples of individuals commemorated include Col. Benjamin Logan, Col. Richard Henderson, and Col. Daniel Boone. Approximately 11.4% of these markers use the title, indicating its historical significance. The exhibit scratches the surface on Kentucky epitaphs which recognize individuals that were Kentucky Colonels.

15. **Kentucky Progress Commission:** This exhibit is a summary of the Kentucky Progress Commission Magazine series (1928-1936). The magazine, published by a state development agency, featured stories and photographs related to Kentucky's history and culture, often referencing Kentucky Colonels.

16. **Legal Analysis of HOKC Trademarks:** This exhibit provides a legal analysis of the trademark filings by the Honorable Order of Kentucky Colonels (HOKC). It argues that

HOKC attempted to monopolize the term "Kentucky Colonels" through improper legal tactics and that the term is inherently descriptive and not within the public domain.

17. **Myth of the Kentucky Colonel 1813 Origin:** This exhibit consists of communications by the Honorable Order of Kentucky Colonels (HOKC) from 1941 through 1985, focusing on the 1813 origin narrative. It includes the 1941 Derby Eve Dinner Program, which is the earliest known source of the claim that the Kentucky Colonel title originated in 1813. The exhibit also contains a 1975 HOKC member letter, a 1976 newspaper article, and other communications promoting the 1813 origin story.

18. **Notable and Prominent Kentucky Colonels:** This exhibit identifies historical individuals who were known or recognized as "Colonel" in Kentucky from 1775 through 1929+. It emphasizes that these individuals held the title as a mark of leadership, civic standing, or honorary distinction, independently of the HOKC.

19. **The Kentucky Colonel, A Study in Semantics:** This exhibit analyzes two sources from 1947 that address the historical and semantic meaning of the Kentucky Colonel. It discusses the lack of a formal definition for the title and its evolution from colonial militia customs.

20. **US Congress 1936 Recognition:** This exhibit is a Congressional Record from April 2, 1936, where Congressman Edward Wester Creal formally recognized the Kentucky Colonel title. Creal discussed the historical significance of the title, linking it to military and civic contributions. He acknowledged the controversy surrounding the overuse of the title and defended its importance to Kentucky's heritage.

## C. Overview of Appendix E: Evidentiary Record Supporting Fraud, Genericness, Descriptiveness, and Extensive Historical Use

Appellant respectfully directs the Court's attention to **Appendix E** – Section VI (B) Supplemental Exhibits for the Sixth Circuit Court **[Document 50 Filed: 05/27/2025 Page: 11]** and Section VI (C) Exculpatory Evidence Exhibits of the Appellant **[Document 50 Filed: 05/27/2025 Page: 18] which consolidates over eighty primary exhibits establishing the historical, legal, and constitutional basis** for this appeal. Appendix E *is not a mere attachment*—it is an integrated evidentiary matrix that documents the Plaintiff-Appellee's historical misrepresentations, improper trademark assertions, and constitutional violations, and it merits judicial consideration under Federal Rule of Evidence 201 and 1006. The Appendix demonstrates through public records, academic literature, USPTO filings,

historical documents, and government archives that the Plaintiff-Appellee's claims are rooted in a sophisticated manufactured origin story that has been institutionally entrenched through the USPTO and the US Courts that is unsupported by objective fact or public record. **Appendix E is linked to over 25,000 pages of online text at the Library of Congress and Archive.org**.

**Appendix E** includes verified materials such as the 1981 Metry USPTO Application, the Plaintiff's 2020 trademark filings, early 20th-century literature and commentary on the Kentucky Colonel identity, 1836 international news coverage from Ireland of Kentucky Colonels as a class of people, and communications with the Plaintiff-Appellee itself. Together, these documents reveal a consistent pattern: the Plaintiff-Appellee built its identity and commercial strategy on the appropriation and institutional distortion of a public honorific title. The evidence collectively undermines the asserted distinctiveness and goodwill claimed in Plaintiff's trademark litigation and shows that "Kentucky Colonel" has always been a public, state-issued, non-commercial civic designation. Moreover, they illustrate Appellant's longstanding fair use and expressive engagement with this identity well before the Plaintiff's recent enforcement actions.

Appellant has made the full original versions of these exhibits publicly accessible via authenticated public source links, as indexed and summarized in Appendix E. This complies with the procedural requirements of FRE 1006 and allows the Court and opposing party to independently verify the evidence. Appendix E should be reviewed as a foundational record for judicial notice and a basis for assessing the underlying fraud that taints every order issued against Appellant by the District Court.

## D. Supplemental Judicial Commentary Exhibits

Appellant hereby incorporates **Exhibit – Supplemental Judicial Commentary 1** and **Supplemental Judicial Commentary 2** into this **Motion Supplement** pursuant to Federal Rules of Evidence 1006 and 901. These documents provide detailed analytical comparisons of primary and secondary sources—literary, historical, and scholarly—demonstrating how the Plaintiff-Appellee's narrative has

systematically distorted public understanding of the term "Kentucky Colonel." These exhibits offer a clear basis for judicial notice and are submitted as evidentiary supplements in support of Appellant's argument that the Plaintiff-Appellee's claims rest upon a constructed historical falsehood designed to monopolize a public-domain identity. As such, they are not only relevant but necessary to provide the Court with a full, accurate, authentic, and truthful understanding of the foundational historical record central to this appeal.

## VI. RECORD SUPPLEMENTATION UNDER RULE 10(e)

In light of recent district court rulings **[DE 182, DE 183]** that refused to consider this evidence, Appellant moves under **Fed. R. App. P. 10(e)** to expand the appellate record to include:

- DE 169 – Notice of Intent to File Rule 11 Sanctions
- DE 170 – Motion to Recuse with Supporting Declaration (Exhibits)
- DE 171 – Motion for Judicial Notice (Exhibits)
- DE 176 – Motion for Rule 11 Sanctions (Exhibits)
- DE 181 – Amended Objection to Return of TRO Bond
- **Document 36 – Notice of Judicial Suppression (filed in this Court)**

These documents "exemplary filings" collectively demonstrate suppression of exculpatory and adjudicative facts, fraud upon the court, and factual misstatements central to the case's disposition. Their inclusion is essential for this Court to assess the full procedural and evidentiary record including any evidence that was judicially entrenched in *The Honorable Order of Kentucky Colonels, Inc v. Building Champions, LLC* (3:04-cv-00465) in 2004, consistent with its supervisory obligations. The Appellant requests that the Court review the docket beginning here **[KYWD 3:04-cv 465-JGH Document 1 Filed 08/12/04 Page 1 of 10 PageID #: 1]**, prior to reviewing the Opinion by Judge Heyburn in *Honorable Order of Kentucky Colonels v. Building Champions,* 345 F. Supp. 2d 716.

## VII. LEGAL BASIS AND JUSTIFICATION

A corporation that uses a historical first-use date of 1931 and a false origin narrative in 1813 to mislead the government or gain an unfair position in the marketplace shall be held accountable for its actions historically; all the contrary facts must be examined. This motion is further supported by:

- *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944) – Courts must address fraud upon the judiciary even post-judgment.

- *Demjanjuk v. Petrovsky,* 10 F.3d 338 (6th Cir. 1993) – Structural misrepresentation and concealment warrant post-[judgment] relief.

- **Fed. R. Evid. 201(b)** – Judicial notice is appropriate where facts are capable of accurate and ready determination.

- **Fed. R. App. P. 10(e)(2)(B)** – Record supplementation is warranted where a material omission occurred "by error or accident."

---

## IV. PRAYER FOR RELIEF

Appellant respectfully requests that this Honorable Court:

1. **Take Judicial Notice** of the adjudicative facts set forth in this motion in consideration of the type and nature of personal injury sustained by the Appellant together with **[Document: 44, Filed: 05/27/2025, Page: 1]**.

2. **Expand the Record** under Fed. R. App. P. 10(e) to include all of the referenced materials.

3. **Grant Appellant Leave** to file additional motions factual exhibits rebutting HOKC's origin, cancel fraudulent trademark claims, and bring a Motion for a Circuit Court Mediated Settlement Conference as requested in **Appellant's Motion for Leave [Document: 37 Filed: 05/05/2025 Page: 1].**

4. **Accept this Motion Amendment** as a combined motion and in response to its limitation, properly filed under FRAP 27 and Sixth Circuit procedures;

5. **Deny Plaintiff-Appellee's Motion to Limit Filings** [Document 53]; and

6. **Recognize Appellee's litigation conduct falls within the fraud exception to the** *Noerr-Pennington* **doctrine**, thereby invalidating any judicial protection or presumption of regularity accorded to its trademark-based claims.

7. **Issue Any Further Orders** as remedies as may be necessary to ensure full and fair appellate review in light of record suppression, fraud, and procedural irregularities.

Appellant reserves the right to supplement this record with any exhibits or memoranda specifically requested by the Court, or as may be necessary by the Appellant to clarify his position as the victim of bad-faith litigation and correct the record, he submits that all filings are made in good faith, in furtherance of accurate adjudication, and in accordance with all governing rules and precedents.

Respectfully submitted this 30th day of May, 2025,

Puerto Carreño, Colombia.

*Col. David J. Wright*

**Col. David J. Wright**

Defendant-Appellant, Pro Se

## CERTIFICATE OF SERVICE

I hereby certify that on **May 30, 2025**, I **submitted** the foregoing "Motion Amendment" with "20 Exhibits" and "Response to Appellee's Motion Document 53" for filing via **email** to the Clerk of the Court, in accordance with the Court's procedures for pro se litigants. Upon docketing, the Court's **CM/ECF system** will automatically serve all registered ECF users, including counsel for Appellee.

| | |
|---|---|
| Deborah S. Hunt, Clerk | /s/ Col. David J. Wright |
| Sixth Circuit Court of Appeals | David J. Wright, Pro-se Appellant |
| 501 Potter Stewart U.S. Courthouse | DATED: May 30, 2025 |
| 100 East Fifth Street | |
| Cincinnati, Ohio 45202-3988 | |