# Exhibit — Adlai E. Stevenson, Something of Men I Have Known, A Kentucky Colonel in Personal Memory

**Author**: Hon. Adlai E. Stevenson (1835–1914)

**Source**: *Something of Men I Have Known*, McClure Company, 1909

**Chapters**: XIV — "A Kentucky Colonel" and XXX — "The Colonels"

**RECEIVED**
05/30/2025
KELLY L. STEPHENS, Clerk

## Exhibit Summary and Descriptive Authority

This exhibit features two anecdotal yet historically rich memoir chapters by **Adlai E. Stevenson**, who served as **23rd Vice President of the United States under President Grover Cleveland (1893–1897)**. A respected legal mind, statesman, and native of Kentucky, Stevenson's reflections predate the rise of the Honorable Order of Kentucky Colonels (HOKC) and offer a **firsthand, unembellished account** of the Kentucky Colonel as he existed in the political and cultural landscape of the 19th century.

## Chapter XIV – "A Kentucky Colonel"

This chapter provides an affectionate portrait of **Col. Dick Wintersmith**, a towering civic figure in Frankfort and Washington. Stevenson writes not of a ceremonial or honorary title, but of a **man known universally as "the Colonel" by virtue of public service, rhetorical talent, and moral character**. Wintersmith is revealed as a living emblem of Kentucky's civil tradition—generous, humorous, and steeped in the memory of Henry Clay, with whom he served.

Highlights include:

- His decades-long service as **State Treasurer without partisan appointment**.

- A humorous philosophical exchange with Congressman Ignatius Donnelly that exemplifies both wit and reverence for intellectual tradition.

- A recollection of Kentucky public figures and orators, anchoring the Colonel in a **deep network of civic leadership and oral culture**.

## Chapter XXX – "The Colonels"

Here, Stevenson expands his reflections to the **regional phenomenon of the title "Colonel"** as it existed across the South. He recounts a social gathering of Southern lawyers—several of them "Colonels"—marked by **hospitality, legal camaraderie, and storytelling**.

Notably, he contrasts the **cultural honorific** with dry administrative formality, recalling a satirical tale of a snake-bitten traveler in dry Maine who is denied alcohol for want of a prescription—highlighting the contrast between **regulatory bureaucracies and the informality of Southern traditions**.

## Legal and Historical Relevance

This exhibit provides an **unbroken literary record of Kentucky Colonelcy prior to 1909**, grounded in personal memory, not state commissions. Its legal significance lies in the following:

1. **Independent Verification**: It evidences the use and public recognition of the title *"Colonel"* wholly separate from any formal commission process or institutional license.

2. **Pre-HOKC Usage**: The work was published nearly **25 years before the HOKC was founded (1933)**, affirming that the Kentucky Colonel was already a known **archetype of public virtue and communal honor**.

3. **Semantic Distinction**: The Colonel in Stevenson's memoir is not military nor ornamental—but social, rhetorical, and civic in essence. This supports the claim that the title's meaning was **anchored in tradition and reputation**, not in statutory appointment or trademark registration.

As such, this document qualifies for:

- **Judicial notice under FRE 201(b)(2)** as historical fact available from credible and widely accepted sources.

- **Summary submission under FRE 1006** as it condenses and exemplifies a larger class of literary and autobiographical testimony concerning the Kentucky Colonel.

## XIV

## A KENTUCKY COLONEL

COL. WINTERSMITH'S GREAT POPULARITY — HIS ADMIRATION FOR MR. CLAY — HIS MARVELLOUS MEMORY — HIS WIT AND HUMOR.

FEW men were better known in Washington, a quarter of a century and more ago, than Colonel Dick Wintersmith of Kentucky. He had creditably filled important positions of public trust in his native State. His integrity was beyond question, and his popularity knew no bounds. Without the formality of party nomination, and with hardly the shadow of opposition at the polls, he had held the office of State Treasurer for nearly a score of years. An ardent Whig in early life, he was a devout worshipper at the shrine of Henry Clay. In the later years of his life, he would often with the deepest emotion refer to himself as "the last of the old guard." He never tired of relating interesting incidents of Mr. Clay. It was his glory that he had accompanied "the great pacificator" to Washington, when, with the fond hope of being able by his historic "compromise" to pour oil on the troubled waters, he returned to the Senate for the last time.

Wintersmith was the close friend of Theodore O'Hara, and stood beside him when at the unveiling of the monument to the Kentuckians who had fallen at Buena Vista he pronounced his now historic lines beginning —

> "On fame's eternal camping-ground
> Their silent tents are spread."

Colonel Wintersmith knew, as he knew his children, two generations of the public men of Kentucky. His memory was a marvel to all who knew him. He could repeat till the dawn, extracts from famous speeches he had heard from the lips of Clay, Grundy, Marshall, and Menifee. More than once, I have heard him declaim the wonderful speech of Sargent S. Prentiss delivered almost a half-century before, in the old

Harrodsburg Court-house, in defence of Wilkinson for killing three men at the Galt House.

It is hardly necessary to say that the Colonel was the soul of generosity. It was a part of his living faith that —

"Kind hearts are more than coronets."

That he was possessed in no stinted measure of wit and its kindred quality, humor, will appear from an incident or two to be related.

The Hon. Ignatius Donnelly, member of Congress from Minnesota, had written a book to prove that Lord Bacon was the veritable author of the plays usually accredited to Shakespeare. Soon after the appearance of Donnelly's book, he met Colonel Wintersmith on Pennsylvania Avenue.

After a cordial greeting, the Colonel remarked, "I have been reading your book, Donnelly, and I don't believe a word of it."

"What?" inquired Donnelly, with great surprise.

"Oh, that book of yours," said the Colonel, " in which you tried to prove that Shakespeare never wrote 'Hamlet' and 'Macbeth' and 'Lear' and all those other plays."

"My dear sir," replied Donnelly with great earnestness, " I can prove beyond all peradventure that Shakespeare never wrote those plays."

"He did," replied Wintersmith, "he did write them, Donnelly, *I saw him write three or four of them, myself.*"

"Impossible!" exclaimed Donnelly, who was as guiltless of anything that savored of humor as the monument recently erected to the memory of Hon. John Sherman, " impossible, Colonel, that you could have seen Shakespeare write those plays; they were written three hundred years ago."

"Three hundred years, three hundred years," slowly murmured the Colonel in pathetic tone, " is it possible that it has been so long? *Lord, how time does fly!*"

The Colonel often told the following with a gravity that gave it at least the semblance of truth. Many years ago, his State was represented in part in the Upper House by a statesman who rarely, when in good form, spoke less than

an entire day. His speeches, in large measure, usually consisted of dull financial details, statistics, etc. He became in time the terror of his associates, and the nightmare of visitors in the galleries. His "Mr. President," was usually the signal for a general clearing out of both Senate Chamber and galleries.

"Upon one occasion," said Colonel Dick, "I was seated in the last tier in the public gallery, when my Senator with books and documents piled high about him solemnly addressed the Chair. As was the wont, the visitors in the gallery as one man arose to make their exit. With a revolver in each hand, I promptly planted myself in front of the door, and in no uncertain tone ordered the crowd to resume their seats, and remain quietly until the Senator from Kentucky had concluded his remarks. They did so and no word of complaint reached my ears. Hour after hour during the long summer day the speech drew itself along. At length as the shadows were lengthening and the crickets began to chirp, the speech ended and the Senator took his seat. I promptly replaced my pistols and motioned the visitors to move out. They did so on excellent time. As the last man was passing out, he quietly remarked to me, "Mister, that was all right, no fault to find, but *if it was to do over again, you might shoot.*"

# XXX

## THE COLONELS

A CONVIVIAL MEETING OF LAWYERS — HILARITY SMOTHERED BY THE MAINE LAW — A FAINTING WAYFARER IS REFUSED A DRINK IN A MAINE VILLAGE — THE APOTHECARY DEMANDS A PHYSICIAN'S PRESCRIPTION — SNAKE-BITES IN GREAT DEMAND.

SOME years ago, I spent a few weeks of inclement winter in a beautiful village in southern Georgia. Upon calling at his office to renew my acquaintance with a well-known lawyer, he soon invited in the remaining members of the local bar. Everything was propitious, and the conversation never for a moment flagged, many experiences of the legal practitioners of the South and of the North being related with happy effect.

I at length remarked that since my arrival, I had, somewhat to my surprise, learned that "local option" had been adopted in their county. An aged brother, in a tone by no means exultant, assured me that such was the fact. I then observed that I was not a hard drinker, but being a total stranger and liable to sudden sickness, I asked what I would do under such circumstances.

An equally venerable brother, who bore the unique title of "Colonel," slowly responded, "Have to do without, sir; *have to do without;* not a drop to be had in the county, absolutely not a drop, sir."

The brief silence which followed this announcement was broken by the corroborative testimony of a more youthful associate of similar official distinction, and a genial and hospitable expression of countenance, somehow suggesting memories of old cognac.

"Yes, sir, the use of spirituous liquors is now only a tradition with us; but I have heard my father say, that

Case: 23-5795   Document: 63   Filed: 05/30/2025   Page: 7

before the war, the indulgence in such hospitality was not uncommon among gentlemen."

At the conclusion of still further cumulative testimony of the same tenor, I remarked that something about the general situation reminded me of an incident that occurred in a State far to the north while the "Maine Law" was in operation.

A dilapidated-looking pedestrian, with a pack on his back, early one afternoon of a hot July day pulled up in front of the post-office in a small village in the interior of Maine. Humbly addressing a citizen who was just coming out with his copy of the *Weekly Tribune* in hand, he inquired,

"Where can I get a drink?"

"The Maine Law is in force," was the reply, "and it is impossible for you to get a drink in the State."

The heart of the wayfarer sank within him.

"Would you let a man die right here on your streets, for lack of a drink?"

The "better angel" of the citizen being touched thereat, he replied,

"My friend, I am very sorry for you, but no liquor is ever sold here, except by the apothecary, and then only as a medicine."

Upon further inquiry, the important fact was disclosed that the shop of the apothecary was three-quarters of a mile away, on the left-hand side of the road. With an alacrity indicating something of hope, the pedestrian immediately gathered up his pack, and through the dust and heat at length reached the designated place. Sinking apparently exhausted upon the door-step, he feebly requested the man behind the counter to let him have something to drink. The immediate reply of the apothecary was that the Maine Law was in force, and no spirituous liquors could be sold except upon the prescription of a physician. After earnest inquiry, it was ascertained that the nearest doctor's office was one mile away, and the man with the pack again betook himself to the weary highway. Returning an hour later, in tone more pitiful that before, he begged the apothecary, as he

hoped for mercy himself, to let him have a drink. Upon inquiry as to whether he had procured the required certificate, he said, "No, the doctor wouldn't give me any."

The assurance of the apothecary that the case appeared hopeless only added to the distress of the poor man, whose sands seemed now indeed to be running low.

Stirred to the depths by the agony of his visitor, the apothecary at length said,

"My friend, I would be glad to help you, but it is impossible for me to let you have a drink of spirituous liquor unless you have a doctor's certificate *or have been snake-bit*."

At the last-mentioned suggestion, the face of the man of repeated disappointments measurably brightened, and he eagerly inquired where he could find a snake. The now sympathetic man of bottles told him to follow the main road three miles to the forks, and then a few hundred yards to the west, and he would find a small grove of decayed trees, where there still lingered a few snakes, and by the exercise of a reasonable degree of diligence he might manage *to get bit*, and thereby lay the foundation for the desired relief. With bundle again in place, and evincing a buoyancy of manner to which he had been a stranger for many hours, the traveller resumed the quest.

Hours later, when the shadows had lengthened, and the fire-flies were glistening in the distance,

> "With a look so piteous in purport,
> As if he had been loosed out of hell
> To speak of horrors,"

he reëntered the apothecary's shop, threw down his bundle, and in tones suggestive of the agony of lost souls, again begged for a drink.

"Did you get snake-bit?" was the feeling inquiry of the man at the helm.

"No," was the heart-rending reply, "*every snake I met had engagements six months ahead, for all the bites he could furnish!*"