RECEIVED
05/30/2025
KELLY L. STEPHENS, Clerk

# Exhibit — The Ambiguous Influence of the Honorable Order of Kentucky Colonels on the Title and Its Meaning

*Submitted as evidence of material divergence from historical tradition and public customs in the traditional use of the Kentucky Colonel title resulting in its dilution.*

**Submitted in support of Appellant's request for judicial notice under FRE 201(b) and in accordance with FRE 902 and 1006**, this exhibit documents the emergence, narrative transformation, and commercial repositioning of the honorable title *"Kentucky Colonel"* following the formation of the Honorable Order of Kentucky Colonels ("HOKC") between 1933 until 1957. Drawing from **verifiable newspaper archives, corporate bulletins, published books, and official government records**, this document presents evidence of a **historical divergence** between the pre-existing public traditions that were commonplace surrounding the Kentucky Colonel title and the **proprietary narrative** advanced by HOKC in the decades following its emergence.

HOKC was founded as an unincorporated association during the Great Depression, **decades after the Kentucky Colonel identity had already been cultivated through civic, fraternal, and social traditions**. Rather than continuing these traditions, HOKC reinterpreted the title within a framework of private association, spectacle, and later, philanthropic branding. Through **selective narrative construction**, the organization introduced an *origin myth unsupported by public records*, obscured or disregarded civic uses of the title that predated it, and eventually **asserted exclusive legal control** over the phrase *"Kentucky Colonels"* via trademark.

This transformation is historically traceable. A **1953 article** reprinted by the Dayton Power and Light Company in the *Edison Electric Institute Bulletin* reported that the role and origin of the HOKC was already *"confusing and uncertain to many people,"* and acknowledged **contradictory conceptions** of its legitimacy and historical foundation. That article is among the earliest documentary acknowledgments of the public's struggle to distinguish the honorary gubernatorial title from the claims made by a private, self-branded organization.

The compiled sources demonstrate that HOKC **neither inherited nor preserved** the earlier **customs, uniforms, ceremonial rites, or civic functions** associated with pre-1933 Kentucky Colonel clubs and appointments. Rather, HOKC **reshaped the title as a proprietary brand**. Initially characterized by **elite**

**social functions** and later repositioned as a **charitable institution**, the organization's self-promotional history reflects an **intentional divergence** from earlier public meanings of the title. This narrative, having gained legal recognition through **federal trademark registrations**, now displaces the **cultural and historical realities** that defined the Kentucky Colonel as a **public, honorific identity issued by governors on behalf of the Commonwealth**.

**FRE 201(b)** authorizes judicial notice of facts that are *not subject to reasonable dispute* because they are either *generally known* or can be *accurately and readily determined* from sources whose accuracy cannot reasonably be questioned. This exhibit meets those standards. Each item in this compilation is drawn from **authenticated newspaper archives, corporate publications, or official public records**, and each is cited for inspection. Additionally, the **summary format adheres to FRE 1006**, as the number of original articles and historical records exceeds 500 pages. The **authenticity of each source is also verified under FRE 902(6)**, as they are official publications or certified historical reproductions.

# I. Early Public Recognition of the Ambiguity Surrounding the HOKC

As illustrated by *The Edison Electric Institute Bulletin*, July 1953, Volume 21, Issue 7, not all members of the public or corporate community accepted the self-fashioned narrative promoted by the *Honorable Order of Kentucky Colonels* (HOKC). The HOKC's version of history, which sought to project an unbroken lineage from 1813 to its own creation in 1933, defied readily verifiable facts. Some, including organizations such as *The Dayton Power and Light Company*, took steps to investigate the historical record independently, consulting Kentucky state archives and public sources. Their findings, as discussed in the reprinted notice that follows, highlight widespread public uncertainty and confusion concerning the HOKC's origins and legitimacy—contradicting its claims of authoritative succession.

Whether the HOKC consciously used ambiguation to take advantage of the state's inherent values during the Great Depression or not remains to be seen, however it is a fact that neither they or the governor, Ruby Laffoon aligned themselves with the existing state narrative which was being promoted by Kentucky Progress Magazine and the state's historians which it relied on.

# I (A). Exploiting Confusion Through IP and Narrative Power

During a crisis like the **Great Depression,** the public is especially vulnerable to **semantic instability** and **informational vacuum**. This is how deception, partnered with governance, legally cloaked in

trademark law and institutionally enforced by narrative repetition, becomes embedded in public memory. A politically aligned organization can exploit this by:

1. **Introducing a Rebranded Identity**: By coining or co-opting a historically ambiguous term (like "Kentucky Colonel"), they attach it to new branding, media campaigns, and symbolic authority.

2. **Filing Strategic Trademarks**: They secure federal trademarks — possibly in bad faith — to appear "official" and to suppress dissent, previous protagonists, and/or alternate claims. This gives the illusion of legal legitimacy and control over the narrative.

3. **Harnessing Confusion**: Rather than avoiding public confusion, they **embrace and engineer it**. As Alfred Yen explains, confusion can *constructively serve* those who wish to reshape public meaning and solidify dominance over a concept.

4. **Diluting Historical Legacy**: Through **cultural dilution**, the authentic legacy of the term is blurred, overwritten, or rendered invisible. The newer, politically aligned narrative becomes "the truth" simply through repetition, branding, and power of access.

5. **Creating a False Sense of Institutional Continuity**: By implying ties to government or history (even when fabricated), the organization can displace legitimate historical institutions or meanings — what Ann Bartow calls the ***"trademarks of privilege"***. See *Trademarks of Privilege: Naming Rights and the Physical Public Domain*. Ann Bartow - University of South Carolina School of Law. Vol. 40. March 2007.

6. **Chilling Effect on Critics**: By owning the narrative and the legal marks, critics — even historically valid ones — may be silenced or delegitimized as infringers, counterfeiters, or frauds.

## I (B). Cracking the HOKC Code - Exploiting Confusion and Dilution to Reshape Public Narrative

1. **Crisis-Induced Ambiguity**

    a. **Trigger**: A societal crisis (e.g., economic downturn, political upheaval) creates uncertainty and a demand for authoritative narratives.

   b. **Opportunity**: The public seeks clarity, making them susceptible to simplified or authoritative explanations.

2. **Introduction of a New Organization**

   a. **Action**: A new entity emerges, aligning itself with prevailing political powers.

   b. **Strategy**: Presents itself as a custodian of tradition or authority, often adopting symbols or terminology associated with historical legitimacy.

3. **Strategic Trademark Filings**

   a. **Tactic**: The organization files for trademarks on terms or symbols with historical or cultural significance.

   b. **Objective**: Establishes legal control over these terms, lending an appearance of legitimacy and exclusivity.

4. **Engineering Public Confusion**

   a. **Method**: Through branding and messaging, the organization blurs distinctions between its identity and the historical concepts it appropriates.

   b. **Effect**: The public begins to associate the organization with the traditional authority or concept, even if the connection is tenuous or fabricated.

5. **Dilution of Original Meaning**

   a. **Consequence**: The original significance of the appropriated terms or symbols becomes diluted.

   b. **Result**: Alternative narratives or historical truths are overshadowed or forgotten, consolidating the organization's version of the narrative.

6. **Suppression of Dissent**

   a. **Mechanism**: Legal actions (e.g., cease and desist letters, lawsuits) are taken against entities that challenge or offer alternative narratives.

b. **Outcome**: Critics are silenced or marginalized, reinforcing the organization's control over the narrative.

# I (C). Leveraging the Crisis Contrary to the Actual History

During the most dire years of the Great Depression, when Kentucky's government faced severe economic shortfalls, Governor Ruby Laffoon's administration sought novel methods to generate revenue and political goodwill. As early as February 1932, legislation was introduced to impose a $100 annual tax on bearers of the honorary title "Kentucky Colonel" — a clear indication that the title had become so widely and indiscriminately distributed that it was perceived by legislators as a potentially lucrative source of state income.

This policy proposal was followed by a marked acceleration in the production of colonelcies. Governor Laffoon and Lieutenant Governor A.B. Chandler together issued over 1,200 honorary military-style titles by mid-1934, creating what newspapers dubbed an "army" of honorary officers, including admirals, commodores, and colonels — many bestowed upon non-residents and political figures, entirely divorced from any military or historical function.

The public confusion was immediate and profound. By 1933, the Honorable Order of Kentucky Colonels (HOKC) had been launched from offices in New York, organized under General Charles C. Pettijohn — a Hollywood insider and motion picture executive — not a Kentucky historian, judge, or archivist. The group was staffed with celebrities such as Mae West, Will Rogers, James A. Farley, and Morton Downey. It hosted its first formal gathering at the Kentucky Derby, tying the Colonelcy to alcohol, horse racing, and social spectacle, rather than the authentic history of Kentucky governance or service.

The establishment of HOKC during this period served as a *constructive act of narrative appropriation*. Rather than emerging from a legitimate genealogical or constitutional tradition, the organization fabricated a new mythos for the Kentucky Colonelcy through celebrity spectacle and politically motivated branding. In legal terms, this closely mirrors what the doctrine of **reverse confusion** under the Lanham Act prohibits — when a powerful junior user (HOKC) usurps the goodwill and distinctiveness

of an earlier mark or tradition, causing the public to associate the original concept with the new, dominant user.

Critically, no professional historians or academic institutions were involved in verifying the origins of the Colonelcy during this transformation. The traditions created were based on theatricality, not authenticity. From humorous "NRA codes" banning goatees and capping mint julep prices, to speeches promising to appoint one million colonels for political leverage, the HOKC reshaped a once-symbolic gubernatorial commission into a pop-cultural brand with alleged state connections.

This documented transformation is foundational to the present confusion suffered by the public — and the false belief that the HOKC possesses a historic mandate. Exhibits that follow detail the tax proposals, public media campaigns, and political celebrity endorsements that laid the groundwork for this manufactured identity.

## I (D). Supporting Evidence (Newspaper Articles)

The following newspaper articles introduce the evidentiary record for this Exhibit, which traces the evolving public perception of the Kentucky Colonel title and the ambiguous, often conflicting, role played by the Honorable Order of Kentucky Colonels (HOKC). These sources span from the early 1930s through the mid-20th century and provide contemporaneous accounts of political maneuvers, media campaigns, and the strategic alignment of the HOKC with celebrity culture during times of crisis.

The initial articles (1932–1935) document the Laffoon administration's unprecedented mass appointments of honorary Colonels and the state's attempt to monetize the title during the Great Depression. These reports reveal a pattern of narrative construction through public spectacle and political patronage — laying the foundation for the HOKC's later dominance over the Colonelcy's symbolic meaning.

Significantly, the 1953 article published in the *Edison Electric Institute Bulletin* marks the earliest known instance in which public **confusion** over the Kentucky Colonel title and the HOKC's role was acknowledged by a competent, resourceful business-facing institution. This recognition serves as a pivotal transition point, just before the organization undergoes its mid-century corporatization and aligns itself more closely with non-profit branding strategies.

Together, these articles serve as a body of evidence contextualizing the three major phases of influence:

1. **1933–1957**: Origin and media fabrication
2. **1957–1992**: Institutional entrenchment and narrative consolidation
3. **1992–present**: Commercialization and aggressive enforcement of a fabricated legacy

Further exhibits document the continued and intensifying confusion that followed, including statements, legal admissions, and documentary evidence of HOKC branding practices in conflict with historical fact.

### Edison Electric Institute Bulletin (July 1953)

- **Title**: The Kentucky Colonel Commission explained by Dayton Power & Light Co.
- **Summary**: Corporate communication alleges public confusion and the uncertainty concerning the origin of the title by the Honorable Order of Kentucky Colonels.
- **Legal Relevance**: Establishes longstanding commercial and public ambiguity created by the HOKC prior to its incorporated status furthering a need for judicial clarity.

# President's Initials Stand for "Kentucky Colonel"

*An Ohio electric company explains an old Kentucky commission in the following article, reprinted from our contemporary,* Forward, *published by The Dayton Power and Light Co.*

WE don't know what Governor Frank J. Lausche said to Governor Lawrence W. Wetherby of Kentucky, but we recently discovered we have a Kentucky Colonel in our midst commissioned by the Governor of Kentucky in the person of Kenneth C. Long, President of our company.

The Honorable Order of Kentucky Colonels is confusing and uncertain to many people, there being numerous conceptions and some rather positive statements as to its origin.

On delving into the records of Kentucky, we find the first Kentucky Colonel commission was granted 161 years ago when Kentucky's first governor, the Honorable Governor Isaac Shelby, was elected to office in 1792.

The Kentucky Colonel is commissioned on the Governor's Staff as an Aide de Camp but does not lose his title at the end of the commissioning Governor's term of office. He has no duties but it is to be expected that he will continue to promote the welfare of Kentucky.

Recipients of the award have always been proud of the title conferred upon them as it was conceded to be a mark of distinction held only by those who had unselfishly given of their time and talents for the betterment of Kentucky. Throughout the years many outstanding citizens were thusly honored and as time wore on the distinction increased.

There is but one stated and important meeting of the Order each year and that is held Derby eve, in Louisville, Ky., at the Brown Hotel. Guests are served a sumptuous meal of favored southern dishes in the traditional hospitable Kentucky manner.

It is to be understood that commissions are not restricted to Kentuckians. Many notable citizens from many states in the Union are holders of this coveted award and title.

The accompanying poem, written by Colonel R. W. Wilson, typifies the character of the historic Kentucky Colonel.

*A smile and a 'Howdy' is his salute,*
*He's a gentleman clear from his hat to his boot.*
*A mustache, perhaps—but a glint in his eye,*
*And sometimes maybe the little string tie.*
*A highball in temperance, a julep at leisure,*
*A man who enjoys both business and pleasure.*
*A man who's inspired by the Thoroughbred Journal,*
*I'm referring to 'Suh'—*
*"The Kentucky Colonel."*
Congratulations—Suh!

8

**Damon Runyon (Fact Based Journalist)**

Alfred Damon Runyon was an American journalist and short-story writer. He was best known for his short stories celebrating the world of Broadway in New York City that grew out of the Prohibition era.

Damon Runyon, a widely syndicated journalist and celebrated writer known for his wry humor and sharp social commentary, emerges here as a cultural critic and skeptical observer of the **Honorable Order of Kentucky Colonels**. In 1937, through his coverage of their gatherings, whimsical rituals, and unchecked title inflation, he highlights both the absurdities and cultural fascination surrounding the Colonel designation. His tone—simultaneously admiring and satirical—suggests Runyon viewed the title as an entertaining relic of regional identity, increasingly divorced from its original intent.

---

**Kentucky Colonels Are Going To Meet In Louisville Next Week.**



New York, April 30.—The Kentucky Colonels of the U.S.A. will hold their annual meeting in Louisville, Kentucky, next week. It is expected that upward of a thousand will be present at the feasting and the what-not.

Lest some reader see warlike significance in this announcement, let us hasten to explain that the Kentucky Colonels are mainly men of peaceful disposition. They would not fight anybody, except, of course, at the drop of a hat, and that is grave provocation in any man's country. However, no one is permitted to wear a hat at the annual meeting of the Kentucky Colonels.

We believe there are some lady Kentucky Colonels, too, known as Colonelesses. But we would not know about their dispositions. We never met but one lady Kentucky Colonel. She was beautiful and wonderful, and at the moment of our meeting her countenance was lighted up by a seraphic glow that we thought truly divine, and we said as much to her husband.

He said yes, she had just won a nice little bet on Bold Venture in the Kentucky Derby, and he said sometimes her countenance impressed him as something less than seraphic, suh, but he hoped we would not think he was being uncomplimentary to his wife. She had her off days just like anybody else, suh!

**Bourbon Fanciers** (Continuation of the Same Article)

The Kentucky Colonels gather in Louisville; not to sound any martial calls, but to see the Kentucky Derby, and to make a little of that good old Kentucky bourbon wish it had remained in the barrel. What a well-grounded Kentucky Colonel can do to a few vats of Kentucky bourbon during the annual meeting is something worth putting in your memoirs.

They almost had a scandal at the meeting of the Colonels last year. A fellow claiming to be a Kentucky Colonel, and accepted as a Kentucky Colonel, fell under the table after drinking just a couple of jeroboams of bourbon.

Still thinking him a real Kentucky Colonel, the other Colonels hushed up the man's inadequacy as best they could, and put him outside the hall under a rain spout to cool off. But their suspicions were aroused, and an investigation was held.

To the great relief of all Kentucky Colonels, it was learned the fellow was not a Kentucky Colonel at all, but a mere West Virginia corporal. We understand that no one will be admitted to the annual meeting this year unless they present their official commissions as Kentucky Colonels.

No one contends that an attendance of a thousand would constitute a legal quorum of all the Kentucky Colonels in this country, but it is enough to hold a banquet, anyway. The exact number of Kentucky Colonels is not known to this affiant. We are told that it is quite large.

The Kentucky Colonels are of two kinds. Those who are commissioned Colonels by Kentucky Governors and who include many American citizens living outside the State, and those Kentuckians who are automatically Colonels under the architectural laws of the State of Kentucky.

This law was once explained to us by Colonel Pat Knebelkamp and Colonel Phil Chinn, who are well-known Kentucky horsemen and automatic architectural Kentucky Colonels. They told us that any man in Kentucky who has two chimneys on his house is a Colonel, without any more ado about the matter.

But most of the Kentucky Colonels you will see at the meeting in Louisville were appointed by various Governors of Kentucky down through the years. They are technically Colonels on the Governor's staff, and the appointments were intended only as Kentucky's accolade to worldly achievement and distinction, or sometimes just as a nice little gesture to a friend of Kentucky.

We see nothing any more incongruous in these appointments than in the naming by the Government to military title of men who have had no actual military experience whatever, just as a compliment, or sometimes as a matter of convenience.

However, it seems that some of the Governors of Kentucky got to overdoing the Kentucky Colonel business. The Colonels became so numerous that strangers to Kentucky took to hitching their horses to them. The current Governor of Kentucky, the redoubtable "Happy" Chandler, has cut down on the Colonels to some extent.

He has not appointed a new Colonel since taking office, which the Republicans in Kentucky claim is rank discrimination. They point out that all Democrats in Kentucky are Colonels, but that there are several Republicans left who still are only Majors.

The committee in charge of Louisville's Derby Week has displayed amazing forethought. On Wednesday night of next week there will be a big parade and pageant, to be followed by dancing in the streets of downtown Louisville.

There is something doing Thursday night, too, but on Friday night, which is the night before the Derby, the meeting of the Kentucky Colonels will take place.

Mark well the kindly consideration in the arrangement of these dates. The Kentucky Colonels would scarcely be able to do any dancing in the streets on the same night of their meeting.

**Citation:** Wilkes-Barre Times Leader, the Evening News. April 30, 1937, Page 13
**Source:** https://www.newspapers.com/article/wilkes-barre-times-leader-the-evening-n/115628332/

**Summary Analysis:** In "Kentucky Colonels Are Going To Meet In Louisville Next Week," Damon Runyon offers a humorous yet pointed critique of the Kentucky Colonel phenomenon, portraying it as a bloated and ceremonial tradition far removed from any martial or official function. He distinguishes between appointed colonels and so-called "architectural" ones, mocks the excessive distribution of titles by governors, and recounts a comic scandal involving an imposter at a previous meeting. Through his satirical tone, Runyon frames the title as more social ornament than substance, subtly questioning its legitimacy while capturing its curious place in American cultural life.

Runyon traveled to Louisville for the Kentucky Derby at the invitation of the Honorable Order of Kentucky Colonels in New York. The poignant article (above) was first published in New York before being syndicated to Wilkes.Barre, it also appears in "The Brighter Side" in the local Louisville Courier-Journal the following week. Much of this story clashes with the accounts we know of from other historical accounts and even the state's own magazine *Kentucky Progress*.

**Gov. Ruby Laffoon—Hard Times, Hollow Titles and New Taxes**

The Great Depression Governor's Legacy is marked as a leader of tax initiatives and frivolous creator of Kentucky Colonels. **Governor Ruby Laffoon likely spent over 200 full working days — or about 1/5 of his entire time in office — processing Kentucky Colonel appointments.** It took him about 10 minutes to create each colonel with the assistance of his staff doing the typing and him reading the letters that flooded the State Capital from 1932-1935 when newspaper editors talked about the Kentucky Colonels being created by Laffoon starting in late January 1932. This staggering figure underscores how central the Kentucky Colonel Commission became during his administration, both symbolically and administratively. The creation of Kentucky Colonels became a mainstay of the function of the governor and central to its need for funding during the Great Depression

When Governor **Ruby Laffoon** took office in **December 1931**, the Commonwealth of Kentucky was mired in the worst years of the Great Depression. Struggling to balance the budget, Laffoon pursued aggressive **revenue measures**, most famously a **state sales tax**, but also supported **creative stopgap proposals** — including one introduced in *February 1932* to **tax Kentucky Colonels $100 annually**. Laffoon had been in office barely two months at the time and was largely seen as **beleaguered but resourceful**, contending with political opposition and economic collapse. Simultaneously, he inherited oversight of the **Kentucky Progress Commission**, which had already defined the "Kentucky Colonel" as a **state-sponsored civic archetype**, prominently featured in **Kentucky Progress Magazine**.

These publications, while operating under his administration, made no mention of a private organization or proprietary meaning of the title, instead portraying the Colonel as a public ambassador of Kentucky culture and hospitality. It was not until **September 1933** that Laffoon **personally authorized** the creation of the **Honorable Order of Kentucky Colonels**, enabling **Anna Bell Ward** and **Charles Pettijohn** to organize the group from New York with a Lexington office. This layered moment — the proposal to tax colonels, the civic narrative in official publications, and the simultaneous birth of a private organization — frames Laffoon's legacy as one of both **desperation and institutional invention**, navigating symbolic identity and fiscal survival.

The several articles that follow exemplify the idea of taxing the title of the Kentucky Colonel. It is also important to note on April 5, 1933, President Roosevelt ordered all gold coins and gold certificates in denominations of more than $100 be turned in for other money. It required all persons to deliver all gold coin, gold bullion and gold certificates owned by them to the Federal Reserve by May 1. Many people with large denomination gold certificates became Kentucky Colonels that year.

12

## "Seth Parker" Favors Compromise Tax On Kentucky "Colonels"

New York, Feb. 10—(AP)— To Phillips H. Lord, writer and radio entertainer, the title of "colonel" may not be worth $100, but he'd like to keep it well enough to compromise for $22.50.

The "Seth Parker" of the radio, who was appointed a "Kentucky colonel" by retiring Gov. Sampson on December 7, offered in an "open letter" to settle for that amount when he learned the Blue Grass state's Legislature had before it a bill calling for a $100 a year tax on the 1000 or more men and women who hold the title.

His was one of many varying reactions among the colonels living in New York, only a few of whom had donned the staid Prince Albert, light gray trousers and broad-brimmed hat traditionally associated with the order.

Col. J. Stoddard Johnston, investment banker, appointed five years ago by Gov. Luke P. Blackburn, said the proposed tax "should be of interest to the entire world because the colonels have been appointed without respect to locality—or to anything else."

**Citation:** Springfield weekly Republican (Springfield, Mass.), February 11, 1932, Front Page
**Source:** https://www.loc.gov/resource/sn83020847/1932-02-11/ed-1/

**Contextual Analysis:** This 1932 article from the *Springfield Weekly Republican* documents a proposed Kentucky state bill to tax honorary colonels $100 annually — nearly two years before the founding of the Honorable Order of Kentucky Colonels (HOKC). Of note is the response from **Phillips H. Lord**, a nationally known radio entertainer who portrayed the fictional preacher "Seth Parker." Speaking partly in character, Lord publicly offered a humorous compromise of $22.50 to retain his colonelcy, reflecting both the social value attached to the title and public skepticism about monetizing it. The article shows

that the Kentucky Colonel commission was already widely distributed, often without geographic or civic connection to Kentucky. It also underscores that controversy around the legitimacy and value of the title existed in state-level discourse and national media **before** any formal organization like the HOKC was established — a fact that directly challenges later claims to authority or exclusivity over the title.

---

## Plan to Tax Kentucky Colonels To Cost Jokester $100 Maybe

### Ex-Legislator Would Be Forced to Pay Levy for Baby Edward Louis Stephens II Got Commission on Day of Birth.



A **joke** played by Edward Louis Stephens, 3435 Brown Street, while he was a member of the Kentucky Legislature two years ago may have serious repercussions on his pocketbook—if it ever finds its way out of the Committee on Fish and Game Protection.

Stephens introduced a resolution two years ago. All its multitudinous "whereases" and "therefores" and "wherefores," summed up, meant the State of Kentucky was running short of cash and taxation sources. Then the resolution resolved:

> "That all honorary members of the Governor's staff (Kentucky colonels) be required to pay into the treasury of the State of Kentucky the sum of $100 each year, or upon the failure of such payment be divested of their title."

It was further resolved that each colonel who failed to pay off and who thereafter used the title of colonel would be guilty of a felony.

Now things are different. About a year after the resolution was introduced Edward Louis Stephens II was born.

Before his first plaintive protest had re-echoed through the hospital corridors, a bright and shining commission arrived. Thus he became a Kentucky colonel on the day of his birth.

14

The commission is signed by A. B. Chandler, who was not even Governor at that time, but who was elected in the recent voting in the State.

"Would you reintroduce your resolution, now?" Stephens was asked.

"Not me. And I hope it got lost in the Fish and Game Committee," he replied.

Citation: Evening star (Washington, D.C.), November 15, 1935, Page  25

Source: https://www.loc.gov/resource/sn83045462/1935-11-15/ed-1/

---

## Premium On Kentucky Colonelcy Is Proposed

### Legislative Resolution Would Tax Thousand Or More Holders Of Title $100 Each

Frankfort, Ky., Feb. 9 (AP) — The thousand or more men and women in Kentucky and around the country generally who bear the complimentary title of "Kentucky Colonel" would have to pay $100 a year to continue to use it under a joint resolution introduced in the House and Senate today.

The resolution pointed out Kentucky is in sore need of raising funds and added that fortunately the State has at its command, "thousands of patriotic, courageous, loyal and fearless colonels whose commissions have expired, but who still presume to use the honorary title."

Citation:The Baltimore Sun. February 10, 1932, Page 2

Source: https://www.newspapers.com/article/the-baltimore-sun-premium-on-kentucky-co/117761523/

---

## M'LEMORE: Colonel's Opinions.

### By Henry McLemore

**WHAT** is your favorite recipe for happiness? What, in your opinion, from a non-political standpoint, does the country need most? What is your favorite story? What is your favorite drink? What is the recipe? These are but a few of the questions which have been sent out to all Kentucky colonels by the head of that honorable order, Col. Anna Friedman, of Louisville.

The questionnaire reached this ol' colonel yesterday just as he came in from weeding his mint bed and just as he was about to sit down to his favorite Dixie dinner of fried filet of filibuster with first battle of Bull Run sauce and a tossed poll tax salad à la Mason-Dixon.

It was delivered by Aunt Dinah Jemima Chloe Saltonstall, an old family retainer who had been with the colonel almost a week.

**"MARSE HENRY,"** she said, "I came to let you know there's someone in the kitchen with Dinah. He says he wants to know if you need any new, black, string bow-ties or any more gold-headed canes."

"Faithful retainer," the colonel said as he braided his goatee, "give the gentleman a fried chicken, a home-cured ham, a mess of eaten

# M'LEMORE: Colonel's Opinions.

#### BY HENRY M'LEMORE.

WHAT is your favorite recipe for happiness? What, in your opinion, from a non-political standpoint, does the country need most? What is your favorite story? What is your favorite drink? What is the recipe? These are but a few of the questions which have been sent out to all Kentucky colonels by the head of that honorable order, Col. Anna Friedman, of Louisville.

The questionnaire reached this ol' colonel yesterday just as he came in from weeding his mint bed and just as he was about to sit down to his favorite Dixie dinner of fried filet of filibuster with first battle of Bull Run sauce and a tossed poll tax salad à la Mason-Dixon.

It was delivered by Aunt Dinah Jemima Chloe Saltonstall, an old family retainer who had been with the colonel almost a week.

"MARSE HENRY," she said, "I came to let you know there's someone in the kitchen with Dinah. He says he wants to know if you need any new, black, string bow-ties or any more gold-headed canes."

"Faithful retainer," the colonel said as he braided his goatee, "give the gentleman a fried chicken, a home-cured ham, a mess of eaten biscuits and two or three of them hound dogs of mine. And tell him to come back tomorrow when I'll be through with this questionnaire and will have time to show him magnolia blossoms."

Using the same old pen with which his great grandfather had forged many a signature, the ol' colonel started answering the questionnaire. "Recipe for happiness," he said to himself; and the scratch of his pen drowned out the sound of pounding hoofs. So absorbed was he that he didn't notice that the Kentucky Derby was being run just outside his window. "Take some dough," he wrote for his recipe for happiness —"in fact, take lots of dough."

"Well," the colonel said, "that takes care of that question. Now, what is my favorite story?"

The ol' colonel was a long time answering this. Torn between Little Red Riding Hood and a story concerning Pat and Mike which a drummer had once told him he finally settled for Chaucer's Canterbury Tales, considering it a happy medium.

The colonel turned to the question concerning his favorite drink. It didn't take him long to answer that one. "My favorite drink," he wrote, "is the one made by the company which pays me the most for posing for its advertisements. Let some distiller pay me $1,000 and I will swear through my goatee that nothing is so mellow, so mild, so clear-headed, so distinctive as a blended mixture of carbolic acid and peach fuzz. I'll lean back in my rocker, hold a slug of the stuff in my hand and allow as how it goes down as smooth as a swallow of water from the Suwannee river."

TE COLONEL'S EYE fastened on another question. Do you think there should be regulation uniforms for Kentucky colonels?

"Yes, by all means," he wrote. "A single-breasted flannel with a chalk stripe, a dozen pair of light weight wool socks, would be an ideal uniform. Let me know when this uniform is available and I'll buy one right away. On the other hand how is a regulation uniform for Kentucky colonels going to work out? Shirley Temple is a Kentucky colonel. So is Sophie Tucker. Neither Miss Temple nor Miss Tucker would approve of this uniform."

Aunt Saltonstall came in from the kitchen. "Marse Henry," she said, adjusting her bandana and straightening the seams of her nylons, "the hoop-skirt repair man is here to fix your niece's party dress."

The colonel gave the rebel yell and disappeared in the smoke house. "Now we'll have cured ham, for sure," Aunt Saltonstall said.

## They Say—

Former Prime Minister Winston Churchill: "Except in the British commonwealth and in the United States, where communism is in its infancy, the communist parties or fifth columns constitute a growing challenge and peril to Christian civilization."

Chinese Foreign Minister Shih Chieh: "The present international entanglements and grave situation throughout the world are due to the lack of harmony, the UNO veto system and the discovery of atomic force."

Chester Bowles, director of economic stabilization: "The next few weeks represent Guadalcanal, the Okinawa and the Stalingrad in our fight to maintain a stabilized economy. To lose this fight will mean disaster. To win it will pay the way for a future of sustained prosperity for all of us."

## One Man's Opinion
### By Walter Kiernan.
International News Service

HENRY KAISER complains to the government that he can't get steel. It seems that automobiles can't be made out of common stock alone.

He has capital, he has buildings, he has workers, but so has the Chase National Bank, and the bankers aren't even planning to build a car.

biscuits and two or three of them hound dogs of mine. And tell him to come back tomorrow when I'll be through with this questionnaire and will have time to show him magnolia blossoms."

Using the same old pen with which his great grandfather had forged many a signature, the ol' colonel started answering the questionnaire. "Recipe for happiness," he said to himself; and the scratch of his pen drowned out the sound of pounding hoofs. So absorbed was he that he didn't notice that the Kentucky Derby was being run just outside his window. "Take some dough," he wrote for his recipe for happiness — "in fact, take lots of dough."

"Well," the colonel said, "that takes care of that question. Now, what is my favorite story?"

The ol' colonel was a long time answering this. Torn between Little Red Riding Hood and a story concerning Pat and Mike which a drummer had once told him he finally settled for Chaucer's Canterbury Tales, considering it a happy medium.

The colonel turned to the question concerning his favorite drink. It didn't take him long to answer this one. "My favorite drink," he wrote, "is the one made by the company which pays me most for posing for its advertisements. Let some distiller pay me $1,000 and I will swear through my goatee that nothing is so mellow, so mild, so clear-headed, so distinctive as a blended mixture of carbolic acid and peach fuzz. I'll lean back in my rocker, hold a slug of the stuff in my hand and allow as how it goes down smooth as a swallow of water from the Suwannee river."

**TE COLONEL'S EYE** fastened on another question. Do you think there should be regulation uniforms for Kentucky colonels?

 "Yes, by all means," he wrote. "A single-breasted flannel with a chalk stripe, a dozen pair of light weight wool socks, would be an ideal uniform. Let me know when this uniform is available and I'll buy one right away. On the other hand how is a regulation uniform for Kentucky colonels going to work out? Shirley Temple is a Kentucky colonel. So is Sophie Tucker. Neither Miss Temple nor Miss Tucker would approve of this uniform."

Aunt Saltonstall came in from the kitchen. "Marse Henry," she said, adjusting her bandana and straightening the seams of her nylons, "the hoop-skirt repair man is here to fix your niece's party dress."

17

The colonel gave the rebel yell and disappeared in the smoke house. "Now we'll have cured ham, for sure," Aunt Saltonstall said.

**Citation:** The South Bend Tribune. Mar 8, 1946, Page 10

**Source:** https://www.newspapers.com/article/the-south-bend-tribune-mlemore-colonel/115503276/

---

### Kentucky Colonels To Mobilize At Governor's Call To Combat Threats To Outlaw Their Titles



*First Assembly of the 3,000 to Be Held May 4*
*By Col. Clark Kinnaird, Central Press Writer*

**LOUISVILLE, Ky., April 27** – Kentucky expects every Kentucky colonel to do his duty, May 4 and if every Kentucky colonel does, there'll be more colonels in Louisville than there are privates in the state militia.

The first assembly of Kentucky colonels has been commanded by Governor Ruby Laffoon to meet in Louisville that day, which is the eve of the running of the western world's richest classic, the Kentucky Derby, when rotation of the traditional trinity of Kentucky—race horses, bourbon and bluegrass women—is to be celebrated.

The governors call also embraces admirals and admirals-in-chief of the various state inland navies, some of whom have only rowboats in their rolls. Of this total, Kentucky colonels command the major cost to the state—at approximately 29 cents each—for white and gold metal seals, blue ribbon, mailing tube and postage.

#### Uniform Costly

The colonels named by the Blue Grass state's various governors and acting governors have been drawn together by a threat to the continuation of their honor in Congress, where there is a pending bill which is intended to do away with such titles. They are prepared to fight the law on the ground that it is another intolerable invasion of states' rights.

18

"What! Does the federal government want a civil war for invading the south's rights?" an aroused colonel demanded today. "The body that will form a protective wall at the assembly here May 4, if the title is taken from the men at which the toasts are to be drawn for the honor of delivering that dinner toast!"

**Kentucky, oh Kentucky!**
 I love the classic shade trees
 Of the dark-eyed Southern maid.
 "'Mid the blossoms newly born
 Where the mocking birds will sing
 And the Colonels full of corn…"

An embarrassing moment has arisen: Insamuch as the mobilization was ordered by the state's chief executive "as a precaution for duty" in full regalia, expected to "do honor to the title of Colonel," having been influenced by tunicless state seals, comes a note by mail, reading as follows in type: "Please designate proper place, gold shoulder knots, gold epaulets, white blaze and—price be sure—and saber or sword." Many of the nobility and gentry honored by the governor by appointment to his personal staff in 1932, it was the highlight of the uniform that made Louis Johnson, secretary to the President, reluctant to accept a Kentucky colonel's commission.

Gov. Laffoon's commander-in-chief, has authority of course to prescribe the uniform of the day, even the sustenance that a collar will be made out of, as long as it is worn in hot potifim where shoes are the emphasis of the season.

**Every Colonel In One War**

If every Kentucky colonel met his duties like every other man, governors of this and other states would have difficulty in finding men to make them colonels. For among those named recently are Al Jolson, George Jessel, Edgar Guest, Ed Farley, William Randolph Hearst, Gov. "Jigger" Jim Adams, Eddie Cantor, Clark Gable, James Earle Dotor of the Mint Nellie Tayloe Ross (who was quoted as saying herself: "More hard-fox' better than army at Pittsburgh.") Col. Hope Hampton, Admiral Foxy DeLong, James Hammond of Memphis, Tenn., who is colonel on the staffs of 22 state governors.

The bill of Rep. Raymond Cannon of Wisconsin, which would diminish titles of commission heads in military or naval forces, would be a blow to the honorary appointees of governors who have emulated Kentucky's chief executives in dispensing grandiloquent titles.

Nebraska had more than 20,000 admirals and not a single boat for admirals to ride on. President Roosevelt and Amos 'n' Andy, among the vast body of distinguished honorary title bearers, including

Gable, Jolson and Guest. Ed Parley (GOP and radio fame), Eddie Cantor, Mae West, Amos, Andy and Jolson.

Gov. Ruby Laffoon, director of Kentucky's record listing of honorary colonels, has refused to curb his generosity in making these appointments. His staff includes many federal and state officials. Among recent commissions were John G. White of the IRS, and playwrights named "Bill" Lovis, and the prosecuting attorney-general of the state.

Connecticut's present governor has banned honorary appointments and engages upon their honor staffs.

**Citation:** Johnson City Staff-News. Johnson City, Tennessee, April 27, 1934. Page 12
**Source:** https://www.newspapers.com/article/johnson-city-staff-news-kentucky-colonel/115308682/

**Contextual Analysis:** This article, published in the *Johnson City Staff-News* on April 27, 1934, provides pivotal insight into how the title of Kentucky Colonel was publicly regarded and politically utilized during Governor Ruby Laffoon's administration. It documents the first mass mobilization of Kentucky Colonels—at the governor's own request—in response to proposed federal legislation aimed at limiting or abolishing honorary military titles. This event occurred during Laffoon's term and prior to the formal incorporation of the Honorable Order of Kentucky Colonels, demonstrating that the concept of a Kentucky Colonel as a symbolic and honorary civic title was already well established and operationally significant.

Governor Laffoon's call to action shows that the colonelship functioned as a semi-official body of honorary representatives, deployed in defense of state sovereignty and cultural identity. The article emphasizes that thousands of colonels, many of them celebrities and public officials, had been commissioned as a reflection of merit or affiliation with Kentucky. Moreover, the article highlights the broad societal understanding that the colonelship was neither militarily operational nor legally binding, but rather ceremonial and symbolic.

This mobilization illustrates that the identity and function of Kentucky Colonels had, by 1934, entered the public domain as a representative and cultural class. The text also underscores the ceremonial character of the title through humorous depictions of uniform confusion and the satirical invocation of Southern gallantry. As such, this article supports the argument that the Kentucky Colonel commission, by nature and practice, had become a widely understood honorary status, not one that can be privately owned or institutionally monopolized.

## Ruby Laffoon Dies; Created Thousands of Kentucky Colonels

*Term as Governor Was Marked by Bitter Sales Tax Fight*
*By the Associated Press.*

**MADISONVILLE, Ky., March 1.** — Ruby Laffoon, 72, who created thousands of "Kentucky colonels" while he was Governor of Kentucky from 1931 to 1935, died at 2:50 a.m. (C.S.T.) today after a long illness. He suffered a paralytic stroke last week.

Gov. Laffoon, a Democrat, was succeeded in office by his Lieutenant Governor, A. B. (Happy) Chandler, now a United States Senator.

Gov. Laffoon's term as chief executive was marked by a bitter intraparty fight over a State sales tax and the method of choosing the party's gubernatorial candidate. Senator Chandler led the opposition.

After leaving office, Gov. Laffoon returned here to practice law

.**Citation:** Evening Star (Washington, D.C.), March 1, 1941, Page 8
**Source:** https://loc.gov/resource/sn83045462/1941-03-01/ed-1/

---

## Summary of Ruby Laffoon's Transformation of the Kentucky Colonelcy

Governor Ruby Laffoon, who served from 1931 to 1935 during the depths of the Great Depression, played a pivotal role in redefining the Kentucky Colonel as both a symbolic institution and a public identity. Faced with a struggling economy, Laffoon explored creative means of raising state revenue and national goodwill, which led to his unprecedented mass commissioning of over 9,800 Kentucky Colonels. In doing so, he reshaped the role from a somewhat formalized honorary distinction grounded in civic or military achievement into a widely distributed symbol of cultural affiliation.

His term saw several attempts to monetize the title through proposed annual taxes on colonels—ideas floated in both jest and legislative seriousness. These tax proposals and the overwhelming volume of commissions were met with national media coverage and even satire, but they reflected a deeper transformation underway.

Perhaps most significantly, Laffoon aligned the Kentucky Colonel with the spectacle and social energy of the Kentucky Derby. He mobilized colonels as celebrants, not soldiers—more celebrities than civil servants—thereby altering not only the quantity but the *quality* of colonelcy. In contrast to the 19th-century model of the Kentucky Colonel—a bearded gentleman in formal coat and honorific humility—Laffoon's colonels were public personalities selected for fame, flair, and loyalty to the state's image. Their role became promotional and performative, often defined by personal celebrity more than public duty.

This shift disregarded over 150 years of historical development and tradition, replacing it with a modernized, mass-marketed archetype of the Kentucky Colonel. Laffoon's decisions thus laid the foundation for the Kentucky Colonel as a cultural brand, paving the way for the later formation of organizations such as the Honorable Order of Kentucky Colonels, whose own vision followed the populist, promotional mold Laffoon had popularized.

In short, Ruby Laffoon did not merely expand the ideal of what a Kentucky Colonel did—he redefined its meaning, redirected its purpose, and reshaped its national identity by spending at least 20-30% of his entire 1,000 days in office writing honorary commissions.

For the Court: Various other exhibits can be cross-referenced here.

## I (E). 17,000 Commissions Cancelled, U.S. Congress Alerted

In early 1936, following the end of Governor Ruby Laffoon's term, Kentucky Attorney General **Beverly Vincent** issued a formal opinion declaring that over **17,000 Kentucky Colonel commissions**—granted during Laffoon's administration—were legally **null and void**. His reasoning was based on a lack of statutory authority for such appointments, widespread public ridicule, and what was viewed as excessive and indiscriminate issuance of the honorary title. This legal void exposed the fragility of the colonelcy's formal standing and created a moment of national attention.

The cancellation triggered a strong reaction in **Washington, D.C.**, where several members of the **U.S. Congress**—some of whom were themselves commissioned colonels under prior administrations— expressed concern over the action. On **April 1, 1936**, during debate in the House of Representatives, multiple members spoke with humor but also genuine distress over the symbolic loss. This culminated on **April 2, 1936**, when **Congressman Edward Wester Creal** of Kentucky formally addressed the

House in defense of the Kentucky Colonel tradition. In his speech, Creal detailed the honorable origins of the title, tracing it to **military and civic distinction** dating back to **George Rogers Clark** and the **War of 1812**, and warned that the title's devaluation through overuse did not negate its historic and cultural legitimacy.

Importantly, Congressman Creal's remarks **did not endorse any private organization**, but reflected ideals consistent with those promoted by earlier, unincorporated Kentucky Colonel associations—such as the **Kentucky Colonels Association**, with active member rosters published in handbooks from 1930. These informal associations, including chapters in **Louisville**, **Dallas**, and **Chicago**, operated on the principle of **"Once a Colonel, Always a Colonel,"** reinforcing the view that colonelship was a lifetime honor rooted in civic culture, not a revocable title bound by statute or confined to any single private entity.

Exactly **30 days after the cancellation**, acting Governor **James Wise** restored the 17,000 Colonel commissions, exercising the **inherent common-law powers** of the Governor's office. This act implicitly affirmed the validity of honorary colonel commissions as a matter of custom and executive discretion, even absent codified law. No statute was ever passed to repeal or overturn that restoration.

Taken together, this episode underscores that the Kentucky Colonel title has long functioned as a **public cultural institution**, not a proprietary or statutory office, and has been **recognized at the highest levels of government** as part of Kentucky's enduring symbolic identity.

None of the Articles printed in newspapers in nearly all large metropolitan areas discussed the Honorable Order of Kentucky Colonels.

So the next part of the story comes from one of the articles you already transcribed by Damon Runyon.

.

**Newspaper Article: Screwball Clubs**

**Screwball Clubs Flourish In N. Y., Expert Finds**

By SAUL PETT AP Newsfeature Writer

New York, April 12—Some sociologist of the future may try to measure our civilization by the clubs we join. The odds are he'll go nuts.

The current Manhattan telephone directory, alone, lists 3,214 clubs and associations of all types, or approximately one for every 600 residents of one New York City borough. And that doesn't include the organizations too secret, too screwy, too temporary or too small to have a phone.

The reason Americans join clubs seem as endless as the list of clubs themselves.

Harold Labow, a New York advertising man, makes it a hobby to collect information on joiners. His favorite is an extinct group, the Farragut club. It's a good commentary on "joinitis."

Word went around town of this new, highly exclusive club. Applications were distributed. All candidates were black-balled.

Inferiority complexes were beginning to spring up in high places until the truth came out. The membership of the Farragut club consisted of one man. He held club sessions all alone every afternoon near the Farragut statue in Madison Square.

The business of each meeting was simply this: the membership sat on a bench, lighted a cigar and thought of all the people invited to join and then black-balled.

Labow has been collecting information on clubs and societies for years. Here are a few, with odd titles or missions:

Skyscraper Club, for men 6 feet, two inches, or more, demanding longer beds in hotel rooms; Blizzard Men of 1888 who will never forget that storm; Tall Story Club; the Pandettes, some New Jersey women who play golf in the snow; Society of Former Special Agents of the Federal Bureau of Investigation, Inc.; Society for the Prevention of Disparaging Remarks About Brooklyn, recently replaced by the First Families of Brooklyn.

The Moles, subway contractors; Society for the Promotion of Good Will Toward Men; Seafood Eating, Whiskey Drinking and Fist Fighting Society of Greater New York (in the making); Committee to Abolish Inhuman Treatment to Horses in Motion Pictures; Society of Timid Souls, a fraternity of stage-frightened musicians and actors.

We Do Your Excavation Watching for You Society; Wine and Turkey Tasting Society; Collectors of Religion on Stamps Society; The Plug Shrinkers, for reducing radio commercials; Society for Protection of Animals in North Africa; Dotted Line Club; National Man's Club, whose slogan reads: "for prosperity and defense, abolish all female labor"; Horseless Carriage Club; Society for Prevention of Married Men Posing as Bachelors; Original Order of Zunks—they're stamp collectors; Seraphic Secretaries of America, secretaries to 83 top-flight people;

Society for the Prevention of Calling Sleeping Car Porters George; The Thank God It's Friday Club, started at the University of Missouri; American Grandmas Association; Seven O'Klockers' Club, Philadelphia to New York commuters; Electric Railroad Association, just a bunch of guys who like to ride trolleys; Gag Writers Protective Association;

Colonial Brick Club, people looking for historic bricks; International Association of Peaceful Pipe Smokers; Association for Prevention of Taking Off Hats in Elevators; **Honorable Order of Kentucky Colonels**; Fellows of the Bellows, well known men who once pumped the organ in their boyhood; Bald Head Club of America; Smell Society, to foster good odors and remove bad ones. Labow says a survey in little Montclair, N. J., once showed 350 clubs there. So they began to form a federation.

Citation: The Chronicle-Star April 25, 1947, Page 8
Source: https://www.loc.gov/resource/sn87065528/1947-04-25/ed-1/

## II. Early Signs of Commercialization and Semantic Recasting of the Kentucky Colonel Title (1934–1957)

Following its formation as an unincorporated association in 1933, the *Honorable Order of Kentucky Colonels* (HOKC) did not continue or preserve the genuine civic traditions that had historically shaped the Kentucky Colonel identity. Instead, from 1934 through 1957, the HOKC increasingly transformed the title into a vehicle for social gatherings, publicity stunts centered around the Kentucky Derby, and internally generated prestige — activities often characterized by national commentators as semi-satirical, commercial, or self-serving in tone.

Published accounts from the period, including Damon Runyon's 1937 report on the Kentucky Colonels' Derby meeting, portrayed the organization more as a convivial, bourbon-fueled fraternity than a serious civic institution. This characterization is further reinforced by the 1947 publication *Howdy Colonel*, a revisionist and whimsical compilation produced under HOKC auspices, which openly reframed Kentucky Colonelcy through an exaggerated, fictionalized, and nostalgic lens. At the same time, contemporaneous scholarly analysis — notably *The Kentucky Colonel: A Study in Semantics* published in *American Notes & Queries* — recognized that the title had become an undefined, satirical cultural label, not a credentialed or serious office of government. Even the study's authors noted explicitly that their examination of the Honorable Order of Kentucky Colonels involvement with the title was *not intended as a serious historical or legal claim*, underscoring the cultural trivialization that had occurred.

The 1941 Annual Banquet Program of the *Honorable Order of Kentucky Colonels* (HOKC) (retrieved from the Kentucky Writer's Project and the KDLA) marks the earliest known instance in which the organization publicly introduced what would become its central origin myth: the claim that the title of "Kentucky Colonel" began in 1813 when Governor Isaac Shelby allegedly commissioned Col. Charles S. Todd. This narrative, first appearing nearly 130 years after the date it purports to describe, is unsupported by any contemporaneous records—no gubernatorial order, legislative act, commission certificate, or historical biography from the early 19th century confirms its validity. Prior to this 1941 revisionist introduction with Governor Keen Johnson, respected Kentucky historians, the state itself as illustrated in *Kentucky Progress Magazine* (1937-1936) and public commentators traced the origins of the title to the Revolutionary frontier period of 1775–1777, aligning with the founding of "Old

Kentucky" and the early conventions of the Transylvania colony. By asserting a fabricated link to Charles S. Todd and retroactively associating itself with gubernatorial authority, the HOKC began to displace these more grounded historical traditions in favor of a fictionalized institutional narrative. This maneuver served to reframe the title's origin around the HOKC itself, effectively erasing prior civic, cultural, and military usages that predated the organization by more than 150 years. Other statements in the 1941 banquet program clearly indicate that the HOKC did not use any historian or state official to create their previously unheard narrative.

This section compiles primary evidence showing that, during the period 1934 to 1957, the Kentucky Colonel title was recast away from its civic and military origins into a largely symbolic, commodified, and often humorously exaggerated identity. Although the HOKC hosted annual events and created publications to advance its profile, it did not act as the inheritor of historical Kentucky Colonel traditions. Rather, it participated in reshaping public perceptions of the title into an ambiguous social and promotional device, setting the stage for later commercial trademark claims that fundamentally departed from prior cultural reality.

## II (A). The Fabrication of a False Historical Narrative (1941–1949)

In addition to reshaping the public image of the Kentucky Colonel through social gatherings and self-promotional literature, the *Honorable Order of Kentucky Colonels* during this period also manufactured a new, factually unsupported origin story. At their 1941 Annual Banquet, the HOKC introduced for the first time the claim that Governor Isaac Shelby had commissioned his son-in-law, Charles S. Todd, as the "first" Kentucky Colonel in 1813. This assertion appears nowhere in any known 19th-century archival sources, including Isaac Shelby's papers, Charles Todd's memoirs, state military records, it contradicts historical works such as those by John Randolph Spears (1903) or E. Polk Johnson (1912).

Subsequently, the fabricated narrative propagated outward. In 1942, Alvin F. Harlow's *Weep No More, My Lady* repeated the story without archival citation. Again in 1949, the book *Four Keys to Kentucky* echoed the same account, again without documentary proof, further embedding the HOKC's manufactured version into popular culture. Notably, neither book was authored by a trained historian nor based on verified government records; both appear to have relied on unofficial creative writing sources

associated with Anna Bell Ward, then a leader within the HOKC and a contributor to the Kentucky Writer's Project.

Despite independent investigations, including by representatives of the *Edison Electric Institute* in 1953, no official records validating the Todd-Shelby origin story have ever been found. As recently as 2021, Kentucky Secretary of State Michael Adams reviewed the historical evidence and ordered removal of the false narrative from the Kentucky government's public websites upon confirming its lack of authenticity.

The creation and spread of this false historical narrative between 1941 and 1957 demonstrate that the HOKC was not merely engaging in charitable or social promotion; it was actively seeking (knowing or unknowingly) to displace earlier, verifiable traditions of Kentucky Colonelcy rooted in the Revolutionary era (1775–1777) with a fabricated, self-serving mythology intended to fortify its own institutional legitimacy so it could be viewed as an authoritative historical source.

---

## III. Incorporation, Institutionalization, and Expansion of Trademark Interests (1957–1992)

The year 1957 marks a major turning point in the history of the *Honorable Order of Kentucky Colonels* ("HOKC"). That year, the organization, previously operating as an informal social association, formally incorporated under Kentucky law. This corporate structuring allowed the HOKC to institutionalize itself as a permanent entity with legal standing, centralized governance, and the capacity to receive, manage, and distribute charitable donations. Incorporation also positioned the HOKC to assert greater control over the public narrative surrounding the Kentucky Colonel title, eventually culminating in claims of brand ownership and exclusive trademark rights using their name.

During the period from 1957 through 1992, the HOKC pursued an increasingly public profile. Its activities shifted from primarily social gatherings toward large-scale fundraising efforts, high-visibility philanthropic campaigns, and extensive media outreach portraying the organization as the definitive embodiment of the Kentucky Colonel. However, while charitable functions expanded, so too did efforts to blur the lines between the organization and the honorary title itself. Through newsletters, advertising, merchandise, and later trademark applications, the HOKC began systematically promoting the idea that

affiliation with the organization was synonymous with recognition as a Kentucky Colonel—despite the historical and statutory reality that colonel commissions remained separate civil appointments issued solely by the Governor of Kentucky, which it does not control.

Sources from this period show that the HOKC increasingly engaged in activities that framed the Kentucky Colonel identity as a brand-like asset controlled by the organization, including the early stages of federal trademark filings starting in 1983. This evolution laid the groundwork for the more aggressive intellectual property strategies that would emerge after 1992 when it restated its Articles of Incorporation. While charitable undertakings were real and significant, they were intertwined with a steady expansion of organizational self-promotion, commodification of the title, and administrative practices aimed at consolidating exclusive rights over the use of "Kentucky Colonel" imagery and terminology which it developed based on a misconstrued history introduced in 1941.

This section presents primary evidence from newspaper coverage, organizational publications, historical analysis, and early trademark filings, demonstrating how the HOKC's incorporation initiated a long trajectory of self-branding, legal consolidation, and semantic monopolization distinct from the public, folkloric, and civic traditions that had historically surrounded the office of the Kentucky Colonel.

## IV. Strategic Trademark Domination, Court Litigation, and Suppression of Public Use (1992–2020)

The period from 1992 to 2020 marks the most aggressive and transformational phase in the activities of the *Honorable Order of Kentucky Colonels* ("HOKC"). During these decades, the HOKC shifted decisively from a charitable organization with social traditions into a corporate entity pursuing strategic control over the Kentucky Colonel identity itself—through a calculated program of trademark registrations, enforcement actions, and legal threats directed at other legitimate users of the title.

Beginning in 1992, the HOKC restated its Articles of Incorporation and reorganized its branding strategies and by 2003 had successfully secured federal trademark registrations over the phrase "Kentucky Colonels" for merchandise, novelty goods, and related commercial products through licensing its trademarks and using third-party vendors. The HOKC thereafter sought to assert exclusive rights not merely over its own organizational name, but over any and all public and commercial uses of the term "Kentucky Colonel"—a radical departure from the historical tradition in which the title had long existed freely in the public domain.

This period also witnessed the filing of aggressive litigation. In 2004, the HOKC brought suit against *Building Champions, LLC*, a newly formed basketball team in Louisville that adopted the historic "Kentucky Colonels" name. Although the Court ultimately denied the HOKC's motion for a preliminary injunction the litigation itself revealed the HOKC's core strategy: to monopolize the cultural, traditional, noncommercial, and commercial meaning of the term through intimidation, regardless of the title's long and open public history against anyone that posed a threat to them.

Meanwhile, during this same period, independent efforts to celebrate and preserve the Kentucky Colonel tradition outside the HOKC's framework were actively suppressed. In 1998, Col. David J. Wright created the first independent website honoring Kentucky Colonels under the domain "Colonel.org." three full years before the HOKC developed an online presence. Despite a clear disclaimer distinguishing his program from the HOKC, in 2001 Wright was contacted by attorneys from Wyatt, Tarrant & Combs, acting on behalf of the HOKC, and was threatened with legal action. Rather than engage in costly litigation, Wright voluntarily disbanded his original program with just over 100 members in 2001 and published a public notice to his supporters explaining the situation.

The evidence compiled in this section demonstrates that, far from preserving the broad, civic, and historical meaning of the Kentucky Colonel title, the HOKC from 1992 to 2020 engaged in a sustained campaign to redefine the term as a privatized, trademarked commodity under its own exclusive control. This shift not only disregarded other legitimate cultural expressions of Kentucky Colonelcy, but actively undermined the public's rightful, historical connection to the title as a shared symbol of Kentucky heritage.

## IV (A). Institutional Weaponization of Trademark Law and Serial Trademarking to Suppress Public Use (2003–2022)

As part of its campaign to assert exclusive control over the public title "Kentucky Colonel," the *Honorable Order of Kentucky Colonels* ("HOKC") undertook a calculated legal strategy involving serial trademarking and aggressive enforcement tactics. These efforts were not grounded in historical continuity or cultural stewardship but represented a deliberate effort to monopolize a public honorific for commercial gain.

In 2003, the HOKC secured a federal trademark registration for "Kentucky Colonels" covering merchandise such as clothing, jewelry, and novelty goods, a decade later trademarked tobacco products,

then in 2019 food products. Then a year later, on February 17, 2020, the HOKC filed three additional federal trademark applications—again using the identical phrase "Kentucky Colonels"—for overlapping goods and services. This tactic, known as *serial trademarking*, artificially expanded their claims to the term by layering new applications over prior registrations, despite no intervening historical development justifying broader rights.

Only three days later, on February 20, 2020, the HOKC initiated litigation against Col. David J. Wright, founder of the first independent Kentucky Colonels website (Colonel.org, established 1998), alleging infringement based on these newly filed trademarks. This premeditated sequence of filings and litigation evidences a strategic abuse of the trademark system—creating rights after-the-fact to suppress longstanding independent cultural expressions of the Kentucky Colonel identity.

The HOKC's misuse of trademark law was not isolated. In 2012, the organization filed a formal opposition against *Heritage Tobacco Group, LLC* over its attempt to register "Kentucky Colonel" for tobacco products. In 2021, they filed a second opposition against *Neeley Family Distillery* for its *Old Kentucky Colonel* bourbon trademark. In both cases, the HOKC asserted ownership claims over the "Kentucky Colonel" designation irrespective of the context, cultural history, or the independent legitimacy of the applicant's use. It has also gone after other uses of the term with cease and desist letters seeking negotiation.

Collectively, the record reveals that the HOKC acted not as a legitimate guardian of a public tradition, but as a commercial monopolist intent on controlling and privatizing a historically public title as its own. The use of serial trademark applications, retaliatory lawsuits, and opportunistic oppositions demonstrate a consistent pattern of behavior designed to extinguish public use, cultural diversity, and independent celebration of the Kentucky Colonel honorific.