# Exhibit — The Kentucky Colonel: A Study in Semantics

## A Semantic Archetype of the Kentucky Colonel and Its Judicial Relevance, Summarized Pursuant to FRE 1006 and FRE 201(b)

### I. Purpose of Exhibit

This exhibit consolidates and analyzes two primary contemporaneous sources from 1947 that address the historical and semantic meaning of the Kentucky Colonel:

- The article *"The Kentucky Colonel: A Study in Semantics"* by B. Alsterlund and Walter Pilkington, published in *American Notes & Queries*, April 1947. (Attached)

- A contemporaneous newspaper editorial about the study, *"About Kentucky Colonels,"* published in *The Lexington Herald*, April 24, 1947.

Together, these documents provide a window into the **public consciousness and intellectual understanding of the Kentucky Colonel** prior to the consolidation of revisionist narratives by the Honorable Order of Kentucky Colonels (HOKC).

### II. Summary of Findings from American Notes & Queries (1947)

**Authorship**: B. Alsterlund and Walter Pilkington

**Publication**: *American Notes & Queries*, Vol. 7, No. 1, April 1947

**Key Observations and Factual Assertions:**

- The title *Kentucky Colonel* was never officially defined; even Irvin S. Cobb (himself a 4-time colonel) stated it was undefined by statute or consensus.

- The term "colonel" in America derives from colonial militia customs where nearly all able-bodied men were organized for frontier defense.

[RECEIVED 05/30/2025 KELLY L. STEPHENS, Clerk]

- By 1825, "Kentucky Colonel" was already a **byword**, satirized by Chief Justice John Marshall in his oft-quoted quatrain:

    > *"In the Blue Grass region, A 'Paradox' was born,*
    >
    > *The corn was full of kernels, And the colonels full of corn."*

- The article demonstrates that colonelcy evolved from **functional civil-military authority to a symbolic and often satirical cultural rank**.

- It references legislative records, uniform standards, and postbellum cultural shifts—including the **rise of honorary commissions**, often disconnected from public service.

**Legal-Semantic Conclusion:** The term "Kentucky Colonel" by 1947 was publicly acknowledged to be a **semantic placeholder (for a person)**, not a credentialed office of continuing governmental authority.

## III. Lexington Herald Editorial: "About Kentucky Colonels" (April 24, 1947)

**Publication**: *The Lexington Herald*, April 24, 1947

**Type**: Editorial commentary reacting to the article in *American Notes & Queries*

**Key Contributions:**

- Serves as a **public-facing reflection** of the scholarly piece from AN&Q, affirming its credibility and relevance.

- Notes the historical absurdity of titles: from **Mae West as a Kentucky Colonel**, to "admirals" of artificial lakes, and "generals" of fictional campaigns.

- Highlights institutional embarrassment: Governor A.B. Chandler and Attorney General Beverly Vincent attempted to nullify all colonelcies in 1936—only to have them reinstated by Acting Governor Wise in their absence.

- Emphasizes how the **Derby season reinvigorated public satire** on colonelship, with The Lexington Herald engaging in wit as well as warning about the erosion of cultural seriousness.

**Civic Observation:** The article frames colonelcy as a **cultural phenomenon open to critique**, not one bound by exclusive rights or state-backed succession.

## IV. Joint Analytical Commentary

Together, these sources clarify three points of critical judicial relevance:

1. **The title "Kentucky Colonel" was not proprietary, official, or exclusive in 1947**. It had become a **folk-semantic term** broadly applicable and freely bestowed by consensus or caricature.

2. **Governmental efforts to constrain or void the title (e.g., Chandler and Vincent in 1936) failed publicly** and were reversed through democratic and administrative action—not legal formalism.

3. The sources **predate the HOKC's trademark claim and institutional monopoly**, and thus are evidence of preexisting public domain usage and cultural authorship not controlled by any nonprofit entity.

## V. Judicial Relevance Under FRE 201(b) and 1006

These works, taken together, are:

- Proper subjects of **judicial notice under FRE 201(b)** as "facts not subject to reasonable dispute" and "capable of accurate and ready determination."

- Supportive of a summary exhibit under **FRE 1006**, as they distill voluminous historical and cultural analysis into an accessible, court-admissible narrative.

Their publication and public discussion illustrate the **longstanding satirical, literary, and cultural life of the term "Kentucky Colonel"**, undermining any proprietary assertion to its control post-1933.

## VI. Appendix and Citation

**Appendix E** as: **[Exhibit — The Kentucky Colonel: A Study in Semantics]**, based on:

- B. Alsterlund and Walter Pilkington, "The Kentucky Colonel: A Study in Semantics," *American Notes & Queries*, Vol. 7, No. 1 (April 1947)
  https://www.kycolonelcy.us/kentucky-colonel-a-study-in-semantics

- *The Lexington Herald*, "About Kentucky Colonels," April 24, 1947
  https://newspapers.com/article/the-lexington-herald-about-kentucky-colo/117843545

# AMERICAN Notes & Queries

*A Journal for the Curious*

**EDITORS**

B. Alsterlund and Walter Pilkington

## NOTES

### New Face, New Year

FOR SIX years *AN&Q* has worn a cover that had a certain resemblance to the weather—it was talked about but never acted upon. Several able individuals made tentative offers and then withdrew when they discovered that the unhandy-work which they proposed to replace was our own. But a few weeks ago, a printer and designer graciously offered to send us a cover of his own devising.

We like to think of it as the token of a Lucky Seventh.

*The Editors*

### The Kentucky Colonel: A Study in Semantics

THE LATE Irvin S. Cobb, who was himself a Kentuckian and the holder of four commissions as honorary colonel, once remarked that a *Kentucky colonel* had never been defined. On the best available evidence, he was right, both literally and figuratively. In view of the fact that *colonel* was a commonplace two hundred years ago in territory that afterward became the State of Kentucky, this failure to place both the term and the type in their proper historical categories is all the more alarming. The best explanation, however, seems to be this: that *Kentucky colonel*, as a label, is largely a matter of semantics, and a rather involved one, at that.

Our American "fondness for hollow titles," says Mencken in his *Supplement I*, "goes back to colonial days."[1] And one of the earliest sources in proof thereof is Edward Kimber's "Observations" [1745-46]:

> Wherever you travel in *Maryland* (as also in *Virginia* and *Carolina*) your Ears are constantly astonished at the Number of *Colonels*, *Majors*, and *Captains*, that you hear mentioned: In short, the whole Country seems at first to you a Retreat of Heroes . . .[2]

The rest of the sentence, which appears to have been given less attention in the hands of historians, has a direct bearing on the lineage of the Kentucky colonel, for virtually every able-bodied Kentuckian [legally still a Virginian] in the mid-eighteenth century belonged to some form of military unit for protection against Indian attack; and this association between militia and colonel has survived the beginning of the present century:

> but alas! to behold the Musters of their Militia, would induce a Man to nauseate a Sash, and hold a Sword, for ever, in Derision.[3]

Nor did Kimber fail to mention, too, their "Diversity" of weapons and uniforms, the "Unsizeableness of the Men," and the "Want of the least Grain of Discipline." He continued:

> Even at this Time they are alarm'd with an *Indian* Excursion, and Num-

3

bers are marched towards the back of the Province to defend the Out-Settlements.[4]

When Kentucky became a State in 1792, much of the same on-guard sentiment obtained. The State's first Constitution provided that "The freemen of this Commonwealth shall be armed and disciplined for its defense." Military titles were cheap, and most innkeepers had them. English travelers, of course, did not overlook that fact. C.W. Janson, who came to America in 1793, said that Americans "rigidly adhere to the vulgar adage, 'once a captain always a captain.'"[5] (Oddly enough, it was with this same "adage"—substituting *colonel* for *captain*—that Ruby Laffoon, 143 years later, answered an Attorney General's "informal opinion" whereby the titles of some 17,000 Kentucky colonels would have been nullified. The phrase, in fact, became a kind of battle cry among the defenders.)

Precisely when *Kentucky* and *colonel* were first inseparably joined is not too clear, but Mencken[6] asserts that the term had become "a byword as early as 1825," when Chief Justice Marshall wrote his catchy quatrain:

> In the Blue Grass region,
>   A "Paradox" was born,
> The corn was full of kernels
>   And the "colonels" full of corn.

According to Beveridge,[7] Marshall rattled off these lines at a rather jovial club meeting in Philadelphia, held in a tavern. Directly across the hall from the room that Marshall had entered was the bar, with several Kentucky colonels standing about. And when Marshall was asked, in the course of the evening's entertainment, for "an extemporaneous rhyme on the word 'paradox,'" he glanced at the bar and the verse came to him in a moment.

During the 1830's the militia system was beginning to undergo a fundamental change; and with the introduction of a volunteer National Guard the position of an officer on the Governor's staff shifted from one of military usefulness to executive ornamentation. Staff officers multiplied, while the list of bona fide generals, colonels, and majors shrank; and the number of "aides with the rank of colonel" increased. During the administrations of J. Proctor Knott, who took office in 1883, and Simon Bolivar Buckner, 1887, a number of such aides—with gold braid, shoulder knots, and "swords a-dangle"—were conspicuous at State receptions. As late as 1915, the last of Governor McCreary's four years, the list ran to as high as seventy and the uniforms were of the traditional splendor. But with the outbreak of World War I, and the consequent ban on uniforms among civilians, the tone was abruptly altered.[8]

In the course of about a century, then, the somewhat romantic Kentucky colonel had come and gone. In a not too serious letter written by the Honorable William F. Neill, Assistant Attorney General (Ky.), to Colonel George M. Chancellor of Cloverport, Kentucky, it is recorded that in an earlier period the Kentucky colonel was recognized by a "brace of dueling pistols, a plug of chewing tobacco, an overwhelming desire to hunt, fight, place a bet or make love to some woman, and a quart bottle of bourbon whisky."[9] In the cushiony days of the Old South, he wore, wrote Neill, a frock coat, a pair of baggy trousers, and a shoestring necktie; the love of strong drinks had not left him but he had acquired a "veneer of culture."

And from 1865 to the turn of the century one of his most noticeable characteristics was a "marked dislike towards anything northern."

Opie Read's *Kentucky Colonel*, first published in the *Arkansaw Traveler* and issued in book form in 1890, gives our subject the warmth-and-kindliness with which the colonel, traditionally, wanted to be associated. That the Governor's staff officers were "nice gentlemen and delightful companions" but inferior, as officers, to militia men of comparable rank is clear from records of Kentucky legislative debates of this period.[10]

The legendary figure—colonel by deference or by appointment—was still recognizable forty years ago, but his prestige was never to regain itself in full.

There is a rather nice touch of historical allegory in the fact that Colonel Jack Chinn, long regarded as a kind of prototype of the old-time Kentucky colonel, died on January 31, 1920, only a few weeks after the accession of Governor Morrow, with whom the commissioning of colonels entered a mass-production era. Chinn, "Eph" Lillard, and Robert B. Franklin made up the famous trio that sang at (Democratic) political rallies, popularizing "Trouble in de Lan'" and other pieces of political doggerel. And it was Chinn and Lillard who were acting as bodyguards to Governor Goebel when he was murdered on the old Statehouse Square at Frankfort, January 30, 1900. Irvin S. Cobb, who was then a reporter in Louisville, helped carry the stricken man away, and got the bare outlines of the story. (Interestingly enough, Cobb called him "Colonel 'Dirk Knife' Jack Chinn.")[11]

Until World War I, the number of "governor's aides with the rank of colonel" was not excessive, though it may have been larger than the occasion warranted. But with the coming of Governor Edwin P. Morrow, the significance of a colonel's commission was in a noticeable decline. During his first few weeks in office he posted fifty-odd colonelcies. His immediate misfortune, however, came not so much from the length of the list as from the fact that one of the persons to whom the rank had been tendered was Henry Watterson, the liberal, strong-spoken prime mover of the Louisville *Courier-Journal*, who had already refused the honor several times. Watterson, of course, fought back with his pen.[12] Even Morrow must have been a little apprehensive when he wrote the official notification letter, dated January 12, 1920, a day after the newspapers had carried the story of the appointments. He was, he explained, taking the "somewhat rash liberty of making you a Colonel on my staff,"[13] and he acknowledged the fact that the commission, "through misuse and abuse," had fallen—in public favor. Yet in spite of all this, he continued, Watterson was the "real Kentucky Colonel," and should —"above all others"—enjoy this new honor. (Evidently Watterson was successful in refusing the appointment; at any rate, he ignored it with sufficient vehemence to escape being listed when the names of past colonels were published in 1936. Quite apart from this Morrow invitation above, Watterson had long been known as "Colonel Watterson," as a kind of mark of professional respect and general popular favor. Even this he disliked, and it is said that it was always made clear to a cub reporter that Watterson would not tolerate anything but "Mr. Watterson.")

But to return to 1920: Four days after Morrow's letter was mailed, the *Courier-Journal*, in a long, bubbling editorial, suggests that the Governor should "think twice before palming upon a real friend one of these absurd titles." Then follows a slightly more bellicose interpretation—

> It's a dollar to a tin sword that the Governor could never think of a sweeter revenge than to sneak up on an enemy — one who has never smelled powder and never will smell powder—and while the latter isn't looking pin a colonelcy on his swallow-tail coat.[14]

Then the editorial writer touches upon the fact that naval titles are conspicuous by their absence. And since the Governor is commander-in-chief of the State's army and navy, this, he argues, is a discrepancy worth mentioning. Even the uniform, he says, needs attention. It tends to make the Kentucky colonel look a bit like a cross between Admiral Sir Joseph Porter in *H. M. S. Pinafore* and a Knight of Pythias. To remedy this, he suggests the appointment of a commission for drawing up a new uniform; and on this five might serve: a milliner, an architect, a scene painter, a wholesale hardware dealer, and a photographer. And finally, on the almost certain chance that one of the colonels will some day suffer from injured feelings, the *Courier-Journal* suggests that a form of "wound stripe" be designed and cut, for use in an emergency.

The reverberations went well beyond State boundaries. The New York *Tribune* of February 1, 1920, worked the controversy into a long feature story, uttering, if anything, a quiet approval of the stand taken by the opposition.

All through the twenties, the colonel —in Kentucky — seemed to thrive. When, in the spring of 1926, Governor Ritchie of Maryland and Governor Byrd of Virginia publicly announced their intention of skimping on colonels, the New York *World* rushed to the defense. They were, they said, "unconditionally opposed" to the "strange withdrawal in Maryland and Virginia." But the *World*'s impression of the contemporary colonel was a trifle too glamorous; and the *Courier-Journal* wasted no time in pointing out that while the Kentucky colonel in full regalia is "a gorgeously beautiful thing," not one in a hundred could afford to own full dress. The *World*, too, had estimated that about three-fourths of the colonels, in uniform, still lent a lustre to State functions. Kentucky, replied the native paper, "has never had a State occasion that three-fourths of them could crowd into."

The cumulative effect of all these pronouncements, no doubt, was a certain publicity victory for the colonels. But four years later they evidently felt a need for some kind of group centralization. On May 23, 1931, they held a long session in the Brown Hotel in Louisville; a constitution was adopted, by-laws ratified, and Andrew H. Morris, Sr., was elected commander. A Bostonian, Percy Hobart Titus, reminded them that "to be a Kentuckian means romance, chivalry, a standing for principle. . . ."

The next wave of anti-colonel sentiment came during the Laffoon administration, when the Governor and the Lieutenant Governor [Albert ("Happy") Chandler] tried to outdo each other on staff appointments. The *Courier-Journal* on June 9, 1933, noted that

Case: 23-5795   Document: 73   Filed: 05/30/2025   Page: 8

there was an "admiral for nearly every stream and lake in the State." As of August 9, the Governor, with 684, was leading the Lieutenant Governor by only 40. (This count, to be sure, included a scattering of generals, admirals, commodores, and even canoeists, but 95 per cent of them were colonels.) At this time it was disclosed that the actual cost of commissioning a colonel was 20¼ cents a head (covering cost of commission blank, ribbon, seal, mailing tube, and postage); if desk work is figured in, on the basis of official salaries, the charge is about doubled. By this estimate it could be shown that no more than about five hundred dollars had been spent, in all, on the commissions proffered by Laffoon and Chandler. (Laffoon's total eventually rose to more than 10,000.) Meantime the colonels had left the "association" level and had become the Honorable Order of Kentucky Colonels. In August, 1933, they launched their own magazine, the *Colonel*, "devoted to the social, industrial, and political interest of Kentucky and of those states which are faced with problems identical with those now confronting Kentucky." They would, they said, be "strictly non-partisan in the political sense," and "avoid sectarian controversy as the plague."[15]

The *Courier-Journal* continued its expression of alarm at the new high in the Kentucky-colonel birth rate. Since so many new colonels had come into existence, why not tell us something, it suggested, of their

> sizes, weights, heights, reaches . . . Do brunettes or blondes predominate? . . . Occasionally one may get into jail or prison. . . . All of them die. Their records should be kept clean, their ideals unblemished.

Three years later came another piece of news which stirred up enough public indignation to carry the colonels over the next reign of calm—presumably a danger sign in the life of the colonel tradition. Beverly M. Vincent, Kentucky's Attorney General issued an informal opinion holding that "no person has a right now to be designated as a Kentucky Colonel, either in Kentucky or elsewhere." Thereby some 17,000 were demoted. Governor Chandler had as yet appointed no honorary aides, and Vincent's conclusion was that when a Governor's term expires, by death or otherwise, all coloneley commissions issued by him become "absolutely void."

The protest was thunderous.

Exactly a month later, Acting Governor James E. Wise, in the absence of both the Governor and the Lieutenant Governor, restored to good standing the 17,000 honorary aides. Attorney General Vincent stated that he was standing by his original opinion: both State and Federal Constitutions, he reaffirmed, provided that no titles of nobility shall be issued; and since colonels have no duties, terms of office, or authority, the commissions are substantially an acknowledgment of a mild form of peerage. A resolution covering payment of a bonus to the temporarily decommissioned colonels had been pending in the House of Representatives; but the fate of it is not clear, from later accounts.

This rapid resuscitation came about just in time for the colonels' annual banquet on May 1, at the Kentucky Hotel in Louisville. For some time, this Derby Eve dinner—with much fine food, mint juleps, and southern good humor—has been the only official gathering of the clan. Indeed, eighty-five-year-old Matt Winn, who has directed

the Derby since 1902 and built it up from a $2,800 to a $100,000 stake, is a colonel of no mean repute. At their 1942 conclave they announced twenty-five posthumous commissions—to Kentuckians reported killed or captured while on active duty. Over the past seven or eight years scores of public figures—some of whom have since died—have been added to the roster; among them, Will Rogers, Grantland Rice, James Farley, Quentin Reynolds, Christopher Morley, John Kieran, J. Edgar Hoover, Edgar Bergen, and Shirley Temple.

According to Colonel Anna Friedman, Secretary and Keeper of the Great Seal, the Order is about to issue a kind of historical scrapbook (*Howdy, Colonel*), with pictures of the Derby, dinners, and barbecues; profiles; the "correct method of mixing mint juleps"; and "as nearly a complete list of Colonels as could be compiled."

For a little light on the present status of the title itself, one would do well to examine a letter—quoted in Mencken's *Supplement I*—written (about 1934) by Colonel Patrick H. Callahan of Louisville (1866-1940), in reply to an Illinois critic of Laffoon's lavishness. (Callahan had the rank by appointment, and Mencken calls him "one of the most conspicuous colonels of the between-war era.")

> *Colonel* [in Kentucky] is not much more than a nickname, like *Tom*, *Dick*, or *Harry*, and is used and appreciated mostly on that account. It is often applied to all Kentuckians without the formality of appointment, just as *major* is used in Georgia. Nine out of ten people who call me *colonel* otherwise would be saying *Mr.* Callahan. It is a handle that breaks down formality.

Or, as one of the past commanding generals of the Honorable Order put it, only a few days ago—"No Kentucky colonel, in our time, takes his title seriously."

                                      B. A.

---

1. H. L. Mencken, *Supplement I: The American Language* (N. Y., 1945), pp. 525 ff.
2. Kimber, "Observations in several Voyages and travels in America," *London Magazine*, July, 1746, p. 324.
3. *Ibid.*
4. *Ibid.*
5. Read, "Words Indicating Social Status in America in the Eighteenth Century," *American Speech*, October, 1934, p. 208.
6. Mencken, *op. cit.*, p. 533.
7. Albert J. Beveridge, *The Life of John Marshall* (Boston, 1919), IV, 83.
8. N. Y. *Tribune*, February 1, 1920 (sec. 4, p. 8).
9. *Kentucky State Bar Journal*, September, 1944, pp. 29 ff.
10. *See* official *Report* [*s.v.* "Militia"] of the Constitutional Convention [Ky.], which assembled in 1890.
11. Irvin S. Cobb, *Exit Laughing* (Indianapolis, 1941), p. 204.
12. Watterson was in Florida at that time; he may not have written the series of editorials that immediately followed, but the tone was in keeping with his attitude.
13. Henry Watterson Papers, Library of Congress.
14. Louisville *Courier-Journal*, January 16, 1920, p. 6, col. 3.
15. *Colonel*, August, 1933.

# Exhibit — About Kentucky Colonels 1947

## About Kentucky Colonels

American Notes and Queries, a "journal for the curious," contains an article on "The Kentucky Colonel; a Study in Semantics."

This discussion is somewhat timely because of the fact that the annual Kentucky Colonels dinner in Louisville prior to the Kentucky Derby always attracts attention to the vanishing colonels, though the line can not literally be said to be "thinning" if avoidurpois is taken into consideration.

At any rate, American Notes and Queries says that the late Irvin S. Cobb, who was himself a Kentuckian and the holder of four commissions as honorary colonel, once remarked that "a Kentucky colonel has never been defined." We think that the commissions used to carry something of a definition which emphasized the fact that "this commission carries no salaries or expenses" and might have added that it carried no duties or obligations.

Many Kentuckians are not impressed with colonels' commissions because of the way the issuance of them was abused. It will be recalled that Mae West was made a colonel. We think she wired Gov. Ruby Laffoon, "Come up and see me some time," and he replied, "I'm no angel."

At any rate there were admirals of Lake Ellerslie and Herrington Lake, and at least one general in J. Fred Miles.

Henry L. Mencken in his Supplement I, according to the article by B. Alsterlung and Walter Pilkington in American Notes and Queries, says that the

American fondness for hollow titles goes back to Colonial days. This article said that in the middle of the Eighteenth century nearly every Kentuckian belonged to some military unit.

"When Kentucky became a state in 1792, much of the same on-guard sentiment obtained. The state's first Constitution provided that "The freemen of this Commonwealth shall be armed and disciplined for its defense." Military titles were cheap, and most inn-keepers had them. English travelers, of course, did not overlook that fact. C. W. Jansson, who came to America in 1793, said that Americans "rigidly adhere to the vulgar adage, 'once a captain always a captain.'" (Oddly enough, it was with this same "adage" substituting colonel for captain—that Ruby Laffoon, 143 years later, answered an attorney general's "informal opinion" whereby the titles of some 17,000 Kentucky colonels would have been nullified. The phrase, in fact, became a kind of battle cry among the defenders.)

"Precisely" when Kentucky and colonel were first inseparably joined is not too clear, but Mencken asserts that the term had become "a byword as early as 1825," when Chief Justice Marshall wrote his catchy quatrain:

"In the Blue Grass region,

A 'Paradox' was born,

The corn was full of kernels,

And the colonels full of corn."   [- Justice John Marshall 1825]

The article continues:

"According to Beveridge, Marshall rattled off these lines at a rather jovial club meeting in Philadelphia, held in a tavern."

The article recalls that when Gov. A. B. Chandler was in office, Attorney General Beverly M. Vincent issued an informal opinion that "no person has a right now to be designated a Kentucky colonel in Kentucky or elsewhere."

By order, Governor Chandler abolished 17,000 commissions, with Lt. Gov. Keen Johnson concurring. When they were both out of the state Acting Gov. J. E. Wise, a state senator who as president pro tempore of the Senate became acting governor, restored all the commissions.

Governor Willis has not abused the privilege and the issuance is now largely confined to special occasions. Since there is usually talk about colonels around Derby time, this article in an out-of-state publication is timely.

---

"About Kentucky Colonels" Newspapers.com, The Lexington Herald, April 24, 1947, https://www.newspapers.com/article/the-lexington-herald-about-kentucky-colo/117843545/