# Supplemental Judicial Commentary Exhibit 2

**On the Reliable Historical Foundations vs. Romantic Mythologies of the Kentucky Colonel**

**Prepared Under FRE 1006 and FRE 201(b)**

## I. Purpose and Comparative Framework

This exhibit provides a formal judicial commentary and comparative assessment of **four historical-cultural sources**, two of which are **seminal and reliable**, and two of which (analyzed earlier) were **distorted by the institutional narratives of the HOKC**. The present focus is on works that, though varied in tone, provide either **direct evidence** or **serious scholarly treatment** of the Kentucky Colonel as a public, historical, and literary identity.

The following works are evaluated:

1. **B. Alsterlund and Walter Pilkington**, "The Kentucky Colonel: A Study in Semantics" (*American Notes & Queries*, April 1947)

2. **Adlai E. Stevenson**, *Something of Men I Have Known* (New York: McClure Co., 1909), Chapters XIV "The Kentucky Colonel" & XXX "The Colonels"

3. **Matt J. Holt**, *The Kentucky Spirit or Why the Kentucky Colonel* (1922)

4. **J. Winston Coleman Jr.**, "Kentucky Colonel—New Vintage," in *The Collected Writings of J. Winston Coleman Jr.*, Winburn Press, 1969

Each is examined for (1) factual basis, (2) literary interpretation, and (3) whether it resists or adopts assumptions introduced by the **Honorable Order of Kentucky Colonels (HOKC)** post-1933.

## II. Reliable Source #1: Alsterlund and Pilkington — The Kentucky Colonel: A Study in Semantics (1947)

**Factual Strengths:**

- Details the **evolution from military commission to honorary style**.

- Correctly cites the colonial militia traditions of Virginia and Kentucky.

- Uses primary documentation, including **early satire by Chief Justice John Marshall (1825)** and observations from **Edward Kimber (1745)**.

- Shows how the title drifted into **voluntary social address** in public culture.

**Interpretive Value:**

- Frames the Kentucky Colonel as a **semantic construct**, identifying its symbolic attributes through multiple eras.
- Explains the change from martial to social function, citing post-Civil War and World War I cultural trends.

**Resists HOKC Myth:**

- Recognizes the mass commissioning under Governor Morrow and Laffoon as **a break from earlier practice**.
- Notes the **satirical backlash** against overuse of the title.
- Acknowledges the 1933 formalization of the Order but **does not legitimize it as a historical continuation**.

**Conclusion:** The treatment by Alsterlund and Pilkington is well-reasoned, document-based, and openly skeptical of romanticized misuse. It supports **judicial recognition** of the title's public domain and semantic malleability.

## III. Reliable Source #2: Adlai E. Stevenson — Something of Men I Have Known (1909), Chapters: "A Kentucky Colonel" and "The Colonels"

**Factual Strengths:**

- Provides **first-person accounts** of 19th-century colonels like **Col. Dick Wintersmith**.

- References early Kentucky political, legal, and social institutions with **clarity and authenticity**.

- Notes that colonelship was linked to **public character, oratory, humor, and status**, not just military commission.

**Interpretive Value:**

- Distinguishes between colonels as **social prototypes** and as **civic figures**.

- Elevates the idea of colonelcy as both a **badge of charisma** and a **performative cultural rank**.

**Resists HOKC Myth:**

- Published **before HOKC's founding**, it contains **no reference to post-1933 corporatized colonelcy**.

- Reflects the understanding of colonelship as **cultural and regional**, not proprietary or formalized.

**Conclusion:** Stevenson's memoir captures the authentic environment in which colonelship **existed naturally**. His work stands as a **primary source** rejecting any single organizational claim over the title.

## IV. Reliable Source #3: Matt J. Holt — The Kentucky Spirit or Why the Kentucky Colonel (1922)

**Factual Strengths:**

- Traces the **genealogy of the title "Colonel"** back to pre-statehood militia commanders and station leaders.

- Describes "Colonel Boone," "Colonel Gibson," and "Colonel Cresap" as figures of **public defense, community authority, and local sovereignty**.

- Emphasizes that the colonel title was **assigned by public consensus**, not formal decree.

**Interpretive Value:**

- Asserts that "Colonel" in Kentucky is a **regional style and station-based designation**.

- Shows the transformation from **defensive authority** to **landed prestige** and later, social cachet.

**Resists HOKC Myth:**

- Clearly distinguishes between **true civic-military colonels** and later **secretary-issued titles**.

- Indicates that **even lieutenants and captains** in early Kentucky were colloquially "promoted" by their peers as a mark of esteem.

**Conclusion:** Holt's account is invaluable. It is one of the **few pre-HOKC** published works that directly narrates the evolution of colonelcy **from the Revolution forward** with no institutional distortion.

## V. Reliable Source #4: J. Winston Coleman Jr. — Kentucky Colonel—New Vintage (1969)

**Factual Strengths:**

- Offers a **literary and ethnographic portrait** of the modern rural colonel as a living cultural figure.

- Emphasizes the role of **localism, hospitality, and heritage**, tracing the traditions of *real-life* colonels rooted in land, legacy, and lifestyle.

**Interpretive Value:**

- Distinctly **refuses the theatrical archetype** of the white-suited dandy.

- Presents a **nuanced modernization** of the Kentucky Colonel as a civic-minded land steward, bibliophile, and cultural critic.

**Resists HOKC Myth:**

- Demonstrates **organic continuity** with Kentucky history, not via trademark or commission.

- Draws a clear **distinction between the lifestyle of authentic Bluegrass gentlemen and the commodified image manufactured post-1933**.

**Conclusion:** Coleman's firsthand ethnographic sketch gives rare clarity to the **post-agrarian, mid-20th-century evolution** of the colonel as a real person—not a brand. It affirms colonelcy as **lived tradition**, not legal franchise.

## VI. Concluding Analysis

All four works examined in this commentary—*Alsterlund & Pilkington*, *Stevenson*, *Holt*, and *Coleman*—form a **coherent evidentiary bloc** affirming that:

- The Kentucky Colonel is a **public domain archetype**, rooted in Revolutionary War practice and civic recognition.

- No single governor, nonprofit organization, or modern administrative entity has sole claim to its origin.

- The HOKC, founded in 1933, represents a **novel creation**, disconnected from authentic civil or historical continuity.

These sources should be afforded **judicial weight** as evidence of customary use, semantic evolution, and civic heritage of the term "Kentucky Colonel."

This Commentary is submitted as part of **Appendix E** and offered for **judicial notice under FRE 201(b)** and as a summarizing digest under **FRE 1006**.

## VII. Appendix Citations

- **B. Alsterlund and Walter Pilkington,** "The Kentucky Colonel: A Study in Semantics," *American Notes & Queries*, Vol. 7, No. 1 (April 1947)

- **Adlai E. Stevenson,** *Something of Men I Have Known*, Chapters XIV and XXX (McClure Co., 1909)

- **Matt J. Holt,** *The Kentucky Spirit or Why the Kentucky Colonel* (1922)

- **J. Winston Coleman Jr.,** *The Collected Writings of J. Winston Coleman Jr.*, "Kentucky Colonel—New Vintage" (Winburn Press, 1969)

# Exhibit — The Kentucky Colonel: A Study in Semantics

## A Semantic Archetype of the Kentucky Colonel and Its Judicial Relevance, Summarized Pursuant to FRE 1006 and FRE 201(b)

### I. Purpose of Exhibit

This exhibit consolidates and analyzes two primary contemporaneous sources from 1947 that address the historical and semantic meaning of the Kentucky Colonel:

- The article *"The Kentucky Colonel: A Study in Semantics"* by B. Alsterlund and Walter Pilkington, published in *American Notes & Queries*, April 1947. (Attached)

- A contemporaneous newspaper editorial about the study, *"About Kentucky Colonels,"* published in *The Lexington Herald*, April 24, 1947.

Together, these documents provide a window into the **public consciousness and intellectual understanding of the Kentucky Colonel** prior to the consolidation of revisionist narratives by the Honorable Order of Kentucky Colonels (HOKC).

### II. Summary of Findings from American Notes & Queries (1947)

**Authorship**: B. Alsterlund and Walter Pilkington

**Publication**: *American Notes & Queries*, Vol. 7, No. 1, April 1947

**Key Observations and Factual Assertions:**

- The title *Kentucky Colonel* was never officially defined; even Irvin S. Cobb (himself a 4-time colonel) stated it was undefined by statute or consensus.

- The term "colonel" in America derives from colonial militia customs where nearly all able-bodied men were organized for frontier defense.

- By 1825, "Kentucky Colonel" was already a **byword**, satirized by Chief Justice John Marshall in his oft-quoted quatrain:

  > *"In the Blue Grass region, A 'Paradox' was born,*
  > *The corn was full of kernels, And the colonels full of corn."*

- The article demonstrates that colonelcy evolved from **functional civil-military authority to a symbolic and often satirical cultural rank**.

- It references legislative records, uniform standards, and postbellum cultural shifts—including the **rise of honorary commissions**, often disconnected from public service.

**Legal-Semantic Conclusion:** The term "Kentucky Colonel" by 1947 was publicly acknowledged to be a **semantic placeholder (for a person)**, not a credentialed office of continuing governmental authority.

## III. Lexington Herald Editorial: "About Kentucky Colonels" (April 24, 1947)

**Publication**: *The Lexington Herald*, April 24, 1947

**Type**: Editorial commentary reacting to the article in *American Notes & Queries*

**Key Contributions:**

- Serves as a **public-facing reflection** of the scholarly piece from AN&Q, affirming its credibility and relevance.

- Notes the historical absurdity of titles: from **Mae West as a Kentucky Colonel**, to "admirals" of artificial lakes, and "generals" of fictional campaigns.

- Highlights institutional embarrassment: Governor A.B. Chandler and Attorney General Beverly Vincent attempted to nullify all colonelcies in 1936—only to have them reinstated by Acting Governor Wise in their absence.

- Emphasizes how the **Derby season reinvigorated public satire** on colonelship, with The Lexington Herald engaging in wit as well as warning about the erosion of cultural seriousness.

**Civic Observation:** The article frames colonelcy as a **cultural phenomenon open to critique**, not one bound by exclusive rights or state-backed succession.

## IV. Joint Analytical Commentary

Together, these sources clarify three points of critical judicial relevance:

1. **The title "Kentucky Colonel" was not proprietary, official, or exclusive in 1947**. It had become a **folk-semantic term** broadly applicable and freely bestowed by consensus or caricature.

2. **Governmental efforts to constrain or void the title (e.g., Chandler and Vincent in 1936) failed publicly** and were reversed through democratic and administrative action—not legal formalism.

3. The sources **predate the HOKC's trademark claim and institutional monopoly**, and thus are evidence of preexisting public domain usage and cultural authorship not controlled by any nonprofit entity.

## V. Judicial Relevance Under FRE 201(b) and 1006

These works, taken together, are:

- Proper subjects of **judicial notice under FRE 201(b)** as "facts not subject to reasonable dispute" and "capable of accurate and ready determination."

- Supportive of a summary exhibit under **FRE 1006**, as they distill voluminous historical and cultural analysis into an accessible, court-admissible narrative.

Their publication and public discussion illustrate the **longstanding satirical, literary, and cultural life of the term "Kentucky Colonel"**, undermining any proprietary assertion to its control post-1933.

## VI. Appendix and Citation

**Appendix E** as: **[Exhibit — The Kentucky Colonel: A Study in Semantics]**, based on:

- *B. Alsterlund and Walter Pilkington*, "The Kentucky Colonel: A Study in Semantics," *American Notes & Queries*, Vol. 7, No. 1 (April 1947)
  https://www.kycolonelcy.us/kentucky-colonel-a-study-in-semantics

- *The Lexington Herald*, "About Kentucky Colonels," April 24, 1947
  https://newspapers.com/article/the-lexington-herald-about-kentucky-colo/117843545

# AMERICAN
# Notes & Queries

*A Journal for the Curious*

**EDITORS**

*B. Alsterlund and Walter Pilkington*

## NOTES

### New Face, New Year

FOR six years *AN&Q* has worn a cover that had a certain resemblance to the weather—it was talked about but never acted upon. Several able individuals made tentative offers and then withdrew when they discovered that the unhandy-work which they proposed to replace was our own. But a few weeks ago, a printer and designer graciously offered to send us a cover of his own devising.

We like to think of it as the token of a Lucky Seventh.

*The Editors*

### The Kentucky Colonel: A Study in Semantics

THE LATE Irvin S. Cobb, who was himself a Kentuckian and the holder of four commissions as honorary colonel, once remarked that a *Kentucky colonel* had never been defined. On the best available evidence, he was right, both literally and figuratively. In view of the fact that *colonel* was a commonplace two hundred years ago in territory that afterward became the State of Kentucky, this failure to place both the term and the type in their proper historical categories is all the more alarming. The best explanation, however, seems to be this: that *Kentucky colonel*, as a label, is largely a matter of semantics, and a rather involved one, at that.

Our American "fondness for hollow titles," says Mencken in his *Supplement I*, "goes back to colonial days."[1] And one of the earliest sources in proof thereof is Edward Kimber's "Observations" [1745-46]:

Wherever you travel in *Maryland* (as also in *Virginia* and *Carolina*) your Ears are constantly astonished at the Number of *Colonels, Majors,* and *Captains,* that you hear mentioned: In short, the whole Country seems at first to you a Retreat of Heroes . . .[2]

The rest of the sentence, which appears to have been given less attention in the hands of historians, has a direct bearing on the lineage of the Kentucky colonel, for virtually every able-bodied Kentuckian [legally still a Virginian] in the mid-eighteenth century belonged to some form of military unit for protection against Indian attack; and this association between militia and colonel has survived the beginning of the present century:

but alas! to behold the Musters of their Militia, would induce a Man to nauseate a Sash, and hold a Sword, for ever, in Derision.[3]

Nor did Kimber fail to mention, too, their "Diversity" of weapons and uniforms, the "Unsizeableness of the Men," and the "Want of the least Grain of Discipline." He continued:

Even at this Time they are alarm'd with an *Indian* Excursion, and Num-

bers are marched towards the back of the Province to defend the Out-Settlements.[4]

When Kentucky became a State in 1792, much of the same on-guard sentiment obtained. The State's first Constitution provided that "The freemen of this Commonwealth shall be armed and disciplined for its defense." Military titles were cheap, and most innkeepers had them. English travelers, of course, did not overlook that fact. C.W. Janson, who came to America in 1793, said that Americans "rigidly adhere to the vulgar adage, 'once a captain always a captain.'"[5] (Oddly enough, it was with this same "adage"—substituting *colonel* for *captain*—that Ruby Laffoon, 143 years later, answered an Attorney General's "informal opinion" whereby the titles of some 17,000 Kentucky colonels would have been nullified. The phrase, in fact, became a kind of battle cry among the defenders.)

Precisely when *Kentucky* and *colonel* were first inseparably joined is not too clear, but Mencken[6] asserts that the term had become "a byword as early as 1825," when Chief Justice Marshall wrote his catchy quatrain:

> In the Blue Grass region,
> A "Paradox" was born,
> The corn was full of kernels
>     And the "colonels" full of corn.

According to Beveridge,[7] Marshall rattled off these lines at a rather jovial club meeting in Philadelphia, held in a tavern. Directly across the hall from the room that Marshall had entered was the bar, with several Kentucky colonels standing about. And when Marshall was asked, in the course of the evening's entertainment, for "an extemporaneous rhyme on the word 'paradox,'" he

glanced at the bar and the verse came to him in a moment.

During the 1830's the militia system was beginning to undergo a fundamental change; and with the introduction of a volunteer National Guard the position of an officer on the Governor's staff shifted from one of military usefulness to executive ornamentation. Staff officers multiplied, while the list of bona fide generals, colonels, and majors shrank; and the number of "aides with the rank of colonel" increased. During the administrations of J. Proctor Knott, who took office in 1883, and Simon Bolivar Buckner, 1887, a number of such aides—with gold braid, shoulder knots, and "swords a-dangle"—were conspicuous at State receptions. As late as 1915, the last of Governor McCreary's four years, the list ran to as high as seventy and the uniforms were of the traditional splendor. But with the outbreak of World War I, and the consequent ban on uniforms among civilians, the tone was abruptly altered.[8]

In the course of about a century, then, the somewhat romantic Kentucky colonel had come and gone. In a not too serious letter written by the Honorable William F. Neill, Assistant Attorney General (Ky.), to Colonel George M. Chancellor of Cloverport, Kentucky, it is recorded that in an earlier period the Kentucky colonel was recognized by a "brace of dueling pistols, a plug of chewing tobacco, an overwhelming desire to hunt, fight, place a bet or make love to some woman, and a quart bottle of bourbon whisky."[9] In the cushiony days of the Old South, he wore, wrote Neill, a frock coat, a pair of baggy trousers, and a shoestring necktie; the love of strong drinks had not left him but he had acquired a "veneer of culture."

And from 1865 to the turn of the century one of his most noticeable characteristics was a "marked dislike towards anything northern."

Opie Read's *Kentucky Colonel*, first published in the *Arkansaw Traveler* and issued in book form in 1890, gives our subject the warmth-and-kindliness with which the colonel, traditionally, wanted to be associated. That the Governor's staff officers were "nice gentlemen and delightful companions" but inferior, as officers, to militia men of comparable rank is clear from records of Kentucky legislative debates of this period.[10]

The legendary figure—colonel by deference or by appointment—was still recognizable forty years ago, but his prestige was never to regain itself in full.

There is a rather nice touch of historical allegory in the fact that Colonel Jack Chinn, long regarded as a kind of prototype of the old-time Kentucky colonel, died on January 31, 1920, only a few weeks after the accession of Governor Morrow, with whom the commissioning of colonels entered a mass-production era. Chinn, "Eph" Lillard, and Robert B. Franklin made up the famous trio that sang at (Democratic) political rallies, popularizing "Trouble in de Lan'" and other pieces of political doggerel. And it was Chinn and Lillard who were acting as bodyguards to Governor Goebel when he was murdered on the old Statehouse Square at Frankfort, January 30, 1900. Irvin S. Cobb, who was then a reporter in Louisville, helped carry the stricken man away, and got the bare outlines of the story. (Interestingly enough, Cobb called him "Colonel 'Dirk Knife' Jack Chinn.")[11]

Until World War I, the number of "governor's aides with the rank of colonel" was not excessive, though it may have been larger than the occasion warranted. But with the coming of Governor Edwin P. Morrow, the significance of a colonel's commission was in a noticeable decline. During his first few weeks in office he posted fifty-odd colonelcies. His immediate misfortune, however, came not so much from the length of the list as from the fact that one of the persons to whom the rank had been tendered was Henry Watterson, the liberal, strong-spoken prime mover of the Louisville *Courier-Journal,* who had already refused the honor several times. Watterson, of course, fought back with his pen.[12] Even Morrow must have been a little apprehensive when he wrote the official notification letter, dated January 12, 1920, a day after the newspapers had carried the story of the appointments. He was, he explained, taking the "somewhat rash liberty of making you a Colonel on my staff,"[13] and he acknowledged the fact that the commission, "through misuse and abuse," had fallen—in public favor. Yet in spite of all this, he continued, Watterson was the "real Kentucky Colonel," and should —"above all others"—enjoy this new honor. (Evidently Watterson was successful in refusing the appointment; at any rate, he ignored it with sufficient vehemence to escape being listed when the names of past colonels were published in 1936. Quite apart from this Morrow invitation above, Watterson had long been known as "Colonel Watterson," as a kind of mark of professional respect and general popular favor. Even this he disliked, and it is said that it was always made clear to a cub reporter that Watterson would not tolerate anything but "Mr. Watterson.")

Case: 23-5795    Document: 77    Filed: 05/30/2025    Page: 12

But to return to 1920: Four days after Morrow's letter was mailed, the *Courier-Journal*, in a long, bubbling editorial, suggests that the Governor should "think twice before palming upon a real friend one of these absurd titles." Then follows a slightly more bellicose interpretation—

> It's a dollar to a tin sword that the Governor could never think of a sweeter revenge than to sneak up on an enemy — one who has never smelled powder and never will smell powder—and while the latter isn't looking pin a colonelcy on his swallow-tail coat.[14]

Then the editorial writer touches upon the fact that naval titles are conspicuous by their absence. And since the Governor is commander-in-chief of the State's army and navy, this, he argues, is a discrepancy worth mentioning. Even the uniform, he says, needs attention. It tends to make the Kentucky colonel look a bit like a cross between Admiral Sir Joseph Porter in *H. M. S. Pinafore* and a Knight of Pythias. To remedy this, he suggests the appointment of a commission for drawing up a new uniform; and on this five might serve: a milliner, an architect, a scene painter, a wholesale hardware dealer, and a photographer. And finally, on the almost certain chance that one of the colonels will some day suffer from injured feelings, the *Courier-Journal* suggests that a form of "wound stripe" be designed and cut, for use in an emergency.

The reverberations went well beyond State boundaries. The New York *Tribune* of February 1, 1920, worked the controversy into a long feature story, uttering, if anything, a quiet approval of the stand taken by the opposition.

All through the twenties, the colonel —in Kentucky — seemed to thrive. When, in the spring of 1926, Governor Ritchie of Maryland and Governor Byrd of Virginia publicly announced their intention of skimping on colonels, the New York *World* rushed to the defense. They were, they said, "unconditionally opposed" to the "strange withdrawal in Maryland and Virginia." But the *World*'s impression of the contemporary colonel was a trifle too glamorous; and the *Courier-Journal* wasted no time in pointing out that while the Kentucky colonel in full regalia is "a gorgeously beautiful thing," not one in a hundred could afford to own full dress. The *World*, too, had estimated that about three-fourths of the colonels, in uniform, still lent a lustre to State functions. Kentucky, replied the native paper, "has never had a State occasion that three-fourths of them could crowd into."

The cumulative effect of all these pronouncements, no doubt, was a certain publicity victory for the colonels. But four years later they evidently felt a need for some kind of group centralization. On May 23, 1931, they held a long session in the Brown Hotel in Louisville; a constitution was adopted, by-laws ratified, and Andrew H. Morris, Sr., was elected commander. A Bostonian, Percy Hobart Titus, reminded them that "to be a Kentuckian means romance, chivalry, a standing for principle. . . ."

The next wave of anti-colonel sentiment came during the Laffoon administration, when the Governor and the Lieutenant Governor [Albert ("Happy") Chandler] tried to outdo each other on staff appointments. The *Courier-Journal* on June 9, 1933, noted that

there was an "admiral for nearly every stream and lake in the State." As of August 9, the Governor, with 684, was leading the Lieutenant Governor by only 40. (This count, to be sure, included a scattering of generals, admirals, commodores, and even canoeists, but 95 per cent of them were colonels.) At this time it was disclosed that the actual cost of commissioning a colonel was 20¼ cents a head (covering cost of commission blank, ribbon, seal, mailing tube, and postage); if desk work is figured in, on the basis of official salaries, the charge is about doubled. By this estimate it could be shown that no more than about five hundred dollars had been spent, in all, on the commissions proffered by Laffoon and Chandler. (Laffoon's total eventually rose to more than 10,000.) Meantime the colonels had left the "association" level and had become the Honorable Order of Kentucky Colonels. In August, 1933, they launched their own magazine, the *Colonel*, "devoted to the social, industrial, and political interest of Kentucky and of those states which are faced with problems identical with those now confronting Kentucky." They would, they said, be "strictly non-partisan in the political sense," and "avoid sectarian controversy as the plague."[15]

The *Courier-Journal* continued its expression of alarm at the new high in the Kentucky-colonel birth rate. Since so many new colonels had come into existence, why not tell us something, it suggested, of their

> sizes, weights, heights, reaches . . . Do brunettes or blondes predominate? . . . Occasionally one may get into jail or prison. . . . All of them die. Their records should be kept clean, their ideals unblemished.

Three years later came another piece of news which stirred up enough public indignation to carry the colonels over the next reign of calm—presumably a danger sign in the life of the colonel tradition. Beverly M. Vincent, Kentucky's Attorney General issued an informal opinion holding that "no person has a right now to be designated as a Kentucky Colonel, either in Kentucky or elsewhere." Thereby some 17,000 were demoted. Governor Chandler had as yet appointed no honorary aides, and Vincent's conclusion was that when a Governor's term expires, by death or otherwise, all colonelcy commissions issued by him become "absolutely void."

The protest was thunderous.

Exactly a month later, Acting Governor James E. Wise, in the absence of both the Governor and the Lieutenant Governor, restored to good standing the 17,000 honorary aides. Attorney General Vincent stated that he was standing by his original opinion: both State and Federal Constitutions, he reaffirmed, provided that no titles of nobility shall be issued; and since colonels have no duties, terms of office, or authority, the commissions are substantially an acknowledgment of a mild form of peerage. A resolution covering payment of a bonus to the temporarily decommissioned colonels had been pending in the House of Representatives; but the fate of it is not clear, from later accounts.

This rapid resuscitation came about just in time for the colonels' annual banquet on May 1, at the Kentucky Hotel in Louisville. For some time, this Derby Eve dinner—with much fine food, mint juleps, and southern good humor—has been the only official gathering of the clan. Indeed, eighty-five-year-old Matt Winn, who has directed

the Derby since 1902 and built it up from a $2,800 to a $100,000 stake, is a colonel of no mean repute. At their 1942 conclave they announced twenty-five posthumous commissions—to Kentuckians reported killed or captured while on active duty. Over the past seven or eight years scores of public figures—some of whom have since died—have been added to the roster; among them, Will Rogers, Grantland Rice, James Farley, Quentin Reynolds, Christopher Morley, John Kieran, J. Edgar Hoover, Edgar Bergen, and Shirley Temple.

According to Colonel Anna Friedman, Secretary and Keeper of the Great Seal, the Order is about to issue a kind of historical scrapbook (*Howdy, Colonel*), with pictures of the Derby, dinners, and barbecues; profiles; the "correct method of mixing mint juleps"; and "as nearly a complete list of Colonels as could be compiled."

For a little light on the present status of the title itself, one would do well to examine a letter—quoted in Mencken's *Supplement I*—written (about 1934) by Colonel Patrick H. Callahan of Louisville (1866-1940), in reply to an Illinois critic of Laffoon's lavishness. (Callahan had the rank by appointment, and Mencken calls him "one of the most conspicuous colonels of the between-war era.")

*Colonel* [in Kentucky] is not much more than a nickname, like *Tom*, *Dick*, or *Harry*, and is used and appreciated mostly on that account. It is often applied to all Kentuckians without the formality of appointment, just as *major* is used in Georgia. Nine out of ten people who call me *colonel* otherwise would be saying *Mr*. Callahan. It is a handle that breaks down formality.

Or, as one of the past commanding generals of the Honorable Order put it, only a few days ago—"No Kentucky colonel, in our time, takes his title seriously."

*B. A.*

---

1. H. L. Mencken, *Supplement I: The American Language* (N. Y., 1945), pp. 525 ff.

2. Kimber, "Observations in several Voyages and travels in America," *London Magazine*, July, 1746, p. 324.

3. *Ibid.*

4. *Ibid.*

5. Read, "Words Indicating Social Status in America in the Eighteenth Century," *American Speech*, October, 1934, p. 208.

6. Mencken, *op. cit.*, p. 533.

7. Albert J. Beveridge, *The Life of John Marshall* (Boston, 1919), IV, 83.

8. N. Y. *Tribune*, February 1, 1920 (sec. 4, p. 8).

9. *Kentucky State Bar Journal*, September, 1944, pp. 29 ff.

10. *See* official *Report* [*s.v.* "Militia"] of the Constitutional Convention [Ky.], which assembled in 1890.

11. Irvin S. Cobb, *Exit Laughing* (Indianapolis, 1941), p. 204.

12. Watterson was in Florida at that time; he may not have written the series of editorials that immediately followed, but the tone was in keeping with his attitude.

13. Henry Watterson Papers, Library of Congress.

14. Louisville *Courier-Journal*, January 16, 1920, p. 6, col. 3.

15. *Colonel*, August, 1933.

# Exhibit — About Kentucky Colonels 1947

## About Kentucky Colonels

American Notes and Queries, a "journal for the curious," contains an article on "The Kentucky Colonel; a Study in Semantics."

This discussion is somewhat timely because of the fact that the annual Kentucky Colonels dinner in Louisville prior to the Kentucky Derby always attracts attention to the vanishing colonels, though the line can not literally be said to be "thinning" if avoidurpois is taken into consideration.

At any rate, American Notes and Queries says that the late Irvin S. Cobb, who was himself a Kentuckian and the holder of four commissions as honorary colonel, once remarked that "a Kentucky colonel has never been defined." We think that the commissions used to carry something of a definition which emphasized the fact that "this commission carries no salaries or expenses" and might have added that it carried no duties or obligations.

Many Kentuckians are not impressed with colonels' commissions because of the way the issuance of them was abused. It will be recalled that Mae West was made a colonel. We think she wired Gov. Ruby Laffoon, "Come up and see me some time," and he replied, "I'm no angel."

At any rate there were admirals of Lake Ellerslie and Herrington Lake, and at least one general in J. Fred Miles.

Henry L. Mencken in his Supplement I, according to the article by B. Alsterlung and Walter Pilkington in American Notes and Queries, says that the

American fondness for hollow titles goes back to Colonial days. This article said that in the middle of the Eighteenth century nearly every Kentuckian belonged to some military unit.

"When Kentucky became a state in 1792, much of the same on-guard sentiment obtained. The state's first Constitution provided that "The freemen of this Commonwealth shall be armed and disciplined for its defense." Military titles were cheap, and most inn-keepers had them. English travelers, of course, did not overlook that fact. C. W. Jansson, who came to America in 1793, said that Americans "rigidly adhere to the vulgar adage, 'once a captain always a captain.'" (Oddly enough, it was with this same "adage" substituting colonel for captain—that Ruby Laffoon, 143 years later, answered an attorney general's "informal opinion" whereby the titles of some 17,000 Kentucky colonels would have been nullified. The phrase, in fact, became a kind of battle cry among the defenders.)

"Precisely" when Kentucky and colonel were first inseparably joined is not too clear, but Mencken asserts that the term had become "a byword as early as 1825," when Chief Justice Marshall wrote his catchy quatrain:

"In the Blue Grass region,
 A 'Paradox' was born,
 The corn was full of kernels,
 And the colonels full of corn."   [- Justice John Marshall 1825]

The article continues:

"According to Beveridge, Marshall rattled off these lines at a rather jovial club meeting in Philadelphia, held in a tavern."

The article recalls that when Gov. A. B. Chandler was in office, Attorney General Beverly M. Vincent issued an informal opinion that "no person has a right now to be designated a Kentucky colonel in Kentucky or elsewhere."

By order, Governor Chandler abolished 17,000 commissions, with Lt. Gov. Keen Johnson concurring. When they were both out of the state Acting Gov. J. E. Wise, a state senator who as president pro tempore of the Senate became acting governor, restored all the commissions.

Governor Willis has not abused the privilege and the issuance is now largely confined to special occasions. Since there is usually talk about colonels around Derby time, this article in an out-of-state publication is timely.

---

"About Kentucky Colonels" Newspapers.com, The Lexington Herald, April 24, 1947,

https://www.newspapers.com/article/the-lexington-herald-about-kentucky-colo/117843545/

# Exhibit — Adlai E. Stevenson, Something of Men I Have Known, A Kentucky Colonel in Personal Memory

**Author**: Hon. Adlai E. Stevenson (1835–1914)

**Source**: *Something of Men I Have Known*, McClure Company, 1909

**Chapters**: XIV — "A Kentucky Colonel" and XXX — "The Colonels"

## Exhibit Summary and Descriptive Authority

This exhibit features two anecdotal yet historically rich memoir chapters by **Adlai E. Stevenson**, who served as **23rd Vice President of the United States under President Grover Cleveland (1893–1897)**. A respected legal mind, statesman, and native of Kentucky, Stevenson's reflections predate the rise of the Honorable Order of Kentucky Colonels (HOKC) and offer a **firsthand, unembellished account** of the Kentucky Colonel as he existed in the political and cultural landscape of the 19th century.

## Chapter XIV – "A Kentucky Colonel"

This chapter provides an affectionate portrait of **Col. Dick Wintersmith**, a towering civic figure in Frankfort and Washington. Stevenson writes not of a ceremonial or honorary title, but of a **man known universally as "the Colonel" by virtue of public service, rhetorical talent, and moral character**. Wintersmith is revealed as a living emblem of Kentucky's civil tradition—generous, humorous, and steeped in the memory of Henry Clay, with whom he served.

Highlights include:

- His decades-long service as **State Treasurer without partisan appointment**.

- A humorous philosophical exchange with Congressman Ignatius Donnelly that exemplifies both wit and reverence for intellectual tradition.

- A recollection of Kentucky public figures and orators, anchoring the Colonel in a **deep network of civic leadership and oral culture**.

## Chapter XXX – "The Colonels"

Here, Stevenson expands his reflections to the **regional phenomenon of the title "Colonel"** as it existed across the South. He recounts a social gathering of Southern lawyers—several of them "Colonels"—marked by **hospitality, legal camaraderie, and storytelling**.

Notably, he contrasts the **cultural honorific** with dry administrative formality, recalling a satirical tale of a snake-bitten traveler in dry Maine who is denied alcohol for want of a prescription—highlighting the contrast between **regulatory bureaucracies and the informality of Southern traditions**.

## Legal and Historical Relevance

This exhibit provides an **unbroken literary record of Kentucky Colonelcy prior to 1909**, grounded in personal memory, not state commissions. Its legal significance lies in the following:

1. **Independent Verification**: It evidences the use and public recognition of the title *"Colonel"* wholly separate from any formal commission process or institutional license.

2. **Pre-HOKC Usage**: The work was published nearly **25 years before the HOKC was founded (1933)**, affirming that the Kentucky Colonel was already a known **archetype of public virtue and communal honor**.

3. **Semantic Distinction**: The Colonel in Stevenson's memoir is not military nor ornamental—but social, rhetorical, and civic in essence. This supports the claim that the title's meaning was **anchored in tradition and reputation**, not in statutory appointment or trademark registration.

As such, this document qualifies for:

- **Judicial notice under FRE 201(b)(2)** as historical fact available from credible and widely accepted sources.

- **Summary submission under FRE 1006** as it condenses and exemplifies a larger class of literary and autobiographical testimony concerning the Kentucky Colonel.

XIV

## A KENTUCKY COLONEL

COL. WINTERSMITH'S GREAT POPULARITY — HIS ADMIRATION FOR<br>MR. CLAY — HIS MARVELLOUS MEMORY — HIS WIT AND HUMOR.

FEW men were better known in Washington, a quarter of a century and more ago, than Colonel Dick Wintersmith of Kentucky.   He had creditably filled important positions of public trust in his native State.   His integrity was beyond question, and his popularity knew no bounds. Without the formality of party nomination, and with hardly the shadow of opposition at the polls, he had held the office of State Treasurer for nearly a score of years.   An ardent Whig in early life, he was a devout worshipper at the shrine of Henry Clay.   In the later years of his life, he would often with the deepest emotion refer to himself as "the last of the old guard."   He never tired of relating interesting incidents of Mr. Clay.   It was his glory that he had accompanied "the great pacificator" to Washington, when, with the fond hope of being able by his historic "compromise" to pour oil on the troubled waters, he returned to the Senate for the last time.

Wintersmith was the close friend of Theodore O'Hara, and stood beside him when at the unveiling of the monument to the Kentuckians who had fallen at Buena Vista he pronounced his now historic lines beginning —

> "On fame's eternal camping-ground
> Their silent tents are spread."

Colonel Wintersmith knew, as he knew his children, two generations of the public men of Kentucky.   His memory was a marvel to all who knew him.   He could repeat till the dawn, extracts from famous speeches he had heard from the lips of Clay, Grundy, Marshall, and Menifee.   More than once, I have heard him declaim the wonderful speech of Sargent S. Prentiss delivered almost a half-century before, in the old

216

Harrodsburg Court-house, in defence of Wilkinson for killing three men at the Galt House.

It is hardly necessary to say that the Colonel was the soul of generosity.   It was a part of his living faith that —

> "Kind hearts are more than coronets."

That he was possessed in no stinted measure of wit and its kindred quality, humor, will appear from an incident or two to be related.

The Hon. Ignatius Donnelly, member of Congress from Minnesota, had written a book to prove that Lord Bacon was the veritable author of the plays usually accredited to Shakespeare.   Soon after the appearance of Donnelly's book, he met Colonel Wintersmith on Pennsylvania Avenue.

After a cordial greeting, the Colonel remarked, "I have been reading your book, Donnelly, and I don't believe a word of it."

"What?" inquired Donnelly, with great surprise.

"Oh, that book of yours," said the Colonel, "in which you tried to prove that Shakespeare never wrote 'Hamlet' and 'Macbeth' and 'Lear' and all those other plays."

"My dear sir," replied Donnelly with great earnestness, "I can prove beyond all peradventure that Shakespeare never wrote those plays."

"He did," replied Wintersmith, "he did write them, Donnelly, *I saw him write three or four of them, myself*."

"Impossible!" exclaimed Donnelly, who was as guiltless of anything that savored of humor as the monument recently erected to the memory of Hon. John Sherman, "impossible, Colonel, that you could have seen Shakespeare write those plays; they were written three hundred years ago."

"Three hundred years, three hundred years," slowly murmured the Colonel in pathetic tone, "is it possible that it has been so long?   *Lord, how time does fly!*"

The Colonel often told the following with a gravity that gave it at least the semblance of truth.   Many years ago, his State was represented in part in the Upper House by a statesman who rarely, when in good form, spoke less than

an entire day. His speeches, in large measure, usually consisted of dull financial details, statistics, etc. He became in time the terror of his associates, and the nightmare of visitors in the galleries. His "Mr. President," was usually the signal for a general clearing out of both Senate Chamber and galleries.

"Upon one occasion," said Colonel Dick, "I was seated in the last tier in the public gallery, when my Senator with books and documents piled high about him solemnly addressed the Chair. As was the wont, the visitors in the gallery as one man arose to make their exit. With a revolver in each hand, I promptly planted myself in front of the door, and in no uncertain tone ordered the crowd to resume their seats, and remain quietly until the Senator from Kentucky had concluded his remarks. They did so and no word of complaint reached my ears. Hour after hour during the long summer day the speech drew itself along. At length as the shadows were lengthening and the crickets began to chirp, the speech ended and the Senator took his seat. I promptly replaced my pistols and motioned the visitors to move out. They did so on excellent time. As the last man was passing out, he quietly remarked to me, "Mister, that was all right, no fault to find, but *if it was to do over again, you might shoot.*"

## XXX

## THE COLONELS

A CONVIVIAL MEETING OF LAWYERS — HILARITY SMOTHERED
BY THE MAINE LAW — A FAINTING WAYFARER IS REFUSED
A DRINK IN A MAINE VILLAGE — THE APOTHECARY DEMANDS
A PHYSICIAN'S PRESCRIPTION — SNAKE-BITES IN GREAT
DEMAND.

SOME years ago, I spent a few weeks of inclement winter
in a beautiful village in southern Georgia.   Upon call-
ing at his office to renew my acquaintance with a well-
known lawyer, he soon invited in the remaining members
of the local bar.   Everything was propitious, and the con-
versation never for a moment flagged, many experiences
of the legal practitioners of the South and of the North be-
ing related with happy effect.

I at length remarked that since my arrival, I had, some-
what to my surprise, learned that "local option" had been
adopted in their county.   An aged brother, in a tone by no
means exultant, assured me that such was the fact.   I then
observed that I was not a hard drinker, but being a total
stranger and liable to sudden sickness, I asked what I would
do under such circumstances.

An equally venerable brother, who bore the unique title
of "Colonel," slowly responded, "Have to do without, sir;
*have to do without;* not a drop to be had in the county,
absolutely not a drop, sir."

The brief silence which followed this announcement was
broken by the corroborative testimony of a more youthful
associate of similar official distinction, and a genial and hos-
pitable expression of countenance, somehow suggesting mem-
ories of old cognac.

"Yes, sir, the use of spirituous liquors is now only a
tradition with us; but I have heard my father say, that

before the war, the indulgence in such hospitality was not uncommon among gentlemen."

At the conclusion of still further cumulative testimony of the same tenor, I remarked that something about the general situation reminded me of an incident that occurred in a State far to the north while the "Maine Law" was in operation.

A dilapidated-looking pedestrian, with a pack on his back, early one afternoon of a hot July day pulled up in front of the post-office in a small village in the interior of Maine. Humbly addressing a citizen who was just coming out with his copy of the *Weekly Tribune* in hand, he inquired,

"Where can I get a drink?"

"The Maine Law is in force," was the reply, "and it is impossible for you to get a drink in the State."

The heart of the wayfarer sank within him.

"Would you let a man die right here on your streets, for lack of a drink?"

The "better angel" of the citizen being touched thereat, he replied,

"My friend, I am very sorry for you, but no liquor is ever sold here, except by the apothecary, and then only as a medicine."

Upon further inquiry, the important fact was disclosed that the shop of the apothecary was three-quarters of a mile away, on the left-hand side of the road. With an alacrity indicating something of hope, the pedestrian immediately gathered up his pack, and through the dust and heat at length reached the designated place. Sinking apparently exhausted upon the door-step, he feebly requested the man behind the counter to let him have something to drink. The immediate reply of the apothecary was that the Maine Law was in force, and no spirituous liquors could be sold except upon the prescription of a physician. After earnest inquiry, it was ascertained that the nearest doctor's office was one mile away, and the man with the pack again betook himself to the weary highway. Returning an hour later, in tone more pitiful that before, he begged the apothecary, as he

hoped for mercy himself, to let him have a drink. Upon inquiry as to whether he had procured the required certificate, he said, "No, the doctor wouldn't give me any."

The assurance of the apothecary that the case appeared hopeless only added to the distress of the poor man, whose sands seemed now indeed to be running low.

Stirred to the depths by the agony of his visitor, the apothecary at length said,

"My friend, I would be glad to help you, but it is impossible for me to let you have a drink of spirituous liquor unless you have a doctor's certificate *or have been snake-bit*."

At the last-mentioned suggestion, the face of the man of repeated disappointments measurably brightened, and he eagerly inquired where he could find a snake. The now sympathetic man of bottles told him to follow the main road three miles to the forks, and then a few hundred yards to the west, and he would find a small grove of decayed trees, where there still lingered a few snakes, and by the exercise of a reasonable degree of diligence he might manage *to get bit*, and thereby lay the foundation for the desired relief. With bundle again in place, and evincing a buoyancy of manner to which he had been a stranger for many hours, the traveller resumed the quest.

Hours later, when the shadows had lengthened, and the fire-flies were glistening in the distance,

> "With a look so piteous in purport,
>     As if he had been loosed out of hell
>     To speak of horrors,"

he reëntered the apothecary's shop, threw down his bundle, and in tones suggestive of the agony of lost souls, again begged for a drink.

"Did you get snake-bit?" was the feeling inquiry of the man at the helm.

"No," was the heart-rending reply, *"every snake I met had engagements six months ahead, for all the bites he could furnish!"*

# Exhibit — Why the Kentucky Colonel? 1922

## The Kentucky Spirit

### Why the Kentucky Colonel?

By Matt J. Holt, 1922, Voices; Birth-Marks; The Man and the Elephant

Orange County, Virginia, was formed by Colonial act in 1734; and its boundary was: "to the uttermost limits of Virginia." The limits of Virginia were; "westward to the Mississippi and so much further as the Colony had a mind to claim."

From Orange County, Augusta County was formed in 1738, extending beyond the Alleghanies to the "uttermost limits of Virginia." Botetourt was carved from Augusta in 1769 and Fincastle from Botetourt in 1772. Kentucky County was carved by a partition of Fincastle in 1776, under one of the earliest acts of the new Commonwealth of Virginia; and Kentucky County, known as the District of Kentucky, was, in 1780, subdivided into Lincoln, Fayette and Jefferson Counties. These three counties were resubdivided in the making of the additional counties of Nelson, Bourbon, Mercer, Madison, Mason and Woodford; and these nine counties of Virginia, on June 1, 1792, became the State of Kentucky.

The days following the Revolution found the people of Virginia restless, poor and out of touch with the ordinary occupations of pre-war days. Their market for tobacco, the product which had sustained the aristocrat in lavish prodigality and supported the colony, was lost and the plantations were mazes of briars and underbrush.

As was the intention of the statute, the abolition of entails by the legislature of the new Commonwealth of Virginia, first diluted, then dissipated the power of the aristocracy. The family estate, the plantation of thousands of acres, which had been kept intact in the family for generations, was subdivided and resubdivided between the proprietor's heirs and creditors and their vendors, until the old-style, feudal-lord-like life was impossible.

These still land-hungry "First Families," looked to the District of Kentucky, where land, more fertile than Tidewater Virginia, was almost free for the taking—to re-establish themselves as proprietors of vast landed estates, as their fathers had been; thus to revive the prestige and influence of the old family name; and many such emigrated to Kentucky. A great many plain farmers, impoverished by the war and seeing no hope for improved fortune at the old home, hazarded a try for better fortune in the new country. A yet more numerous and important element was the discharged veterans of the Continental Army; they had desired a more adventurous life than was to be found in clearing their old fields to start afresh the life of a poor farmer; and they came to Kentucky.

These three classes of emigrants, and a conservative estimate places their number at exceeding ten thousand a year for the decade succeeding the Revolution, were of pure English stock, democratic, courteous, hardy, self-willed and trained to defend their rights—created the Kentucky Spirit.

Those who had preceded them could not be classified as settlers. As a rule they were wilderness tramps, or land jobbers, or conscienceless traders, who built cabins surrounded by picketings of timbers planted deep in the ground to protect their "stations" from surprises by the Indians; and such cabins soon became widely known. It was around these stations the real immigrant settled.

In case of attack, the settlers near gathered at the "station." The owner, of course, assumed command and exercised all the rights of proprietor. Thus by consent he was designated as Colonel Boone, or Colonel Morgan, or Colonel Gibson, or Colonel Cresap; which title he retained, as is the way of such adventurers, though his "station" frequently degenerated into a joint for the sale of rum or brandy and a resort for the dissolute or criminal of those early days.

Thus the title "Colonel" was applied to any one temporarily in authority; and in Kentucky might be said to have a local meaning. Not all "Kentucky Colonels" have seen military service or are holders of commissions designating them as such; though the secretaries of Kentucky's recent governors, spend much of their time issuing such commissions.

The writer has known instances where Kentuckians holding a commission as lieutenant or captain during actual service; as they grew in importance locally, or became a celebrity because the owner of a great race horse, or in appearance venerable, have been raised by the courtesy of their neighbors to the rank of "General."

Emigrants from Virginia to the District of Kentucky had the choice of the river route down the Ohio, or overland by way of the Old Wilderness Road.

Those coming by river had first to travel caravan style to the head of navigation of the Allegheny, Monongahela, or Kanawha river or to Pittsburgh. There they loaded their cattle into flat boats, or batteaux, or on rafts of poplar logs and floated down the Ohio; carefully keeping to the center of the stream, out of range from the shore. Reaching their destination, usually Limestone (Maysville) or Louisville, they sold their boat or raft and took to pack horse or wagon, completing their journey as they traveled on the first stage of it.

In 1787, M. St. John de Crevecoeur, a native of Normandy published in a Paris journal an account of his river trip from Pittsburgh to Louisville. Considering the date, the narrative seems somewhat overdrawn.

In part he said:

"After having waited twenty-two days at Pittsburgh I took advantage of the first boat which started for Louisville. It was 55 feet long, 12 wide and 6 deep, drawing 3 feet of water. On its deck had been built a log cabin, but very neat, divided into several compartments, and on the forecastle the cattle and horses

were kept in a stable. It was loaded with bricks, boards, planks, bars of iron, coal, instruments of husbandry, dismounted wagons, anvils, bellows, dry goods, brandy, flour, biscuit, lard, salt meat, etc. These articles came in part from the country in the vicinity of Pittsburgh and from Indiana. (The Indiana here referred to was a section of Virginia lying east of the Alleghenies.) I observed the larger part of the passengers were young men who came from nearly all of the middle (coast) states; pleasant, contented, full of buoyant hopes; having with them money coming from the sale of their old farms, or from the share received from their parents.

They were going to Kentucky to engage in business, to work at their trades and to acquire and establish new homes. What a singular but happy restlessness, that which is constantly urging us all to become better off than we are and which drives us from one end of a continent to the other. In the evening after laying up, the more skillful hunters would go to the land to shoot wild turkeys, which you are aware wait for the last rays of the sun to fade away before going to roost in the tops of the highest trees."

When the settler fixed upon his location he appropriated a four hundred acre boundary, the settler's allowance; and taking possession, held it by what was then known as the "Tomahawk Claim;" that is, he blazed his boundary lines with a tomahawk and hacked his initials on the corner trees. He then built a log cabin and felled a few trees to give notice to the world that the blazed boundary was appropriated. His appropriation was usually respected, mainly from custom and sentiment; though the right, if questioned, was usually defended by the rifle.

In the mid-summer of 1787 the Campbells with Mrs. McDonald, the Clarks, and the Fairfaxes, having sold their plantations, emigrated overland by the Wilderness Trail to Kentucky.

Their experiences were much the same as the many who had preceded them; except as they had Indian guides, Oliuachica and two Mingo braves, they were in little danger of attack from the Indians.

What was then known as the Wilderness Road extended from the last settlements on the east side of the Alleghenies, over the mountain on to the headwaters of Clinch River, down that river valley, thence across the mountain into Powell's Valley, thence with the valley to Cumberland Gap and thence through the Gap into the District of Kentucky.

The road had been marked off by Daniel Boone in 1774-5, some said at the direction of Lord Dunmore and others at the direction of Colonel Richard Henderson, as a highway to his colony of Transylvania; a vast boundary mostly in Kentucky, which he had purchased from the Cherokees at the Council of Sycamore Falls.

The road after crossing Cumberland Gap, as shown by John Filson's map of "Kentucke," forked at Flat Lick; the Indian trail known as the "Warrior's Path," passing north across the Ohio River to old Shauane-Town and to the chief settlement of the Mingo Nation on the "Sciotha" River. The other fork, Boone's or the Wilderness Road, from Flat Lick followed a southwest course to Rock Castle River, where the road again forked, the right to Blue Licks and Boonesboro, the left on to the head of Dick's

River, to Logan Station or St. Asaph's Plantation, then forks to Danville, to Lexington and to the Green River Settlements.

It was little more than a bridle path, being intended for pack horses and foot travelers, though it was possible to follow it in a wagon. After 1780, quite a few came through carrying their heavy household effects in wagons; and a few of the aristocrats drove through their family carriages, the tops of which were usually torn off by trailing vines from the trees or overhanging limbs.

Along a good portion of the road at intervals of the average day's journey, were "stations" or taverns where travelers usually passed the night; but if these were not reached they used well-known camp grounds cleared of underbrush and near a good spring, where they bivouaced around a great open fire and slept under awnings or in their wagons.

The caravan led by Colonel Campbell, used to frontier life, preferred the camping grounds. The taverns or stations had a bad name, as headquarters for bandits who frequently robbed and murdered travelers and then spread the rumor of an Indian raid.

The four families, with their slaves, servants and three Indian guides made a total of thirty-two persons. There were eight wagons, two carriages, thirty horses, six oxen, more than eighty head of beef and milk cattle, a small flock of sheep and on the back of each wagon, resting on the tail gate, was either a coop of chickens or a crate of pigs. The camp outfits were carried on pack horses so as not to disturb the loaded wagons. The five negro slaves with their three children, driving the three ox wagons and bringing up the rear, whistling, singing and laughing, were the boisterous ones of the party. The three Indians, Colonel Campbell and Richard Cameron took the lead, and John, when he was not driving the Fairfax carriage, rode with them, conversing with his Indian friends. The Indians were the watchful, silent leaders by day, and one of them with a white companion, the guard by night.

The train bore a marked resemblance to the caravan of a patriarch of ancient days, searching for verdant pasture lands and sweet water courses; who rode at the head with a body-guard and was followed by his dependents and herds.

They had cause to be thankful for their three Indian guides. Traveling through Powell's Valley, in a dense forest, one of the braves gave the signal for a halt and silence, while he stole silently ahead. In a half hour he returned accompanied by more than thirty Mingoes and Shauanese who had placed themselves in ambush, expecting to massacre the party.

Several were members of the Prophet's own tribe and treated him and Chief Cross-Bearer with formal courtesy. In fact they had been sent to escort the Prophet back to his village. Had it not been for the three Indians it is probable some of their party would have been murdered, before John's girdle had been noticed or their identity discovered. At their suggestion his sign was painted with puccoon root stain upon the sides of the wagon covers. The Indians remained with them until they crossed over Cumberland Gap into the Yellow Creek Valley, where Middlesboro now stands.

4

There, Colonel Campbell, reminded of his old home in Scotland and his more recent one in Virginia, pleased with the beautiful meadow free of timber and the fruitful valley, which was a great deer and buffalo pasture, decided to settle; and sought to persuade his friends to do so; but they, with the exception of the Camerons, concluded to travel on until they reached the "cane-brake" or blue grass country.

He fixed upon his "Tomahawk Claim" of four hundred acres as did Mr. Cameron; and their boundaries which joined were blazed off and marked by them and re-marked by their Indian friends with the Indian sign that this was the lodge of Chief Cross-Bearer and therefore sacred from attack. Then the Indians left them and took the "Warrior's Trail" for the Scioto Valley, the land of the Mingo nation.

The Clarks and Fairfaxes remained for a week at Campbell Station and helped get out the timbers for cabins and barns, but could not be persuaded to remain longer. Then they moved on to Logan's Station and subsequently pre-empted land in the vicinity of Danville, then the capital of the District of Kentucky.

On the Sunday before they left Dorothy and John rode horseback to Cumberland Gap; where, tying their horses in a dense copse of pawpaw bushes, fearing they might otherwise be stolen, they climbed to the

Pinnacle overlooking the valleys on either side of the range.

The path to the Pinnacle was as old as man in America. The outcropping layers of stone, which made a rough natural stairway, in places was worn deep by the Indians and those who before them had trod its windings and on the highest point built their signal fires. Now white settlers coming through the Gap, mounted to the summit by the same trail and looked over the Valley and the lesser mountains to the northward into the land of promise; and then back the way they had come towards their old home.

"Dorothy, when you visit a place like this do you take in the view as you climb? I do not like to raise my eyes from the path until I reach the top; therefore I see first the footworn stones, which have the polish of a floor worn smooth by countless feet, though this path's surface is worn by the feet of uncounted generations.

"When I first come upon a peak, which like this over-towers its fellows, in thought I always entreat: Speak, gray mountain head! You know the past, which to me is speechless! Do not thy members reach inward to the spirit of the mountain, which like a great beast of burden has lain asleep for a million years, yet has a heart of life? Tell of those who have gone before; of the sun worshippers, who from your apex, making of an attribute a god, have glorified the day, God's first creation; of the Indians, creatures of the forest shade, as silent as its shadows; who, coming into the bright light of your summit, from this wider vista, have felt more completely the power and dignity of God and lacking a bettername have called him the Great Spirit; of the white man, the servant of ten talents, who, having bitten deeper into the fruit of the tree of knowledge and knowing the true God, must be lifted in spirit above the earth and things earthly as from this altar he looks out and sees that which though of the earth is not earthly, and

5

things above which though of the heavens are not heavenly. When I go into the high places of the mountains I feel I am led of the Spirit that I may be near the Lord and receive from Him my commandments. Such places are either shrines of worship, or sanctuaries where God abides.

"I look out and at first view see the earth below, the tree and mountain tops, the clouds, the azure under-pinions of the everlasting wings; then, if my thoughts are clear as crystal, the veil may be rent, and I may see His face through a haze of glory.

"Dorothy, when you come as today, I feel that you too are led of the Spirit and that our spirits in unison offer praise to God. I am glad that mind and spirit are in communion and I recall that God hath said that man shall not travel the way alone and hath made for each his helpmate. If you are not to be, God hath not yet shown her face to me in life or dream; nor has fancy painted any other or fairer vision than thy sweet face."

"John, I do not see all this. Below I see the green and gray and brown of earth, except off in the valley the silver thread-like rivulet. When I lift my eyes towards the sun I see only the clouds and the sky. That is all; though my face is fanned and my hair tousled by the south wind that whispers to me. Do you hear what the south wind says? You have never tousled it, John, except when as little children we played together; never so much as caught a button of your coat in a stray strand and only the wind has played sweetheart and kissed my face. Oh! You need not move over. But when you were at William and Mary's and I climbed to John Calvin Rock—I like the name—you are not tempest-tossed like other men, but sail a stormless sea or ride too deep for tossing—and looked out upon the valley, I always saw the same, allowing for change of season and sky. But when I closed my eyes, I looked through the peep hole of the old partition and saw a little boy in homespun of oak-bark brown—and when I said ''ittle boy peek through,' he would not peek, but sat on the church bench as a thing of bronze, doubtless greatly shocked at my frivolity. Then the same little fellow took me to the mountain top and showed me the valley and the kingdom of men below; and talked of things I did not understand, as he continues to do. Again it was the same little boy who was the knight of my first adventure, and without a show of fear wiped away my tears. Then we came to live in the Valley and he was my nearest neighbor and, though my own age, taught me more than the master. I have long since given up hope of escape from him. Why has it always been the same little boy?—because it is going to be the same man, John. Oh, John! John!" And her eyes were filled with tears and John wiped them away.

That night John met Captain Fairfax as he was returning from looking after his horses, which had been grain-fed preparatory to continuing their journey in the morning; and without preliminary, as was his way, asked for his daughter.

The Captain, taken by surprise, as bluntly declined. Then ashamed of his bluntness, explained: "You know Dorothy is of gentle birth as are you on your father's side. Your mother's people for generations have been preachers or teachers, they are of an old family though not of the nobility, and she is as good a woman as ever lived. My objection is not to your family; and I know you would make Dorothy a good husband; but you have been educated for and expect to be a Presbyterian minister. As such you will not

make a living sufficient to support Dorothy. Your father and I are no longer rich men, having given all except our lands to the cause of the Colonists. I am a Presbyterian, but I want Dorothy to marry a lawyer, or a planter—not a minister. I doubt if a minister in this new country should marry; he is almost a creature of charity. If you will go to Lexington or Danville and practice law or to the 'cane country' and with your father's and my help buy a thousand acres and improve it, in two or three years I will give my consent. If not, in my opinion, you should remain unmarried. It is the church or Dorothy for your bride. Son, it is up to you."

John did not answer but walked out into the night.

When Captain Fairfax went into the partly finished house and told his wife what had occurred, she burst into tears and upbraided him for showing an unchristian spirit, saying: "No good will result from your decision. John is just the husband I would have chosen for Dorothy. I had hoped that they would marry."

She left the room, looking for Dorothy and sent her to find John.

Though the moon was full and one could see quite distinctly it was sometime before she found him in the shadow of a great elm near the creek. She came up as though it were accidental.

"Why in the shadow and so pensive when we were so happy today? Let us walk in the moonlight or sit on that great rock at the head of the riffle and watch the moonbeams play with the running water."

John, before answering, took her by the hand and led her to a seat on the great boulder. Then he said: "Your father refuses. He looks at the matter from a different view point and his may be the correct one. Whether he or I am right rests with you; not upon your decision but your nature. If we do not marry it may mean a happier life for you, though for me a necessary sacrifice. I offer very little more than my love and fidelity; offsetting this, as he puts it, is a life of privation, hardship and sacrifice—if service can be so called. What he expects for you to have is what you have been brought up to expect—and I can never give."

"John, I love life and joy and gayety but I also love helping others. I love serving God; but as a king should be served, with praise and thankfulness. I think a song of thanksgiving is as divine worship as tears of penitence, though each in order. If you will wait, and you and I are but twenty, in time he will come around to mother's and my way of thinking. We run the Captain, though he is often victor in the preliminary skirmish. Mother said she had always expected me to be your wife and I have never thought of any one else for a husband."

An hour later they came to the house chatting happily; Dorothy having convinced John that her happiness was dependent upon their marriage; and that before the end of another year Captain Fairfax would give his consent.

————

John and Richard rode with the Fairfaxes and the Clarks to the ford of the Cumberland and after farewells and many promises of extended visits, left them to continue their journey over the Wilderness Trail to Logan Station; and they returned home.

Two years passed before John saw Dorothy again, though he wrote her many letters sending them by travelers from Virginia to the settlements. He received fewer than he sent, as the travel was mainly to and not from the settlements.

————————

Colonel Campbell, his son, their one servant and Richard Cameron were kept busy through the fall and winter completing their buildings, foraging for grain and roughness for their cattle, more than thirty head, and making necessary clearings for the spring crops. There was not a great deal of clearing, as they used the meadow of nearly a hundred acres across the creek, from which the Indians by their repeated fires had years before burned off the timber to make pasture land for buffalo. More than half of this, after being cleared of briars and bush growth, they expected to cultivate in corn. John and the servants were assigned to this work while Colonel Campbell and Richard attended to the cattle and other duties. Their work was somewhat retarded by immigrants, who, coming through the gap, stopped overnight, sometimes longer, at Campbell's Station, as the place from the first was called. Several

traders made a proposition to Colonel Campbell to open a tavern; which he declined, although it was an excellent place for one.

Their life was a rude and busy one. The days were given to great physical labor, particularly during that first winter. Under it and the plain wholesome diet of meat, corn bread, milk and dried fruits, John thrived and grew muscular and broad of shoulder. The windows of their house were without glass and there were many crevices between the logs, but the great fireplaces were heaped with seasoned logs, which burned through the night and which as they burned out were replaced by John; though an oak or hickory one occasionally taxed even his strength.

From the ingoing settlers they procured small quantities of flour, grain and tea, voluntarily exchanged or offered for their entertainment; as Colonel Campbell always refused to charge a guest.

Late in the fall two other families settled in the Valley and increased their colony by eight persons. One of these was a girl nearly John's age; who when she saw him cast her vote in favor of the valley location.

The first of December two young men with a pack horse, delayed by a severe snow storm, were employed by the Colonel to help with the work of clearing and plowing the meadow and remained until the following April. One of them carried off as his bride the girl, who first only had eyes for John; but when he did not respond to her advances, named him the "Moon Calf," saying: "His mind is in the moon or some other planet."

8

By the first of June the Campbells had more than forty acres planted to corn and Richard about fifteen acres. Twenty acres of the meadow had been fenced for a hay field and the balance with some open woodland had been made into a pasture. The summer was a fine one for their crops, rain and sun as needed; and when the corn was shocked in the fall the station had much the appearance of an old plantation.

After a year in Yellow Creek valley, Richard Cameron sold his place and moved to the blue grass. There he bought a large boundary of land, became a successful planter, having given up the ministry. In his old age he was sent to congress from his district. He died a rich man.

# Exhibit — Kentucky Colonel—New Vintage © 1969

**Author**: J. Winston Coleman Jr., LL.D., Litt.D.
**Source**: *The Collected Writings of J. Winston Coleman Jr.*
**Publisher**: Winburn Press, Lexington, Kentucky, 1969
**Pages**: 73–78

## Exhibit Summary and Judicial Description

This narrative portrait by noted Kentucky historian **J. Winston Coleman Jr.** presents a rich ethnographic sketch of the Bluegrass gentleman colloquially known as the "Kentucky Colonel" during the early 1940s. Set against the pastoral landscape of Winburn Farm, Coleman contrasts the **mythical stage version of the Colonel**—with Van Dyke beard, gold-headed cane, and theatrical flair—with a living embodiment of **rural intelligence, agrarian independence, and cultural refinement.**

Coleman's account dismantles stereotypes by presenting the Kentucky Colonel not as a caricature or gubernatorial appointee, but as a **living archetype**, a man rooted in land stewardship, historical literacy, and southern hospitality. His colonel is a *"dirt farmer"*, scholar, and wit, whose values of **leisure, learning, and civic companionship** form the true legacy of the title.

The piece is especially useful in the context of judicial historical notice because:

- It **rejects HOKC theatrical branding**, instead celebrating the authentic civic-cultural persona.

- It evidences continuity between **pre- and post-industrial Kentucky identity**, resisting any narrative of decline or privatization.

- It offers **cultural anthropology in real time**, describing the values, affiliations, and mannerisms of colonels known by neighbors and the local intelligentsia—not by ceremonial decree.

Coleman also references **generational continuity**, revealing a personal and local connection to colonelship dating back to 1810, and distinguishes the Kentucky Colonel from absentee elites, artificial titles, or trademark-based orders. His portrait is one of authentic, lived identity—not legal fiction.

## Legal Relevance

This exhibit refutes the notion that colonelship is the exclusive creation of a nonprofit (e.g., HOKC) or a modern state branding practice. It supports the argument that "Kentucky Colonel" is a **public domain civic identity**, well-known and popularly recognized **prior to the 1933 creation of the HOKC**. The Colonel described herein **owes no allegiance to institutional control**, but instead exemplifies a cultural legacy shaped by custom, honor, and historical memory.

As such, this Exhibit is submitted under:

- **FRE 201(b)** as evidence of cultural fact "not subject to reasonable dispute," and

- **FRE 1006** as part of a broader pattern of evidentiary summary concerning the nature and public ownership of the Kentucky Colonel title.

---

## Kentucky Colonel—New Vintage © 1969

ON A RECENT TRIP TO KENTUCKY I had the opportunity to observe the 1940-41 style of Kentucky Colonels. Driving south from Cincinnati, I approached the fertile limestone basin of Lexington and was immediately conscious of being in a "fency" country, with white rails to confine the spirited race horses and quaint stone fences that were unlike those of New England. As I approached the home of the Squire,! I was reminded of the childhood days of "The Little Colonel" who rode her pony, "Tar Baby" down a long avenue of locust trees.

The Squire of Winburn Farm was proud to announce that he was a "dirt farmer". There was nothing about him to suggest the stage version of the old Kentucky Colonel, with Van Dyke beard, frock coat, and gold-headed cane. Rather, he was a robust gentleman of early middle age, with a frank, sun-tanned countenance, and a hearty voice. His coat was off, his belt was loose, and his shirt open at the throat. He made his living by growing tobacco and raising hay and corn to feed the race horses in his vicinity. He informed me that before the Roosevelt agricultural policies were adopted, he had cultivated twenty-two acres of tobacco, but since the government had curtailed the production of the "sovereign weed" his quota has been fixed at sixteen acres.

The machine age has reached the Kentucky farms. The Squire uses tractors instead of horses to plough his land, and he plants his tobacco crop with an ingenious machine. He communicates with his tenants

by a private telephone system, and he rides into Lexington for his luxuries in a Pontiac car. In olden days the Kentucky Colonels had obtained their ice for their juleps from domestic ice houses sunk in the ground, with conical shaped roofs. Such relics of the past may still be seen in the rear of "Ashland", Henry Clay's home. But the modern Colonel has a General Electric refrigerator that provides him with ice cubes. His food is cooked on an electric stove and a washing machine lightens domestic service. In fact, the rural life of the well-to-do in the South has been revolutionized by electricity and gasoline.

Before the Civil War, the growing of hemp was the distinctive crop of Kentucky, the "money crop" of the old Colonels. After a long period of abandonment, hemp is being planted again in the rich loams of the Bluegrass as a supplement to tobacco, and Winburn Farm can boast of fourteen acres planted in this ante-bellum staple. Today, however, it is necessary to secure a permit from the Federal Government to grow hemp, since marihuana, the habit-forming narcotic, is made from the leaves and blossom of the plant. The Colonel's permit, therefore, describes him as a "Producer of Marihuana" for the year 1941.

Around his farm are the luxurious estates where the Kentucky thoroughbred horses and their long-legged colts graze. This Lexington limestone basin is not a country for the yeoman farmer. Land is too expensive. The Squire told me that the proprietor of a neighboring farm had been offered seven hundred and fifty dollars an acre for his land. Many of these lordly estates are owned by northern capitalists, such as "Dixiana" and "Faraway Farm", the home of Man o' War. They are the playthings of the rich absentee owners. The Colonel does not attempt to breed race horses, for he says it is the quickest way "to break" a gentleman of moderate means. Nevertheless, he delights in horseflesh and is proud of the Kentucky racers. He escorts his friends to these "show places" and jokes with the old Negroes who display the retired horses of the turf. Old Will [Harbut], who should be called the major-domo to his majesty, Man o' War, has a tremendous sense of his importance in caring for the famed racer, "that super hoss", who was defeated but once in his career of racing, and the jockey who rode him on that occasion, Will significantly remarks, received his walking papers.

The natives, I am told, made invidious remarks about the gadgets which the wealthy Yankees have imported into the horse country, such as highly polished brass hardware in the stables and air-conditioned rooms for the harness. But, doubtless, they are glad that the profits from automobiles, moving pictures, etc., are devoted to supporting the horse farms in a manner that "dirt farmers" and the old generation of Colonels could not begin to afford.

The Squire has attained a happy and tranquil philosophy of life on his Bluegrass farm, which has been owned by the family since 1810. In his earlier years he was a business man, but the worries and uncertainties of that mode of life caused him to abandon it and return to the soil. Now he enjoys the

independence and peace of mind of a country gentleman. No Southerner could be more hospitable than the Colonel. The food that he serves his guests is grown largely on his farm, the bread and pancakes are made from his own grain, the sausages and hams from his own hogs, the chickens and eggs are furnished by his tenants, the cream and strawberries are home products, and the flowers that adorn his table are gathered in his garden. When he makes a mint julep, he steps outside his door and pulls a sprig of mint from the bank of the stream by the spring house. He serves his delicious concoction from coin silver julep cups that his grandfather Coleman drank from, and he gleefully shows you how worn are the edges of the spoon, with which his "grandpappy'" stirred his juleps.

The focal room in the house of Winburn Farm is the library. Its shelves are filled with books on Kentuckiana, for the Squire is one of the non-professional historians of the South. Many of the dollars that were earned from the sale of tobacco and livestock have gone into buying rare books on southern history. The Colonel has written books on the romance of stage-coaching days and of the old taverns of Kentucky," such as Postlethwait's in Lexington. His magnum opus, however, is a mellow study of slavery times in Kentucky.* On the walls of his library hang the photographs of many eminent southern writers who have visited his home. They indicate that the proprietor has a gift for friendship and has carried on the old southern virtue of hospitality.

The Colonel belongs to a book club of the intelligentsia of Lexington called the "Book Thieves". The members meet for lunch at each other's homes at frequent intervals and discuss books and life. There is no formal program for these gatherings to restrain the spontaneous flow of wit and good conversation. The culture of the Blue Grass region is reflected in the membership of this club which includes gentlemen from various professions and walks of life. Perhaps the most outstanding personality in this group is a white-haired, aristocratic judge,* "the dean of Kentucky historians', who has the largest private library in the state. Other members are: an eye specialist? whose hobby is the collection of rare first editions; a loquacious and witty business man,° nicknamed "The General"; the dignified President' of the University of Kentucky; a physician who has written a book on the conquest of cholera; a lawyer who has devoted years of research on the life of Abraham Lincoln and has collected one of the most valuable libraries of Lincolniana in the world; a young professor? at the University of Kentucky who has published a number of volumes on southern history. In such a group the visitor feels that he may discuss many subjects, especially the history of the Old South in a free spirit, without the inhibition of partisanship.

I believe that the Colonel determines the tone of the club, and his influence is in the direction of informality and freedom. He makes fun of high-brows, stuffed shirts and bigwigs. Certain society folks of the Blue Grass region who follow the fox and hounds in fancy costumes are the butt of his wit and

mimicry. He is especially amused at "the blessing of the hounds" when a portly bishop! prays over the hounds in a deep voice that rumbles forth from the depths of his belly. The Colonel also jokes about his ancestors, making many flippant remarks as he shows you family portraits done by Jouett,!? and ancestral silver. He observes that the Blue Grass region contains some inhabitants that are "long on ancestors and short on cash". But one of the most appealing facets of his personality is his philosophy of enjoying life. He thoroughly believes in leisure. Hence he does most of his farming by telephone. Especially does he believe that every person should have a hobby. He is fond of contrasting his carefree and pleasant mode of existence with the prosaic life of some other farmers who work hard, fret and fume, and have little fun out of life.

It is this appreciation of leisure, to use for culture and the enjoyment of good companionship, that forms the connecting link between this splendid specimen of the Kentucky Colonel of 1941 and his prototype, the old Colonel with the Van Dyke beard and gold-headed cane.

**Coleman, J. Winston Jr.** *The Collected Writings of J. Winston Coleman Jr., LL.D., Litt.D.* Lexington, KY: Winburn Press, 1969.

Source: https://archive.org/details/collectedwriting0000jwin/page/73/mode/2up