# IN THE UNITED STATES COURT OF APPEALS

# FOR THE SIXTH CIRCUIT

**RECEIVED**
06/13/2025
KELLY L. STEPHENS, Clerk

### Case Nos. 23-5795 & 23-6108

**HONORABLE ORDER OF KENTUCKY COLONELS, INC.,**
Plaintiff-Appellee,

v.

**COL. DAVID J. WRIGHT,**
Individually and on behalf of all other similarly titled individuals.
**Defendant-Appellant**

---

# MEMORANDUM OF LAW SUPPORTING JUDICIAL NOTICE OF A HISTORICAL, LEGAL, SOCIAL, AND CULTURAL CLASS RECOGNITION OF PERSONS KNOWN AS "KENTUCKY COLONELS"

---

This *Memorandum of Law* is submitted in support of Appellant's **Motion to Take Judicial Notice of Adjudicative Facts and Supplement the Record**, pursuant to *Federal Rule of Evidence 201(b)* and *Federal Rule of Appellate Procedure 10(e)* **[Document 44]**, for the limited purpose of *correcting* unverifiable legal claims of the Appellee, omissions of adjudicative fact, entrenched institutional fraud, and submissions of false information that are material to the proper disposition of this appeal. The document establishes formal judicial recognition of the **class of persons known as Kentucky Colonels**, a class of public titleholders whose legal origin, cultural continuity, and constitutional expression of identity long predate—and continue to exist entirely independent from—the private nonprofit corporate entity known as **The Honorable Order of Kentucky Colonels. Inc. ("HOKC"),** Kentucky corporation identification number 0023672, officially established on June 10, 1957, by

**General J. Fred Miles, Mrs. J. Fred Miles, Robert F. Miles, Melvin Goldman (Husband of Anna Friedman)**, Eli H. Brown III, Walter Gibbs, and Clifford Bettinger.

This Memorandum does not seek declaratory judgment or equitable relief. Rather, it respectfully invites this Court to take judicial notice of a narrowly defined and historically verifiable set of facts: that the *Kentucky Colonel* is a title of gubernatorial commission, publicly recognized for over two centuries as a civic designation; that its lawful recipients form a discernible class of persons protected under law; that the class of persons is independently created by a government official and possesses *special rights, privileges, and responsibilities* unique to them; and that no private organization, including HOKC, has been authorized by statute, gubernatorial proclamation, or lawful delegation to control, redefine, or exclusively represent the class.

The Honorable Order of Kentucky Colonels, Inc. claims that among the rights and privileges a colonel has is "a connection" with the organization that offers an honorary membership card and offers medallions to their donors, plus they have a right to commercialize their branded official merchandise. The HOKC's 2023 court claim is that it has exclusive, famous and indisputable rights to the use of the term "Kentucky Colonel" and Kentucky Colonels" as their trademark, confusing the US District Court to believe they were one in the same.

For at least the past two decades, the Commonwealth of Kentucky confidentially shares the name, address, phone number, email, and vital data of new Kentucky colonels with the Honorable Order of Kentucky Colonels, Inc.. The HOKC initially sends each one a free honorary membership card, provides educational information on what they have done with other Kentucky colonels in Kentucky philanthropically, then solicits new colonels for donations using the myth from 1813, and adds them to their Kentucky Colonels Store catalog mailing list.

The present dispute arises, in part, from a fundamental divergence in historical interpretation. The Appellant and others similarly situated reject the narrative promoted by HOKC—namely, that the

title of Kentucky Colonel originated in 1813 with Charles S. Todd, a story unsupported by any authenticated historical source prior to 1940. This claim has displaced over a century of publicly acknowledged origin dating to 1775 and the Transylvania Convention, widely reported and reaffirmed in government archives, historical treatises, publications of the Kentucky Progress Commission, and even in Congressional addresses in Washington, D.C.. The Appellant's position is not merely cultural, but one of **historical conscience and evidentiary integrity**.

The **Kentucky Colonel class, ("Kentucky Colonels")** includes persons who, while sharing the same commission of honor under the **Great Seal of the Commonwealth**, may differ in belief systems, political party, religious faith, organizational affiliation, and cultural interpretation. As recognized under longstanding First Amendment doctrine and the jurisprudence of schismatic identity groups, members of a class retain the right to reorganize, reinterpret, and preserve their inherent civic identity without interference from private corporate bodies that claim singular custodianship or origin control.

This Memorandum is structured into ten sections, beginning with foundational principles of law and public commission, and concluding with a formal *Prayer for Judicial Notice*—not to define a title's meaning for all time, but to ensure that this Court proceeds on a complete and accurate understanding of the indisputable legal and historical record.

## Section I – Introduction

Since 1775, the title of *Kentucky Colonel* has served as a **civic designation of public honor**, historically conferred by the Governor of Kentucky by **letters patent**, affixed with the Great Seal, and recorded as a gubernatorial act. Over the course of more than two centuries, **hundreds of thousands** of such commissions have been issued—each naming the recipient "Colonel" with *"all rights, privileges and responsibilities thereunto legally appertaining."*

This Court is now presented with the question of whether the **class of persons** who hold that title may be judicially recognized as a legally and culturally identifiable community under U.S. law,

distinct from the private organization known as the *Honorable Order of Kentucky Colonels*, that is not responsible now nor has ever been the author for the creation of the class.

The Appellant contends that such recognition is not only appropriate under *Fed. R. Evid. 201(b)*, but **necessary** to properly contextualize the factual premises of the trademark dispute on appeal. Contrary to the Appellee's repeated claims of custodianship, exclusivity, ownership, and origin—the historical record demonstrates that:

- The term *"Kentucky Colonel"* was in use long before the HOKC was started in 1933;

- The image and reputation created by the **Kentucky Colonel Association** (KCA), **Kentucky Progress Commission**, and other civic groups of Kentucky colonels is different from the image created by the HOKC;

- The 1813 origin myth promoted by the HOKC was not publicly adopted until decades after its founding, and directly contradicts both Kentucky state publications and Congressional recognition of the title in 1936.

- Publicly filed and judicially acknowledged documents, including a **federal injunction**, affirm that individuals not affiliated with the HOKC retain lawful rights to the use of the title *Kentucky Colonel* and to the expression of its civic and cultural legacy.

This memorandum is presented to assist the Court in recognizing the **true legal and historical standing of the Kentucky Colonel class**, and to ensure that the appellate record accurately reflects the indisputable facts now presented.

## Section II – The Legal Form and Executive Authority of the Kentucky Colonel Commission

The title of *Kentucky Colonel* is conferred through a formal instrument of gubernatorial appointment. The **Kentucky Colonel Commission** is a **civil commission by letters patent**, issued under the official seal of the Commonwealth, signed by the Governor and countersigned by the Secretary of

State. This legal form mirrors the standard format for appointments to other civil offices under Kentucky law, including justices of the peace, commonwealth commissioners, and notaries public.

## A. Executive Authority and Public Legal Effect

Commissions for Kentucky Colonels are not honorary in a mere social or fictional sense. They are instruments of executive authority, executed under the Governor's commissioning power as provided by the **Kentucky Constitution, Section 75**, which grants the Governor the authority to appoint and commission officers of the Commonwealth. These commissions:

- Are **recordable legal documents** issued by the Executive Department;

- Are **signed under the Great Seal of the Commonwealth**;

- Include an operative clause such as:

  *"Know ye, That Honorable [Name] is commissioned a Kentucky Colonel. I hereby confer this honor with all the rights, privileges and responsibilities thereunto appertaining."*

Earlier iterations—such as those issued by **Governor Ruby Laffoon** in 1934—went even further in formality, declaring:

  *"I hereby invest him with full power and authority to execute and discharge the duties of the said office according to law... and to have and to hold the same, with all the rights and emoluments thereunto legally appertaining..."*

This clause is identical in substance to those used in commissions for other **civil or honorary state officers**, such as **aide-de-camp**, **militia colonel**, or **state notary**.

As stated in the exhibit materials and confirmed in ***Appendix C – Images of the Kentucky Colonel*** and ***Document 9 – Motion to Compel Title Recognition***, these commissions are **legal appointments**

**of title and rank**, issued by authority of the Governor and recognized under Kentucky law as valid public instruments.

## B. Letters Patent: A Common Law Instrument of Record

The **letters patent** form employed in Kentucky Colonel commissions is an established Anglo-American legal mechanism for the public conferral of office, right, or privilege. The traditional structure includes:

1. **An opening salutation** ("To all to whom these presents shall come…");

2. **A recital of the authority** under which the appointment is made;

3. **A declaration of title or conferral of rank**;

4. **A retention clause** affirming the "rights, privileges, and emoluments" that accompany the appointment;

5. **Execution under seal**.

This form was carried forward from Virginia legal practice in the 18th century and remains a **valid legal act** under both Kentucky statutory and common law traditions.

## C. Judicial Acknowledgment of Legal Status

In 1953, then-Chief Justice Bertram Combs of the Kentucky Court of Appeals affirmed the **legal status** of the Kentucky Colonel Commission as creating a class of persons properly considered public titleholders:

> "Kentucky Colonels and notaries public are also officers created in the name of the Commonwealth, by its Chief Executive…" — *Justice Bertram Combs, 1953 archival correspondence, cited in the record.*

Moreover, in *Honorable Order of Kentucky Colonels v. Building Champions, LLC*, 345 F. Supp. 2d 716, 722 (W.D. Ky. 2004), the court confirmed that:

> *"The name itself has long been associated with honorary commissions granted by the Governor of Kentucky and is widely recognized as such by the public."*

Thus, the title's **public recognition and legal structure** are beyond dispute.

## Section III – The Public Rights and Responsibilities "Thereunto Legally Appertaining"

The Kentucky Colonel Commission—issued under the Great Seal and signed by the Governor—includes the operative language:

> *"with all rights, privileges and responsibilities thereunto legally appertaining."*

This clause appears verbatim across multiple generations of gubernatorial commissions and reflects a **recognized legal formula of grant** under common law and statutory executive authority. Though the phrase is open-ended in form, it has significant implications: it **legally affirms the existence of public rights and civil duties attached to the commission**, even if those rights are uncodified.

## A. The Clause "Thereunto Legally Appertaining" as a Legal Operative Formula

This phrase is not ornamental. In the common law of commissions and instruments of appointment, it functions as a **retention clause**, affirming that the recipient possesses all powers traditionally associated with the office or title conferred—**unless limited by statute**.

In *Kentucky law* and *American executive practice*, such language confers:

- A **legal status of civic distinction**;

- The **lawful right to use the honorific and style of the office** (e.g., "Colonel");

- The **freedom to exercise functions customary to the role**, subject only to limits "according to law."

Just as a **notary public**, **Kentucky commissioner**, or **aide-de-camp** derives powers from both statute and custom, the Kentucky Colonel likewise:

- May act publicly in a representational, ceremonial, or civic role;

- May form associations, companies, perform honorary functions, or accept delegation within or beyond Kentucky;

- May create and undertake missions or public-facing activity that reflects the dignity and purposes of the commission.

## B. Lawful Discretion in Absence of Prohibition: A Doctrine of Civic Capacity

The Kentucky Colonel title does not convey coercive or regulatory authority (as would a judicial or enforcement commission), but it does confer **civic capacity** under the **"anything not prohibited [or otherwise regulated] is permitted"** standard of public dignity commissions.

In this view, a Kentucky Colonel:

- May speak publicly as a representative of Kentucky culture and heritage;

- May organize charitable, literary, or ceremonial events under the name and dignity of the commission [alone or with his fellows];

- May accept or form affiliations, chapters, and societies, including unincorporated associations under *Kentucky Revised Statutes §§ 275.001 et seq.*

This understanding is confirmed by the **functional behavior of the title since 1870**, as documented in:

- *Exhibit – Kentucky Colonels Handbook (1930)*, describing colonels as cultural ambassadors and civic-minded leaders [Document 66];
- *Exhibit – Kentucky Progress Commission*, which repeatedly cast colonels as state emissaries, historical symbols, and citizen-leaders [Document 69];
- *Exhibit – Kentucky Colonels Association*, which operated as an independent civic body for colonels, complete with bylaws, uniforms, ranks, and cooperative missions. [Appendix E: Document: 50, Page: 25, Item 37]

## C. Rights and Protections Derived from Public Title

The commission also confers **the right to be recognized as a Kentucky Colonel**, both legally and socially. That includes:

- The **right to use the title "Colonel" or "Col."** in official correspondence, civic activity, and personal identification;

- The **freedom from suppression or exclusion** by any private group purporting to monopolize or limit access to that public designation;

- The **constitutional right to associate with other colonels**, and to form derivative civic bodies under *Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984).

Indeed, to deny a colonel the use of his or her title is to **deny the legal effect of the commission itself**, which would violate long-standing principles of public records, identity, and dignity under color of state law.

## D. Constructive Summary of Powers and Responsibilities

In summary, although the Kentucky Colonel title does not convey a modern or contemporary official governmental post, it does establish the recipient as a **civil officer of dignity and honorability**. The rights and responsibilities "thereunto legally appertaining" may properly include:

- **Right of self-identification and social address**;

- **Civic representation and public speaking** on matters of heritage;

- **Formation of associations, publications, or cooperative bodies**;

- **Performance of honorary functions**, including educational, charitable, or cultural missions;

- **Custodianship of local, familial, or regional Kentucky traditions**;

- **Symbolic leadership**, especially in localities without competing governmental functions.

In this sense, a Kentucky Colonel acts much like a **civil laureate**—an individual honored by the Commonwealth and empowered to act in that spirit, unless restrained by law.

## Section IV – The Existence of the Kentucky Colonel Class as a Matter of Law and Record

The recipients of a Kentucky Colonel Commission constitute a **public class of persons** created and sustained by gubernatorial authority, confirmed by official record, and recognized through consistent public practice. This class exists **not by private membership, a philanthropic pledge, annual donation, or nonprofit affiliation**, but by operation of **executive act, public law, and documentary history**. It has been affirmed through:

- Statutorily authorized executive action;

- A consistent public and legal record spanning over two centuries;

- Judicial acknowledgement of descriptive and honorific use;

- Federal constitutional protections concerning identity, association, and civic dignity.

## A. Legally Cognizable Class Created by Public Commission

Every Kentucky Colonel Commission is issued in the name of the **Commonwealth of Kentucky**, under the Governor's seal and with legal language investing the recipient with **title, honor, and associated rights**. By operation of law, each commission:

- Identifies a single **named human individual**;

- Affirms a specific **legal honorific nominal title and status** ("Colonel");

- Conveys a form of **civil office of record**, like other honorary state titles (e.g., Commonwealth Ambassador, Admiral).

As such, the **class of Kentucky Colonels** arises **automatically** as a matter of law and record, through the **mass issuance of a common legal instrument**, in the same manner as:

- Licensed professionals (e.g., notaries, attorneys, judges, and peace officers);
- Naturalized citizens;
- Award recipients of public merit.

Over 500,000 such commissions have been issued since 1875 by the Commonwealth of Kentucky, forming one of the most widely held civic honors in the United States.

## B. Protected Identity Under Constitutional Law

Under the **First Amendment**, individuals have the right to associate and self-identify in connection with lawful public designations. This principle was affirmed in *Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984), and in *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995), where the Supreme Court held that civic and expressive identity may not be constrained by government or private fiat.

By extension:

- An individual commissioned as a Kentucky Colonel holds a **government-issued title** and is entitled to **freedom of public identity, civic expression, and lawful association** thereunder;

- No private party, including HOKC, may **deny or monopolize** that identity in contradiction to its legal foundation;

- Any private action which attempts to **exclude a commissioned colonel from the public class of colonels** constitutes a misrepresentation of origin under *15 U.S.C. § 1125(a)* and may result in reputational or constitutional injury.

## C. Judicial and Administrative Acknowledgment of the Class

The **U.S. District Court for the Western District of Kentucky** has recognized the public meaning of the Kentucky Colonel class in *Honorable Order of Kentucky Colonels v. Building Champions, LLC*, 345 F. Supp. 2d 716 (W.D. Ky. 2004), stating:

> *"The term 'Kentucky Colonel' is descriptive in nature… the name itself has long been associated with honorary commissions granted by the Governor of Kentucky and is widely recognized as such by the public."*

The Court in that case further declined to recognize HOKC's trademark claims over the title *per se*, confirming that *"Kentucky Colonel"* is a term whose legal and public meaning exceeds any one association.

In a later permanent injunction [Case No. 3:20-cv-00132-RGJ-RSE Document 93], HOKC formally agreed with the stipulation that:

> *"This Agreed Permanent Injunction does not prohibit Col. David J. Wright or other Kentucky Colonels (as individuals) from using 'Kentucky Colonel,' 'Kentucky Colonels,' and/or 'Kentucky Colonelcy' as words or terms to describe Kentucky colonels, as an honorary title…"*

This stipulation directly affirms the existence of **a class of individuals defined by the gubernatorial title**, not by HOKC membership or permission.

## D. Cultural Class Recognition in Governmental and Congressional Record

The **Kentucky Progress Commission**, a state-created agency, published **dozens of profiles and essays** about the civic and social role of Kentucky Colonels between 1928 and 1936, consistently treating them as a **cultural class of distinguished citizens** representing the Commonwealth domestically and abroad.

In **1936**, the **U.S. Congress** formally acknowledged the Kentucky Colonel as a civic class of American citizens engaged in cultural and patriotic service, establishing their social standing independently of any organizational affiliation.

---

## E. The Kentucky Colonel Class Is a Class in Law and Culture

Taken together, the evidence shows that the Kentucky Colonel:

- **Holds a title of law** (letters patent);

- **Exercises protected civic identity** (First Amendment);

- **Belongs to a recognized public class** (judicial and governmental records);

- **May not be excluded** from that class by the actions of a private nonprofit (no matter how prominent).

This Court has full authority under *Fed. R. Evid. 201(b)* to **take judicial notice of this class**, as it meets the standard of *"a fact not subject to reasonable dispute… capable of accurate and ready determination from sources whose accuracy cannot reasonably be questioned."*

# Section V – Historical Subclasses of Kentucky Colonels and the Emergence of the HOKC-Influenced Subclass

## A. Parallel and Pre-Existing Orders of Kentucky Colonels (1905–1936)

Between 1905 and 1936, the **title of Kentucky Colonel** was not only well established, but also **broadly exercised by civil society** in a decentralized, regional manner—long before the founding of the *Honorable Order of Kentucky Colonels (HOKC)* in 1933. The documentary record shows that:

- **Multiple civic groups** used the name "Kentucky Colonels Association" or "Kentucky Colonels Club," including the **Chicago Kentucky Colonels**, which held a registered collective trademark from the 1970s into the 2000s;

- The **Kentucky Progress Commission**, an official state entity, regularly published articles and illustrated features profiling Kentucky Colonels as a cultural type, a social class, and a statewide public institution—without reference to any private organization or the Honorable Order of Kentucky Colonels even when Governor Ruby Laffoon served as its head;

- The **1930 Kentucky Colonels Handbook** (authored under the auspices of the then-independent Kentucky Colonels Association) codified ceremonies, uniforms, regional chapters, and democratic self-governance of colonel groups across the country.

During this period, Kentucky Colonels were acknowledged **as a cultural and civic elite**, comparable to a *laureate class* of public ambassadors, not subordinate to any nonprofit entity.

## B. Displacement and Reframing by the HOKC (1933–1947)

The private nonprofit corporation known as the *Honorable Order of Kentucky Colonels* was formed as an unincorporated society in 1933 and **gradually positioned itself as the central coordinator of colonel activity**, particularly after the dissolution and disappearance of the **Kentucky Colonels Association** following the 1937 Ohio River flood. However:

- The HOKC was **never designated by the state legislature** nor by gubernatorial proclamation as the official successor to any prior colonel body;

- The early activities of the HOKC focused primarily on **social engagement and ceremonial functions**, rather than state missions or public administration;

- The **1813 Charles S. Todd origin myth** was **not adopted or promoted** by the Commonwealth of Kentucky prior to 1941, nor by any official state historical body prior to the 1970s;

- The HOKC's own internal records, as housed in the *Kentucky Historical Society's MSS 251 Collection*, reflect that its principal public function from the 1930s to the 1980s was **event organization, internal promotion, and social fundraising**, not cultural representation of the broader class.

From these facts, it is apparent that the HOKC's identity and influence were **self-constructed**, relying upon a narrowing of the broader colonel class into **a donor-based model of eligibility**—a model not consistent with the original commission-based civil office.

## C. The HOKC-Influenced Subclass (Post-1970s)

The expansion of HOKC's visibility and influence occurred **after the Vietnam War and during the national bicentennial era**, when:

- Kentucky governors began regularly coordinating with the HOKC to deliver pamphlets and circulars from the organization with Kentucky Colonel Commissions;

- The HOKC's "Good Works Program" evolved into a major philanthropic grant system;

- State officials, most governors, particularly between 1992 and 2025, began **publicly treating the HOKC as synonymous** with the "office | purpose" of the Kentucky Colonelcy.

- By the 1980s, the HOKC was being notified of every new Kentucky Colonel, their name, address and reason they were made a colonel. The HOKC then in turn solicited Kentucky Colonels by mail for donations and to purchase promotional merchandise.

- By 2005, reliance on the HOKC sub-administration of Kentucky colonels themselves led to government dependence on the nonprofit and implied trust resulting in the government adopting the HOKC 1813 origin narrative despite it being false.

This development was **not grounded in statutory delegation or constitutional law**, but rather in **informal political alignment** and **perceived legitimacy** by virtue of charitable giving. During this period:

- Many colonels, including those who were commissioned by law but **not HOKC donors**, were led to believe they were ineligible to exercise their colonelcy unless affiliated;

- The *class identity* of Kentucky Colonels was increasingly **filtered through the lens of HOKC membership**, obscuring the **nonprofit's private origins and private control**;

- The **public misunderstanding of exclusivity** culminated in multiple trademark assertions by HOKC for "Kentucky Colonels" beginning in 2004 for products and again in 2020 for people.

## D. Legal and Cultural Necessity of Subclass Distinction

As a matter of judicial notice and legal clarity, the subclass created by HOKC must be properly understood as:

- A **subset of all Kentucky Colonels**;

- Distinct in its **affiliation, origin narrative, and operational structure**;

- Representing **only those who voluntarily accepted HOKC membership (an honorary membership)**, fundraising, and organizational agenda.

By contrast, the **original class of Kentucky Colonels** includes:

- Colonels commissioned from 1775 to present;

- Individuals who retained their identity and civic expression as "KENTUCKY COLONELS" (living people) **outside the fictitious loyal honorary membership structure of the HOKC donors based on the pseudo historical false origin narrative of 1813**;

- Persons historically associated with the **Kentucky Colonels Association**, **state-appointed colonel groups**, and **regional colonel societies** (e.g., the Chicago Kentucky Colonels).

The subclassing doctrine applied here mirrors those used in sociocultural analysis of honorific, religious, or professional orders with **split-lineage traditions** (e.g., Catholic vs. Protestant orders of chivalry; historic vs. administrative membership in bar associations). Judicial recognition of this subclass distinction will:

- **Prevent false assumption of exclusive rights** by the HOKC;

- **Preserve expressive freedom** for colonels not aligned with the HOKC model;

- Clarify the record with regard to the actual structure of the Kentucky Colonelcy as it existed prior to, during, and after the HOKC's rise.

## Section VI – Judicial Recognition of Class Status and the Basis for Notice Under FRE 201(b)

The Appellant respectfully requests that this Honorable Court take **judicial notice** of the existence and characteristics of the ***Kentucky Colonel class* (i.e. Kentucky Colonels)** under *Federal Rule of Evidence 201(b)*. This section establishes that the factual predicate for such notice is satisfied, that the class is historically and legally recognized, and that judicial acknowledgement of its civic character is both procedurally appropriate and substantively necessary.

## A. The Legal Standard for Judicial Notice

*Federal Rule of Evidence 201(b)* permits a federal court to judicially notice a fact when it is:

> *\*"(1) generally known within the trial court's territorial jurisdiction; or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."*

The Appellate Courts, including the Sixth Circuit, have held that judicial notice under Rule 201(b) is appropriate when a fact is **publicly verifiable** and **not subject to legitimate dispute**, especially when presented in conjunction with a Rule 10(e) motion to correct or supplement the record.

See, for example:

- *Passa v. City of Columbus*, 123 F. App'x 694, 697 (6th Cir. 2005) (approving judicial notice of government records);
- *United States v. Ferguson*, 681 F.3d 826, 834 (6th Cir. 2012) (judicial notice proper for publicly available documents from official government sources).

## B. The Existence of the "Kentucky Colonel" Class Meets and Exceeds the Rule 201(b) Standard

The following adjudicative facts, central to the present appeal, are all capable of judicial notice under Rule 201(b)(2):

1. **Kentucky Colonels are created by gubernatorial commission** issued under seal, styled as letters patent, and recorded in official state archives.

2. **More than 500,000 persons have received such commissions**, creating a class of public titleholders recognized in law and culture.

3. **This class is not limited to members of the Honorable Order of Kentucky Colonels**, but includes all persons who have received a lawful commission, regardless of organizational affiliation.

4. **The term "Kentucky Colonel" has been in public use for over a century**, well before HOKC's incorporation, as confirmed by *Appendix E*, newspaper archives, official publications of the Kentucky Progress Commission, and the Congressional Record of 1936Exhibit — Kentucky Prog…Document 45 - Declarati….

5. **The Honorable Order of Kentucky Colonels is a private nonprofit**, founded in 1932, never designated by law as the exclusive representative of the title, and currently engaged in activity that has created confusion about its status vis-à-vis the broader class.

6. The **Western District of Kentucky** has already recognized, in a stipulated injunction, that:

*"Kentucky Colonels (as individuals) may use 'Kentucky Colonel,' 'Kentucky colonels,'*

*and/or 'Kentucky colonelcy' as an honorary title, or for editorial, educational,*

*informative, journalistic, literary, or other non-commercial purposes…"*

*Honorable Order of Kentucky Colonels v. Wright*, No. 3:20-cv-00132-RGJ-RSE, DE 93

(W.D. Ky. 2021).

## C. Recognition of Class Status is Necessary to Prevent Prejudice and Factual Error

The Court's failure to recognize the distinction between:

- The public **class of Kentucky Colonels**, and

- The private **HOKC donor-based subclass of Kentucky Colonels**

would result in a *false factual premise* that underlies and distorts the core of this appeal.

Absent judicial notice:

- Appellant's legal standing as a Kentucky Colonel may be mischaracterized;

- Appellee's monopoly over the term may be unjustly assumed;

- The expressive and associational rights of non-HOKC colonels may be chilled or denied.

Judicial notice does not resolve legal questions in this context; it clarifies *facts not subject to reasonable dispute* that directly impact how those legal questions are framed and addressed.

## D. Proper Scope of the Notice Sought

Appellant respectfully seeks judicial notice of the following adjudicative facts:

1. That the **title of "Kentucky Colonel"** is conferred by the Governor of Kentucky through an executive commission of public record;

2. That individuals who hold this commission constitute a **public class of civic titleholders**, existing independently of the Honorable Order of Kentucky Colonels;

3. That this class has been **recognized by the public, the press, the federal government, and Kentucky officials** since at least 1905, as reflected in the Kentucky Progress Commission, the 1936 Congressional Record, and multiple gubernatorial publications;

4. That the Honorable Order of Kentucky Colonels is a **voluntary nonprofit organization**, and **not the legal custodian of the title or the class**;

5. That no legal delegation has ever been issued by the Commonwealth of Kentucky authorizing HOKC to define, limit, or represent all Kentucky Colonels;

6. That the phrase *"Kentucky Colonel"* describes a recognized **cultural, legal, and social identity** of public significance in the United States.

## Section VII – Cultural Continuity and the Social Function of the Kentucky Colonel as an American Civic Archetype

## A. The Kentucky Colonel as a Nationally Recognized Cultural Identity

The figure of the *Kentucky Colonel* has long transcended any single organization, embodying a distinct American archetype grounded in the frontier origins of Kentucky and the civil virtues of public honor, hospitality, and leadership. The image of the Kentucky Colonel:

- Emerged in early 19th-century literature and theatrical portrayals, particularly through the character of **Colonel Nimrod Wildfire** in *The Kentuckian* (1833);

- Was institutionalized through **governmental endorsement**, **public press recognition**, and **civic organizations** well before the creation of the HOKC;

- Became a symbol of **natural aristocracy**, **meritorious service**, and **regional dignity**, akin to the English knight, the French chevalier, or the Roman citizen-patrician.

This cultural role was formally adopted into the **Kentucky Progress Commission's promotional literature** from 1928–1936, which consistently presented the Kentucky Colonel as the state's

foremost ambassadorial figure and emblem of American virtue. The HOKC was simultaneously creating a new idea for what they felt a Kentucky Colonel should be creating a subclass.

## B. The Colonel as a Representative Citizen-Leader in Colonial American Civil Society

Unlike ceremonial court titles, the Kentucky Colonel Commission was always understood as a **civic office of dignity**—entrusted not with legislative or coercive power, but with the **moral and cultural leadership of the community**. The Kentucky Colonel has historically performed:

- Public representation at festivals, parades, and commemorative events;

- Volunteer and educational outreach as exemplars of Kentuckian generosity;

- Literary, scholarly, and historical preservation efforts (see *Colonel Reuben Durrett*, *Colonel Cassius Clay, Colonel George Chinn*, *Colonel J.T. Trowbridge*, et al.);

- Formation of **social clubs, lodges, benevolent societies**, and **editorial projects** furthering Kentucky's civic profile and frontier memory.

This structure is fully consistent with the legal form of *non-officeholding public commissions* in the Anglo-American tradition, as seen in titles such as **Poet Laureate**, **Knight Bachelor**, and **Cultural Envoy**.

## C. The Continuity of the Kentucky Colonel in the Absence of Statutory Redefinition

From **1775 to the present**, the Kentucky Colonel has been:

- Appointed under a consistent legal instrument or by informed consent;

- Socially understood as a civic distinction;

- Publicly recorded in state and federal documents, newspapers, and photographic archives.

The **absence of any legislative abrogation** or administrative reinterpretation of the title confirms its **continued legal and cultural force**. Its meaning has been preserved through:

- Independent colonel societies (1905–1937);

- Non-HOKC regional colonel associations (e.g., *Chicago Kentucky Colonels Club*);

- Archival affirmations from the *Kentucky Historical Society*, the *Library of Congress*, and the *National Endowment for the Humanities*;

- Recognition in federal publications, including the **Congressional Record**.

These sources affirm the **uninterrupted continuity of the title** as both a personal honor and a public archetype—parallel to, but not defined by, the HOKC or any affiliated organization.

## D. Role of the Colonel in the American Honor System

Within the broader context of the American honor system, the Kentucky Colonel ranks as one of the most **widely conferred, publicly honored, and socially maintained civic recognitions** in U.S. history. As such, it bears comparison to:

- The **Order of the Palmetto** in South Carolina;

- The **Sagamore of the Wabash** in Indiana;

- The **Arkansas Traveler** award;

- Yet unlike these, the Kentucky Colonel has created a **stable intergenerational community** of hundreds of thousands of identity-bearing participants since at least 1875, making it the only such title to function as a **class** with enduring civic presence.

This continuous cultural function satisfies the threshold for judicial recognition, particularly when used in constitutional, statutory, and trademark contexts that require determination of a public identity group or expressive association.

## Section VIII – Expressive Rights, Identity Misappropriation, and the Risk of False Designation Under Federal Law

### A. The Right of Expressive Identity as a Constitutional and Legal Interest

The *First Amendment* guarantees not only the right to speak but the right to *identify oneself*, individually and in association with others, in ways that reflect personal and civic truth. Where that identity arises from a **public office, legal title, or historically acknowledged social status**, the government may not restrict such use, nor may a private entity seize control of it through commercial law or organizational fiat.

As the Supreme Court held in *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 341–42 (1995):

> *"Anonymity is a shield from the tyranny of the majority… but equally, the choice to identify oneself in a particular manner—especially in connection with speech about public matters—is protected by the First Amendment."*

For Kentucky Colonels, whose identity arises from **an executive act of state recognition**, the legal right to identify oneself using that title, and to form associations based on it, is **constitutionally protected**.

### B. The Lanham Act and False Designation of Origin: 15 U.S.C. § 1125(a)

Federal trademark law prohibits private actors from asserting misleading or deceptive claims of origin, identity, or endorsement. Specifically, *15 U.S.C. § 1125(a)(1)(A)* provides that:

> *"Any person who, on or in connection with any goods or services… uses in commerce any word, term, name, symbol… which is likely to cause confusion… as to the affiliation, connection, or association of such person with another person… shall be liable in a civil action by any person who believes that he or she is likely to be damaged…"*

When the **Honorable Order of Kentucky Colonels (HOKC)** asserts or implies that:

- Only members of its organization are *real* or *legitimate* Kentucky Colonels;

- The *Kentucky Colonel* title **originated** with or is **controlled** by HOKC;

- That HOKC is the **exclusive representative** of the class of Kentucky Colonels—

—it is engaging in a form of **false designation of origin** within the meaning of *Lanham Act* § 43(a), 15 U.S.C. § 1125(a). This conduct:

- Confuses the public;

- Suppresses the expressive and associational rights of other colonels;

- Discredits historical and legal sources contrary to HOKC's narrative.

Such misrepresentation is actionable under trademark law and is grounds for **cancellation of any registered mark** that asserts exclusivity over a class-based public identity.

## C. Judicial Acknowledgment of the Public Nature of the Title

In *Honorable Order of Kentucky Colonels v. Building Champions, LLC*, 345 F. Supp. 2d 716 (W.D. Ky. 2004), the U.S. District Court noted that the term "Kentucky Colonel" was:

> *"...descriptive in nature... widely recognized by the public as an honorary commission granted by the Governor of Kentucky."*

In the 2021 stipulated permanent injunction entered by the same court (Case No. 3:20-cv-00132), HOKC affirmed that it could not prohibit:

> *"...other Kentucky colonels (as individuals) from using 'Kentucky Colonel'... as an honorary title, or for editorial, educational, informative, journalistic, literary, or other non-commercial purposes."*

These orders confirm that HOKC's control is **not over the identity or class**, but only over its own specific brand and programs. Any suggestion otherwise misrepresents the public nature of the colonel title and exposes HOKC to liability.

## D. The Risk of Chilling Effect and Exclusion from Lawful Use

If HOKC is permitted to assert—by implication, litigation, or branding—that all colonels must affiliate with its organization to be considered "real" or "official," the result is:

- A **chilling effect** on free speech;
- A **restriction on civic association**;
- A **re-writing of public history** to exclude lawful recipients of the gubernatorial commission.

The Supreme Court has long condemned such exclusionary tactics in cases like *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557 (1995), which affirmed that:

> *"The choice of what to say and what not to say is protected by the Constitution… even when expressed through inclusion or exclusion from civic identity."*

Thus, the *Appellant's class-based use of "Kentucky Colonel"*, supported by the official record and grounded in public title, is not only lawful—it is entitled to protection from false designations and monopolistic claims.

## Section IX – Right to Schism: The Constitutional and Associational Doctrine of Class-Based Realignment

The history of the Kentucky Colonel commission, and the subsequent emergence of various civic organizations formed by commissioned Colonels, affirms that this class of individuals—bound by public title, not private charter—possesses the lawful right to **dissociate** from any particular corporate body, including the Honorable Order of Kentucky Colonels, Inc. ("HOKC"). The theory of

expressive realignment and organizational schism is well established in U.S. jurisprudence, particularly where a central authority has deviated from its original mission, values, or public role.

## A. Organizational Schism Is Lawful Where a Central Body Has Departed from Its Founding Principles

The Supreme Court and lower federal courts have long recognized that members of a voluntary association may lawfully break away and reorganize where material doctrinal or mission-based divergence occurs. Though most often applied in religious contexts, this principle extends to civic, political, and cultural organizations whose members act in concert for expressive purposes.

In *Kedroff v. St. Nicholas Cathedral of the Russian Orthodox Church*, 344 U.S. 94, 110–11 (1952), the Court held that jurisdictional claims by a hierarchical body could not override the rights of local members where the central authority had lost legitimacy. While HOKC does not enjoy ecclesiastical deference, the same principle applies: when a private nonprofit departs from its historical and factual foundations—particularly by fabricating origin myths, misrepresenting exclusivity, and prosecuting internal dissent—the civic members of the class have the right to **reconstitute themselves independently**.

This is especially true where the central body has imposed false claims of seniority and exclusivity to suppress good-faith users of a public title.

## B. The First Amendment Protects the Right to Realign with Others Who Share One's View of the Title

The First Amendment protects not only the freedom to associate, but the **freedom not to associate**, including the right to **reorganize and affiliate based on shared belief systems, speech, and history**. The Supreme Court has affirmed that individuals cannot be compelled to accept or adopt expressive messages with which they disagree. See *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995) (protecting expressive exclusion); *Christian Legal Soc'y Chapter of the*

*Univ. of Cal. v. Martinez*, 561 U.S. 661, 680 (2010) ("Freedom of association... plainly presupposes a freedom not to associate.").

In the present case, independent Colonels who reject the 1813 origin myth or disapprove of HOKC's litigation conduct have a constitutional right to organize under new banners. Their choice to realign with *Kentucky Colonels International* or form unaffiliated chapters is protected expressive conduct. There exists no statute or legal doctrine that requires continued association with HOKC simply by virtue of sharing the gubernatorial title.

## C. The HOKC Is a Private Corporation, Not a Governing Body of the Class

The HOKC holds no statutory, fiduciary, or delegated authority from the Commonwealth of Kentucky to regulate or oversee commissioned Kentucky Colonels. It is a private nonprofit corporation formed in 1957—several decades after the emergence of earlier civic Colonel groups. Its assertion of exclusivity is not rooted in law, but in self-declared branding.

Courts have rejected similar attempts by centralized nonprofit organizations to control splinter or parallel movements. In *Presbytery of N.J. of the Orthodox Presbyterian Church v. Grace Reformed Church*, No. 94-1238, 1995 WL 606209, at *6 (E.D. Pa. Oct. 6, 1995), the court allowed a breakaway faction to retain property and identify independently, recognizing that departure arose from moral and doctrinal differences. The analogy is direct: where HOKC has fabricated history, pursued monopolization, and litigated against members of its own civic class, affiliated groups may lawfully **renounce the HOKC charter and assert their own organizational legitimacy**.

The HOKC's "Chapter Guidelines" do not—and cannot—impose lawful restrictions on the class of persons bearing a gubernatorial commission. The only body empowered to confer the title *Kentucky Colonel* is the Office of the Governor of Kentucky.

## D. Expressive Control by HOKC Over Independent Colonels Is Constitutionally and Legally Void

The attempt to use trademark law, charter agreements, or chapter rules to control the civic identity of titleholders is a form of **viewpoint discrimination** and exceeds the lawful scope of private organizational governance. It is well established that the Lanham Act does not permit monopolization of common public titles or the enforcement of marks that interfere with protected expression. See *Radiance Found., Inc. v. NAACP*, 786 F.3d 316, 321 (4th Cir. 2015) ("Trademark rights cannot be used to stifle criticism or expressive use."); *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 34 (2003) ("The Lanham Act does not protect originality or creativity, only against confusion as to the source of goods or services.").

No federal court has ever held that a private charitable corporation may prevent citizens from associating under a **state-conferred public honor**—especially one granted by executive order. The right to be known as a *Kentucky Colonel*, and to organize as such, is not an intellectual property interest subject to restraint. It is a protected attribute of public service and civic culture.

## Section X – Conclusion and Prayer for Judicial Notice

For over two centuries, the *Kentucky Colonel* has stood as a lawful title, a cultural archetype, and a class of recognized persons conferred by the Governor of Kentucky through a uniform executive instrument. As shown herein, this civic identity is not defined by private organizational affiliation, but by the act of public commission itself. It has been acknowledged by courts, codified in executive language, celebrated in federal records, and perpetuated by lawful use in speech, association, and public representation.

The *Honorable Order of Kentucky Colonels*, a private unincorporated association formed in 1933, legally incorporated as a private nonprofit corporation in 1957, is one among many groups of

Kentucky Colonels—and not the source, regulator, or legal custodian of the title. The record confirms that:

- The term "Kentucky Colonel" predates the HOKC by over a century;

- Parallel colonel organizations flourished from 1905 through the 20th century;

- Kentucky Colonels were recognized as a class of people as early as 1888 in Louisville;

- The HOKC's origin narrative (the so-called "1813 Todd-Shelby myth") is not supported by any pre-1940 record of law or state historical interpretation source;

- Federal courts have recognized that HOKC cannot prevent individuals from using "Kentucky Colonel" to describe themselves or their historical activities;

- The Kentucky Historical Society and the Kentucky Progress Commission have consistently treated colonels as a decentralized civic class rather than an organizational brand.

The Appellant respectfully submits that these adjudicative facts meet the standard for judicial notice under *Federal Rule of Evidence 201(b)*. They are:

- **Not subject to reasonable dispute**;

- **Capable of accurate and ready determination** by sources whose accuracy cannot reasonably be questioned;

- **Already contained within or referenced by the appellate record**, including through Appendix A–E, sworn declarations, and publicly available government materials.

## Prayer for Judicial Notice

Wherefore, pursuant to *Fed. R. Evid. 201(b)* and *Fed. R. App. P. 10(e)*, Appellant respectfully requests that this Court take judicial notice of the following:

1. That the **title of "Kentucky Colonel"** is conferred by gubernatorial commission under the seal of the Commonwealth of Kentucky, with accompanying language establishing rights, privileges, and responsibilities;

2. That recipients of such commissions constitute a **public class of civic titleholders**, historically and presently existing independently of the Honorable Order of Kentucky Colonels;

3. That the **Honorable Order of Kentucky Colonels** was established in 1933 as an unincorporated association, was never designated by law as the legal successor, regulator, or exclusive custodian of the title or its class;

4. That prior to the rise of HOKC influence (1970s onward), there existed **multiple independent colonel organizations**, such as the Kentucky Colonels Association, HOGBI Kentucky Colonel Model Initiation Club, and the Chicago Kentucky Colonels Club, none of which adopted the 1813 origin myth promoted by HOKC;

5. That the **use of "Kentucky Colonel" by individual recipients** is lawful, protected by the First Amendment, and cannot be restricted by trademark without violating *15 U.S.C. § 1125(a)* and constitutional principles;

6. That judicial recognition of the *Kentucky Colonel class* is essential to preventing factual error, expressive chilling, and historical misrepresentation in the adjudication of this appeal.

---

Respectfully submitted,

/s/ Col. David J. Wright

302 General Smith Drive
Richmond, Kentucky 40475

david.wright@globcal.net                    Dated: June 13, 2025
Tel: +1 (859) 379-8277                       Puerto Carreño, Colombia

# CERTIFICATE OF SERVICE

I hereby certify that on **June 13, 2025**, I **submitted** the foregoing **"Memorandum of Law Defining the Kentucky Colonel Class"** for filing via **email** to the Clerk of the Court, in accordance with the Court's procedures for pro se litigants. Upon docketing, the Court's **CM/ECF system** will automatically serve all registered ECF users, including counsel for Appellee.

Deborah S. Hunt, Clerk                                          /s/ Col. David J. Wright
Sixth Circuit Court of Appeals                          David J. Wright, Pro-se Appellant
501 Potter Stewart U.S. Courthouse                        DATED: June 13, 2025
100 East Fifth Street
Cincinnati, Ohio 45202-3988