# IN THE UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

RECEIVED
06/30/2025
KELLY L. STEPHENS, Clerk

### Case Nos. 23-5795 & 23-6108

**HONORABLE ORDER OF KENTUCKY COLONELS, INC.,**
Plaintiff-Appellee,

v.

**COL. DAVID J. WRIGHT,**
Individually and on behalf of all other similarly titled individuals.
**Defendant-Appellant**

---

# MEMORANDUM OF LAW ON THE GENERIC AND DESCRIPTIVE NATURE OF THE TERMS "KENTUCKY COLONEL" AND "KENTUCKY COLONELS"

---

## I. INTRODUCTION

This memorandum addresses the generic and descriptive status of the terms "Kentucky Colonel" and "Kentucky Colonels" under federal trademark law as a matter for judicial notice **[Document 44]**. In accordance with **Federal Rule of Evidence 201(b)** and this Court's authority under **Federal Rule of Appellate Procedure 10(e)(2)(B)**, which collectively permit the correction of the record and judicial notice of adjudicative facts not subject to reasonable dispute, including facts established by historical public records, official government documents, and self-authenticating exhibits presented in the Appellant's filings **[Document 45; Document 50 and Document 78]**. These *terms* are widely recognized as a reference to honorary titles conferred by the Governor of Kentucky, designating individuals recognized for civic service, good deeds, or notable achievements. The title, term, and phrase are not inherently associated with any single organization or commercial entity.

The title has been consistently recognized, both within Kentucky and internationally, as a public honor rooted in the Commonwealth's civic traditions dating to as early as 1775, as documented in verified historical sources compiled in **[Appendix A, Document 46]** and **[Appendix E, Document 50]**. Judicially noticeable materials, including the U.S. Congressional Record from 1936, further confirms that the terms belong to the public domain and are emblematic of Kentucky's cultural identity since at least 1776. See **[Exhibit – US Congress 1936 Recognition, Document 67]**.

The Honorable Order of Kentucky Colonels (HOKC), a private social association originating in 1933/34 and incorporated in 1957, has attempted to appropriate exclusive trademark rights to 'Kentucky Colonels' in connection with charitable fundraising and promotional services. However, historical evidence, legal principles, and federal trademark law demonstrate that these terms are either too generic or merely descriptive of colonels from Kentucky, without secondary meaning, making them ineligible for exclusive protection under the **Lanham Act, 15 U.S.C. § 1051** et seq.

Federal courts have consistently held that generic terms and merely descriptive titles, particularly those conferred by governmental authority or embedded in public culture, are not subject to private trademark ownership absent clear evidence of a secondary meaning. See *Nalpac, Ltd. v. Good Vibrations, Inc.*, 84 F.3d 1111, 1118 (6th Cir. 1996); *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976); *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992).

## II. BACKGROUND

The title **"Kentucky Colonel" originated as an honorary commission granted by the Governor of Kentucky**, recognizing individuals for civic service, good deeds, progressive advancements, or personal achievements. Documentary evidence submitted for judicial notice establishes that the title 'Kentucky Colonel' traces to civic-militia leadership commissions originating in 1775 under the authority of the Transylvania Convention and Governor Patrick Henry of Virginia in 1776, preceding Kentucky statehood **[Declaration of Historical Fact, Document 45; Appendix E, Document 50]**. Historical records, literary sources, and governmental archives confirm that the title has been publicly

recognized, culturally celebrated, and used in both formal and satirical contexts since the late 18th century, with widespread literary references, including the 1833 theatrical portrayal of 'Colonel Nimrod Wildfire' in The Lion of the West, demonstrating its entry into the public lexicon as both an honorific and cultural archetype **[Exhibit - Colonel Nimrod Wildfire, Document 56]**.

By the late 19th century, the term was adopted as an honorific title by Kentucky government after becoming widely known across the United States, then shortly thereafter with independent Kentucky Colonels Clubs in major cities such as Washington, D.C., Chicago, Los Angeles, and Dallas beginning at the turn of the century. These organizations are further evidenced by historical publications such as the *Kentucky Colonels Handbook* (1930) and contemporaneous news sources, which predate the formation of the Honorable Order of Kentucky Colonels and demonstrate public, civic use of the title and related terms without proprietary restriction. See **[Exhibit–Kentucky Colonels Handbook, Document 66]** and **[Exhibit–Kentucky Colonels Newspaper Clippings, Document 72], et.al**. These clubs were independent of the HOKC and used the title to promote civic pride, Kentucky heritage, and cultural identity among the Kentucky diaspora.

The Honorable Order of Kentucky Colonels was started in September 1933 as an unincorporated social association under Governor Ruby Laffoon's administration, approximately 20 months after his assumption of office. Historical evidence indicates this formation followed proposals by private individuals, including Charles Pettijohn and Anna Bell Ward, and was unrelated to any longstanding legal or governmental origin of the Kentucky Colonel title **[Exhibit - Myth of the Kentucky Colonel 1813 Origin, Document 74]**. Despite later narratives promoted by HOKC, including an unsubstantiated 1813 origin myth involving Governor Isaac Shelby, no verifiable governmental record connects the HOKC to the authentic, historical tradition of Kentucky Colonel appointments documented in the Commonwealth's public records. Although the organization became engaged in charitable fundraising as early as 1951, it did not create or control the title "Kentucky Colonel," nor did it originate the cultural tradition associated with it, it was other organizations that did.

This Court has recognized that terms grounded in governmental honors or cultural traditions are not subject to exclusive appropriation absent proof of distinctiveness acquired through sustained, source-identifying use, which the record demonstrates is absent here. See *Nalpac, Ltd. v. Good Vibrations, Inc.*, 84 F.3d 1111, 1118 (6th Cir. 1996); see also **[Exhibits - Exposition of Public Domain Records, Document 50]**.

## III. LEGAL CLASSIFICATION OF TERMS

### A. Generic Terms

Under the Lanham Act, a term is generic when it refers to a general class of goods, services, or persons, rather than identifying a particular source or origin. Generic terms are never eligible for trademark protection. See *Miller Brewing Co. v. G. Heileman Brewing Co.*, 561 F.2d 75, 79 (7th Cir. 1977).

The term "Kentucky Colonel" is generic within the meaning of federal trademark law because it refers to a publicly conferred honorary title, long recognized as denoting a class of civic recipients commissioned by the Governor of Kentucky. As established by verified historical records and adjudicative exhibits submitted to this Court, including the *Declaration of Historical Fact* and *Appendix E – Exhibits Exposition*, the title originated from civic-militia recognitions from **Kentucky's first head-of-state Colonel Judge Richard Henderson in 1775** and the title "Colonel" has been consistently used to denote distinguished individuals recognized as colonial leaders rather than any proprietary organization or commercial source. See **[Declaration of Historical Fact, Document 45]; [Appendix E – Exhibits Exposition, Document 50];** and **[Exhibit – Historical Markers at Boonesborough, Document 59]**.

The word "Colonel" is itself a widely recognized term of military rank, civilian leadership, or as an honorary designation, used broadly across governmental, social, and literary domains. The addition of "Kentucky" serves only as a geographic modifier, creating a regional designation within this

generic class. Numerous other states, including Tennessee and Alabama, have recognized analogous honorary titles, further evidencing the descriptive and generic character of such designations. See **[Appendix A – Origins and Sources, Document 46]** and **[Kentucky Colonels Handbook, Document 66]**.

The title "Kentucky Colonel" has been continuously granted by the Commonwealth of Kentucky for over two centuries without proprietary limitation, commercial exclusivity, or consistent association with any particular entity, including the Plaintiff-Appellee. See *Honorable Order of Kentucky Colonels v. Building Champions, LLC*, 345 F. Supp. 2d 716, 719–21 (W.D. Ky. 2004) (denying exclusive rights to "Kentucky Colonels" in view of its public honorary status), see **[Appendix E – Exhibits Exposition, Document 50]**.

## B. Descriptive Terms

A term is merely descriptive if it conveys an immediate idea of the qualities, characteristics, or status of the goods, services, or persons to whom it applies. See *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 790 (5th Cir. 1983). The terms "Kentucky Colonel" and "Kentucky Colonels" fall squarely within this category as they directly describe individuals who have received a formal ceremonial commission from the Commonwealth, recognized for civic merit, good deeds, or other distinctions. See **[Exhibit – US Congress 1936 Address, Document 67]** and **[Exhibit – Kentucky Progress Commission, Document 69]**.

Descriptive terms may be eligible for trademark protection, only if they have acquired distinctiveness through secondary meaning—that is, the consuming public has come to recognize the term as identifying a specific source of goods or services rather than merely describing status or class. See **15 U.S.C. § 1052(f)**; *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992).

This principle is consistently applied in the Sixth Circuit, where courts have held that marks incorporating geographic or descriptive terms, or common titles, must demonstrate acquired

distinctiveness to warrant protection. See, e.g., *Johnny's Fine Foods, Inc. v. Johnny's Inc.*, 286 F. Supp. 2d 876, 882 (M.D. Tenn. 2003) (holding that without persuasive evidence of secondary meaning, marks with descriptive or personal name elements lack enforceability).

Even if a term acquires secondary meaning and thus qualifies for trademark protection, the rights granted do not prohibit fair, truthful, descriptive use of the term in its primary meaning context.

We learn in *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 122 (2004) — Trademark rights do not bar others from using a protected term descriptively, even if some confusion occurs, provided the use is in good faith and reflects the term's primary meaning.

The evidentiary record in this appeal demonstrates herein conclusively, that "Kentucky Colonel" and "Kentucky Colonels," when used to describe titleholders, lack secondary meaning tied exclusively to the Plaintiff-Appellee. Judicially noticeable exhibits, including public records, independent club formations, historical publications, and widespread civic usage, establish that the title has been employed generically and descriptively by countless individuals and organizations for nearly two centuries. See **[Exhibit – Kentucky Colonels Handbook, Document 66]; [Appendix B – Descriptive Quotation Passages, Document 47]** and **[Exhibit – The Kentucky Colonel, A Study of Semantics, Document 73], et.al**.

## C. Absence of Inherent Distinctiveness in "Kentucky Colonels"

Inherent distinctiveness is reserved for terms that are **fanciful, arbitrary, or suggestive** within the meaning of federal trademark law as a source. See *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976). Fanciful terms are invented words with no preexisting meaning (e.g., "Kodak"). Arbitrary terms apply common words in an unrelated context (e.g., "Apple" for computers). Suggestive terms simply imply qualities without direct description (e.g., "Coppertone" for sun tan lotion).

In contrast, descriptive terms, which convey characteristics, functions, or class membership, and generic terms, which refer to the general category itself, are not inherently distinctive and may not be protected absent proof of secondary meaning. See *Two Pesos*, 505 U.S. at 769; *Nalpac, Ltd. v. Good Vibrations, Inc.*, 84 F.3d 1111, 1118 (6th Cir. 1996).

The title "Kentucky Colonel" has been conferred by the Commonwealth since the 18th century as an honorary civic status, publicly recognized by state officials, cultural organizations, independent associations, and within the broader public domain. The plural term "Kentucky Colonels" organically describes the collective class of such honorees and carries no inherent distinctiveness capable of supporting exclusive private ownership. See **[Memorandum of Law Supporting Judicial Notice of a Historical, Legal, Social, and Cultural Class Recognition of Persons Known As "Kentucky Colonels", Document 82]**.

The Plaintiff-Appellee's claims that "Kentucky Colonels" operates as a distinctive trademark fail under settled legal standards. The term is neither fanciful, arbitrary, nor suggestive with respect to its use by HOKC which is made up of Kentucky colonels itself. Instead, it describes a longstanding, widely recognized civic title historically embedded in Kentucky's cultural identity and acknowledged as belonging to the public domain. See *Building Champions*, 345 F. Supp. 2d at 719–22.

Moreover, the Plaintiff-Appellee's inconsistent trademark applications, including three 2020 filings made three days prior to bringing its case asserting false "first-use" dates in 1931 or 1951 and unsubstantiated claims of exclusivity, further undermine any assertion of inherent distinctiveness. See **[Exhibit – Legal Analysis of HOKC Trademarks, Document 71]** and **[Exhibit – Myth of the Kentucky Colonel 1813 Origin, Document 74]**.

Accordingly, under governing authority, the terms "Kentucky Colonel" and "Kentucky Colonels" lack inherent distinctiveness and reside within the public domain, precluding Plaintiff-Appellee from

asserting exclusive trademark rights absent irrefutable proof of a secondary meaning (differing from actual Kentucky colonels), which is wholly absent from the evidentiary record before this Court.

## IV. PUBLIC DOMAIN STATUS OF "KENTUCKY COLONEL" AND "KENTUCKY COLONELS"

The honorary title "Kentucky Colonel" and its plural form "Kentucky Colonels" are **terms embedded in the public domain**, originating from the Commonwealth of Kentucky's longstanding tradition of recognizing individuals for distinguished civic service, personal achievement, or cultural contributions. The public domain status of these terms is conclusively established by:

1. **Historical Records Demonstrating Public Use and Origin**

   a. The title "Kentucky Colonel" was first publicly conferred in 1775 by the civic-militia leadership under the authority of Governor Patrick Henry of Virginia, as documented in the verified records following the Transylvania Convention and subsequent gubernatorial commissions. See **[Declaration of Historical Fact, Document 45]** and **[Appendix E – Exhibits Exposition, Document 50]**.

   b. From the late 18th century onward, the term evolved into a recognized civic designation conferred by the Governor of Kentucky, independent of any private organization. Official records, historical archives, and cultural references spanning over two centuries confirm this continuous, non-proprietary usage. See **[Exhibit – Kentucky Progress Commission, Document 69]** and **[Exhibit – Kentucky Colonels Handbook (1930), Document 66]**.

2. **Legislative and Governmental Recognition**

   a. In 1936, the United States Congress, through formal proceedings recorded in the Congressional Record, acknowledged the Kentucky Colonel title as a symbol of civic honor and American cultural heritage. See **[Exhibit – U.S. Congress 1936 Recognition, Document 67]**.

   b. The Commonwealth of Kentucky has consistently recognized the title as a gubernatorial commission for public distinction, reflected in certified state historical

markers, government publications, and archival documents. See **[Appendix E, Document 50]** and **[Exhibit – Kentucky Progress Commission, Document 69]**.

3. **Cultural and Literary Public Domain Status** – The title "Kentucky Colonel" entered American literary and popular culture by at least 1833 with the character "Colonel Nimrod Wildfire" in the widely circulated play The Lion of the West, where the term was used satirically and honorifically as a cultural archetype. See **[Exhibit – Colonel Nimrod Wildfire, Document 56]** and **[Appendix B – Descriptive Quotations, Document 47]**.

Subsequent appearances of the "Kentucky Colonel" figure in newspapers, humor publications, theater, and literature—spanning from the 19th century through the modern era—establish the term as an openly used cultural symbol. See **[Exhibit – The Kentucky Colonel: A Study in Semantics (1947), Document 73]** and **[Appendix B, Document 47]**.

4. **Independent and Unaffiliated Civic Associations**

a. Independent Kentucky Colonels clubs, civic groups, and social associations operated in major U.S. cities including Washington, D.C., Chicago, Los Angeles, and Dallas, as early as the late 19th and early 20th centuries, promoting civic pride, state heritage, and cultural identity, without association to the Plaintiff-Appellee. See **[Exhibit – Kentucky Colonels Handbook (1930), Document 66]; [Exhibit – Ambiguous Influence of HOKC Exhibit, Document 65]** and **[Exhibit – Kentucky Colonels Newspaper Clippings, Document 72].**

b. The Plaintiff-Appellee, the Honorable Order of Kentucky Colonels (HOKC), was organized in 1933 as a private social organization or unincorporated society (representing a social class of colonels), with no proprietary creation. legal control, or authority over the preexisting title or term "Kentucky Colonels." Despite subsequent incorporation and trademark applications, its own formation postdates the longstanding public domain status of "Kentucky Colonel" and "Kentucky Colonels." See **[Exhibit – Myth of the Kentucky Colonel 1813 Origin, Document 74]** and **[Exhibit – Legal Analysis of HOKC Trademarks, Document 71]**.

5. **Judicial Recognition of Public Domain Status**

a. The United States District Court for the Western District of Kentucky, in **Honorable Order of Kentucky Colonels, Inc. v. Building Champions, LLC (aka Kentucky Colonels basketball)**, expressly acknowledged that "Kentucky Colonels" is a term historically associated with an honorary public distinction, not subject to exclusive appropriation by Plaintiff-Appellee. See *Honorable Order of Kentucky Colonels v. Building Champions, LLC*, 345 F. Supp. 2d 716, 719–22 (W.D. Ky. 2004).

b. The absence of secondary meaning, coupled with over a century of independent public use, bars any exclusive trademark claim to the term "Kentucky Colonels" under established Sixth Circuit and federal law. See *Nalpac, Ltd. v. Good Vibrations, Inc.*, 84 F.3d 1111, 1118 (6th Cir. 1996); *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768–69 (1992).

The record, as properly supplemented and judicially noticeable under *Fed. R. Evid. 201(b)*, irrefutably demonstrates that:

- "Kentucky Colonel" and "Kentucky Colonels" are civic titles of historical, cultural, and governmental significance;

- They reside in the public domain, accessible for descriptive, cultural, and associative use by individuals, organizations, and communities worldwide;

- They lack inherent distinctiveness and fail to meet the legal threshold for exclusive trademark protection.

Accordingly, Plaintiff-Appellee's attempt to monopolize these terms through trademark registrations and litigation is unsupported by history, contrary to federal trademark law, and inconsistent with the public's longstanding right to use these designations freely.

# V. CULTURAL USAGE AND SECONDARY MEANING OUTSIDE ORGANIZATIONS FOR THE CLASS OF PEOPLE NAMED

The terms "Kentucky Colonel" and "Kentucky Colonels" have long acquired cultural recognition and usage in contexts wholly independent of the Plaintiff-Appellee, The Honorable Order of Kentucky

Colonels, Inc.. This widespread, independent cultural usage demonstrates that the HOKC cannot claim exclusive trademark rights over terms embedded in public, governmental, and cultural traditions; nor can it claim the rights of individuals to collectively or cooperatively identify themselves a part of the Kentucky Colonel class. See **[Memorandum of Law Supporting Judicial Notice of a Historical, Legal, Social, and Cultural Class Recognition of Persons Known As "Kentucky Colonels", Document 82]**

## A. Independent Cultural and Commercial Usage of "Kentucky Colonels"

Extensive historical evidence confirms that "Kentucky Colonel" and "Kentucky Colonels" have been used descriptively, honorifically, and commercially across numerous contexts, predating and existing separately from the HOKC:

1. **Civic and Social Organizations –** Independent Kentucky Colonels Clubs operated in cities such as Chicago, Dallas, New Orleans, Los Angeles, and Washington, D.C., as early as the late 19th and early 20th centuries, promoting civic pride, fellowship, and cultural identity among titleholders without association to the HOKC. See **[Kentucky Colonels Handbook (1930), Document 66]**; **[Appendix B–Descriptive Quotation and Passages, Document 47]**.

2. **Sports and Entertainment** – The **Kentucky Colonels basketball franchise (1967–1976)**, a prominent American Basketball Association team, used the name to evoke civic pride and Kentucky heritage, independent of HOKC affiliation. The **Kentucky Colonels bluegrass band**, active during the 1960s folk music revival, popularized the term nationally as a symbol of Kentucky identity, again without HOKC association. See **[Appendix D – Things Referred to as Kentucky Colonel(s), Document 49].**

3. **Commercial Branding** – Colonel Harland Sanders, founder of Kentucky Fried Chicken, achieved global fame as the **archetypal "Kentucky Colonel,"** creating one of the world's most recognizable icons of Southern hospitality and food fame, entirely unrelated to HOKC.

   The term has been used historically in connection with whiskey, tobacco, hospitality, and other consumer products, leveraging the public's recognition of "Kentucky Colonel" as an

emblem of cultural character, not as a proprietary mark. See **[Appendix D – Things Referred to as Kentucky Colonel(s), Document 49]**.

To establish a secondary meaning such as for the basketball team, fried chicken entrepreneur, and the music group, the claimants had to demonstrate:

1. Substantial, continuous use of the mark specifically identifying its goods or services.

2. Widespread public recognition linking the term to the claimant as a singular source.

3. Absence of significant third-party use or any cultural dilution of the term.

HOKC has failed to meet these standards because:

- The term "Kentucky Colonel" originates with state-issued honorable recognition, predating HOKC's existence by a century.

- Public usage extends far beyond HOKC, encompassing cultural icons, theatrical characters, independent associations, products, media references, and in US court cases before 1899.

- HOKC's own USPTO filings are inconsistent and undermined by false first-use claims, contradicting their assertion of singular source recognition.

Further, HOKC's efforts to create or reinvent the idea of Kentucky Colonels—those affiliated with HOKC and all others—are legally untenable and contradict the public domain status of the generic and descriptive term. See *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504, 514 (6th Cir. 2007) holding, "To establish secondary meaning, a plaintiff must show, by a *preponderance of the evidence*, that the relevant public primarily associates the mark with the plaintiff rather than the product itself." (emphasis added)

Without clear, credible evidence of an actual secondary meaning (differing from the original descriptive idea of honorary civilian colonels), HOKC cannot claim exclusive rights to "Kentucky Colonels" as a creation or a source identifier for its organization or merchandise.

## B. Failure of HOKC to Establish Secondary Meaning for Exclusive Rights

Federal trademark law permits exclusive rights over descriptive terms only if the claimant proves the term has acquired secondary meaning, defined as:

"The term has come to be uniquely associated by the relevant consuming public with a particular source of goods or services." See *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 795 (5th Cir. 1983); 15 U.S.C. § 1052(f).

HOKC has failed to meet this standard:

- The title "Kentucky Colonel" originated as a governmental honor conferred since at least 1775, long before HOKC's formation. See **[Declaration of Historical Fact, Document 45]** and **[Appendix E – Exhibits Exposition, Document 50]**.

- The terms "Kentucky Colonel" and "Kentucky Colonels" are used broadly in cultural, commercial, and civic contexts locally, regionally, nationally and worldwide, with no consistent association linking them exclusively to HOKC.

- HOKC's own trademark filings contain false first-use claims (e.g., 1931) and omit disclosure of lawful concurrent users. See **[Exhibit – Legal Analysis of HOKC Trademarks, Document 71]** and **[Appendix E, Document 50]**.

## C. Lanham Act Does Not Permit Suppression of Public Descriptive Terms

The United States Supreme Court has held:

"The Lanham Act does not prevent a person from making a truthful use of a term descriptive of his goods or services, even though another person has registered it as a trademark." See *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 122 (2004).

See also *Matal v. Tam*, 582 U.S. 218 (2017) which affirms:

"Trademarks are private speech, and the government cannot use trademark registration as a tool to suppress expression, especially where cultural, political, or historical terms are [the] issue."

HOKC's attempt to assert exclusive rights over "Kentucky Colonels" constitutes an impermissible attempt to restrict public use of an ordinary, descriptive term long associated with state honors, cultural identity, and independent civic organizations.

The Sixth Circuit further confirms:

"Trademark law does not allow a party to control language in general discourse or prevent others from making expressive or descriptive use of commonly understood terms." See *ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 926 (6th Cir. 2003).

## D. Generic Trade Names — Applying Blinded Veterans Precedent

Where terms describe a class of persons or organizations, they cannot be monopolized by any single entity, even if confusion might result. See *Blinded Veterans Ass'n v. Blinded Am. Veterans Found.*, 872 F.2d 1035, 1041 (D.C. Cir. 1989). Where Judge Ruth Bader Ginsburg, writing for the court, held:

"Generic terms that designate a class of persons, organizations, or goods cannot be appropriated by one entity to the exclusion of others, even if confusion results."

The term "Kentucky Colonels" identifies:

- A class of individual people honored by the Commonwealth of Kentucky as colonels;
- A cultural and historical designation embedded in American life since the 19th century;
- A public domain term used descriptively by organizations, for products, and individuals.

Accordingly, under binding federal precedent, HOKC cannot claim exclusive trademark rights over "Kentucky Colonel" or "Kentucky Colonels" as these terms are generic, descriptive, and inseparably tied to civic identity and public tradition.

Similarly, "Kentucky Colonels" identifies a well-established, government-recognized class of individuals honored by the Commonwealth of Kentucky. The term is inherently generic or, at best, descriptive, and *no amount of organizational activity* by HOKC can retroactively convert this public designation into their exclusive property.

# VI. HOKC'S STRATEGIC REBRANDING AND NARRATIVE IS PROPAGANDA BASED HISTORICAL REVISIONISM

The Plaintiff-Appellee, the Honorable Order of Kentucky Colonels (HOKC), has engaged in a pattern of historical revisionism and strategic rebranding designed to misappropriate the title "Kentucky Colonel" and the term "Kentucky Colonels" for exclusive commercial control benefitting the operation of a private charity, false membership scheme, and a commercial enterprise using serialized trademarks founded on a false designation of origin. This conduct contravenes public domain principles, conflicts with historical fact, and undermines the integrity of the federal trademark system.

## A. Fabrication of the 1813 Origin Myth

HOKC's origin narrative falsely claims that the title "Kentucky Colonel" began in 1813 with Governor Isaac Shelby's purported commission of Charles S. Todd as the first Kentucky Colonel. However:

- Verified public records and historical research establish that no such 1813 commission exists. See **[Declaration of Historical Fact, Document 45]** and **[Appendix E – Exhibits Exposition, Document 50]**.

- The 1813 origin story first appeared in HOKC's promotional materials at the 1941 Derby Eve Dinner, nearly 30 years after the organization's actual formation. See **[Exhibit — Myth of the Kentucky Colonel 1813 Origin, [Document 74] et.al**.

- Kentucky state government officials, including the Secretary of State in 2021, removed public facing documented references to the false 1813 origin narrative following independent review of the historical record. **[Appendix E – Exhibits Exposition, Document 50]**

## B. Misrepresentation of Organizational History and Legal Status

1. HOKC was organized as an unincorporated private association starting in 1933 and later incorporated in 1957. See **[Exhibit – Legal Analysis of Trademarks, Document 71].**

2. Despite its recent formation, HOKC has repeatedly misrepresented itself as the exclusive successor to the broader Kentucky Colonel tradition, completely disregarding independent civic clubs previously using the term, historical use in the 19th century, and longstanding public domain recognition anchored in Americana. See **[Exhibit – Ambiguous Influence of HOKC, [Document 65]**.

3. Internal HOKC records, trademark filings, and membership communications reveal contradictions regarding its claimed history, membership structure, and asserted proprietary rights. See **[Appendix E – Exhibits Exposition, Document 50]**.

## C. Improper Trademark Filings and False Designation of Origin

HOKC's trademark applications to the United States Patent and Trademark Office (USPTO) reflect intentional misstatements:

- HOKC claimed false "first-use" dates in 1931, predating its actual creation.
- Known, lawful concurrent users of the terms "Kentucky Colonel" and "Kentucky Colonels" were omitted.
- HOKC falsely implied exclusive fame, secondary meaning, and proprietary rights over terms historically recognized as civic titles in the public domain.

These actions violate 15 U.S.C. § 1125(a), which prohibits false designation of origin, and implicate grounds for trademark cancellation under 15 U.S.C. § 1119. See **[Declaration of Historical Fact, Document 45]** and **[Appendix E – Exhibits Exposition, Document 50]**.

## D. Judicial Recognition of HOKC's Inconsistent Narrative

The United States District Court for the Western District of Kentucky has previously denied HOKC exclusive rights to "Kentucky Colonels," expressly recognizing the title as an honorary civic distinction associated with the public at large. See *Honorable Order of Kentucky. Colonels v. Building Champions, LLC*, 345 F. Supp. 2d 716, 719–22 (W.D. Ky. 2004).

Further, federal courts have consistently rejected attempts to trademark governmental titles, public designations, or cultural symbols absent clear, proven distinctiveness. See *In re California Innovations, Inc.*, 329 F.3d 1334, 1336 (Fed. Cir. 2003); *Blinded Veterans Ass'n v. Blinded Am. Veterans Found.*, 872 F.2d 1035, 1041 (D.C. Cir. 1989).

HOKC's strategic rebranding efforts, reliance on false historical narratives, and improper trademark filings represent:

- A deliberate effort to monopolize public titles and terms of civic honor;
- A distortion of historical and governmental fact;
- An abuse of the trademark system contrary to the Lanham Act and controlling case law.

This Court should reject HOKC's exclusive trademark claims and affirm the public domain status of "Kentucky Colonel" and "Kentucky Colonels," consistent with historical record, legal precedent, and constitutional principles safeguarding public expression.

The HOKC has engaged in a long-term strategy to rebrand the title "Kentucky Colonel" as an exclusive designation for its own membership associated with the Kentucky Derby since 1933. This strategy includes:

- **Misleading Historical Narrative:** The HOKC presents itself as the custodian of the Kentucky Colonel tradition, falsely suggesting that it is the sole successor to an 1813 honorific title as an honorary aide-de-camp of the governor.

- **Trademark Claims:** The HOKC has secured multiple federal trademark registrations for "KENTUCKY COLONELS" despite the title's established public use.

- **Public Confusion:** As early as 1953, the *Edison Electric Institute Bulletin* reported that the HOKC's origins were "confusing and uncertain to many people."

The HOKC did not create the title, nor does it have the menial authority to monopolize, control, or prohibit its use. Its narrative is a rebranding effort that conflicts with historical fact and state records.

## VII. MISREPRESENTATION OF MEMBERSHIP STATUS AND FRAUDULENT TRADEMARK FILINGS

The Plaintiff-Appellee, the Honorable Order of Kentucky Colonels (HOKC), has engaged in material misrepresentations concerning both its organizational membership structure and its filings before the United States Patent and Trademark Office (USPTO) and in the U.S. Courts. These misrepresentations constitute violations of the Lanham Act and support cancellation of HOKC's asserted trademark rights under 15 U.S.C. § 1119 and § 1120.

## A. Misrepresentation of Membership and Organizational Structure

HOKC publicly represents itself as a "membership association" composed of Kentucky Colonels worldwide. However, the evidentiary record establishes the following:

1. HOKC is not a true membership organization under Kentucky law or its corporate charter. It operates without voting members, elected representatives from the Kentucky Colonel community, or mechanisms for democratic governance. See **[Appellant's Motion For Leave, Document 37, Page 10; Exhibit A – Memorandum of Law on the Misrepresentation of Legal Membership Status by The Honorable Order of Kentucky Colonels, Inc.]**.

2. HOKC's fundraising campaigns deliberately imply that donors automatically receive "membership" in the organization, when in fact the organization functions solely as a charitable trust controlled by self-perpetuating directors. [id]

3.  This deceptive portrayal of membership status has misled the public, potential donors, and the USPTO, contributing to improper assertions of exclusive goodwill over the terms "Kentucky Colonel" and "Kentucky Colonels." [id]

The HOKC has consistently described itself as a "membership organization" in its trademark applications, claiming to provide "membership services" and "social club services." However, this representation is directly contradicted by the HOKC's corporate documents:

- **No Voting Membership:** The HOKC's Restated Articles of Incorporation (1992) clearly state that the organization "shall have no voting members." Despite this, the HOKC routinely refers to its donors as "active members," creating a misleading impression of a genuine membership structure that provides no membership benefits consistent with actual fraternal, civic minded, or mutual benefit organizations.

- **Donors Misrepresented as Members:** Individuals who donate to the HOKC receive dated membership cards identifying them as "members," but they possess no governance rights, voting privileges, or meaningful participation in the organization's operations. These are donors, not members in any legal sense.

- **False Claim to Membership Services:** Despite lacking a genuine membership structure, the HOKC has secured trademark registrations for "membership services" and "social club services" (Class 041) and "association services" (Class 035). These claims are inconsistent with the HOKC's actual operations.

## B. Fraudulent Trademark Filings and False Statements to USPTO

HOKC's recent trademark filings contain multiple material misrepresentations, including:

- Asserting a "first-use" date in 1931 and 1951 for "Kentucky Colonels," despite the organization's acknowledged formation in 1933/34 and incorporation in 1957.

- Falsely implying exclusive fame, continuous use, and proprietary control over the term "Kentucky Colonels," notwithstanding widespread historical use by independent clubs,

cultural organizations, sports teams, music groups, individuals, and commercial entities. See **[Appendix – D Things Referred to as Kentucky Colonel(s), Document 49]**.

- Failing to disclose the existence of numerous lawful concurrent users, including the Appellant and prior civic associations documented in the public record. See **[Appendix – D Things Referred to as Kentucky Colonel(s), Document 49];  [Appendix E – Exhibits Exposition, Document 50]** and **[Exhibit – HOKC Disambiguation, Document 70]**.

These actions violate:

- **15 U.S.C. § 1051(a)** — Requiring truthful, bona fide use claims in trademark applications.

- **15 U.S.C. § 1120** — Imposing liability for knowingly procuring trademark registration through false or fraudulent declarations.

- **15 U.S.C. § 1125(a)** — Prohibiting false designation of origin and misleading representations concerning goods, services, or organizational status.

## C. Trademark Cancellation Under 15 U.S.C. § 1119

The Lanham Act authorizes this Court to cancel improperly obtained trademark registrations:

"The [C]ourt may order the cancellation of registrations… in any action involving a registered mark." See *15 U.S.C. § 1119*.

Here, HOKC's trademark registrations, procured through fraudulent statements and historical revisionism, directly impact this proceeding and undermine the integrity of the public record. Cancellation is warranted to:

- Prevent further monopolization of public domain civic titles.

- Protect the cultural, historical, and governmental integrity of the Kentucky Colonel tradition.

- Correct false claims of organizational exclusivity inconsistent with federal trademark law and historical fact.

## D. Judicial Precedent Supporting Cancellation for Fraud

Federal courts have consistently canceled trademarks obtained through material falsehoods:

- *In re Bose Corp.*, 580 F.3d 1240, 1245 (Fed. Cir. 2009) — Establishing cancellation where the applicant knowingly makes false material representations with intent to deceive the USPTO.
- *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246 (1944) — Recognizing courts' inherent authority to correct fraud upon tribunals, including through vacatur and cancellation of improperly obtained legal rights.

HOKC's misrepresentations concerning both its organizational structure and its trademark filings demonstrate bad faith, fraud upon the USPTO, and improper attempts to monopolize terms belonging to the public domain. The Court should:

- Cancel HOKC's fraudulent trademark registrations under 15 U.S.C. § 1119.
- Recognize that "Kentucky Colonel" and "Kentucky Colonels" are generic, descriptive, and historically public domain terms.
- Reject HOKC's false assertions of exclusivity, consistent with historical fact, governing trademark law, and constitutional principles protecting public discourse.

The Honorable Order of Kentucky Colonels (HOKC) has secured multiple federal trademark registrations for "KENTUCKY COLONELS" by presenting misleading and presumptive claims to the United States Patent and Trademark Office (USPTO), including false representations about its fantastical structure, charitable services, and first-use dates. The HOKC is merely an intermediary philanthropic endeavor for Kentucky's colonels that choose to support it, much like the "United Way" is for the general public.

## E. Inadequate Specimens of Use Submitted to the USPTO

The HOKC's trademark applications included specimens of use that fail to demonstrate the claimed services being provided:

- **Class 036 (Charitable Fundraising Services):** The specimens submitted were screenshots of its website and grant guidelines, which do not establish that the mark was used in a manner identifying a source of charitable services.
- **Class 041 (Social Club Services):** The specimens showed event photographs but did not demonstrate the existence of an actual social club composed of active members.
- **Class 035 (Association Services):** The specimens provided no evidence of any genuine "association" promoting the interests of titleholders. Instead, the services appeared to be limited to charitable fundraising.

Trademark applications must be accurate, complete, and truthful. Misrepresentations in an application may render the resulting registration void if they are shown to have been material to the USPTO's decision. See *In re Bose Corp.*, 580 F.3d 1240, 1243 (Fed. Cir. 2009) (fraud on the USPTO requires a false, material representation made with intent to deceive).

## VIII. LIMITATIONS ON TRADEMARK RIGHTS IN DESCRIPTIVE AND GENERIC TERMS

Trademark rights are limited in scope when applied to terms that are merely descriptive or generic, particularly where those terms relate to governmental titles, cultural honors, or classes of individuals. Federal law recognizes that such terms may not be monopolized by private parties absent clear, legally sufficient evidence of distinctiveness.

## A. Descriptive and Generic Terms Are Not Inherently Protectable

A registered trademark, including "Kentucky Colonels," is not inherently strong or enforceable unless it is distinctive. Distinctiveness may be:

- Inherent (fanciful, arbitrary, or suggestive); or
- Acquired through secondary meaning linking the term to a specific source.

See *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 198 (1985); *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976).

Here:

- "Kentucky Colonel" describes individuals who have received a ceremonial honor from the Commonwealth of Kentucky.

- The term "Kentucky Colonels" refers to a well-established, government-recognized class of individuals, consistent with public usage for over a century. See **[Declaration of Historical Fact, Document 45]; [Appendix E – Exhibits Exposition, Document 50].**

- Such descriptive terms are inherently weak and ineligible for trademark protection unless proven to have acquired distinctiveness.

## B. Public Policy Forbids Monopolization of Cultural and Civic Titles

Trademark law serves to:

- Prevent consumer confusion;
- Protect legitimate commercial brands; and
- Preserve fair competition and free expression.

It does not authorize private appropriation of public, cultural, or governmental terms. See *Worthy v. Michigan Bell Telephone Co.*, 472 F. App'x 342, 343 (6th Cir. 2012) (holding that generic or merely descriptive terms cannot be protected absent secondary meaning).

Granting the HOKC exclusive rights to "Kentucky Colonels" would:

- Suppress fair, truthful, descriptive use of a civic honor;

- Permit rewriting of public history and state traditions;

- Create a misleading monopoly over a cultural symbol long in the public domain.

## C. Independent Public Use Demonstrates Lack of Distinctiveness

Historical evidence confirms:

- "Kentucky Colonel" and "Kentucky Colonels" were widely used by civic organizations, cultural groups, and commercial enterprises long before HOKC's formation in 1933. See **[Exhibit – Kentucky Colonels Handbook, Document 66]; [Exhibit – Ambiguous Influence of HOKC, Document 65]** and **[Exhibit – Kentucky Colonels Newspaper Clippings, Document 72].**

- The term appears in thousands of newspapers, literary works, advertising, and public events to describe titleholders recognized for honor, leadership, or civic merit. See **[Appendix B – Descriptive Quotation and Passages, Document 47]** and **[Exhibit – Internet, Libraries, and Newspapers, Document 64].**

- HOKC's own trademark filings are undermined by false first-use claims and misrepresentations. See **[Legal Analysis of HOKC Trademarks, Document 71].**

The terms "Kentucky Colonel" and "Kentucky Colonels":

- Are generic or, at best, descriptive public domain designations;

- Lack inherent distinctiveness;

- Have not acquired secondary meaning uniquely linking them to HOKC.

Accordingly, HOKC's trademark rights, if any, are extremely limited and do not extend to suppressing truthful, descriptive, or cultural use of the title by others, including the Appellant and similarly situated Kentucky Colonels.

## IX. "KENTUCKY COLONELS" IS NOT A FAMOUS MARK OF THE HONORABLE ORDER OF KENTUCKY COLONELS, INC.

The Plaintiff-Appellee, the Honorable Order of Kentucky Colonels, Inc. (HOKC), falsely asserts that "Kentucky Colonels" is a famous mark entitled to heightened protection under the Federal Trademark Dilution Act (FTDA), codified at 15 U.S.C. § 1125(c). This claim is legally baseless, unlawful, and factually unsupported.

The title "Kentucky Colonel" and its plural form "Kentucky Colonels" were already widely recognized, culturally significant, and celebrated across the United States long before the Honorable Order of Kentucky Colonels (HOKC) was created in 1933:

- As early as 1905, the *Louisville Courier-Journal* reported on the front page about a "Kentucky Colonels Club" that hosted civic events, created a presence as public guardians, and symbolized Southern hospitality with authority.

- In 1889, the same newspaper declared, The Kentucky Colonel is a figure of civic pride and Southern hospitality, known from New York to San Francisco.

- An 1890 book, *A Kentucky Colonel*, defined the life of the Kentucky Colonel archetype.

- A silent film, *The Kentucky Colonel*, produced in 1920 portrayed the life of a Kentucky Colonel in the South based on the book *A Kentucky Colonel*.

- A 1935 article in *The Washington Times* described a "Kentucky Colonels Club" in Washington, D.C., which was an independent social organization with no connection to the Honorable Order of Kentucky Colonels.

- Commercial advertisements used the title "Kentucky Colonel" to promote products like whiskey, tobacco, insurance, lodging, and even grapefruit juice as early as the 1880s.

These examples demonstrate that the term "Kentucky Colonels" was already famous as a cultural and civic designation long before the HOKC emerged and adopted it for its own use.

## A. Legal Standard for Fame Under Federal Law

To qualify as a famous mark under 15 U.S.C. § 1125(c), a plaintiff must demonstrate:

- Widespread recognition of the mark by the general consuming public of the United States;

- That the mark is inherently distinctive or has acquired distinctiveness; and

- That the mark identifies a single commercial source, distinct from general descriptive or cultural use.

See *Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 433–34 (2003); *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1372 (Fed. Cir. 2012).

## B. "Kentucky Colonels" Lacks Fame and Distinctiveness Claim by HOKC

The term "Kentucky Colonels" cannot meet the legal standard for fame for HOKC because:

1. It describes a well-known class of individuals honored by the Commonwealth of Kentucky, not a proprietary commercial source. See **[Declaration of Historical Fact, Document 45]; [Appendix E – Exhibits Exposition, Document 50]** and **[Memorandum of Law Supporting Judicial Notice of a Historical, Legal, Social, and Cultural Class Recognition of Persons Known As "Kentucky Colonels", Document 82].**

2. It has been used broadly and descriptively by:

   - Independent civic organizations, including the Kentucky Colonels Clubs documented as early as 1930;

   - Sports teams, such as the Kentucky Colonels basketball franchise (1967–1976);

   - Cultural entities, including the Kentucky Colonels bluegrass band;

   - Commercial enterprises, including Colonel Harland Sanders' globally recognized persona.

See **[Exhibit – Kentucky Colonels Handbook, Document 66]; [Exhibit – Ambiguous Influence of HOKC, Document 65]** and **[Appendix E Things Referred to as Colonel(s), Document 49]**.

3. The public does not associate "Kentucky Colonels" exclusively with HOKC. Instead, the term has historically evoked civic pride, cultural identity, and governmental honors independent of HOKC's philanthropic activities which began as early as 1951 or as late as 1957 upon its Kentucky incorporation.

## C. Widespread Independent Use in Civic Organizations

The title was used by independent Kentucky Colonel Clubs in cities across the United States, including:

- **Louisville:** *The Butler Times* (1904) in Missouri documented the uniform of the first Kentucky Colonels Club and its purpose. [Document 72, Page 14]

- **Los Angeles:** The Los Angeles Times (1908) establishes that a cultural diaspora organization was being operated in California. [Document 72. Page 8]

- **Chicago:** The *Chicago Tribune* (1914) reported on a Kentucky Colonels Club that hosted social events and promoted civic goodwill. [Exhibit – Honorable Order of the Blue Goose, Document 60]

- **Dallas:** The *Brownsville Herald* (1915) described a Kentucky Colonels Club that celebrated Kentucky heritage. [Document 72, Page 13]

- **Washington, D.C.:** The *Washington Times* (1935) documented a thriving Kentucky Colonels Club that held formal gatherings and civic celebrations. [Document 72, Page 8]

None of these organizations were associated with the HOKC, yet they used the title freely, describing a civic class of individuals commissioned by governors demonstrating its widespread public recognition across the United States.

## D. The HOKC Did Not Create or Popularize the Title

The HOKC did not create the title "Kentucky Colonel," nor did it popularize it. The organization was not idealized until 1933—decades after the title had already become a widely recognized public honor. The HOKC's narrative that it is the sole custodian of the Kentucky Colonel tradition is not supported by historical records, further it is contradicted by the Kentucky Progress Commission (a contemporaneous office of the Kentucky governor). See [Exhibit – Kentucky Progress Commission, Document 69].

Instead, the HOKC adopted a title that was already well known and sought to reframe it some 60 years later as an exclusive brand. This exclusive rebranding effort is contradicted by extensive evidence of the title's public use, cultural significance, and independent recognition across the U.S..

## E. HOKC's Own Actions Contradict Its Fame Claim

HOKC undermines its own assertion of fame by:

- Falsely claiming a 1931 "first-use" date in trademark applications, when no legally verifiable chain of succession or use by HOKC existed until 1933/34 or proven assumption of tradition exists. See **[Exhibit – Fraudulent Succession of 1931 First Use, Document 58]** and **[Exhibit – Legal Analysis of HOKC Trademarks, Document 71]**.

- Promoting the historically false "1813 origin" narrative to imply a longer proprietary history, contrary to established public records. See **[Exhibit – Myth of the Kentucky Colonel 1813 Origin, Document 74]**.

- Failing to control (police, litigate, or pursue) third-party uses of "Kentucky Colonels" over the past century, resulting in widespread, lawful descriptive use outside its organization.

## F. Judicial and Statutory Barriers to Fame

Courts routinely reject fame claims for:

- Geographically related terms;

- Government issued titles;
- Generic or descriptive terms embedded in public culture.

See *Nobility Homes, Inc. v. Superior Homes, Inc.*, 512 F. Supp. 1242, 1246 (N.D. Ind. 1981) (denying exclusive rights to "Nobility" for manufactured homes) and *Building Champions, LLC*, 345 F. Supp. 2d 716, 719–22 (W.D. Ky. 2004) (rejecting HOKC's exclusivity over "Kentucky Colonels").

HOKC's assertion that "Kentucky Colonels" is a famous mark fails legally and factually. The term:

- Is a descriptive, geographic, and cultural designation;
- Resides in the public domain as a governmental title and social identifier;
- Cannot serve as a famous mark under 15 U.S.C. § 1125(c).

This Court must reject HOKC's fame-based trademark claims as inconsistent with the Lanham Act, historical record, and constitutional protections of public expression.

Under the Lanham Act, a mark is considered famous only if it is widely recognized by the general consuming public as identifying the source of the owner's goods or services. See 15 U.S.C. § 1125(c)(2)(A). Fame is reserved for marks like "Coca-Cola" or "Nike," which are instantly recognized as identifying a specific source. The term "Kentucky Colonels" fails to meet this standard.

## G. The HOKC's Attempt to Manufacture Fame Through Enforcement

Rather than achieving fame through public recognition of its services, the HOKC has attempted to manufacture the appearance of fame through aggressive trademark enforcement, trademark bullying, and overreaching claims of exclusive origin as a source of Kentucky colonels:

- The HOKC has secured multiple federal trademark registrations for "KENTUCKY COLONELS" by presenting misleading and assumptive claims to the USPTO and the courts, including false first-use dates, concealing knowledge, and inaccurate descriptions of services.

- The HOKC has served cease and desist letters and initiated litigation against other parties using the term, including cultural organizations, tobacco companies, breweries, bourbon distillers, and independent Kentucky Colonels according to the USPTO Trademark Trial and Appeals Board (TTAB).

- The organization has promoted a narrative suggesting that it is the sole custodian of a Kentucky Colonel tradition originating in 1813 without evidence of such a historical claim and despite overwhelming evidence of the title's independent and public use otherwise.

## X. THE DESCRIPTIVE NATURE OF THE TITLE "KENTUCKY COLONEL"

The title "Kentucky Colonel" is inherently descriptive because it conveys specific qualities, characteristics, and cultural associations widely recognized by the American public since the late 19th century when it was first officially used by the Commonwealth in 1875. Historical records, educational texts, newspaper articles, and national magazines demonstrate that the title is used to describe a class of individuals recognized for their hospitality, honor, civic merit, status, and social influence, rather than any single source or organization.

### A. Defining Qualities of a Kentucky Colonel

The term "Kentucky Colonel" has consistently been used to describe individuals recognized for their cultural, social, and civic attributes:

- **Honor and Leadership:** As early as 1875, Kentucky governors began formally conferring the honorific title on distinguished citizens, recognizing them for service, goodwill, or civic leadership. Governor James B. McCreary is credited with establishing the practice of honorary colonel commissions for this purpose. See **[Item 21, Exhibit – Governors' Appointments and Commissions, Appendix E, Document 50, Page 22]**

- **Civic Recognition:** The title has been awarded to public figures, including poets, businessmen, military officers, and civic leaders. Governor Luke Blackburn was known for his generous distribution of Kentucky Colonel titles, honoring individuals for various achievements, from poetry to business management.

- **Hospitality and Southern Culture:** The Kentucky Colonel is frequently portrayed as a symbol of Southern hospitality, wit, and chivalry. A 1903 article in the *Lexington Leader* described the Kentucky Colonel as "a lasting symbol of Southern honor, hospitality, chivalry, and wit," directly associating the title with Kentucky's cultural identity. **[Exhibit - Kentucky Colonel Newspaper Clippings, Document 72, Page 59]**

- **Cultural and Social Prominence:** Kentucky Colonels Clubs, which operated independently across the United States, used the title to promote fellowship, civic engagement, cultural heritage, and social recognition among titleholders and other Kentuckians. These clubs were not affiliated with the HOKC but were part of a broader cultural tradition.

## B. Diverse Contexts and Attributes

The title "Kentucky Colonel" is also descriptively used in various contexts to convey different qualities:

- **Military Associations:** While some Kentucky Colonels were actual honor guards (quasi-military officers), while others were civilians granted the title as an honorary designation. These "colonels" were often expected to participate in ceremonial roles, such as appearing at the governor's inaugurations or leading public processions.

- **Cultural Archetype:** The Kentucky Colonel became a popular cultural icon, depicted in literature, humor, and advertising as a figure of hospitality, charm, and authority. For example, an 1889 article declared, The Kentucky Colonel is a figure of civic pride and Southern hospitality, known from New York to San Francisco.

- **Commercial Use:** The title was used to endorse products, including whiskey, insurance, and grapefruit juice, leveraging the public's recognition of the Kentucky Colonel as a trusted, discerning figure. An advertisement from 1901 presented a Kentucky Colonel as an authority on fine whiskey, declaring, "There's lickers and lickers, but some's better than others".

## C. The Public Understands "Kentucky Colonel" as a Descriptive Title

For a century prior to the HOKC emerging in 1933, the consistent use of the title "Kentucky Colonel" to describe individuals recognized for honor, hospitality, civic merit, and cultural influence

demonstrates that the term is inherently descriptive. It directly conveys the qualities of the individuals it designates rather than identifying any single organization or commercial source.

- The title describes a recognized class of honorary titleholders based on deeds they performed that were recognized by governors, rather than a brand name or proprietary designation.

- It has been used in thousands of newspaper articles, advertisements, and public events to describe individuals who embody Southern honor, leadership, or cultural influence.

- This descriptive use is further reinforced by the existence of Kentucky Colonels Clubs, which operated independently across the United States without any connection to the HOKC.

## D. Judicial Recognition of Descriptive Terms

Under the Lanham Act, a term is descriptive if it directly conveys an immediate idea of the qualities or characteristics of the goods or services. See *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 790 (5th Cir. 1983). Here, the title "Kentucky Colonel" is clearly descriptive because it directly identifies individual persons who have received a ceremonial honor from the Commonwealth of Kentucky.

Because the term is descriptive, originated by the state, it is inherently weak as a trademark and can only be protected if it has acquired secondary meaning—an association with a single source in the public's mind. The historical evidence demonstrates that "Kentucky Colonel" has always been recognized as an honorary title, not as a brand name associated with the HOKC.

## XI. GENERIC USE AND PUBLIC DOMAIN REFERENCES BY GOVERNMENT AND MEDIA

The term "Kentucky Colonel" and its plural form "Kentucky Colonels" have been used generically by government authorities, media outlets, and the general public for nearly two centuries. This consistent, widespread usage reinforces that the terms belong to the public domain and are not subject

to exclusive trademark ownership by the Plaintiff-Appellee, the Honorable Order of Kentucky Colonels, Inc. (HOKC) which did not appear anywhere until 1933.

## A. Government Use Confirms Public Domain Status

The Commonwealth of Kentucky, as well as federal authorities, have consistently used "Kentucky Colonel" and "Kentucky Colonels" as:

- Honorary titles of civic distinction;
- Descriptors for recipients of the Kentucky Colonel commission;
- Cultural symbols of Kentucky's heritage and hospitality.

The evidentiary record demonstrates:

1. The Kentucky Colonel title originated from official civic and militia commissions dating back to 1775 under the authority of Governor Patrick Henry of Virginia. See **[Declaration of Historical Fact, Document 45]** and **[Appendix E – Exhibits Exposition, Document 50]**.

2. The United States Congress formally recognized "Kentucky Colonel" as a symbol of cultural and civic honor in 1936 notwithstanding the independence of HOKC's private formation. See **[Exhibit – U.S. Congress 1936 Recognition, Document 67]**.

3. Kentucky state agencies and governors have publicly conferred the title to thousands of individuals without regard to HOKC affiliation. See **[Exhibit – Ambiguous Influence of HOKC, Document 65]; [Exhibit – Kentucky Progress Commission, Document 69]**, et.al.

## B. Media and Cultural References Establish Generic Usage

The term "Kentucky Colonel" has appeared generically in:

- Newspaper articles, magazines, and journals spanning the 19th and 20th centuries;
- Popular literature, including theatrical productions and satire dating to at least 1833;

- Descriptive references to civic clubs, entertainment figures, products, and organizations unrelated to HOKC.

Specific evidence includes:

- The character "Colonel Nimrod Wildfire" in *The Lion of the West* (1833), introducing "Kentucky Colonel" as a culturally satirical public archetype. See **[Exhibit – Colonel Nimrod Wildfire 1833, Document 56]**.

- Media coverage of Kentucky Colonels civic organizations in major cities such as Chicago, Dallas, Los Angeles, and Washington, D.C., predating HOKC's 1933 formation. See **[Exhibit – Kentucky Colonel Newspaper Clippings, Document 72]**.

- References to Colonel Harland Sanders as a "Kentucky Colonel," contributing to global recognition of the term independent of HOKC. See **[Appendix D – Things Referred to as Kentucky Colonel(s), Document 49]**.

## C. Judicial Precedent Recognizes Generic Public Use

Courts have repeatedly held that *generic terms embedded in public discourse* cannot serve as exclusive trademarks:

- Geographic, honorary, and governmental titles are inherently weak or generic terms. See *MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION* § 12:47 (5th ed. 2025).

- Terms widely used by government entities and the media to describe a class of individuals belong to the public domain. See *Blinded Veterans Ass'n v. Blinded Am. Veterans Found.*, 872 F.2d 1035, 1041 (D.C. Cir. 1989).

- This Court has recognized that "Kentucky Colonels" is historically understood as a public distinction, not an exclusive mark of HOKC. See *Honorable Order of Ky. Colonels, Inc. v. Building Champions, LLC*, 345 F. Supp. 2d 716, 719–22 (W.D. Ky. 2004).

The consistent, generic use of "Kentucky Colonel" and "Kentucky Colonels" by:

- Government authorities;

- Media outlets;

- Civic organizations; and

- The general public;

establishes that these terms are part of the public domain, not the proprietary property of HOKC. Any trademark rights asserted by HOKC are necessarily weak, limited, and subordinate to the public's right to use these terms descriptively and culturally.

## XII. HOKC'S LITIGATION CONDUCT AND ABUSE OF PROCESS

The Plaintiff-Appellee, the Honorable Order of Kentucky Colonels, Inc. (HOKC), has engaged in abusive litigation tactics designed to suppress legitimate, descriptive use of the terms "Kentucky Colonel" and "Kentucky Colonels," monopolize public domain cultural identifiers, and perpetuate fraudulent historical narratives. Such conduct constitutes an abuse of legal process and undermines judicial integrity.

## A. Initiating Litigation Based on False Historical Claims

HOKC commenced this legal action by asserting:

- An "1813 origin" myth for the Kentucky Colonel title, falsely attributing its creation to Governor Isaac Shelby;

- A continuous, exclusive proprietary right to the terms "Kentucky Colonel" and "Kentucky Colonels," contrary to historical fact;

- Trademark rights derived from fabricated first-use dates and omitted disclosures to the United States Patent and Trademark Office (USPTO).

The evidentiary record refutes these claims:

1. No verifiable 1813 gubernatorial commission of Charles S. Todd as the "first Kentucky Colonel" exists. See **[Declaration of Historical Fact, Document 45]; [Exhibit – Myth of the Kentucky Colonel 1813 Origin, Document 74].**

2. HOKC was organized in 1933 and incorporated in 1957, long after widespread, independent public use of the disputed terms. See **[Exhibit – Legal Analysis of HOKC Trademarks, [Document 71].**

3. HOKC knowingly omitted material facts and concurrent users from its USPTO filings to falsely create a basis for this litigation. See **[Document 71]** and **[Appendix E. Item 4. 1981 Metry USPTO Application 73299122, Page 14, Document 50]**.

## B. Misuse of Judicial Process to Suppress Protected Speech

HOKC has used litigation to:

- Restrain Appellant's lawful, descriptive use of "Kentucky Colonels" as part of the trade name "Kentucky Colonels International" to identify independent civic activities;
- Enforce a preliminary injunction as an agreed permanent injunction based on demonstrably false claims of exclusive and overreaching trademark rights;
- Suppress public access to historical records, civic titles, and cultural expressions rooted in Kentucky's traditions by passing off a misconceived origin using its political influence.

This constitutes a misuse of legal process, inconsistent with the First Amendment, the Lanham Act, and fundamental due process protections. See *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 122 (2004) and *Matal v. Tam*, 582 U.S. 218, 228–29 (2017).

## C. Litigation Conduct Falling Outside Noerr-Pennington Immunity

While the Noerr-Pennington doctrine protects genuine petitioning activity, it does not shield:

- Knowingly using false representations to courts or government agencies;
- Sham litigation intended to interfere with lawful competition or public discourse;
- Fraud upon the court through material misstatements and omitted disclosures.

See *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60–61 (1993); *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961).

HOKC's initiation of this lawsuit, based on fraudulent historical narratives and false trademark filings, constitutes:

- A calculated effort to suppress independent Kentucky Colonel organizations;
- An improper attempt to monopolize public domain terms;
- Bad faith litigation unprotected by Noerr-Pennington principles.

HOKC's litigation conduct reflects a deliberate abuse of process designed to:

- Suppress truthful, historical, and cultural expression;
- Monopolize public honors and civic designations;
- Mislead courts through false narratives and fraudulent filings.

This Court should:

- Recognize HOKC's litigation as an abuse of process;
- Reject HOKC's asserted claims of exclusivity over "Kentucky Colonel" and "Kentucky Colonels";
- Uphold the public domain status of these terms, consistent with constitutional and statutory protections.

## XIII. CONCLUSION

The evidence presented confirms that the terms "Kentucky Colonel" and "Kentucky Colonels" are, at most, descriptive, long embedded in public, historical, and cultural use, and lacking the inherent distinctiveness required for exclusive trademark protection under federal law. See *Nalpac, Ltd. v. Good Vibrations, Inc.*, 84 F.3d 1111, 1118 (6th Cir. 1996); *Miller Brewing Co. v. G. Heileman Brewing Co.*, 561 F.2d 75, 79 (7th Cir. 1977).

These terms originate from honorary commissions granted by the Commonwealth of Kentucky and have been recognized across the United States for over a century as symbols of civic honor, cultural

identity, and historical tradition. See *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 790 (5th Cir. 1983).

The Honorable Order of Kentucky Colonels (HOKC) has failed to demonstrate secondary meaning linking these terms uniquely to its organization, as required by law. See *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504, 514 (6th Cir. 2007); *Coach Services, Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1373 (Fed. Cir. 2012).

Efforts to monopolize "Kentucky Colonels" through trademark enforcement violate longstanding principles prohibiting the restriction of ordinary, descriptive language. See *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 122 (2004); *Matal v. Tam*, 582 U.S. 218 (2017); *ETW Corp. v. Jireh Pub., Inc.*, 332 F.3d 915, 926 (6th Cir. 2003).

As Judge Ginsburg explained in *Blinded Veterans Ass'n v. Blinded American Veterans Found.*, 872 F.2d 1035 (D.C. Cir. 1989), generic terms designating a class of individuals cannot be monopolized, regardless of alleged confusion.

The HOKC's trademark registrations for "Kentucky Colonels" are invalid, obtained through material misrepresentations to the USPTO regarding membership status, first-use dates, service descriptions, and exclusivity of use. See *In re Bose Corp.*, 580 F.3d 1240, 1243 (Fed. Cir. 2009). Such conduct violates fundamental principles of candor before the USPTO, as articulated in *Bose* where the Court emphasized that material misrepresentations invalidate registrations.

The HOKC's attempt to privatize a public, civic honor contradicts historical record, legal precedent, and public interest. The term "Kentucky Colonels" belongs to the public domain, available for lawful, good faith use by independent associations, civic groups, and individuals.

Plaintiff-Appellee has an affirmative duty to amend its position, withdraw legally untenable claims of inherent distinctiveness, and cease efforts to monopolize this term. Failure to do so perpetuates misrepresentations to the Court and undermines judicial integrity.

Accordingly, HOKC's trademark claims must be rejected, and judicial relief granted to preserve the public's right to cultural, historical, and honorary expressions.

## AFFIRMATIVE RELIEF IS IMPERATIVE

This memorandum necessitates that the following actions be taken:

1. **Cancellation of the HOKC's Federal Trademark Registrations** for "KENTUCKY COLONELS" in International Classes 036 (Charitable Fundraising Services), 041 (Social Club Services), and 035 (Association Services) under 15 U.S.C. § 1064, on the grounds that:

   ○ The marks are either generic or descriptive without secondary meaning.

   ○ The registrations were obtained based on false representations to the USPTO.

2. **Judicial Notice of the Generic or Descriptive Nature** of the terms "Kentucky Colonel" and "Kentucky Colonels" under Federal Rule of Evidence 201(b), recognizing their long-established public use as honorary designations.

3. **In the Alternative, Restriction of the HOKC's Trademark Registrations** to ensure that:

   ○ The HOKC may not assert exclusive rights to the terms "Kentucky Colonel" or "Kentucky Colonels" in any context where they are used descriptively to identify actual recipients of the honorary title.

   ○ The HOKC must disclaim any claim of exclusive rights in the term "Kentucky Colonel(s)" apart from its specific use as a brand name in connection with its charitable fundraising activities.

   ○ The HOKC is prohibited from asserting trademark rights against other civic organizations, historical societies, or cultural entities that use "Kentucky Colonel" in a descriptive, cultural, or honorary context.

4. **Such Other and Further Relief as the Court or Administrative Authority Deems Just and Proper to Protect the Kentucky Colonel class.**

The title "Kentucky Colonel" is a public honor, a symbol of civic recognition, and a part of the cultural heritage of the Commonwealth of Kentucky. It must not be monopolized by any single organization.

Respectfully submitted,

/s/ Col. David J. Wright

302 General Smith Drive
Richmond, Kentucky 40475

david.wright@globcal.net               Dated: June 30, 2025
Tel: +1 (859) 379-8277                 Puerto Carreño, Colombia

# CERTIFICATE OF SERVICE

I hereby certify that on **June 30, 2025**, I **submitted** the foregoing **"Memorandum on the Generic and Descriptive Nature of Kentucky Colonels"** for filing via **email** to the Clerk of the Court, in accordance with the Court's procedures for pro se litigants. Upon docketing, the Court's **CM/ECF system** will automatically serve all registered ECF users, including counsel for Appellee.

Deborah S. Hunt, Clerk                                    /s/ Col. David J. Wright
Sixth Circuit Court of Appeals                   David J. Wright, Pro-se Appellant
501 Potter Stewart U.S. Courthouse              DATED: June 30, 2025
100 East Fifth Street
Cincinnati, Ohio 45202-3988