# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

**RECEIVED**
07/22/2025
KELLY L. STEPHENS, Clerk

### Case Nos. 23-5795 & 23-6108

**HONORABLE ORDER OF KENTUCKY COLONELS, INC.,**
Plaintiff-Appellee,

v.

**COL. DAVID J. WRIGHT,**
Individually and on behalf of all other similarly titled individuals.
**Defendant-Appellant**

---

# MOTION FOR COURT-FACILITATED MEDIATION AND SETTLEMENT CONFERENCE UNDER FRAP 33

---

**COMES NOW** the Defendant-Appellant, **Col. David J. Wright ("Appellant")**, appearing *pro se* and *in forma pauperis*, pursuant to **Federal Rule of Appellate Procedure 33** and Sixth Circuit Rule 33, respectfully moves this Honorable Court to **refer the above-captioned consolidated appeals to the Sixth Circuit's Mediation Office for an expeditious court-facilitated mediation and settlement conference,** that is resolute based on the merits of this motion and the record.[1]

This Motion is presented in conjunction with **Memorandum and Legal Declaration for Restorative Relief [Document 89]**, and is submitted in good faith to advance the public interest, promote judicial economy, and support a comprehensive and restorative resolution of all issues.

---

[1] Pursuant to Fed. R. App. P. 27(d)(2)(A), Appellant respectfully acknowledges that this Motion exceeds the 5,200-word limit applicable to motions. Appellant submits that the additional length is warranted by the procedural complexity of the consolidated appeals, the substantial factual record underlying the dispute, and the constitutional and equitable dimensions of the relief sought. In the interest of judicial economy, this Motion addresses in bulk—rather than in piecemeal fashion—dozens of intertwined legal errors, misappropriations, factual misrepresentations, and public interest concerns. Appellant respectfully requests that the Court accept this overlength Motion so that the full record and all issues may be efficiently considered together.

With the recent filings for judicial notice the record now reflects not only litigation misconduct that tainted the District Court's findings in **[DE 129]** (on appeal), but also clear evidence that the Appellee manufactured a retaliatory SLAPP action to silence the Defendant's lawful advocacy on behalf of the Kentucky Colonel class (≧ 500,000 people) and to halt the operations of Kentucky Colonels International (est. 2009). This action was initiated just three days after the Appellee submitted three fraudulent, backdated trademark applications, omitting the Defendant's concurrent use—filing them in bad faith—to support and pursue a predatory anticompetition strategy in the US Federal Courts.

The **Verified Complaint [DE 1]; Minutes [DE 1–1]** falsely asserts (suggests or insinuates) that the Appellee originated the term and concept idea of **"Kentucky Colonels"** (as an organization) in 1931 in a meeting with Governor Flem Sampson, concealing contravening facts and misleading the Court with a government record. See *HOKC v. KCI*, No. 3:20-cv-00132-RGJ, Complaint, Page 5, ¶¶ 12, 13, 15; Governor Sampson Minutes, Page 24. In fact, historical records clearly show that the **Kentucky Colonels Association was established in 1930**, nearly four years prior to HOKC's conceptual idealist formation, and the association had over one thousand commissioned Kentucky Colonels by October 1930, some dating back to 1875. See *The Kentucky Colonels Handbook* (Col. Oliver Vickery & Col. John E. Goddard, Oct. 1930) **[Document 66]**. The Appellee's reliance on inventing a 1931 origin date begins in 2004 asserting the same false origination claim in *Honorable Order of Kentucky Colonels v. Building Champions, LLC*, 345 F. Supp. 2d 716 (2004); judicially entrenching the false 1931 narrative in the court record in what essentially amounts to a land grab and gross historical misappropriation in the fraudulent succession and conflation of another organization's identity and legacy, intended to deceive the Court and secure unjust judicial deference and overreaching trademark rights on mistaken merits. There is no evidence or showing that the Appellee had ever used or claimed the '1931' date during its previous public facing history narratives from 1934–2003, or shown that any legitimate merger occurred with the association, or provided legal documentation during the lifetimes of its original founders, incorporators, and officers having a role in the 1930 organization. Even the initial purposes of the two organizations differed radically. The Honorable

Order of Kentucky Colonels, Inc, (1933–Date), is not the Kentucky Colonels Association of (1930–1937), and it is not the Kentucky Colonels Club of Louisville (1903–1927), and it is not the Chicago Kentucky Colonels Club (c. 1913–2006).

Contemporaneous sources confirm this critical timeline: the Kentucky Colonels Association ("KCA") operated from the Brown Hotel in 1930 and later relocated to the Seelbach Hotel between 1933 and 1935, remaining there at least until 1937. See *Evening State Journal*, Jan. 29, 1937, at 4 (noting the group's Seelbach headquarters were "dark and gloomy" during the Great Flood of the Ohio River). Meanwhile, Governor Ruby Laffoon's support for formalizing a high-society celebrity version of the organization began only in 1933 establishing an office in New York, with HOKC formally meeting the first time in 1934, they quickly surpassed the KCA. See *HOKC Disambiguation* [Document 70].

The court record also reflects a previous settlement attempt with an **Agreed Permanent Injunction** ("API" or "Agreed Injunction") [**DE 93**] binding the parties in a mutual pact governed by a **Confidential Court Mediator's Proposal ("Agreement")** [DE 97–6] became effective upon entry of the API on February 23, 2021. It is shown that the spirit and material terms had been disregarded or subverted by the Plaintiff-Appellee, the Honorable Order of Kentucky Colonels, Inc. ("HOKC"), particularly its licensed agents, and the District Court erroneously applied the four stipulations of the **Preliminary Injunction [DE 58]** mistakenly **in place of the six stipulations afforded by the API** and failed to recognize the Mediation Agreement. We know this because **Stipulation 5 of the API and the Mediation Agreement** (settlement terms) are left out, they are not considered in the **Contempt Hearing [DE 121]; [DE 122],** or **Memorandum Opinion and Order [DE 129]** causing severe damage to the Appellant, his allies, livelihood, and his interests developed since the case was previously settled.

While this Court possesses the inherent authority to summarily reverse or vacate prior orders—or remand with special instructions—based on any of the foregoing noteworthy revelations or other issues presented on appeal, it also retains equitable discretion and jurisdiction to permit correction

through mediated settlement. In cases involving judicial deference rooted in misrepresentation or bias, and even in instances of fraud on the court or the USPTO **the law favors resolution when truth is restored, harm is redressed, and the greater public interest is served.**

Exceptional cases such as this—where one party seeks only restorative relief and not punitive enforcement—present the opportunity for mediated agreement to operate as a form of equitable cure, obviating the need for formal sanctions or assessing punitive injury. See *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991) (recognizing courts' inherent power "to fashion an appropriate sanction for conduct which abuses the judicial process," while emphasizing discretion and tailored remedies); see also *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246 (1944) (remedy for fraud on the court may include reopening a judgment, but need not be punitive where justice can be restored through equity).

Thus, should the Appellee elect to engage in meaningful settlement, including acknowledgment of past misrepresentations and restitution for the harm caused, the Court may facilitate such a resolution without imposing penalty, consistent with its duty to uphold integrity while promoting judicial economy and finality.[2]

Therefore, the Appellant respectfully submits that further litigation—absent an opportunity for mediated resolution—will risk compounding the effects of proven trademark fraud, historical revisionism, and misuse of the judicial process as documented in multiple filings, including Appellant's most recent filing **Memorandum and Declaration Supporting Judicial Notice and Restorative Relief [Document 89]** and record entries from the **District Court docket [DE 170]**, **[DE 171]**, and **[DE 176]** and **Circuit Court filings [Document 36]**, **[Document 37]**, **[Document 39]**, **[Document 45]**, **[Document 80]**, and **[Document 85]**, et.al.

---

[2] The Sixth Circuit routinely refers cases—including contentious, high-profile, or sensitive matters—to court-facilitated mediation before adjudicating the merits. See, e.g., *Rudd Equipment Co. v. John Deere Constr. & Forestry Co.*, 834 F.3d 589, 592 (6th Cir. 2016); *Savoie v. Martin*, 673 F.3d 488, 491 (6th Cir. 2012); *Grand Trunk W. R.R. v. Bhd. of Maint. of Way Emps. Div.*, 497 F.3d 568, 570 (6th Cir. 2007).

Consistent with the precedent established in similar institutional and organizational nonprofit identity disputes—e.g., *Nat'l Grange of the Order of Patrons of Husbandry v. California Guild*, No. 17-16410 (9th Cir. 2018), and *The Episcopal Church v. Diocese of Fort Worth*, No. 18-10910 (5th Cir. 2020)—this case presents a compelling practical opportunity for mediated settlement. Mediation is not only appropriate under the standards articulated in FRAP 33 but essential to avoid the unraveling of a historic civic institution under the weight of corporate overreach, judicial error, fraudulent concealment, and reputational harm to its civic honorees and public actors.

Appellant is prepared to engage in good faith with any court-appointed mediator to craft a resolution that addresses public misrepresentation, historical revisionism, digital and professional suppression, and Appellant's continuing rights and responsibilities representing the Kentucky Colonel class under the First Amendment, common law, and federal due process. This motion respectfully urges the Court to exercise its authority under FRAP 33 to intervene at this critical juncture.

## I. Introduction / Request for Mediation

This Motion seeks referral to the Sixth Circuit's appellate mediation program[3] for a facilitated resolution of the underlying litigation concerning the misappropriation, monopolization, and distortion of a state-conferred civic honor—"Kentucky Colonel"—by a nonprofit corporation now seeking permanent, exclusive trademark control over this public title and its 250 year history.

Despite protracted litigation and entry of an *Agreed Permanent Injunction* through prior mediation [DE 93], the Plaintiff-Appellee has pursued an enforcement and expansion campaign that directly contradicts the terms and intent of the mediated agreement violating its very stipulations themselves bestowing rights upon independent charter groups that it does not control embargoed by the injunction. These actions have deprived the Appellant—a duly commissioned Kentucky Colonel and

---

[3] The Sixth Circuit's robust Appellate Mediation Program, conducted pursuant to Federal Rule of Appellate Procedure 33, is expressly designed to encourage voluntary settlement and reduce litigation burdens on the court and parties. See Sixth Cir. R. 33; Sixth Circuit Mediation Program, Mediation | Sixth Circuit – https://www.ca6.uscourts.gov/mediation

independent civic leader—of his constitutional and common law rights, his professional reputation, and access to digital and intellectual property assets built over more than two decades.

The procedural posture of this appeal, along with the record and the parties' prior willingness to mediate, make this case uniquely appropriate for settlement facilitation under Rule 33. Specifically:

- The underlying dispute involves overlapping intellectual property, nonprofit governance, and public domain controversies not easily addressed through adversarial briefing alone.

- The District Court declined to enforce the actual settlement terms reached in prior mediation when the Court refused to acknowledge the Mediator's Proposal (Agreement) in conjunction with Stipulation 5 of the Agreed Permanent Injunction, instead entering a contradictory and erroneously adjudicated order **[DE 129]** that effectively nullified and cancelled Appellant's preserved rights in **[DE 93]** without objective or impartial analysis or findings.

- Appellant has consistently expressed willingness to negotiate and proposed fair, historically grounded solutions—including the restoration of digital assets, acknowledgment of contributions, and public clarification of rights.

This Motion is presented pursuant to FRAP 33 and is accompanied by substantial documentation supporting Appellant's claims and settlement proposals. The Court's intervention to facilitate confidential mediation is not only consistent with its established practice but necessary to ensure procedural fairness, avert additional harm, and preserve the Kentucky Colonelcy as an iconic cultural institution distinct from any single entity's brand control.

## II. Procedural Background

This litigation arises from a series of escalating legal maneuvers undertaken by the Appellee, Honorable Order of Kentucky Colonels, Inc. ("HOKC"), which culminated in the filing of the present civil action in the United States District Court for the Western District of Kentucky. The Plaintiff initiated this action on February 20, 2020, alleging trademark infringement, false designation of origin, and dilution under the Lanham Act, 15 U.S.C. §§ 1114, 1125(a), and state-law unfair

competition, seeking to enjoin the Defendant from using the descriptive and honorific designation "Kentucky Colonels" in the operation and identification of civic, cultural, and fraternal activities associated with **Kentucky Colonels International**, established 11 years earlier on Facebook.

The Defendant, a gubernatorially commissioned Kentucky Colonel since 1996, answered and timely opposed the claims, asserting constitutional defenses, lack of standing, fair-use of the public domain, fraud on the United States Patent and Trademark Office, and raised the question of misuse of process for anticompetitive purposes. The core contention—both at the District Court and now on appeal—is whether the Plaintiff may continue to attempt to dominate or monopolize a title that has been in the public domain since at least the mid-19th century and which has long served as a descriptor for a class of titleholders established by acts of the Governor. The Plaintiff must now concede to the rights it never had, but thought it had, and had assumed, as an authority on the Kentucky Colonelcy.

## Condensed Case History

Following the filing of the Complaint [DE 1], the Plaintiff moved for a Temporary Restraining Order and Preliminary Injunction [DE 7], which resulted in the entry of an ex parte TRO on February 25, 2020 [DE 14], without adversarial notice or hearing claiming its trademarks were incontestable and famous with sophistication leading the court to believe that the trademarks applied for three days prior to the filing of the case were registered and valid. The TRO restricted the Defendant's use of certain marks, terms, and online platforms, while leaving unresolved multiple factual and constitutional questions—including First Amendment defenses—based solely on the Plaintiff's urgent representations and claims.

On March 4, 2020, the Court conducted a preliminary injunction hearing without the Defendant's participation [DE 22], as he lacked legal representation and was not afforded the opportunity to appear so his appearance was mailed [DE 23] and [DE 24] arriving several hours late for the hearing which the court took under advisement. The presiding judge subsequently recused himself, and the case was reassigned. On August 13, 2020, Judge Jennings issued a preliminary injunction [DE 58],

having adopted the prior record, and did so despite the Defendant not yet having submitted his Answer and Affirmative Defenses.

The Defendant filed his Answer and Affirmative Defenses one week later, on August 25, 2020 [DE 62]. Nonetheless, the Court proceeded with pretrial discovery and other litigation steps, effectively depriving the Defendant of a full and fair opportunity to contest the imposition of an injunction or raise constitutional defenses during the initial phase of the case.

Subsequently, the Defendant filed a motion for declaratory relief [DE 82] with memoranda [DE 82–1], but the Plaintiff compelled the matter into a court-mandated Settlement Conference. That process resulted in a binding Agreed Permanent Injunction and a Court-Mediated Settlement Agreement with express obligations upon both parties when interpreting [DE 93] the API.

The agreement held for nearly two years with the Defendant distinguishing his objectives using the terms Kentucky Colonel and Kentucky Colonelcy, and avoiding the use of "Kentucky Colonels" to attract users to his alternative educational, literary, and historical community and forum: without any reciprocation from the HOKC or its store operated by a separate entity (marketing company) competing for search engine page results using the term "Kentucky Colonel" instead of their licensed trademark which uses an 'S' and should have used an ® symbol per 15 U.S. Code § 1111.

On January 25, 2023, the Plaintiff revived the dispute by raising new allegations and filing a renewed complaint [DE 97; DE 99], this resulted in reopening the case against the Defendant upsetting the Court based on the charges in the new complaint. On August 9, 2023, the District Court entered a contempt judgment against the Defendant [DE 129], which he timely appealed [DE 132].

This appeal is now docketed before the United States Court of Appeals for the Sixth Circuit as consolidated Case Nos. 23-5795 and 23-6108. It presents substantial questions of law including whether the Lanham Act permits trademark ownership over governmental titles, whether the

Plaintiff's marks are generic[4] or descriptive without secondary meaning or exclusive protection, and whether prior acts of misrepresentation and fraudulent averment of trademark applications to the USPTO and presentation before the court vitiate the Plaintiff's asserted rights.

In support of his defense and appeal, the Defendant-Appellant has submitted numerous judicially noticeable records, including public-domain historical material, prior federal litigation involving HOKC, USPTO records, a 1936 Congressional Address [Document 67], and contemporaneous self-verifying evidentiary exhibits showing that the HOKC's trademark registrations were procured through misstatement, omissions, and conflicting dates of first use. Notably, in *Honorable Order of Ky. Colonels, Inc. v. Building Champions, LLC*, 345 F. Supp. 2d 716 (W.D. Ky. 2004), the same Plaintiff was previously denied exclusive ownership of "Kentucky Colonels" due to its descriptive nature[5] and widespread public usage by other entities.

The present motion arises in this appellate context and seeks to facilitate a judicially encouraged alternative resolution—namely mediation—before the Court is further burdened with extensive motion practice, evidentiary disputes, and potentially adverse rulings affecting not only the parties, but the broader public class of Kentucky Colonel titleholders. The Motion is supported by extensive record exhibits [Document 81], [Document 82], [Document 85], and the Memorandum and Declaration on Judicial Notice and Restorative Relief [Document 89] filed contemporaneously with this submission.

This case very much mirrors *Blinded Veterans Association v. Blinded American Veterans Foundation* before Justice Ruth Ginsburg in 1989: See 872 F.2d 1035, 812 F.2d 1035, 277 U.S. App. D.C. 65 where a trade name and trademark issue was resolved between the parties following the decision; but

---

[4] "The use of a mark by others in the industry, or its use as a common descriptive name, is strong evidence that the mark is generic and therefore public domain." *Fuji Kogyo Co., Ltd. v. Pacific Bay Int'l, Inc.*, 461 F.3d 675, 683 (6th Cir. 2006).

[5] "A term that is merely descriptive cannot be protected as a trademark unless it has acquired secondary meaning." *Hensley Mfg., Inc. v. ProPride, Inc.*, 579 F.3d 603, 610 (6th Cir. 2009).

it also differs in as much as the Plaintiff-Appellee's degree of motivation to dominate and control the generic[6] and descriptive intellectual property describing a class of individuals for its exclusive use.

Accordingly, the Court's attention is respectfully directed toward the procedural anomalies, extensive evidentiary discrepancies documented by the Appellant, and ongoing potential harm caused by further litigation, all of which support this request for Court-facilitated mediation.

## III. Statement of Indisputable Facts

The following partial list of indisputable facts are drawn from the District Court record, judicially noticeable sources, historical exhibits, government documents, and prior federal case law. They are not subject to reasonable dispute, together they provide an evidentiary basis and argument for the instant Motion for Mediation:

1. **The title "Kentucky Colonel" is a gubernatorial originated commission conferred by the Governor of the Commonwealth of Kentucky since at least 1875.**

   Kentucky Colonel is a civil title awarded and issued to recognize honorary officers selected under the executive common-law authority of the Governor's seal and is not regulated by statute nor administratively delegated in law to any private organization. Unknown to many the title's origins are in civil administration and civil militias during the Colonial Period; one dictionary in 1783 England says, "COLONEL – in America, head of colony; also patron of a company. The "title" was adapted in 1802 becoming a "rank" in the U.S. Army. See *Mem. of Law on Right to Use*, [Document 81], at 1–2; *Mem. on Class Recognition*, [Document 82].

2. **The Honorable Order of Kentucky Colonels, Inc. ("HOKC") is a private nonprofit corporation formed in 1957, restating its Articles of Incorporation in 1992 by Thaddeus Myre of the Wyatt Firm as a private nonprofit charitable organization operated by its board of trustees with no voting members; it has no statutory, fiduciary, or official custodial authority over the title "Kentucky Colonel."**

---

[6] "Generic terms are not eligible for trademark protection because they refer to the genus of which the particular product is a species. ... Descriptive terms ... may be protected only if they have acquired secondary meaning." *Paccar Inc. v. Telescan Techs., L.L.C.*, 319 F.3d 243, 247 (6th Cir. 2003).

See *Ky. Sec'y of State Business Records*, No. 0023673 (June 10, 1957); see also *Hon. Order of Ky. Colonels, Inc. v. Bldg. Champions, LLC*, 345 F. Supp. 2d 716, 719 (W.D. Ky. 2004).

3. **The terms "Kentucky Colonel" and "Kentucky Colonels" were in wide public use, commercially. culturally, and in American literature 100 years before the HOKC.**

   Documented uses include sports teams, music groups, whiskey brands, civic clubs, and literary characters, as well as actors appearing on the American stage dating back to 1833. See *Appendix D* [Document 49], *Kentucky Colonels Newspaper Clippings* [Document 72], *Mem. of Law on Generic & Descriptive Nature of Title*, [Document 85], at 2–4.

4. **In 2004, the U.S. District Court for the Western District of Kentucky found that the HOKC could not claim *exclusive rights* to the name "Kentucky Colonels" in charitable and civic contexts for fundraising merchandise as a proprietary brand.**

   *Hon. Order of Ky. Colonels, Inc.*, 345 F. Supp. 2d at 720–21 (denying preliminary injunction and finding weak evidence of exclusivity or distinctiveness).

5. **The HOKC's current trademark registrations were first applied for in 2020 after failed merger discussions with Appellant's organization, Kentucky Colonels International, armed with confidentially disclosed information, made applications that contain misstatements, omits concurrent users, and overstates dates of first use.**

   See (USPTO Application Serial Nos. 88800020, 88800035, and 88800038) in *Legal Analysis of HOKC Trademarks* [Document 71]; *Mem. on Trademark Fraud*, [Document 80], at 4–6.

6. **The Appellant was conferred the title of Kentucky Colonel in 1996 and has operated a website under the title, term and phrase "Kentucky Colonel" and or "Kentucky Colonels" for civic, educational, and commemorative purposes since at least 1998, including via Kentucky Colonels International which he established on the Facebook platform in 2009.**

   See *Memorandum and Declaration on Kentucky Colonel Rights*, [Document 86], at 1–3.

7. **An "Agreed Permanent Injunction" was entered by the District Court on February 23, 2021, reflecting a confidential mediated agreement between the parties; that order was later contradicted and undermined by subsequent District Court filings by the Plaintiff and the court's rulings made with deference disregarding the equity earned in settlement.**

API Stipulation 5 [DE 93] represents a short equitable position of the defendants; see *Memorandum and Declaration on Kentucky Colonel Rights*, [Document 86], at 1–3.

8. **The Plaintiff-Appellee has repeatedly promoted a historically false narrative that the Kentucky Colonel title originated in 1813 with Charles S. Todd and Governor Isaac Shelby, despite the absence of any contemporaneous evidence supporting that claim creating a false origin that first appears between 1939 and 1941 through several nonacademic sources. That story has affected the state's actual history and taken the legacy of the first Kentucky Colonels identified at Booneborough by the state in the early 20th century.**

See *Myth of the Kentucky Colonel 1813 Origin* [Document 74]; *US Congress 1936 Recognition* [Document 67]; *Mem. of Law on Class Recognition*, [Document 82], at 4–5.

9. **The Appellee has received and retains privileged access to personal information of newly commissioned Kentucky Colonels from the Commonwealth of Kentucky, which it uses to target individuals and to solicit donations or make them customers of their store based on their newfound "Kentucky Colonel" honorific title and identity.**

*Mem. of Law on Class Recognition*, [Document 82], at 2–3.

10. **There is no judicial or statutory authority establishing the HOKC as a gatekeeper, registry, or authorized representative of all persons from the Kentucky Colonel class, and the organization does not represent the interests of its members and donors legally.**

See *Hon. Order of Ky. Colonels, Inc.*, 345 F. Supp. 2d at 719–21; *Mem. of Law on Right to Use Kentucky Colonel(s)*, [Document 81], at 4–6.

11. **Thousands of individuals have historically and lawfully operated under the title "Kentucky Colonel" without affiliation to the HOKC, including numerous civic associations, music groups, businesses, and public figures across the United States and abroad.**

See *Appendix D* [Document 49]; *Mem. on Generic & Descriptive Nature*, [Document 85], at 4.

12. **Appellant has presented evidence of fraud on the USPTO and the District Court, including omission of material facts, intentional fraudulent exclusion of concurrent users, misleading use of first-use claims, failure to acknowledge historical users, and conflicting dates and representations regarding all of HOKC's marks.**

See *Mem. of Law on Trademark Fraud*, [Document 80]; *Motion for Declaratory Judgment* [DE 82] and *Memorandum of Support for Declaratory Judgment* [DE 82–1].

13. **The present appeal includes significant constitutional and equitable claims involving due process, freedom of speech and association, right to operate independent civic organizations, and resistance to compelled false origin attribution or the recognition of a false fount of honor based on a myth.**

See *Mem. of Law on Class*, [Document 82], at 6; *Decl. of Rights*, [Document 86], at 3–7.

14. **The HOKC's post-agreement conduct, including alleged violations of the permanent injunction and resumption of adversarial actions, created apprehension, aggravation, resulting in chilling has effectively nullified the purpose of the prior mediation and created a new set of legal injuries with Memorandum Opinion and Order [DE 129].**

See [DE 97], [DE 99], [DE 129]; *Decl. of Rights*, [Document 86], at 7–9.

15. **The Appellant has proposed and supported court-facilitated mediation to resolve the dispute in a manner that preserves public honor, organizational coexistence, and recognition of lawful uses of the "Kentucky Colonel" title.**

See [Document 85], at 9–10; [Document 86], at 10–12.

16. **The Appellee's trademark design and trade dress falsely imply an origin in 1813, invoking a mythic connection to the War of 1812, creating a false sense of honor, and promoting a historically unsupported false claim regarding the origin of the "Kentucky Colonel" title.**

The Appellee's stylized logotype—featuring an 1813 date, a vintage aide-de-camp insignia with red-white-blue heraldic elements—intentionally fosters consumer confusion and historical ambiguity regarding the origins and nature of the Kentucky Colonel title. However, no contemporaneous documentation from the 19th century supports the claim that the title originated in 1813, nor is Charles S. Todd is documented in state records as a recipient of the commission. Todd became a colonel in the U.S. Army in 1815. See *Mem. of Law on Class*, [Document 82], at 4–5; *Myth of the Kentucky Colonel 1813 Origin*, [Document 74].

17. **The 1813 origin myth and another origin story (cited in January 1976) advanced by the Appellee during the Laffoon Administration (1931–1935) when they were part of his Depression-era campaign to stimulate civic pride, tourism, and Derby attendance, does not**

**reflect the historic accuracy, customary practices, recognition of heritage, or traditional provenance of the Kentucky Colonel commission or the organizations that predate it in 1905, 1920, 1930, 1935 or another in Chicago in 1917 that reformed to endure until 1995.**

Governor Ruby Laffoon significantly increased the issuance of Kentucky Colonel commissions from the numbers issued by 15 or more previous governors that each appointed 50–500–1,000 colonels during their terms to signing a whopping 9,000 in just three years and encouraged stylized ceremonial imagery during the early 1930s, promoting the Honorable Order of Kentucky Colonels as a politically supportive civic association. That repurposing was driven by economic motives related to the Great Depression and aligned with the Kentucky Derby festivities but did not originate the title itself. See *U.S. Congressional Address 1936* [Document 67], *Kentucky Progress Commission* [Document 69], *Mem. on Generic & Descriptive Marks*, [Document 85], at 2–3.

In addition to the essential facts set forth above, Appellant respectfully submits that there are dozens—if not hundreds—of additional facts, legal errors, and equitable considerations that may warrant relief and could be addressed more fully if requested or deemed relevant by the Court. This motion is intended to present the most critical grounds efficiently, not exhaustively, without waiving any other potential basis for appellate review.

## IV. Statement of the Case/Dispute

At its core, this case presents a profound abuse of legal process by the Plaintiff-Appellee, the Honorable Order of Kentucky Colonels, Inc. ("HOKC"), a federally registered nonprofit corporation that has, under color of intellectual property law and the court, initiated a five-year campaign of legal suppression, reputational destruction, and factual distortion against the Defendant-Appellant, Col. David J. Wright. The Defendant is an independent Kentucky Colonel duly commissioned by the Governor of the Commonwealth in 1996, who has publicly and lawfully promoted civic engagement and inclusion under the honorific title "Kentucky Colonel" through an independent membership initiative known as Kentucky Colonels International. Just thirty days prior to the lawsuit the Defendant was recognized as a 23 year member of the HOKC. See *Membership Card* [DE 176–5].

This litigation was not initiated to resolve confusion or protect legitimate trademark rights. Rather, the Appellee filed its Complaint [DE 1] in bad faith—thirty days after rejecting the Defendant's confidential merger and acquisition proposal (labelling it as a shakedown), and just three days after submitting retroactive trademark applications built upon false first-use claims in 1931 and 1951. See *Motion for Rule 11 Sanctions*, [DE 176], at 3–5. Appellee then misrepresented to the District Court that the Defendant was an unknown infringer, omitting a 20-year history of peaceful cooperative contact, acknowledgement, and co-existence, including direct communications from HOKC's own counsel in 2001 and 2014. *Id.*

Appellee further failed to voluntarily disclose the existence of adverse federal precedent—*Honorable Order of Ky. Colonels, Inc. v. Building Champions, LLC*, 345 F. Supp. 2d 716 (W.D. Ky. 2004)—where the same court, facing substantially similar facts, held that HOKC's mark lacked inherent distinctiveness, that "Kentucky Colonels" was at most descriptive, and that exclusive rights could not be afforded or enforced absent strong secondary meaning. *Id*. at 720–21. Appellee's law firm, having served in both cases, deliberately withheld this authority in violation of Rule 11(b)(2).

Worse still, the Appellee's counsel used a fabricated a historical narrative to support its trademark claims, falsely asserting that its organization dates to 1931—a claim contradicted by American newspapers, the HOKC's own sworn filings with the United States Patent and Trademark Office (USPTO), where it stated that the mark's first use in commerce occurred on May 10, 1957—30 days prior to the date of its legal incorporation. See *Motion for Judicial Notice*, [DE 171], at 5–7; *Metry Application, 1981* [DE 171–9]; *Analysis of HOKC Trademarks* [Document 71]; *Fraudulent Succession of Association* [DE 171–12].

The true motivation for this litigation was to silence the Defendant, a whistleblower and former donor-lifetime member, who questioned the governance, exclusivity, and identity control exerted by HOKC over a public title of honor. As early as 2019, the Defendant submitted a merger and reform proposal under confidentiality, offering an inclusive chapter-based civic structure—only to have that

model rejected, litigated, and later appropriated by HOKC after it obtained a preliminary injunction. See [DE 176], at 6–8; [DE 93] (Agreed Permanent Injunction); see also [Document 86], at 3–5.

After securing overbroad injunctive relief through omission and misstatement, the Appellee copied the devised idea of the Defendant's chapter model, began issuing ambassador titles, and launched affiliated international local clubs under the guise of authorized representation—thereby unjustly enriching itself from the Defendant's merger proposal and compounding the Defendant's injuries. See [DE 176], at 11–13; [Document 85], at 9–10. This conduct violated both the injunction's spirit and the equitable principles underlying any enforceable right in equity.

Additionally, Appellee's responsive filings—including [DE 172] and [DE 173]—demonstrate a continued strategy of concealment, evasion, and procedural retaliation. Appellee's refusal to rebut sworn allegations with actual record evidence, and its reliance on strategic misdirection, underscores the need for judicial intervention. See *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246 (1944) (recognizing fraud on the court where a litigant weaponized fabricated documents to secure favorable rulings).

Defendant has endured five years of economic, reputational harm, and legal injury, including the loss of operational capacity for his nonprofit, isolation from the Kentucky Colonel community, and the silencing of constitutionally protected speech and activity. This legal warfare was directed not at protecting a brand, but at erasing an independent civic vision that challenged HOKC's control of a legal title that rightly belongs to the Commonwealth and Kentucky's heritage.

Accordingly, this case is not a conventional trademark dispute—it is a reckoning for the Honorable Order. It calls for restorative, mediated resolution or, failing that, full judicial repudiation of HOKC's fabricated claims, fraud on the court, false designation of origin, its improper *ab initio* trademark assertions to register a class of people as a mark, and its violations of statutory obligations.

# V. Argument for Mediation

Court-facilitated mediation under Federal Rule of Appellate Procedure 33 is both appropriate and necessary in this case. The Appellant respectfully submits that this matter—characterized by (1) a historically rooted title with public and civic significance, (2) disputed claims of exclusivity, (3) prior mediation attempts, and (4) pervasive extensive procedural irregularities—is uniquely suited for confidential resolution through the Sixth Circuit Mediation Office.

## A. Legal Authority for Mediation

Federal Rule of Appellate Procedure 33 explicitly authorizes the courts of appeals to "direct the attorneys—and, when appropriate, the parties—to participate in one or more conferences to address any matter that may aid in the disposition of the proceedings." **Fed. R. App. P. 33(a)**.

The Sixth Circuit has established a robust mediation program administered by the Circuit Mediation Office and has regularly applied Rule 33 to resolve complex, high-conflict matters involving institutional parties, reputation-driven litigation, and trademark disputes with public-facing implications. See similar cases in other circuits: *Nat'l Grange of the Order of Patrons of Husbandry v. California Guild*, No. 17-16410 (9th Cir. 2018) (settled in appellate mediation); *The Episcopal Church v. Fort Worth Diocese*, No. 18-10910 (5th Cir. 2020).

This case fits squarely within the Rule 33 framework, presenting core elements appropriate for appellate mediation:

- Strong emotions, reputational interests, and entrenched party positions;

- Overlapping factual disputes not suited to declaratory or summary adjudication;

- A public or nonprofit actor asserting expansive rights against an individual or class-based interest; and

- Prior evidence of negotiated settlement terms that were later disregarded or undermined.

## B. Unique Suitability of This Dispute for Mediation

This appeal involves much more than a standard trademark conflict—it concerns the monopolization of a civic identity from the public domain, systemic procedural unfairness, and the destruction of an independent nonprofit association through litigation. The Appellee's use of exclusionary branding, its appropriation of a public honorific, and its strategic erasure of the Appellant's lawful civic presence create a dynamic in which mediation offers the only avenue for restorative justice and redemption without further judicial strain.

Moreover, the Appellant's prior willingness to engage in confidential negotiations—as evidenced by the executed *Agreed Permanent Injunction* [DE 93] and Mediator Agreement—demonstrates good faith and openness to equitable terms. The collapse of that agreement, followed by contradictory District Court rulings [DE 129], refusing to aid in the appeal process after fraud could be proven under the guidance of the District Court Chief Judge [DE 182], refusing to take judicial notice of adjudicative facts on procedural and jurisdictional grounds [DE 183], resulted in judicial entrenchment of multiple instances of fraud and malicious retaliatory litigation suppressing evidence and alienating the rights of the Appellant [Document 36], reignited the dispute and added new legal injuries that may only be resolved only through structured facilitation, not adversarial briefing simply because they are so numerous.

Appellant has identified specific avenues for resolution that are better addressed in mediation than through motion practice:

- Disambiguation of organizational identity and expressive use of "Kentucky Colonel";

- Restoration of digital and expressive content wrongfully removed;

- Clarification of rights preserved under the prior agreement;

- A pathway to coexistence and mutual recognition of chapter-based models.

These issues implicate not only intellectual property but also expressive freedom, public dignity, and right to publicity of a class, as well as institutional legitimacy based on a historical record—interests that traditional litigation is poorly equipped to vindicate.

## C. Mediation Will Prevent Further Harm and Promote Judicial Economy

The discovery of abusive unresolved legal causes and issues in this case are likely to increase under the scrutiny of de novo review before an experienced judiciary panel. This Court is already burdened by extensive well-placed procedurally correct filings, including District Court filings requiring it to take judicial notice [DE 171] and hear a Rule 11 Motion [DE 176] with evidence of fraud, concealment, and breach of duty to candor that were denied without due consideration; while before the Circuit Court awaits more than 100 judicial notice exhibits showing factual evidence relevant in this case (see ***Appendix E: Evidentiary Exposition*** [Document 50]) ready to sustain the Appellant's case against the Plaintiff for bringing the initial complaint. Already before the Court there are twenty substantial judicial notice exhibits (Documents [45], [46–50], [56–78]) and nearly a half-dozen substantive memoranda (Documents [80], [81], [82], [85] and [86]) containing constitutional questions and evidentiary challenges that have been presented in addition to the Appellate Brief [Document 34] and Reply Brief [Document 38]. The factual record spans more than five years, includes historical materials dating back to 1775, and involves constitutional claims regarding compelled speech, reputational harm, and constructive disenfranchisement of a civic class.

Absent mediation, the parties will continue down a path of escalating litigation—with no assurance that future rulings will produce compliance, respect for judicial authority, or public legitimacy. Given the cultural nature of the Kentucky Colonel title and the continued confusion created by the Appellee's false historical claims, fraudulent averment of USPTO documents, and goal of overarching branding, this Court risks becoming the final arbiter of a symbolic legacy that should, in the first instance, be resolved through truth, facts, and dialogue that predicate history.

Where the record is already replete with fraud allegations, contested injunctions, and judicial inconsistencies, mediation offers a path that is principled, practical, and aligned with the interests of justice. It allows the parties to negotiate a respectful outcome with institutional safeguards and without setting precedent that may affect countless other titleholders, civic actors, and nonprofit organizations nationwide.

## VI. Benefits of Mediation

Appellate mediation in this case offers not merely the possibility of private resolution, but the opportunity to correct public distortions, reduce institutional harm, and restore legal integrity in a dispute implicating cultural heritage, civic identity, and constitutional rights. The following benefits weigh decisively in favor of referral under Rule 33:

## A. Mediation of a Resolution Would Restore Integrity to the "Kentucky Colonel" Title and Prevent Public Misunderstanding

The heart of this dispute concerns the Appellee's attempt to monopolize a state-conferred honorary title—"Kentucky Colonel"—by rebranding "Kentucky Colonels" as a proprietary organizational identity. This has created widespread confusion among titleholders, donors, and government officials. See *Ambiguous Influence of the Honorable Order of Kentucky Colonels* [Document 65], *Myth of 1813* [Document 74] (debunking the 1813 myth); *HOKC Disambiguation* [Document 70].

**Mediation would enable the parties to:**

- Disambiguate institutional roles without litigation-based delegitimization;

- Craft parallel recognition frameworks that preserve public honor and organizational coexistence or the homogenization of the civic class;

- Ensure that no future party may exploit the state's symbolic titles and cultural identity to secure or mandate  private market control.

The Court's mediation office is uniquely situated and equipped to help the parties untangle branding, digital access, historical representations, and donor-facing communications—all of which cannot be meaningfully addressed by judicial opinion alone.

## B. Mediation Would Minimize the Risk of Further Constitutional Injury and Collateral Harm

As the record may demonstrate, the Appellant has suffered prolonged deplatforming, reputational loss, and economic injury with a direct affect on his livelihood as a result of litigation pursued under false pretenses at the hands of counsel. See [DE 176]. The Appellant is not a commercial competitor but a civic leader, whistleblower, and published cultural historian who challenged the HOKC's self-anointed authority as a commercial good producer and charitable (membership?) organization over a public title it did not originate and is not a source of.

**Litigation has exacerbated:**

- First Amendment chilling effects (suppression of speech, association, and digital publishing);

- Retaliatory harm through abuse of process and compelled silence;

- Unconstitutional takings of expressive works and identity-defining content.

These harms will likely escalate in the absence of mediation—and may trigger broader civil rights implications under federal law, should a finding of fraud on the court be pursued to its natural conclusion. See *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 245–46 (1944).

## C. Mediation Would Conserve Judicial Resources and Prevent Further Procedural Entanglement

This case has already required the District Court and this Court to review over 180 docket entries, multiple dispositive motions, and conflicting interpretations of a previously entered agreed injunction. Additional appeals, sanctions hearings, or remands would place further strain on the judiciary—particularly where factual clarification, not legal precedent, is the key to resolution.

**Referral to the Circuit Mediation Office offers:**

- Efficient case narrowing by stipulation;

- Confidential space to address reputational, restorative, and organizational remedies;

- The possibility of coordinated post-mediation filings to preserve the Court's time and avoid duplicative processes.

## D. Mediation Would Fulfill Public Interest Objectives Consistent with Equity and Civic Governance

The Sixth Circuit has long recognized that mediation promotes not only private resolution but also **judicial legitimacy** and **public confidence**. See *Deutsche Bank Nat'l Tr. Co. v. Fed. Deposit Ins. Corp.*, 784 F. Supp. 2d 1142, 1146 (C.D. Cal. 2011) (citing judicial preference for "meaningful opportunities to resolve complex disputes without prolonged adversarial proceedings").

**Here, the public interest is unmistakable:**

- The "Kentucky Colonel" title belongs to the Commonwealth—not to any corporation.

- The public deserves clarity, inclusion, and access to accurate historical information.

- Future civic organizations must not be chilled or excluded from the use of symbolic identities rooted in state authority.

Mediation ensures that truth, transparency, and equity prevail over branding strategies, donor misdirection, and trademark overreach that cannot continue.

## VII. Pathways to Mediation

Appellant respectfully submits that any meaningful resolution must provide either (1) a full and verifiable restoration of the rights, identity, and reputation that existed prior to the onset of this litigation in 2020; or (2) a structured transfer of rights and equitable compensation for the intellectual, reputational, and operational damage suffered over the past five years.

The following proposed pathways are not final terms but suggested contours for facilitated mediation, in the interest of efficient preparation and focused negotiation. They reflect the existing evidentiary record, including Appellant's intellectual contributions, organizational models, and expressive works—all of which were improperly suppressed or appropriated under the false pretense of assuming the Defendant-Appellant's operation followed by retaliatory trademark enforcement.

## A. Full Restoration Pathway

1. **Immediate return of digital properties and identity assets** owned or used by the Appellant prior to the preliminary injunction, including but not limited to:

    ○ Domain names, web platforms, email accounts, and associated login credentials;

    ○ Social media accounts, including historical archives;

    ○ Access to platforms used to communicate with Kentucky Colonel titleholders.

2. **Public clarification of Appellant's right to operate as an independent civic initiative** representing Kentucky Colonels not affiliated with HOKC, and acknowledgment that "Kentucky Colonel" is a gubernatorial title, not a corporate identity.

3. **Modification of HOKC's branding and communications** to disambiguate the organization from the state honor and to cease the use of "1813" or other fictitious historical origin dates in public-facing materials.

4. **Nullification of Void Ab Initio USPTO-registered trademarks obtained through misrepresentation**, or voluntary cancellation of overlapping marks, names, terms and titles that conflict with Appellant's (and other affiliated parties) expressive and organizational use.

5. **Non-disparagement and non-interference covenants**, affirming both parties' rights to operate without obstruction, misrepresentation, or legal threat.

6. **Restoration of Appellant's pre-2020 reputation and online presence**, including coordinated public notice or joint statement acknowledging Appellant's historical leadership in civic Kentucky Colonel outreach.

## B. Buyout and Compensation Pathway

In the alternative, should restoration be infeasible, too costly, or unwelcome to the Appellee, Appellant is prepared to consider the structured transfer of rights and materials developed from 2001–2020 in exchange for equitable compensation.

**Terms subject to mediation could include:**

1. **Transfer of intellectual property** held by Appellant, including content libraries, unpublished literary works, website content, documentary research compilations, historical disambiguations, and organizational infrastructure.

2. **Assignment of any residual goodwill or brand equity** associated with Appellant's nonprofit initiative, publications, or assimilate media materials through conflation.

3. **Compensatory payment** reflecting personal loss of income, reputational destruction, and operational suspension from 2020–2024, to be valued with expert input or minimal fair wage standards and subject to mutual confidentiality.

4. **Continued transparent professional support** by the Appellant in the delivery and implementation of the historical research work.

5. **Release of claims** and cessation of litigation upon full execution and compliance with all agreed terms.

## C. Mediation Conditions and Structure

To ensure procedural fairness and effective use of time, Appellant requests that:

- Mediation be conducted by a court-appointed mediator with experience in intellectual property, nonprofit governance, or constitutional litigation;

- The parties be allowed to submit pre-mediation position statements, either jointly or in confidence;

- Parties be directed to participate in good faith, with flexibility for ex parte caucusing and confidential proposals;

- All claims and rights be preserved during the mediation process, including rights of appeal or future redress if settlement is not reached.

Appellant does not seek to destroy the Plaintiff-Appellee's organization, nor to rewrite history in reverse—but to restore a legacy that was hijacked by fiction, defended by fraud, and sustained by the improper use of public trust and judicial silence.

Mediation is the only remaining forum where the truth can be told in full and a resolution crafted that honors all Kentucky Colonels—not just those who make donations in lieu of dues.

## VIII. Consequences of Non-Mediation and Alternative Remedies

The Appellant respectfully submits that failure to resolve this dispute through court-facilitated mediation may lead to severe and potentially irreversible outcomes for the Appellee—both procedurally, in terms of the appellate remedies available, and reputationally, as the record and public visibility of the matter continue to expand.

Accordingly, Appellant gives notice that a *Motion for Summary Reversal and Vacatur* will be filed forthwith (7-21 days) following this Motion. That forthcoming Motion will seek immediate and comprehensive relief—including vacatur of the District Court's orders—based on grave procedural, factual, and constitutional errors as well as address and enumerate the fraudulent and mistaken issues summarily. Appellant respectfully requests that the Court consider these related Motions together, in the interest of judicial economy and a just resolution.

## A. Appellee Risks Vacatur, Reversal, and Adverse Judicial Findings

If this Court determines that the District Court's orders were predicated on misrepresentations, omissions, or legal error, it possesses full authority to:

1. **Vacate or reverse the permanent injunction**, including all orders **[DE 14]**, **[DE 58]**, **[DE 93], and [DE 129]**, as having been improperly granted based on incomplete, fraudulent, or

false representations. See *United States v. Throckmorton*, 98 U.S. 61, 65–66 (1878) (fraud vitiates even the most solemn judicial acts).

2. **Order sanctions** or remand for further proceedings under **Fed. R. Civ. P. 60(b)(3)** for fraud, misrepresentation, or misconduct by an opposing party. See *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 245–46 (1944); *Gonzalez v. Crosby*, 545 U.S. 524, 532 (2005).

3. **Declare the Appellee's asserted trademarks invalid**, either as generic or descriptive without secondary meaning, or as having been obtained by fraud on the USPTO. See *In re Bose Corp.*, 580 F.3d 1240, 1245 (Fed. Cir. 2009); *Medinol Ltd. v. Neuro Vasx Inc.*, 67 U.S.P.Q.2d 1205 (T.T.A.B. 2003).

4. **Refer the matter** to the U.S. Patent and Trademark Office's Trademark Trial and Appeal Board (TTAB) or U.S. Department of Justice if the fraud allegations meet the threshold for administrative or prosecutorial review.

5. **Remand for findings of fact** on First Amendment violations, compelled speech, and economic suppression by a nonprofit actor using state-like authority without statutory license—potentially triggering broader constitutional and equitable concerns.

## B. Continued Litigation Will Expand Public and Legal Exposure

Should mediation be declined or fail, the Appellant will be compelled to continue asserting claims in all available forums, including:

- Filing **post-appeal claims for damages** in district court or through ancillary civil proceedings;

- Pursuing **USPTO cancellation petitions** for the Appellee's core trademarks on fraud and descriptiveness grounds;

- Making **public filings and disclosures to state oversight authorities**, including the Kentucky Attorney General, for nonprofit overreach and charitable misrepresentation;

- Engaging **legal historians, media outlets, and civic organizations** in a national effort to correct the record and prevent future monopolization of public titles.

Every month this dispute continues further erodes the HOKC's legitimacy, exposes it to reputational scrutiny, creates doubt about its integrity, and amplifies the visibility of claims that might otherwise be resolved in a quiet, mediated fashion.

## C. Mediation Offers a Path to Avoid These Outcomes

The Appellee now faces a choice: resolve this dispute through structured, good-faith mediation—or risk judicial repudiation of its conduct, cancellation of its trademark claims, and reputational consequences from ongoing exposure and potential findings of bad faith or fraud.

This Motion is not an ultimatum—it is an opportunity to resolve a complex matter prior to the court fully considering the evidence presented by the Appellant. The Appellee has an open path to resolve the dispute honorably, correct the record, protect its legacy, and avoid the long-term damage that will accompany continued litigation.

The Court is respectfully urged to refer the parties to mediation while that window remains open.

# IX. Request and Prayer for Relief

## Summary and Grounds

This case presents a rare confluence of legal error, historical distortion, reputational harm, institutional overreach, concealment of evidence, and judicially entrenched fraud dating back two decades. What began as a civic proposal for unity and transparency with a cooperative merger agreement evolved into a campaign of retaliatory litigation by the Plaintiff-Appellee, the Honorable Order of Kentucky Colonels, Inc., aimed at silencing criticism, erasing lawful competition, focused on its own hedonistic solipsism, and misappropriating the public meaning of a gubernatorial title.

Appellant Col. David J. Wright—a Kentucky Colonel since 1996 and the founder of Kentucky Colonels International—has endured five years of reputational damage, operational loss, and personal hardship as a direct result of the Appellee's improper invocation of trademark law, its own false

historical misrepresentations, and its disregard for prior mediated agreement. See [DE 93], [DE 171], [DE 176], and [Documents 80–82, 84–87, and 89].

**The record now includes undisputed evidence of:**

- Fabricated origin myths and false branding by the Appellee to assert exclusive control over a public title [Document 74];

- Procedural misconduct and intentional omission of adverse precedent in violation of Rule 11(b) [DE 176];

- Trademark fraud through false statements of first use and abandonment of required disclaimers [Document 80];

- Destruction of the Appellant's digital and civic presence through injunctive misuse and unlawful seizure or forced closure of expressive assets [Document 85], [Document 86];

- Violations of constitutional rights, including compelled speech, suppression of historical research, and chilling of public association [Document 81].

Rather than continue costly and harmful litigation that risks further undermining public confidence and civic identity, **the Appellant urges this Court to intervene now and direct the parties into court-facilitated mediation.**

Such action is not merely authorized under **Federal Rule of Appellate Procedure 33**—it is necessitated by the factual record, the constitutional issues at stake, and the parties' past attempts at mediated agreement.

## Prayer for Relief

WHEREFORE, the Defendant-Appellant, Col. David J. Wright, respectfully prays that this Honorable Court:

1. **GRANT** this Motion pursuant to **Fed. R. App. P. 33** and refer the consolidated appeals (Nos. 23-5795 and 23-6108) to the Sixth Circuit's Mediation Office for immediate expedited court-facilitated mediation;

2. **DIRECT** that such mediation include both parties and, where appropriate, the individual officers or representatives of the Honorable Order of Kentucky Colonels, Inc., as necessary to achieve full restoration or resolution;

3. **ORDER** that mediation address, at minimum:

   a. Restoration of Appellant's pre-litigation identity, digital presence, social media assets, and expressive rights;

   b. Disambiguation of the "Kentucky Colonel" title from HOKC's brand and assumptive or presumptive claims of exclusivity;

   c. Compensation for damages resulting from injunctive abuse, reputational destruction, intellectual property dilution, and organizational loss from 2020–2025;

   d. Alternatively, structured acquisition by the Appellee of Appellant's IP and expressive assets, subject to good faith valuation and appropriate release of claims;

4. **STAY** the orders of the District Court pending the outcome of mediation, with the right of either party to resume briefing if mediation is unsuccessful;

5. **GRANT** any other such relief as this Court deems just and proper to restore equity, protect public trust, correct historical fallacy, and ensure lawful adjudication of the parties' rights.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correctly submitted in good-faith.


Respectfully submitted,

/s/ Col. David J. Wright

302 General Smith Drive
Richmond, Kentucky 40475

david.wright@globcal.net          Dated: July 22, 2025
Tel: +1 (859) 379-8277            Puerto Carreño, Colombia

# CERTIFICATE OF MOTION HYPERLINK COMPLIANCE AND JUSTIFICATION FOR OVERSIZED MOTION UNDER FRAP 33

Pursuant to **Federal Rule of Appellate Procedure 27(d)(2)(A)** and **Sixth Circuit Rule 27**, I certify that this Motion exceeds[7] the standard word limit of 5,200 words but does so for the following justifiable and good cause reasons:

1. **Word Count**: This document contains **approximately 8,200 words**, (3,000 words over) excluding the caption, signature block, and this certificate, as determined by the word count function of the software used to prepare the brief (Google Docs to PDF, double-spaced, 12-point Times-Roman font).

2. **Justification for Oversize Filing**: This Motion consolidates a complex procedural history spanning over five years, over 100 docketed entries, institutional entrenchment, and consolidated appeals (Nos. 23-5795 and 23-6108). It presents not only a request for mediation but also outlines substantial factual misrepresentations, historical fraud claims, constitutional defenses, and past settlement terms that are essential to a complete and fair presentation of the issues for an expedited resolution.

Due to the necessity of referencing multiple interrelated judicial findings, mediation documents, and historical records—many of which were misapprehended or omitted at the trial level—additional space was required to clarify the record, correct the legal narrative, and support this Court's potential exercise of equitable discretion under Fed. R. App. P. 33. Were this information divided into separate motions (e.g., for sanctions, vacatur, and judicial notice), it would burden both the Court and the Clerk's Office more than this unified submission.

---

[7] See Fed. R. App. P. 27(a)(4) (allowing combined or alternative relief in a single motion, provided the issues are clearly articulated).

3. **Use of Hyperlinks to CourtListener (RECAP)**: As a pro se litigant filing in forma pauperis, I have included Bluebook-compliant hyperlinks to publicly available docket materials using the RECAP Project recognized by the U.S. Courts hosted by CourtListener. This method of citation:

   ○ Ensures verifiability of cited filings without requiring PACER login;

   ○ Assists the Court and opposing counsel in cross-referencing source documents quickly and efficiently;

   ○ Helps me as a self-represented party verify, edit, and assemble filings more accurately during preparation.

While not required by the Federal Rules, this practice is increasingly recognized in appellate e-filing standards and offers accessibility and transparency to cases without disrupting the formality or integrity of the brief.

4. **Pro Se Consideration**: Given my status as a pro se Appellant, I respectfully request that this Honorable Court accept the modest overage in word count as necessary to responsibly and comprehensively present my position within a single pleading. I have endeavored to comply fully with the Rules of Appellate Procedure and with the formatting standards of this Circuit.

Respectfully submitted,

/s/ **Col. David J. Wright**

Defendant-Appellant, pro se

Dated: July 22, 2025

# CERTIFICATE OF SERVICE

I hereby certify that on **July 22, 2025**, I **submitted** the foregoing **"Motion for Court Facilitated Mediation Conference"** for filing via **email** to the Clerk of the Court, in accordance with the Court's procedures for pro se litigants. Upon docketing, the Court's **CM/ECF system** will automatically serve all registered ECF users, including counsel for Appellee.

Deborah S. Hunt, Clerk

Sixth Circuit Court of Appeals

501 Potter Stewart U.S. Courthouse

100 East Fifth Street

Cincinnati, Ohio 45202-3988

/s/ Col. David J. Wright

David J. Wright, Pro-se Appellant

DATED: July 22, 2025